# GROUP EXHIBIT A

# **EXHIBIT A-1**

Return Date: No return date scheduled
Hearing Date: 12/3/2020 10:00 AM - 10:00 AM
Courtroom Number: 2601
Location: District 1 Court
Cook County, IL

FILED
7/23/2020 1:38 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
9865054

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS individually and on behalf of the class described below,

Plaintiffs,

v.

SEVA BEAUTY, LLC, and KARI COMROV,

Defendants.

Case No. 2020 CH 2020CH05088

JURY DEMANDED

**VERIFIED CLASS ACTION COMPLAINT**

Plaintiffs, MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS on behalf of class members described below, by and through their undersigned attorneys, LOFTUS & EISENBERG, LTD. and for their Complaint against Defendants, SEVA BEAUTY, LLC and KARI COMROV state as follows:

## I. INTRODUCTION

1. Defendant, Seva Beauty, LLC ("Seva"), is a franchisor of the failing "Seva Beauty" system of fast casual spas throughout the nation. Defendants present the "Seva Beauty" franchise as a no-lose investment opportunity for significant passive income when, in reality, the business model is a no-win, except for a select few experienced retailers who have no need for franchise support.

2. Defendants' sales pitch is in direct contravention of Illinois' Franchise Disclosure Act, 815 ILCS 705, *et seq.*; the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq.*; and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq* (collectively referred to herein as "Consumer Protection Laws")

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

3. Sadly, Seva's victims continue to incur franchise fees and the harms multiply each day as Defendants continue to profit on their lies through the pandemic.

4. Defendants engaged in a fraudulent scheme lying to franchisees to acquire over $12,000,000 from franchisees then hiding behind a byzantine and expensive structure of arbitration agreements and fraudulently induced take-it-or-leave-it releases with no consideration that are voidable as a matter of law.

5. Defendants settled a handful of fraud claims in arbitration for over $2,000,000 yet refuse to change their fraudulent conduct without a Court ordering them to stop.

6. Plaintiffs are current Seva franchisees and, on behalf of a class of similarly situated franchisees, seek (1) a declaration that Defendants are violating the Franchise Disclosure Act, 815 ILCS 705, *et seq*., the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq*., and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq*., and (2) an injunction prohibiting them from making future misrepresentations.

## II. PARTIES

7. Plaintiff, MAHESH SASHITAL ("Sashital"), is, and at all times relevant to this action, has been a citizen of the state of Texas.

8. Plaintiff, MARK FERGUSON ("Ferguson"), is, and at all times relevant to this action, has been a citizen of the state of Florida.

9. Plaintiff, MICHAEL SCOTT DAVIS ("Davis"), is, and at all times relevant to this action, has been a citizen of the state of Texas.

10. Defendant, SEVA BEAUTY, LLC ("Seva"), is an Illinois limited liability company with a principal place of business in Puerto Rico. At the time that Seva entered into the Franchise Agreements in question, Seva maintained a principal place of business in Highland Park, Illinois.

11. Defendant, KARI COMROV ("Comrov"), is an individual and citizen of Nevada and resident of Nevada.

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

## III. JURISDICTION AND VENUE

12. Pursuant to 735 ILCS 5/2-209, this Court has personal jurisdiction over all Defendants because Defendants committed the tortious acts complained of in Cook County, Illinois.

13. Venue in this county is proper pursuant to 735 ILCS 5/2-101, because the acts and omissions complained of occurred in this county. Defendants purposely availed themselves of jurisdiction in Cook County by selling franchises to Cook County residents, directing phone, email, and letter correspondence to potential franchisees in Cook County, meeting with potential franchisees in Cook County, and making oral misrepresentations to potential franchisees here.

14. Jurisdiction and venue are proper in this Court pursuant to section 11.07 of the Franchise Agreement.

15. Although the Franchise Agreement contains requirements in sections 10.01 and 10.02 that the parties submit their disputes to mediation and arbitration, respectively, section 10.03 exempts from those requirements "any action for declaratory or equitable relief, including, without limitation, seeking preliminary or permanent injunctive relief, specific performance, other relief in the nature of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder."

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

## IV. CLASS ALLEGATIONS

16. Plaintiffs state claims on behalf of a class of similarly situated franchisees seeking (1) a declaration that Defendants are violating the Franchise Disclosure Act, 815 ILCS 705, *et seq*., the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq*., and the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq*., and (2) an injunction prohibiting them from making future misrepresentations.

17. Plaintiffs bring this lawsuit as a class action on behalf of the classes of persons, defined as follows:

> All persons who purchased a Seva franchise from January 1, 2015 to December 31, 2019 who currently owe monthly royalties to Seva.
>
> Excluded from the proposed Class and subclasses are Defendants, their respective officers, directors, and employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiffs reserve the right to amend the Class definition as necessary.

18. The members of the putative classes are so numerous that joinder of all members is impracticable.

19. Questions of fact and law as to all putative class members predominate over any questions affecting any individual member of the putative class, including, but not limited to:

a. Whether Defendants are violating the Franchise Disclosure Act, 815 ILCS 705, *et seq*.;

b. Whether Defendants are violating the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq*.; and

c. Whether Defendants are violating the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq*.

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

20. Plaintiffs' claims are typical of the claims of the Class because Defendants' violations of the consumer protection acts effected the Plaintiffs in the same way as the Class and the violations will continue if not enjoined.

21. Plaintiffs will fairly and adequately represent and protect the interests of the putative class. Plaintiffs have retained experienced class action counsel. The interests of Plaintiffs are coincident with and not antagonistic to the interests of the Class.

22. The questions of law and fact common to the members of the putative class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all putative class members is impracticable. Moreover, because the damages suffered by individual members of the putative class may be relatively small, the expense and burden of individual litigation makes it impossible for the members of the putative class to redress the wrongs done to them individually.

24. The putative class is readily definable and prosecution of the action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

**CHOICE OF LAW**

25. Defendants have chosen and consented to the choice of Illinois law in their franchise agreement with each Class Member. The Agreement provides in pertinent part:

> You acknowledge that we have appointed and intend to appoint many franchisees on terms and conditions similar to those set forth in this Agreement and the Franchise Agreement. It mutually benefits those franchisees, you and us if the terms and conditions of these license agreements are uniformly interpreted. This Agreement is accepted in the State of Illinois and will be governed by the laws of such state which laws will prevail, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051, et seq.) and except in those states whose franchise laws require exclusive application of those

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

> laws. This choice of laws will not include and does not extend outside of Illinois the scope of application of the Illinois franchise or business opportunity laws. Any portion of this Agreement that requires enforcement in any other state, and is enforceable under the laws of that state but not of Illinois, will be construed and enforced according to the laws of that state. All issues or disagreements relating to this Agreement will be tried, heard, and decided in the state and federal courts in Illinois, which you agree is the most convenient venue for these purposes. You acknowledge and agree that this location for venue is reasonable and the most beneficial to the needs of and best meets the interest of all of the members of the SEVA franchise system.

## V. FACTS COMMON TO ALL COUNTS

26. In connection with the sale of the Franchises to Plaintiffs and the Class, Seva intentionally omitted financial information from its Franchise Disclosure Document ("FDD") regarding the failures of the vast majority of Seva franchises and instead only provided limited financial information from a handful of its most profitable store locations.

### A. Seva Promoted False Examples of Successful Franchisees

27. Those stores that were successful were not compliant with Seva's rules or government employment regulations.

28. Seva instructed its franchisees not to talk to potential franchisees and only allowed select store owners, who, upon information and belief, were coached on what to say talk to potential franchisees, including Plaintiffs.

29. In 2018, seasoned Seva fanchisee, Rajsingh Gohil spoke with numerous prospective franchisees and told them the truth about Seva, explaining that no one should proceed unless they were already very experienced and had a staff of skilled threaders. Gohil told prospective franchisees that stores were going out of business and franchisees were losing significant amounts of money. Comrov learned Gohil was telling prospective franchisees the truth and told him to tell a different story. She then took him off the list of existing franchisees for prospects to speak with.

FILED DATE: 7/23/2020 1:38 PM   2020CH05088

30.     Seva told existing franchisees that they shouldn't communicate with prospective franchisees and that only select franchisees would talk to prospective franchisees. Seva speciously claimed this was to limit the burden on franchisees dealing with inquiries, but in reality this was to conceal their ongoing fraudulent conduct.

31.     The most profitable stores were operated in areas where there were many immigrants familiar with the techniques employed by Seva, so stores in Chicago had a ready pool of labor that did not exist elsewhere. Meanwhile, Plaintiffs were in locations without this large available labor force.

32.     Seva knew this and still promised it was easy to find employees nationwide just like it's Chicago-area exemplars.

33.     Seva knew the exemplar stores were uniquely suited to have adequate labor and the same would not be true nationwide. Despite this knowledge, Seva lied to Plaintiffs and the class during their Discovery Day visits to Chicago and promised they would be able to easily hire and train staff even in the rural south and mountain west.

34.     The Chicago-area exemplars cited by Seva as representative of Plaintiffs' future business skirted employment regulations by having employees work "part-time" at multiple stores, thus creating artificial and illegal savings on labor costs not disclosed to Plaintiffs' who followed the law.

35.     The exemplar franchisees would run three stores near each other and have one employee work 20 hours at each of the stores. Thus the employees would not be full time at any store, would not require benefits, and would not need to be paid overtime. Seva was aware of these fraudulent practices and nonetheless promised Plaintiffs and the class that they would have the same success while following the law.

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

36. Seva relied on one exceptional franchisee, Moyees Merchant ("Merchant"), in particular as a false example of what individual franchisees could expect in order to support its fraudulent sales pitch.

37. Merchant had nearly 20 years' experience prior to joining Seva. Merchant owns over a dozen Seva franchisees as well as several competing franchisees providing the same services in Walmarts. Merchant employs a one of a kind training model not taught by Seva and not encouraged by Seva for its franchisees to employ.

38. Merchant charges potential employees $900 for threading training organized by his wife employing her own techniques, then the new "employees" or apprentices remain in the unpaid training program until an experienced threader confirms they are ready to work on their own after watching them perform the service on dozens of customers.

39. Merchant's training process takes up to three months. All the while Merchant is not paying the "employees". During the training period, the trainee works in the store for free under one-on-one supervision. Then when their ability is confirmed they are paid wages and work independently. Merchant's model yields a highly skilled work force that can grow the business organically based on their superior skill. He can also use this unique model to expand his employee base to people with no experience or training at no cost to him. Merchant's stores are all located in economically depressed areas where people will submit to working for free for weeks or months in the hopes of securing a position.

40. Seva is well aware of Merchant's training program and that it is the key to his success in the rural south. Seva fraudulently conceals that this level of employee training is necessary for a successful franchise. Certainly if franchisees were told they would need to convince people to pay the franchisee for months of full time training before earning a low-wage position

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

in order to succeed, hundreds of franchisees would not have paid the exceptional franchise fees. Merchant struck gold but Seva knows he is a complete outlier not to form the basis for their fraudulent misrepresentations.

41. Instead of the Merchant-model of months of training, Seva offered one hour of video instruction on threading.

42. Seva knows an hour of video instruction is insufficient to train someone in the art of eyebrow threading and nonetheless continues, until a court orders otherwise, to misrepresent that the franchises can be profitably operated with limited video training of employees.

43. Seva fraudulently omitted from the FDD that the stores had to open with at least one qualified threader.

44. Seva claimed that the employees could be trained in threading very easily. Threading is a very complex skill to develop and not everyone can get it. It takes three to six months for someone to develop the skill of how to hold the thread properly and pull the hairs out correctly. The skill to design the perfect eyebrows takes over another year to develop. Threaders work years to develop this skill. There is no way it can be taught in the time Seva promised the class it could be done.

**B. Misrepresentations of Profitability and Absentee Ownership**

45. Seva, through its principal and its employees, namely Comrov, made various representations to Plaintiffs about the profitability of Seva stores that induced Plaintiffs and the class to purchase the Franchises, including statements that the stores would break even or be profitable within a short period of time (1-3 months, 2-4 months, or 3-6 months) and that the class could easily earn at least $90,000 to $150,000 in profit per franchise in the franchise's second year of operations. Seva communicated this verbally throughout the sales process and in a brochure.

FILED DATE: 7/23/2020 1:38 PM    2020CH05088

Seva knew few if any of their franchisees generated this sort of revenue and certainly not when they were paying someone to manage the stores and not training employees for months on end.

46.     Seva's head of operations, Comrov, made the following representations during the Discovery Day in Chicago to potential franchisees while they were wined and dined as part of the final sales pitch:

A.      "Each store will break even in the first six months and earning $100,000 + per store is easy";

B.      "It's a turn-key business without needing any prior skill";

C.      "It's very common for the owner to be an absentee owner";

D.      "If you buy two franchises the third is practically free. All of our very successful store owners own three or more stores and that is formula for success"; and

E.      "I think I'm on the wrong side of the business, I should be an owner of a store instead of being in operations. I would be making so much more if I were an owner instead."

47.     These representations by Comrov are confirmed by at least a dozen Seva franchisees interviewed by counsel who heard the statements and reasonably relied on them.

48.     Comrov made the same representations stated in paragraph 46 above at a meeting of the Seva President's Cabinet, a group of the largest franchisees, when that group was given a sales pitch on buying additional franchises in groups of three at a purported discount.

49.     The statements in paragraph 46 are each false. In reality, few Seva franchisees make any profit at all, the stores can only be profitable if the owner serves as the manager without

FILED DATE: 7/23/2020 1:38 PM    2020CH05088

additional compensation, and Comrov would not make more as an owner of these failing franchises than she did in operations at Seva.

50.     Defendants knew these statements were false when made and failed to correct the misrepresentations.

51.     Defendants continue to receive monthly royalties totaling over $30,000 from the class who was fraudulently induced into agreeing to pay the royalties.

**C.  Misrepresentations Regarding Walmart**

52.     Seva franchises primarily operate inside Walmart stores and rely on foot traffic from Walmart customers.

53.     The only value Seva provided relative to its competing franchisors was that it had a relationship with Walmart.

54.     All of Plaintiffs' franchises were located within Walmart stores and Seva, through Comrov, Vas Maniatis, made numerous representations to Plaintiffs and the class about a continued relationship with Walmart and that the relationship was solid. Meanwhile, the relationship was actually falling apart and Walmart was refusing to renew leases.

55.     The reality is that at the same time Comrov and Seva's employees were saying everything was fine with Walmart it was refusing to enter into new agreements with Seva.

56.     In or about 2018, Walmart cut ties with Seva. Walmart refused to enter into new leases, refused to extend existing leases, and terminated their leases with some class members leaving them in the lurch.

57.     Seva never disclosed any of their agreements with Walmart to the class despite repeated requests.

FILED DATE: 7/23/2020 1:38 PM   2020CH05088

58.     Seva misrepresented that Plaintiffs and Class Members could open the franchises in any Walmart location and that operation in any Walmart store would be profitable. Seva provided each Plaintiff a list of potential locations when they were sold on the franchise.

59.     Seva knew these locations were not all available but would only commit to a location after Class Members paid their fees. Once Plaintiffs and the Class paid their fees the only locations left were far from their homes and far less profitable than what was promised.

60.     After Plaintiffs and the Class purchased the franchises, Seva forced them to select a particular Walmart that was not in a profitable location and placed significant requirements and restrictions on Class Members in selecting a location. These requirements, restrictions, and prohibitions were not disclosed in Seva's FDD, and Seva did not disclose the effect of those requirements and restrictions on the class.

61.     Seva fraudulently represented that the franchise agreement and the Walmart leases would be coterminous and fraudulently concealed their master lease with Walmart. But in reality Walmart terminated the leases prior to the end the of the franchise agreements.

62.     Seva fraudulently represented that they were not taking a profit on the subleases with class members. The reality was that Seva was making money on the sublease arrangement and concealed their master lease with Walmart from Class Members.

63.     Seva's business model is based primarily on handing out discount coupons to Walmart customers and Seva falsely promised that leafletting the store would ensure profitability.

64.     After purchasing the Franchises, Plaintiffs and the Class discovered that Walmart store rules impose significant restrictions on approaching Walmart customers or advertising within Walmart or directly outside Walmart. Seva knew this and fraudulently concealed this fact. These restrictions and prohibitions were not disclosed in Seva's FDD, and Seva did not disclose the effect

FILED DATE: 7/23/2020 1:38 PM    2020CH05088

the restrictions and prohibitions would have on the franchises. Seva did not disclose that the policy for leafletting varied from Walmart to Walmart.

65.     Seva misrepresented to Class Members that no other business near the franchises would be allowed to perform facial threading. After purchasing the franchises, Plaintiffs learned that other businesses within the same Walmart were also performing facial threading, which diverted business away from Plaintiffs' and Class Members' franchises.

66.     One Class Member was told by Comrov that his store would be the only one in the Walmart offering eyebrow waxing and eyelash extensions but, instead, there was one store doing eyelash extensions and two doing eyebrow waxing in the same Walmart Supercenter.

67.     Seva fraudulently advertised online on Entrepreneur.com that Seva provided national media advertising, email marketing, and a loyalty program/app.

68.     None of this is or ever was true. Seva did not offer national media advertising, email marketing, or a loyalty program/app. Seva fraudulently communicated these statements to induce people to buy a franchise.

69.     Seva repeatedly represented that the Franchises could be "manager-managed" so that Plaintiffs would not be required to work in the store personally. However, after Class Members paid the fees, Seva staff including Comrov, insisted that franchise owners needed to spend at least 40 hours per week at the store in order to be successful.

70.     Seva knows that under its franchise model the franchises cannot be financially profitable as a manager-managed model. Seva failed to disclose this information and its effect on the Class Members in its FDD and instead absentee ownership was the key to its sales pitch.

71.      Many franchisees with absentee owners failed. They were later purchased by other franchisees with experience prior to Seva and their own operations system, such as Merchant.

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

72. Ultimately, the only thing of value Seva was selling was a ticket into Walmart, which Defendants lost years ago.

73. Seva speciously attempts to avoid liability for its fraudulent conduct by demanding franchisees sign releases for no consideration whenever there is the slightest change in operations of the franchise and threaten termination if a release is not signed. Seva never disclosed its fraudulent conduct prior to soliciting a subsequent release.

74. Any purported release of the fraudulent conduct will not prevent this Court from enjoining continuing violations or payments owed pursuant to the same conduct. *See Shanahan v. Schindler*, 63 Ill. App. 3d 82, 94 (1st Dist. 1978).

**D. Continuing Harms Suffered by the Class**

75. Were it not for Seva's misrepresentations, the Plaintiffs and the Class would not have an ongoing obligation to pay royalties to Seva.

76. Seva continues to charge royalties even when Class Members' stores are closed by government orders following Covid-19.

77. Seva would only allow a discounted royalty for franchisees shut down by government orders during the pandemic if Class Members signed an unconscionable general release.

78. Defendants will continue to profit from their fraudulent conduct if not enjoined.

**E. Individual Class Members Experiences**

79. On February 15, 2016, Ferguson entered into a franchise agreement with Seva.

80. On or about February 15, 2016, Ferguson visited Chicago where he heard Comrov's misrepresentations detailed in paragraph 46 and entered into a franchise agreement with Seva in Illinois.

FILED DATE: 7/23/2020 1:38 PM   2020CH05088

81.     Ferguson opened his franchise in a Walmart Supercenter in Bradenton, Florida, which has been a complete failure.

82.     Ferguson's franchise lost $57,146.18 in 2016, lost $36,691.94 in 2017, $13,000 in 2018,  and only turned a profit of $3,387.84 in 2019.

83.     In 2020, when the COVID-19 pandemic hit, Ferguson could not safely remain open and was prohibited by government orders to remain closed for two months. Nevertheless Seva continued to charge him rent and royalties despite not being able to operate that, as discussed herein, he was fraudulently induced into paying.

84.     On July 17, 2020, Seva sent Ferguson a notice of termination threatening that if he did not immediately pay what was purportedly owed, his store would be shut down and he would be assessed additional penalties in excess of $40,000.

85.     Ferguson risks irreparable injury if Seva is not enjoined from seeking payments and penalties based on its fraudulent conduct.

86.     At no time did Seva disclose the truth of its fraudulent representations to Ferguson. Ferguson first became aware of the fraudulent misrepresentations in 2019 when Seva settled eight individual claims alleging similar fraudulent representations by Seva for over $2,000,000.

87.     On March 4, 2016, Sashital entered into a franchise agreement with Seva.

88.     On or about March 3, 2016, Sashital traveled to Chicago where he heard Comrov's fraudulent statements detailed in paragraph 46 above and executed the franchise agreement in Chicago based on these statements.

89.     Sashital opened his franchise in a Walmart Supercenter in Richmond, Texas, which has been a complete failure.

FILED DATE: 7/23/2020 1:38 PM    2020CH05088

90. Sashital's franchise lost $48,830.00 in 2016, lost $53,143.00 in 2017, and lost $133,794.00 in 2018.

91. At no time did Seva disclose the truth of its fraudulent representations to Sashital. Sashital first became aware of the truth of Seva's fraudulent misrepresentations until 2019 when Seva settled eight individual claims alleging similar fraudulent representations by Seva for over $2,000,000.

92. Despite being fraudulently induced to purchase the franchise, Sashital continues to timely pay all amounts Seva claims it is owed.

93. On March 4, 2016, Davis entered into a franchise agreement with Seva.

94. On or about March 3, 2016, Davis traveled to Chicago where he heard Comrov's fraudulent statements along with Sashital, detailed in paragraph 46 above and executed the franchise agreement in Chicago based on these statements.

95. Davis opened his franchise in a Walmart Supercenter in Cypress, Texas, which has been a complete failure.

96. Davis's franchise lost $62,499.00 in 2016, lost $61,788 in 2017, and lost $20,717 in 2018.

97. At no time did Seva disclose the truth of its fraudulent representations to Davis. Davis first became aware of the truth of Seva's fraudulent misrepresentations in 2019 when Seva settled eight individual claims alleging similar fraudulent representations by Seva for over $2,000,000.

98. Despite being fraudulently induced to purchase the franchise, Davis continues to timely pay all amounts Seva claims it is owed.

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

## VI. CLAIMS

### FIRST CAUSE OF ACTION
### Illinois Uniform Deceptive Trade Practices Act
### (815CS 510/1 *et. seq*.)

99. Plaintiffs, individually and on behalf of the class, restate and reallege paragraphs 1 through 98, as though fully set forth herein as paragraph 99.

100. Plaintiffs, the Class Members, and Defendants are "persons" under the UDTPA, 815 ILCS 510/1(5), which defines a "person" as "an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity."

101. Under the UDTPA, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, that person:

a. "represents that products or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have." 815 ILCS 510/2(5).

b. "represents that products or services are of particular standard, quality, or grade or that products are of a particular style or model, if they are of another." 815 ILCS 510/2(7).

c. "advertises products or services with intent not to sell them as advertised." 815 ILCS 510/2(9)

d. "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2(12).

FILED DATE: 7/23/2020 1:38 PM   2020CH05088

102.    Through the means described herein above, Defendants have represented, expressly or by implication, in their advertising and promotional material conducted within the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United States, and Plaintiffs and the Class Members that: (a) the franchises were profitable; (b) the franchises could be operated profitably without the owner participating in day to day operations; (c) Seva provided adequate training and support for threaders; and (d) Seva had a business relationship with Walmart that enabled extensions of franchise agreements and on site marketing.

103.    Each representation set forth above is false, misleading, and/or confusing and was not substantiated at the time the representation was made. Therefore, the making of each representation as set forth above constitutes a deceptive act or practice, in violation of the UDTPA.

104.    Defendants intended that Plaintiffs and the Class Members rely on their deceptive practices in an attempt to induce them to purchase franchises from Seva.

105.    Defendants' deception occurred during the marketing and sale of the franchises and related services in the course of Defendants' business.

106.    Defendants have a duty arising from their superior knowledge of their true profitability and mechanics of operating a franchise and its partial representations, omissions, and/or misrepresentations to the contrary, to disclose at the point of sale and/or otherwise that the claims of profitability and ease of ownership were false.

107.    Defendants willfully and intentionally failed to disclose one or more important and material facts that were only known to them and that Plaintiffs and the Class Members could not have discovered; and/or Defendants actively concealed one or more important and material facts from Plaintiffs and the Class Members and/or prevented them from discovering such fact or facts.

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

108. Defendants failed to disclose and concealed the true facts that the claims of profitability and ease of ownership were false. These omissions would be material to a reasonable consumer. Reasonable consumers are likely to be deceived and confused by Defendants' material misrepresentations and omissions.

109. Plaintiffs and Class Members suffered injury-in-fact, including the loss of money, as a result of Defendants' unlawful, unfair, and/or deceptive practices. Plaintiff and Class Members were directly and proximately injured by Defendants' conduct and lost money and incurred debt as a result of Defendants' wrongful conduct, misrepresentations, and material omissions because they would not have purchased or would not have paid as much for a Seva franchise and products had they known the truth. Consumers are likely to be damaged by Defendants' continuing deceptive trade practices.

110. Plaintiffs and Class Members are at a heightened and imminent risk of being financially unable to pay or default on loans and continue to incur charges and penalties from Defendants resulting from Defendants' wrongful and unlawful conduct.

111. Plaintiffs and the Class are suffering actual and imminent harm that is concrete and ongoing with each passing day. An actual dispute between Plaintiff and the other Class Members and Defendants exists, and the parties have genuine, direct, and substantial opposing interests for which a judicial determination will be final and conclusive.

112. Plaintiffs request that the Court: (a) enter an order declaring Defendants' conduct to be a false, misleading, and/or confusing and a willful violation of the UDTPA and applicable state laws; (b) enter an order declaring Defendants engaged in deceptive trade practices in violation of 815 ILCS 510(5), (7), (9), and (12) by, inter alia, misrepresenting the quality, characteristics, uses, and benefits of the franchises, and actively concealing, and causing others to conceal,

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

material information about the true nature of the franchises sold by Defendants; and (c) enter such other orders or judgments as may be necessary to enjoin Defendants from continuing their unfair and deceptive business practices, and to provide such other relief as set forth below and remedy the injury-in-fact resulting from Defendants unlawful conduct.

113. Plaintiffs are entitled to an award of reasonable attorneys' fees and costs under 815 ILCS 510/3 by any declaratory, injunctive, or other relief entered herein.

**SECOND CAUSE OF ACTION**
**Illinois Consumer Fraud And Deceptive Trade Practices Act**
**(815 ILCS 505, *et. seq*.)**

114. Plaintiffs, individually and on behalf of the class, restate and reallege paragraphs 1 through 99, as though fully set forth herein as paragraph 114.

115. The ICFA, 815 ILCS 505, *et. seq.* provides that Defendants may not employ "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2.

116. Through the means described herein above, Defendants have represented, expressly or by implication, in their advertising and promotional material conducted within the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United States, and Plaintiffs and the Class Members that: (a) the franchises were profitable; (b) the franchises could be operated profitably without the owner participating in day to day operations; (c) Seva provided adequate training and support for threaders; and (d) Seva had a business relationship with Walmart that enabled extensions of franchise agreements and on site marketing.

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

117. Defendants intended that Plaintiffs and the Class Members rely on their deceptive practices and induced them to purchase a franchise and related services. Defendants' deception occurred during the marketing and sale of Defendants' business and related services in the course of trade and commerce in the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United States. As a result of Defendants' violations of the ICFA as described herein, Plaintiffs and the Class Members have been harmed and suffered actual damages and injury-in-fact caused by Defendants' deception.

118. Plaintiffs and Class Members are entitled to, and hereby seek, reasonable attorneys' fees and costs, injunctive relief, and any and all further equitable relief that this Court deems appropriate.

**THIRD CAUSE OF ACTION**
**Illinois Franchise Disclosure Act**
**(815 ILCS 705, *et. seq*.)**

119. Plaintiffs, individually and on behalf of the class, restate and reallege paragraphs 1 through 99, as though fully set forth herein as paragraph 119.

120. The IFDA, 815 ILCS 705, *et. seq*. provides that Defendants may not "(a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 815 ILCS 705/6.

121. Through the means described herein above, Defendants have represented, expressly or by implication, in their advertising and promotional material conducted within the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

States, and Plaintiff and the Class Members that: (a) the franchises were profitable; (b) the franchises could be operated profitably without the owner participating in day to day operations; (c) Seva provided adequate training and support for threaders; and (d) Seva had a business relationship with Walmart that enabled extensions of franchise agreements and on site marketing.

122. Defendants intended that Plaintiffs and the Class Members rely on their deceptive practices and induced them to purchase a franchise and related services. Defendants' deception occurred during the marketing and sale of Defendants' business and related services in the course of trade and commerce in the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United States. As a result of Defendants' violations of the IFDA as described herein, Plaintiffs and the Class Members have been harmed and suffered actual damages and injury-in-fact caused by Defendants' deception.

123. Plaintiffs and Class Members are entitled to, and hereby seek, reasonable attorneys' fees and costs, injunctive relief, and any and all further equitable relief that this Court deems appropriate.

**FOURTH CAUSE OF ACTION**
**(Declaratory Relief)**

124. Plaintiffs, individually and on behalf of the class, incorporate by reference the foregoing allegations as if fully set forth herein.

125. A court may make binding declarations of the construction of any statutes, and a declaration of the rights of the parties interested by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well. 735 ILCS 5/2-701.

126. Plaintiffs and the Class Members are at a heightened and imminent risk of being financially unable to repay, and in default of, royalties and interest on loans taken to finance their

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

franchise purchase resulting from Defendants' wrongful and unlawful conduct. Royalty fees and interest on loans continue to accrue every day, whether such loans are in forbearance or default or not. Meanwhile Seva continues to charge fees and penalties based on their fraudulently induced agreements.

127. Plaintiffs and the Class Members are suffering actual and imminent harm that is concrete and ongoing with each passing day of interest and royalties. An actual controversy and dispute between Plaintiffs and the other Class Members and Defendants exists, and the parties have genuine, direct, and substantial opposing interests for which a judicial determination will be final and conclusive.

128. Plaintiffs and the Class are therefore entitled to a declaratory judgment that Defendants' acts and omissions as alleged herein violates applicable State law, including without limitation the UDTPA, ICFA, IFDA, as well as such other and further relief as may follow from the entry of such a judgment.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action as set forth in 735 ILCS 5/2-801, and certifying the proposed Class as defined herein;

B. Designating Plaintiffs as representative of the proposed Class, and Alexander N. Loftus, Esq. as Lead Counsel;

C. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

FILED DATE: 7/23/2020 1:38 PM    2020CH05088

D.        An order temporarily and permanently enjoining Defendants from collecting any royalties or assessing penalties for non-payment of royalties from the Class;

E.        A declaration that the acts, omissions, and practices described in this claim exist, are unfair, deceptive, unlawful, and a violation of applicable State law;

F.        A declaration that the Franchise Agreement is an illegal contract and is void ab initio;

G.        An order enjoining Defendants from engaging in further unfair and deceptive advertising, promotion, distribution and sales practices with respect to the franchises;

H.        A permanent injunction prohibiting Defendants and their officers, agents, employees and successors, from engaging in the unlawful practices complained of herein in violation of applicable state law;

I.        A mandatory injunction requiring Defendants to adopt business practices in conformity with the requirements of applicable laws;

J.        An order requiring Defendants to notify Plaintiffs and members of the Class that the following statements are false and untrue: (a) the franchises were profitable; (b) the franchises could be operated profitably without the owner participating in day to day operations; (c) Seva provides adequate training and support for threading; and (d) Seva had a business relationship with Walmart that enabled extensions of franchise agreements and on site marketing;

K.        An award of costs and attorneys' fees; and

L.        Such other or further relief as may be appropriate.

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

**MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS,**
Plaintiffs

By: /s/*Alexander N. Loftus*______
One of Their Attorneys

Alexander Loftus, Esq.
David Eisenberg, Esq.
Jeffrey Dorman, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
C: 312.772.5396
alex@loftusandeisenberg.com
david@loftusandeisenberg.com

Dated: July 23, 2020

FILED DATE: 7/23/2020 1:38 PM 2020CH05088

**VERIFICATION BY CERTIFICATION**

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in this VERIFIED COMPLAINT are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies that he verily believes the same to be true.

____*/s/Mark Ferguson*_____

____*/s/Mahesh Sashital*_____

____*/s/Michael Scott Davis*____

# EXHIBIT A-2

Return Date: No return date scheduled
Hearing Date: 12/3/2020 10:00 AM - 10:00 AM
Courtroom Number: 2601
Location: District 1 Court
Cook County, IL

FILED
8/3/2020 1:39 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH05088

9973464

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS individually and on behalf of the class described below,

Plaintiffs,

v.

SEVA BEAUTY, LLC, and KARI COMROV,

Defendants.

Case No. 2020 CH 05088

**PLAINTIFF'S MOTION**
**<u>FOR A TEMPORARY RESTRAINING ORDER</u>**

Plaintiffs, MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS, by and through their undersigned attorneys, for their Motion for a Temporary Restraining Order ("Motion"), state as follows:

**INTRODUCTION**

A temporary restraining order ("TRO") is needed to maintain the *status quo* in order to prevent immediate and unwarranted reduction in Plaintiffs' ownership interests.

On July 23, 2020, Plaintiffs filed their Verified Complaint. On August 3, 2020, Plaintiffs filed their Motion and Supporting Memorandum for a Preliminary Injunction. (A true and correct copy of the Motion for a Preliminary Injunction is attached hereto as Exhibit "A" and made a part hereof.)

Consequently, a TRO is needed to cease termination and accumulating penalties until this Court adjudicates Plaintiffs' Motion for a Preliminary Injunction.

FILED DATE: 8/3/2020 1:39 PM   2020CH05088

## LEGAL STANDARD

To obtain a TRO, a plaintiff must establish that (a) it has a protectable interest, (b) it will suffer irreparable injury if the restraining order does not issue, (c) its remedy at law is inadequate, and (d) it is likely to succeed on the merits. *Murges v. Bowman,* 254 Ill. App. 3d 1071, 1081, 627 N.E.2d 330, 337 (1st D 1993); *Houseknecht v. Zagel*, 112 Ill. App. 3d 284, 291-92,445 N.E. 2d 402, 407 (1st D 1983). The party seeking relief need only raise a "fair question" whether the right at issue exists. *Buzz Barton & Assoc, Inc. v. Giannore*, 108 Ill.2d 373, 382, 483 N.E.2d 1271, 1275 (1985).

## ARGUMENT

On August 4, 2020, Plaintiffs filed their Motion and Supporting Memorandum for a Preliminary Injunction. (Exhibit "A"). The legal standard for a motion for temporary restraining order is similar to the standard for a preliminary injunction. Under Illinois law, a preliminary injunction should be granted where the plaintiff: (1) has a clearly ascertainable right that requires protection; (2) will suffer irreparable harm if injunctive relief is not granted; (3) has no adequate remedy at law; and (4) is likely to succeed on the merits. *See, e.g., County of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 635, 834 N.E.2d 643, 649 (2d Dist. 2005). The elements of a TRO and a preliminary injunction are similar. Given the overlap between the elements, Plaintiffs incorporate all of the allegations contained in their Motion and Supporting Memorandum for a Preliminary Injunction attached hereto as Exhibit "A" as their argument for this Motion.

Immediate action is needed between now and a hearing on a motion for preliminary injunction to prevent irreparable harm of terminating franchise agreements for nonpayment of fraudulently induced royalties and assessing penalties in amounts sufficient to put franchises out of business for non-payment of royalties.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

WHEREFORE, Plaintiffs, MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS on behalf of class members described herein, respectfully request that a temporary restraining order be entered enjoining SEVA BEAUTY, LLC from: (1) Assessing any penalties against any franchisees for the failure to pay minimum weekly royalties; (2) Terminating any franchise agreement with any franchisee for non-payment of rents or royalties until Plaintiffs' Motion for Preliminary Injunction can be ruled upon, and for any additional relief that this Court deems necessary and appropriate under the circumstances.

Respectfully submitted,

**MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS,**
Plaintiffs

By: /s/*Alexander N. Loftus*______
One of Their Attorneys

Alexander Loftus, Esq.
David Eisenberg, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
C: 312.772.5396
alex@loftusandeisenberg.com
david@loftusandeisenberg.com

Dated: August 4, 2020

# **EXHIBIT A-3**

Return Date: No return date scheduled
Hearing Date: 12/3/2020 10:00 AM - 10:00 AM
Courtroom Number: 2601
Location: District 1 Court
Cook County, IL

FILED
8/3/2020 1:39 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH05088

9973464

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS individually and on behalf of the class described below,

Plaintiffs,

v.

SEVA BEAUTY, LLC, and KARI COMROV,

Defendants.

Case No. 2020 CH 05088

**PLAINTIFFS' MOTION AND SUPPORTING MEMORANDUM FOR A PRELIMINARY INJUNCTION**

Plaintiffs are seeking to maintain the status quo of operating franchise businesses by preventing assessment of additional fees, interest, penalties, and termination of the franchise agreements between Plaintiffs and Seva Beauty, LLC ("Seva") until this matter can be resolved on the merits. This Motion is necessary now because Seva is causing and threatening irreparable harms against all of their franchisees and illegally pressuring franchisees by trading Covid-19 relief for a broad release of the Consumer Protection Law Claims against Seva. With this Motion Plaintiffs are simply requesting that Plaintiffs and similarly situated franchisees are not further punished or stripped of their franchise while the claims related to their relationship with Seva are litigated.

There is no legitimate question that Defendants violated Consumer Protection Laws as detailed in the well-researched complaint based on interviews with nearly fifty current and former franchisees. (Verified Complaint "Cmplt." Attached hereto as Exhibit "A"). The business model was to sign up as many new franchisees as possible based on a string of lies then take their initial fees and lock them in to weekly minimum royalties regardless of their success. Finally, to complete

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

the fraud, Seva would compel franchisees to sign releases of liability under threats of penalties when the businesses failed. When Seva is finally cornered by a franchisee, Seva settles the moment before it loses insurance coverage. Seva has paid over $2,000,000 to franchisees making similar claims in individual arbitrations. (Original Complaint attached hereto as Exhibit "B"). This injunction seeks to arrest the fraudulent conduct and the irreparable harms caused by the obvious violations until the matter can be finally resolved on the merits. Seva is a scam that is apparently winding down its operations and this preliminary injunction prevents the remaining franchisees from being taken down with Seva.

## RELEVANT FACTS

### I. OVERVIEW OF CLAIMS AND THE NECESSITY TO PRESERVE STATUS QUO WHILE THE MERITS OF THE CLAIMS ARE ADDRESSED.

Defendant, Seva, is a franchisor of the failing "Seva Beauty" system of fast casual spas throughout the nation. Kari Comrov ("Comrov") was its director of operations and primary evangelist. Defendants presented the "Seva Beauty" franchise as a no-lose investment opportunity for significant passive income when, in reality, the business model is a no-win, except for a select few experienced retailers who have no need for franchise support. Defendants' sales pitch is in direct contravention of Illinois' Franchise Disclosure Act, 815 ILCS 705, *et seq*.; the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq*.; and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq* (collectively referred to herein as "Consumer Protection Laws"). Seva, primarily through Comrov, lied about the profitability, ease of operations, and relationship with Walmart in order to induce hundreds of franchisees to pay many millions in royalties to Seva.

Plaintiffs and the proposed class each paid Seva an initial franchise fee of tens of thousands of dollars, a minimum royalty of $250 or 6% of their profits, whichever is greater, as well as

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

assorted additional fees. (2016 Franchise Disclosure Document attached hereto as Exhibit "C"). Few, if any, franchisees ever earned enough to pay any more than the minimum royalty. In reality, the "minimum royalty" far exceeds 6% of profits. Mahesh Sashital paid 11% of his gross revenues to Seva in the life of his agreement in royalties and 16% this year. (Affidavit of Mahesh Sashital attached hereto as Exhibit "D" at ¶ 17). Seva has since discontinued the minimum weekly royalty payment for franchisees joining the system after 2019. *See* (2020 Franchise Disclosure Document attached hereto Exhibit "E"). At issue here is the minimum royalty still assessed to franchisees who joined the system prior to January 1, 2019.

Sadly, Seva's victims continue to incur franchise fees and the harms multiply each day as Defendants continue to profit on their lies through the pandemic and complete the fraud by trading pandemic relief for a release of these claims. Defendants engaged in a fraudulent scheme of lying to franchisees to acquire over $12,000,000 from franchisees, then hiding behind a byzantine and expensive structure of arbitration agreements and fraudulently induced take-it-or-leave-it releases with no consideration that are voidable as a matter of law. Defendants settled a handful of fraud claims in arbitration for over $2,000,000, yet refuse to change their fraudulent conduct without a Court ordering them to stop.

**A. Seva Promoted False Examples of Successful Franchisees**

In connection with the sale of the franchises to Plaintiffs, Seva intentionally omitted financial information from its Franchise Disclosure Document ("FDD") regarding the failures of the vast majority of Seva franchises and instead only provided limited financial information from a handful of its most profitable store locations.

Those stores that were successful were not compliant with Seva's rules or government employment regulations. Seva instructed its franchisees not to talk to potential franchisees and

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

only allowed select store owners, who, were coached on what to say talk to potential franchisees, including Plaintiffs.

In 2018, seasoned Seva franchisee, Rajsingh Gohil spoke with numerous prospective franchisees and told them the truth about Seva, explaining that no one should proceed unless they were already very experienced and had a staff of skilled threaders. Gohil told prospective franchisees that stores were going out of business and franchisees were losing significant amounts of money. Comrov learned Gohil was telling prospective franchisees the truth and told him to tell a different story. She then took him off the list of existing franchisees for prospects to speak with. Seva told existing franchisees that they shouldn't communicate with prospective franchisees and that only select franchisees would talk to prospective franchisees. Seva speciously claimed this was to limit the burden on franchisees dealing with inquiries, but in reality this was to conceal their ongoing fraudulent conduct. *See* (Affidavit of Gohil attached hereto as Exhibit "F" at ¶¶ 4-11).

The most profitable stores were operated in areas where there were many immigrants familiar with the techniques employed by Seva, so stores in Chicago had a ready pool of labor that did not exist elsewhere. Meanwhile, Plaintiffs were in locations without this large available labor force. Seva knew this and still promised it was easy to find employees nationwide just like it's Chicago-area exemplars. Seva knew the exemplar stores were uniquely suited to have adequate labor and the same would not be true nationwide. Despite this knowledge, Seva lied to Plaintiffs and the class during their Discovery Day visits to Chicago and promised they would be able to easily hire and train staff even in the rural south and mountain west. (Sashital Aff. ¶¶ 4-6)

The Chicago-area exemplars cited by Seva as representative of Plaintiffs' future business skirted employment regulations by having employees work "part-time" at multiple stores, thus creating artificial and illegal savings on labor costs not disclosed to Plaintiffs' who followed the

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

law. The exemplar franchisees would run three stores near each other and have one employee work 20 hours at each of the stores. Thus, the employees would not be full time at any store, would not require benefits, and would not need to be paid overtime. Seva was aware of these fraudulent practices and nonetheless promised Plaintiffs and the class that they would have the same success while following the law. *Id.*

The Chicago stores owners that were touted as the most profitable had family members running them, so much of the labor cost was reflected as profits. (Gohil Aff. ¶¶` 10-11). The exemplar stores were staffed by the owners' wives, sisters, or cousins. These exemplars had partners who had a share in the profits working every day to make the salon successful without adding any payroll to the balance sheet. (*Id.*). The trick employees was if the partner had 20% or less share they did not have to sign the Franchise Disclosure Document and disclosed that they were compensated with a share of the profits and not on the balance sheet. (*Id.*). Each of the most profitable franchisees speciously cited as an example of how profitable the franchises had a significant number of "free" employees drawing on the profits. (*Id.*). Seva knew about this and still falsely cited these franchises as examples of what "profits" would be expected. (*Id.*)

**B. Misrepresentations of Profitability and Absentee Ownership**

Seva, through its principal, Vas Maniatis, and its now former employees, namely Comrov, made various representations to Plaintiffs about the profitability of Seva stores that induced Plaintiffs and the class to purchase the Franchises, including statements that the stores would break even or be profitable within a short period of time (1-3 months, 2-4 months, or 3-6 months) and that the class could easily earn at least $90,000 to $150,000 in profit per franchise in the franchise's second year of operations. Seva communicated this verbally throughout the sales process and in a brochure. Seva knew few if any of their franchisees generated this sort of revenue and certainly

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

not when they were paying someone to manage the stores and not training employees for months on end.

Seva's head of operations, Comrov, made the following representations during the Discovery Day in Chicago to potential franchisees while they were wined and dined as part of the final sales pitch:

1. "Each store will break even in the first six months and earning $100,000 + per store is easy";
2. "It's a turn-key business without needing any prior skill";
3. "It's very common for the owner to be an absentee owner";
4. "If you buy two franchises the third is practically free. All of our very successful store owners own three or more stores and that is formula for success"; and
5. "I think I'm on the wrong side of the business, I should be an owner of a store instead of being in operations. I would be making so much more if I were an owner instead."

(Sashital Aff.; Gohil Aff; Affidavit of Michael Scott Davis Attached hereto as Exhibit "G", Affidavit of Mark Fergusson Attached hereto as Exhibit "H", Affidavit of Kittson Speights Attached hereto as Exhibit "I")

These representations by Comrov are confirmed by at least a dozen former Seva franchisees interviewed by counsel as well as Plaintiffs who heard the statements and reasonably relied on them. Comrov made the same representations stated in paragraph  above at Seva's annual meeting in Puerto Rico when that group was given a sales pitch on buying additional franchises in groups of three at a purported discount. (Gohil Aff. ¶ 12)

FILED DATE: 8/3/2020 1:39 PM    2020CH05088

Before Comrov joined Seva, it ran television advertisements directed to South-Asian communities in 2012 and 2013 making outrageous claims of over $500,000 in annual revenues in their stores. (Affidavit of Kiran Thakkar attached hereto as Exhibit "K")



The statements are each false. In reality, few Seva franchisees make any profit at all, the stores can only be profitable if the owner serves as the manager without additional compensation, and Comrov would not make more as an owner of these failing franchises than she did in operations at Seva. Defendants knew these statements were false when made and failed to correct the misrepresentations.

Defendants continue to receive monthly royalties totaling over $100,000 from franchisees who were fraudulently induced into agreeing to pay the royalties including $1,000 per month from each Plaintiff.

**C. Misrepresentations Regarding Walmart**

Seva franchises primarily operate inside Walmart stores and rely on foot traffic from Walmart customers. The only value Seva provided relative to its competing franchisors was that

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

it had a relationship with Walmart.

All of Plaintiffs' franchises were located within Walmart stores and Seva, through Comrov, and Vas Maniatis, made numerous representations to Plaintiffs and the class about a continued relationship with Walmart and that the relationship was solid. Meanwhile, the relationship was actually falling apart and Walmart was refusing to renew leases. The reality is that at the same time Comrov and Seva's employees were saying everything was fine with Walmart it was refusing to enter into new agreements with Seva.

In or about 2018, Walmart cut ties with Seva. Walmart refused to enter into new leases, refused to extend existing leases, and terminated their leases with some class members leaving them in the lurch. Seva never disclosed any of their agreements with Walmart to the class despite repeated requests.

Seva misrepresented that Plaintiffs could open the franchises in any Walmart location and that operation in any Walmart store would be profitable. Seva provided each Plaintiff a list of potential locations when they were sold on the franchise. Seva knew these locations were not all available but would only commit to a location after Class Members paid their fees. Once Plaintiffs and the Class paid their fees the only locations left were far from their homes and far less profitable than what was promised. After Plaintiffs purchased the franchises, Seva forced them to select a particular Walmart that was not in a profitable location and placed significant requirements and restrictions in selecting a location. These requirements, restrictions, and prohibitions were not disclosed in Seva's FDD, and Seva did not disclose the effect of those requirements and restrictions on the class.

Seva fraudulently represented that the franchise agreement and the Walmart leases would be coterminous and fraudulently concealed their master lease with Walmart. But in reality,

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Walmart terminated the leases prior to the end the of the franchise agreements.

Seva fraudulently represented that they were not taking a profit on the subleases. The reality was that Seva was making money on the sublease arrangement and conceals their master lease with Walmart from franchisees.

Seva's business model is based primarily on handing out discount coupons to Walmart customers and Seva falsely promised that leafletting the store would ensure profitability. After purchasing the Franchises, Plaintiffs and the Class discovered that Walmart store rules impose significant restrictions on approaching Walmart customers or advertising within Walmart or directly outside Walmart. Seva knew this and fraudulently concealed this fact. These restrictions and prohibitions were not disclosed in Seva's FDD, and Seva did not disclose the effect the restrictions and prohibitions would have on the franchises. Seva did not disclose that the policy for leafletting varied from Walmart to Walmart. (Speights Aff. ¶¶ 31-40)

Seva misrepresented to franchisees that no other business near the franchises would be allowed to perform facial threading. After purchasing the franchises, Plaintiffs learned that other businesses within the same Walmart were also performing facial threading, which diverted business away from Plaintiffs' and Class Members' franchises. (*Id)*.

Seva fraudulently advertised online on Entrepreneur.com that Seva provided national media advertising, email marketing, and a loyalty program/app. None of this is or ever was true. Seva did not offer national media advertising, email marketing, or a loyalty program/app. Seva fraudulently communicated these statements to induce people to buy a franchise. (Speights Aff. ¶ 37)

Seva repeatedly represented that the Franchises could be "manager-managed" so that Plaintiffs would not be required to work in the store personally. However, after Plaintiffs paid the

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

fees, Seva staff, including Comrov, insisted that franchise owners needed to spend at least 40 hours per week at the store in order to be successful. *See* (Speights ¶ 40). Seva knows that under its franchise model the franchises cannot be financially profitable as a manager-managed model. Seva failed to disclose this information and its effect on the franchisees in its FDD and instead absentee ownership was the key to its sales pitch. Many franchisees with absentee owners failed. They were later purchased by other franchisees with experience prior to Seva and their own operations system. *Id.* Ultimately, the only thing of value Seva was selling was a ticket into Walmart, which Defendants lost years ago.

**D. Continuing Harms Suffered by the Franchisees**

Were it not for Seva's misrepresentations, the franchisees would not have an ongoing obligation to pay $250 weekly royalties to Seva. Seva continues to charge royalties even when franchisees' stores are closed by government orders following Covid-19. Seva would only allow a discounted royalty for franchisees shut down by government orders during the pandemic if Plaintiffs signed an unconscionable general release. (Sashital Aff. ¶¶ 10-12). It is unknown to Plaintiffs or counsel how many franchisees were forced to assent to this unconscionable release.

In 2020, when the COVID-19 pandemic hit, Mark Ferguson ("Ferguson") could not safely remain open and was prohibited by government orders to remain closed. Since the pandemic hit, his gross revenues are as follows: April 2020 $328, May 2020 $1,491, June 2020 $5,081, July 2020 $5,919. After paying his staff and rent there is nothing left to pay a fraudulently induced royalty. Nevertheless, Seva continued to charge him rent and royalties despite not being able to operate that, as discussed herein, he was fraudulently induced into paying. (Fergusson Aff. ¶ 4) On July 17, 2020, Seva sent Ferguson a notice of termination threatening that if he did not immediately pay what was purportedly owed, his store would be shut down and he would be

FILED DATE: 8/3/2020 1:39 PM   2020CH05088

assessed additional penalties in excess of $40,000. (Fergusson Aff. ¶ 5, Ex. 1). Seva has since shut down his point of sale system, indicated on Google that his store was closed, and shut off his access to his stores' Facebook page. *Id.* While his business built on a lie suffers, he continues to accrue interest on a loan from his brother for $50,000 at 5% interest and a line of credit for $45,000 at 4.5% interest. *Id.* These acts of shutting down the franchise cause Ferguson irreparable harm.

Mahesh Sashital ("Sashital") has been required by Seva to continue paying royalties during the pandemic. (Sashital Aff. ¶ 10) Even when his store was closed by government order he continues to pay the weekly $250 royalties. Seva would only allow Sashital to avoid paying royalties if he agreed to release his fraud claims. (*Id. at* ¶ 10, ex 1). Sashital refused the unconscionable request and continues to pay his rent and royalties regardless of whether his store is able to operate. (*Id.).* Meanwhile, Sashital continues to pay interest on his debts incurred to open and operate the franchise including an SBA loan of $17,798 at a rate of 5.5%, an American Express loan of $2,393 at a rate of 9.98%, another American Express loan of $8,629 at a rate of 8.98%, and an Emergency Injury Disaster Loan of $53,400 at a rate of 3.75%. (*Id.* at ¶ 14*)* Meanwhile, as he labors under the debts created by the failed franchise, since the pandemic hit, Sashital's revenues are as follows: March 2020 $4,979, April 2020 $0.00, May 2020 $2,388, June 2020 $4,999, July 2020 $5,023. There is simply nothing left to pay the fraudulently induced royalty. (*Id.)*

Michael Scott Davis ("Davis") has been required by Seva to continue paying royalties during the pandemic. (Davis Aff. ¶ 4) Even when his store was closed by government order he continues to pay the weekly $250 royalties. *Id.* Seva would only allow Davis to avoid paying royalties if he agreed to release his fraud claims. (*Id.* at ¶ 7). Davis refused the unconscionable request and continues to pay his rent and royalties regardless of whether his store is able to operate.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(*Id.).* Davis's business is in shambles and the royalty pushes him over the breaking point. Since the pandemic hit Davis's gross revenues are as follows: March 2020 $ 8,174.87, April. 2020 $ 0.00, May 2020. $ 0.00, and June 2020 $ 2,625.60. (*Id.* at ¶ 7 ) Meanwhile, Davis continues to pay interest on his debts incurred to open and operate the franchise including a $120,000 loan against his retirement fund which he pays a $135 monthly fee.

Comrov left Seva in April 2019 to join another franchisor targeting a similar market. She is now President of TruFusion, LLC selling group fitness franchises by touting profitability nationwide including in Chicago.

## ARGUMENT

### I. THE ELEMENTS NEEDED FOR A PRELIMINARY INJUNCTION

Under Illinois law, a preliminary injunction should be granted where the Plaintiff: (1) has a clearly ascertainable right that requires protection; (2) will suffer irreparable harm if injunctive relief is not granted; (3) has no adequate remedy at law; and (4) is likely to succeed on the merits. *See, e.g., County of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 635, 834 N.E.2d 643, 649 (2d Dist. 2005); *Schweickart v. Powers*, 245 Ill. App. 3d 281, 289, 613 N.E.2d 403, 409 (2d Dist. 1993).

The party seeking the injunction need only make a prima facie showing of evidence on the requisite elements to obtain injunctive relief. *Mohanty v. St. John Heart Clinic, S.C.*, 358 Ill. App. 3d 902, 905-6, 832 N.E.2d 940, 942-43 (1st Dist. 2005), *aff'd.,* 225 Ill. 2d 52, 866 N.E.2d 85 (2007). Plaintiff is not required to make out the entire case that would entitle him to relief on the merits; he must only show that the evidence raises a "fair question" about the existence of the right and that the court should act to preserve the status quo until the case can be decided on the merits. *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill. 2d 373, 382, 483 N.E.2d 1271, 1275 (1985).

In this case, Plaintiffs have detailed the fraudulent acts thoroughly and the harms that continue to flow from these acts including fees, interest, and termination. Plaintiffs certainly

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

present a fair question when read in context of Seva settling other related claims for nearly all of the victims' losses.

## II. THE RECORD DEMONSTRATES A CLEAR RIGHT TO A PRELIMINARY INJUNCTION.

### A. Plaintiffs have a Clearly Ascertainable Right in Preventing Their Franchises from being Terminated

The verified complaint in this case more than satisfies the demonstration of a clearly ascertainable right to avoid payment of royalties and resulting termination. Seva and Comrov violated consumer protection laws and sold Plaintiffs a bill of goods. They know this and have paid millions in other arbitrations, right before they reached the point of losing insurance coverage because of an arbitrator ruling their bad acts were intentional and fraudulent. Their business is now sunsetting and they intend to milk the last bit out of franchisees and strong-arm them into releases under the threat of Covid-19. If the Court does not enjoin Seva from the continued misrepresentations and collection of fees based on those misrepresentations, Plaintiffs' franchise agreements will be terminated and they will be assessed penalties for no valid reason. This Court must intervene now to delay enforcement against current franchisees.

The issue of trading pandemic relief for a blanket release is especially important. In response to growing concerns about how franchisees were treated during the pandemic, Senator Catherine Cortez Maestro wrote the chairman of the Federal Trade Commission on April 30, 2020:

> The Commission should find that it would be an unfair act or practice and thus a violation of Section 5 of the FTC Act (15 U.S.C. §45) for any franchisor to condition any form of relief (including, but not limited to, fee reduction, fee deferrals, deferrals for required store upgrades, etc.) granted to a franchisee on account of the COVID-19 pandemic or the related economic downturn on the franchisee agreeing to material changes in the franchise agreement, operating contract or on a general release of claims.

(Maestro Letter Exhibit "J").

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

This conduct of only offering relief if traded for a release of obvious fraud is reprehensible and must be immediately enjoined and the releases voided. No corporation should be allowed to exploit the pandemic in order to leverage releases of claims.

The consequence, as already played out for Ferguson, of not signing the release and not paying the fees is termination of the franchise agreement. Plaintiffs would suffer irreparable harm where the corporation would cease to exist without the injunction. *Peoria Sav. & Loan Ass'n v. Am. Sav. Ass'n*, 109 Ill. App. 3d 1043, 1048 (3d Dist. 1982) ("The necessity of preserving the status quo to prevent the termination of Peoria's existence would seem to satisfy the requirement that irreparable harm be shown."). Of course, terminating the franchise, disabling its website and POS system is irreparable harm.

An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Falcon, Ltd. v. Corr's Natural Beverages, Inc*., 165 Ill. App. 3d 815, 821 (1st Dist. 1987). In *Travelport, LP v. Am. Airlines, Inc*., 2011 IL App (1st) 111761 P37-40 (1st Dist. 2011), the First District explained, "An injunction was warranted to prevent the termination of an agreement where plaintiff would lose customers and goodwill, and the parties would have difficulty estimating the long-term effects on plaintiff's business." This is exactly what happens when a franchise agreement is terminated. Furthermore, "[t]he loss of sales and customers as well as the threat of continuation of such losses to a legitimate business interest, as alleged by plaintiffs in the present case, have been held sufficient to constitute irreparable injury." *Falcon,* 165 Ill. App. 3d at 821. Again, this is exactly what happens if franchisees refuse to sign the release and are unable to pay royalties. This conduct must be enjoined while we litigate these claims.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### B. The fees assessed each week and interest on loans necessary to operate the business are an irreparable harm.

The franchisees will continue to pay fees and interest as a result of the violation of consumer protection laws and, if they are unable, their franchises will be terminated if this Court does not grant the relief sought. There is ample authority outside the state of Illinois supporting the conclusion that the continued assessment of weekly royalties in the amount of $250 constitutes irreparable harm. *Conigliaro v. 2952 Victory Blvd. Pump Corp.*, 800 N.Y.S.2d 344 (Sup. Ct. N.Y. 2004)(The collection of ongoing fees can be considered irreparable harm); *Guirola-Beeche v. U.S. Dep't of Justice*, 662 F. Supp. 1414, 1415 (S.D. Fla. 1987)(The accrual and payment of interest and other charges can be considered irreparable harm.); *United States v. Gonzales & Gonzales Bonds & Ins. Agency, Inc.*, 2011 U.S. Dist. LEXIS 145170, *3-4 (N.D. Cal. 2011)(The accrual of interest and other charges can be considered irreparable harm); *In re Orthopedic Bone Screw Prods. Liab. Litig. v. United States*, 202 F.R.D. 154, 2001 U.S. Dist. LEXIS 11014, 2001 WL 34131988. Furthermore, as made clear with Seva's treatment of poor Mr. Ferguson, if the royalties are not paid a parade of horribles is unleashed that unquestionably amount to irreparable harm. Plaintiffs request the Court order this conduct to cease by stopping the assessment of minimum royalties completely until this matter can be resolved on the merits; thus saving franchises businesses which are on the brink of collapse while not further enriching Seva for its terrible conduct.

Plaintiffs are entitled to injunctive relief to maintain the *status quo* of keeping their businesses afloat pending a hearing on a permanent injunction. Seva has stopped charging the $250 minimum weekly royalty to franchisees who signed up more recently, no doubt after pressure from franchise regulators who are presently investigating Seva, thus there is no harm to Seva in not collecting these royalties by earlier franchisees.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### C. The Franchisees have No Adequate Remedy at Law.

There is no adequate remedy at law to replace the contractual relationship and the Plaintiffs and proposed class members cannot afford the fees and penalties. "A threatened business interest is an identifiable right which may be protected by injunctive relief." *In re Marriage of Joerger*, 221 Ill. App. 3d 400, 405 (4th Dist. 1991). "A showing of irreparable injury is related to the proof of a legitimate business interest. Once a protectable interest has been established, injury to plaintiff will presumably follow if that interest is not protected." *Donald McElroy, Inc. v. Delaney*, 72 Ill. App. 3d 285, 294 (1st Dist. 1979). The threat of the continuation of losses to a legitimate business "is sufficient to show that plaintiff will suffer irreparable injury unless protected by the court." *Eagle Books, Inc. v. Jones*, 130 Ill. App. 3d 407, 411 (4th Dist. 1985). It is not necessary that a party seeking an injunction show actual harm before relief will be granted...the threat of immediate and irreparable harm will suffice." *U-Haul Co of Cent. Illinois v. Hindahl,* 90 Ill. App. 3d 572, 578 (3d Dist. 1980). In this case, the threat of harm is real where Seva has previously used the non-payment of royalties to terminate franchise agreements. Furthermore, while $1,000 a month plus interest payments may sound small that amounts to more than the total revenues franchisees earn during the pandemic.

Furthermore, the fact that plaintiff's ultimate relief may be a money judgment does not deprive a court of equity of the power to grant a preliminary injunction. *All Seasons Excavating Co. v. Bluthardt*, 229 Ill. App. 3d 22, 28 (1992); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill. App. 3d 671, 684 (1978); *K.F.K. Corp. v. American Continental Homes*, Inc., 31 Ill. App. 3d 1017, 1021(1975). Thus, even though Plaintiffs may seek monetary damages for the fraudulent conduct in another forum, that is not a bar to injunctive relief as a preliminary matter here.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Due to the uniqueness of the franchisees' business interests and the difficulty of determining the value of the impairment to the franchisees' ownership interests, damages are not an adequate remedy at this stage.

**D. Plaintiffs are More than Likely to Succeed on the Merits.**

The last element needed for a preliminary injunction is a likelihood that Plaintiffs will prevail on the merits. *County of Du Page v. Gavrilos*, *supra*. The Complaint here is damning, well researched, and vetted by a group of 36 Seva franchisees. Plaintiffs' claims are representative of the proposed class and counsel represents many class members. Most importantly, Seva has been through this before and settled with another group of franchisees on very favorable terms for the franchisees not long ago. (Complaint attached hereto as Exhibit "B")

Seva has already paid $2,165,000 to settle claims premised on the same basic facts at issue here alleging fraud just like those alleged in this class action. Seva's most recent FDD provides:

> On April 10, 2017, a group of eight franchisees comprised of Anna A. Davis, Christiana Grace, LLC, Punardeep Sandhu, Amarjeet Randhawa, RS Spas & Salons LLC, Ryan Hollis, Jason Bleick, Karen Bleick, Beauty in Spokane, LLC, Greg Kelly, Robin Kelly, Avatar2026 Holdings, Inc., Thomas Cuthbert, Laura Charboneau, Midwest Beauty, Inc., On Call Enterprises, Inc., and Mivas, LLC (collectively, the "Davis Group") filed a complaint ... against SEVA and the SEVA's owners and certain current and former employees (Vasilios Maniatis, Sonal Maniatis, Kari Comrov, Bree Viscia, and Jonathan Kittner) (collectively, the "SEVA Parties"). Plaintiffs sought rescission of their franchises, damages in an amount to be determined at trial and which were estimated to exceed $2 million, plus punitive damages, attorneys' fees and costs, and interest.

The claims based on the same basic facts alleging the same theory of recovery were settled with eight prior franchisees as follows:

> ...franchisees' claims for the following amounts and on the following dates: (i) the Sandhu Arbitration - $25,000 (June 21, 2018); (ii) the Hollis Arbitration - $160,000 (June 21, 2018); (iii) the Davis Arbitration - $855,000 (July 19, 2018); (iv) the Bleick Arbitration - $300,000 (June 21, 2018); (v) the Call Arbitration - $150,000 (October 17, 2018); (vi) the Mivas Arbitration - $175,000 (September 17, 2018)

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(vii) the Kelly Arbitration - $150,000 (November 15, 2018); and (viii) the Midwest Beauty Arbitration - $350,000 (February 5, 2019).

(2020 FDD)

It is extraordinarily unlikely that this Class Action would yield a different result and this whole exercise, frankly, should have ended months ago via mediation. The last time around Seva eventually listened to their sage counsel, Fredrich Cohen, the preeminent franchisor attorney in Chicago, and settled the eight directly analogous claims for nearly the full losses. Despite paying these settlements, Seva and Comrov continue with the scheme virtually unchecked.

## CONCLUSION

Plaintiffs are not seeking any extraordinary relief with this Motion. They are simply trying to lock in the status quo by preventing Seva from accumulating any more damages and causing Plaintiffs and the Class irreparable harm. Seva can continue profitable operations after entry of the Order Plaintiffs are seeking, just as it does with post-2019 franchisees. Seva will suffer no harm as a result of being stopped from penalizing Plaintiffs and the proposed class. The law is clear and directly tied to the relief sought here. "Granting a preliminary injunction is used to prevent a threatened wrong or continuing injury and preserve the status quo with the least injury to the parties concerned." *Kalbfleisch v. Columbia Community Unit School District Unit No. 4*, 396 Ill. App. 3d 1105, 1113 (2009).

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

WHEREFORE, Plaintiffs, MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS on behalf of class members described herein, respectfully request that SEVA BEAUTY, LLC be preliminarily enjoined from: (1) Assessing any penalties against any franchisees for the failure to pay minimum weekly royalties; and (2) Terminating any franchise agreement with any franchisee for non-payment of rents or royalties; and this Court should further (3) Enjoin both Kari Comrov and Seva Beauty, LLC from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint; and (4) Void any release executed by a franchisee in consideration of Covid-19 relief; and for any additional relief that this Court deems necessary and appropriate under the circumstances.

Respectfully submitted,

**MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS,**
Plaintiffs

By: */s/Alexander N. Loftus*______
One of Their Attorneys

Alexander Loftus, Esq.
David Eisenberg, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
C: 312.772.5396
alex@loftusandeisenberg.com
david@loftusandeisenberg.com

Dated: August 3, 2020

Return Date: No return date scheduled
Hearing Date: 12/3/2020 10:00 AM - 10:00 AM
Courtroom Number: 2601
Location: District 1 Court
Cook County, IL

FILED
8/3/2020 1:39 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH05088

9973464

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS individually and on behalf of the class described below,

Plaintiffs,

v.

SEVA BEAUTY, LLC, and KARI COMROV,

Defendants.

Case No. 2020 CH 05088

**PLAINTIFFS' MOTION AND SUPPORTING MEMORANDUM FOR A PRELIMINARY INJUNCTION**

# EXHIBIT "A"

eturn Date: No return date scheduled
earing Date: 12/3/2020 10:00 AM - 10:00 AM
ourtroom Number: 2601
ocation: District 1 Court
Cook County, IL

FILED
7/23/2020 1:38 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

9865054

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS individually and on behalf of the class described below,

Plaintiffs,

v.

SEVA BEAUTY, LLC, and KARI COMROV,

Defendants.

Case No. 2020 CH 2020CH05088

JURY DEMANDED

**VERIFIED CLASS ACTION COMPLAINT**

Plaintiffs, MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS on behalf of class members described below, by and through their undersigned attorneys, LOFTUS & EISENBERG, LTD. and for their Complaint against Defendants, SEVA BEAUTY, LLC and KARI COMROV state as follows:

## I. INTRODUCTION

1. Defendant, Seva Beauty, LLC ("Seva"), is a franchisor of the failing "Seva Beauty" system of fast casual spas throughout the nation. Defendants present the "Seva Beauty" franchise as a no-lose investment opportunity for significant passive income when, in reality, the business model is a no-win, except for a select few experienced retailers who have no need for franchise support.

2. Defendants' sales pitch is in direct contravention of Illinois' Franchise Disclosure Act, 815 ILCS 705, *et seq.*; the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq.*; and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq* (collectively referred to herein as "Consumer Protection Laws")

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

3. Sadly, Seva's victims continue to incur franchise fees and the harms multiply each day as Defendants continue to profit on their lies through the pandemic.

4. Defendants engaged in a fraudulent scheme lying to franchisees to acquire over $12,000,000 from franchisees then hiding behind a byzantine and expensive structure of arbitration agreements and fraudulently induced take-it-or-leave-it releases with no consideration that are voidable as a matter of law.

5. Defendants settled a handful of fraud claims in arbitration for over $2,000,000 yet refuse to change their fraudulent conduct without a Court ordering them to stop.

6. Plaintiffs are current Seva franchisees and, on behalf of a class of similarly situated franchisees, seek (1) a declaration that Defendants are violating the Franchise Disclosure Act, 815 ILCS 705, *et seq*., the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq*., and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq*., and (2) an injunction prohibiting them from making future misrepresentations.

## II. PARTIES

7. Plaintiff, MAHESH SASHITAL ("Sashital"), is, and at all times relevant to this action, has been a citizen of the state of Texas.

8. Plaintiff, MARK FERGUSON ("Ferguson"), is, and at all times relevant to this action, has been a citizen of the state of Florida.

9. Plaintiff, MICHAEL SCOTT DAVIS ("Davis"), is, and at all times relevant to this action, has been a citizen of the state of Texas.

10. Defendant, SEVA BEAUTY, LLC ("Seva"), is an Illinois limited liability company with a principal place of business in Puerto Rico. At the time that Seva entered into the Franchise Agreements in question, Seva maintained a principal place of business in Highland Park, Illinois.

11. Defendant, KARI COMROV ("Comrov"), is an individual and citizen of Nevada and resident of Nevada.

## III. JURISDICTION AND VENUE

12. Pursuant to 735 ILCS 5/2-209, this Court has personal jurisdiction over all Defendants because Defendants committed the tortious acts complained of in Cook County, Illinois.

13. Venue in this county is proper pursuant to 735 ILCS 5/2-101, because the acts and omissions complained of occurred in this county. Defendants purposely availed themselves of jurisdiction in Cook County by selling franchises to Cook County residents, directing phone, email, and letter correspondence to potential franchisees in Cook County, meeting with potential franchisees in Cook County, and making oral misrepresentations to potential franchisees here.

14. Jurisdiction and venue are proper in this Court pursuant to section 11.07 of the Franchise Agreement.

15. Although the Franchise Agreement contains requirements in sections 10.01 and 10.02 that the parties submit their disputes to mediation and arbitration, respectively, section 10.03 exempts from those requirements "any action for declaratory or equitable relief, including, without limitation, seeking preliminary or permanent injunctive relief, specific performance, other relief in the nature of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder."

## IV. CLASS ALLEGATIONS

16. Plaintiffs state claims on behalf of a class of similarly situated franchisees seeking (1) a declaration that Defendants are violating the Franchise Disclosure Act, 815 ILCS 705, *et seq*., the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq*., and the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq*., and (2) an injunction prohibiting them from making future misrepresentations.

17. Plaintiffs bring this lawsuit as a class action on behalf of the classes of persons, defined as follows:

> All persons who purchased a Seva franchise from January 1, 2015 to December 31, 2019 who currently owe monthly royalties to Seva.
>
> Excluded from the proposed Class and subclasses are Defendants, their respective officers, directors, and employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiffs reserve the right to amend the Class definition as necessary.

18. The members of the putative classes are so numerous that joinder of all members is impracticable.

19. Questions of fact and law as to all putative class members predominate over any questions affecting any individual member of the putative class, including, but not limited to:

a. Whether Defendants are violating the Franchise Disclosure Act, 815 ILCS 705, *et seq*.;

b. Whether Defendants are violating the Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505, *et seq*.; and

c. Whether Defendants are violating the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq*.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

20. Plaintiffs' claims are typical of the claims of the Class because Defendants' violations of the consumer protection acts effected the Plaintiffs in the same way as the Class and the violations will continue if not enjoined.

21. Plaintiffs will fairly and adequately represent and protect the interests of the putative class. Plaintiffs have retained experienced class action counsel. The interests of Plaintiffs are coincident with and not antagonistic to the interests of the Class.

22. The questions of law and fact common to the members of the putative class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all putative class members is impracticable. Moreover, because the damages suffered by individual members of the putative class may be relatively small, the expense and burden of individual litigation makes it impossible for the members of the putative class to redress the wrongs done to them individually.

24. The putative class is readily definable and prosecution of the action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

## CHOICE OF LAW

25. Defendants have chosen and consented to the choice of Illinois law in their franchise agreement with each Class Member. The Agreement provides in pertinent part:

> You acknowledge that we have appointed and intend to appoint many franchisees on terms and conditions similar to those set forth in this Agreement and the Franchise Agreement. It mutually benefits those franchisees, you and us if the terms and conditions of these license agreements are uniformly interpreted. This Agreement is accepted in the State of Illinois and will be governed by the laws of such state which laws will prevail, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051, et seq.) and except in those states whose franchise laws require exclusive application of those

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

laws. This choice of laws will not include and does not extend outside of Illinois the scope of application of the Illinois franchise or business opportunity laws. Any portion of this Agreement that requires enforcement in any other state, and is enforceable under the laws of that state but not of Illinois, will be construed and enforced according to the laws of that state. All issues or disagreements relating to this Agreement will be tried, heard, and decided in the state and federal courts in Illinois, which you agree is the most convenient venue for these purposes. You acknowledge and agree that this location for venue is reasonable and the most beneficial to the needs of and best meets the interest of all of the members of the SEVA franchise system.

## V. FACTS COMMON TO ALL COUNTS

26. In connection with the sale of the Franchises to Plaintiffs and the Class, Seva intentionally omitted financial information from its Franchise Disclosure Document ("FDD") regarding the failures of the vast majority of Seva franchises and instead only provided limited financial information from a handful of its most profitable store locations.

### A. Seva Promoted False Examples of Successful Franchisees

27. Those stores that were successful were not compliant with Seva's rules or government employment regulations.

28. Seva instructed its franchisees not to talk to potential franchisees and only allowed select store owners, who, upon information and belief, were coached on what to say talk to potential franchisees, including Plaintiffs.

29. In 2018, seasoned Seva fanchisee, Rajsingh Gohil spoke with numerous prospective franchisees and told them the truth about Seva, explaining that no one should proceed unless they were already very experienced and had a staff of skilled threaders. Gohil told prospective franchisees that stores were going out of business and franchisees were losing significant amounts of money. Comrov learned Gohil was telling prospective franchisees the truth and told him to tell a different story. She then took him off the list of existing franchisees for prospects to speak with.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

30. Seva told existing franchisees that they shouldn't communicate with prospective franchisees and that only select franchisees would talk to prospective franchisees. Seva speciously claimed this was to limit the burden on franchisees dealing with inquiries, but in reality this was to conceal their ongoing fraudulent conduct.

31. The most profitable stores were operated in areas where there were many immigrants familiar with the techniques employed by Seva, so stores in Chicago had a ready pool of labor that did not exist elsewhere. Meanwhile, Plaintiffs were in locations without this large available labor force.

32. Seva knew this and still promised it was easy to find employees nationwide just like it's Chicago-area exemplars.

33. Seva knew the exemplar stores were uniquely suited to have adequate labor and the same would not be true nationwide. Despite this knowledge, Seva lied to Plaintiffs and the class during their Discovery Day visits to Chicago and promised they would be able to easily hire and train staff even in the rural south and mountain west.

34. The Chicago-area exemplars cited by Seva as representative of Plaintiffs' future business skirted employment regulations by having employees work "part-time" at multiple stores, thus creating artificial and illegal savings on labor costs not disclosed to Plaintiffs' who followed the law.

35. The exemplar franchisees would run three stores near each other and have one employee work 20 hours at each of the stores. Thus the employees would not be full time at any store, would not require benefits, and would not need to be paid overtime. Seva was aware of these fraudulent practices and nonetheless promised Plaintiffs and the class that they would have the same success while following the law.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

36. Seva relied on one exceptional franchisee, Moyees Merchant ("Merchant"), in particular as a false example of what individual franchisees could expect in order to support its fraudulent sales pitch.

37. Merchant had nearly 20 years' experience prior to joining Seva. Merchant owns over a dozen Seva franchisees as well as several competing franchisees providing the same services in Walmarts. Merchant employs a one of a kind training model not taught by Seva and not encouraged by Seva for its franchisees to employ.

38. Merchant charges potential employees $900 for threading training organized by his wife employing her own techniques, then the new "employees" or apprentices remain in the unpaid training program until an experienced threader confirms they are ready to work on their own after watching them perform the service on dozens of customers.

39. Merchant's training process takes up to three months. All the while Merchant is not paying the "employees". During the training period, the trainee works in the store for free under one-on-one supervision. Then when their ability is confirmed they are paid wages and work independently. Merchant's model yields a highly skilled work force that can grow the business organically based on their superior skill. He can also use this unique model to expand his employee base to people with no experience or training at no cost to him. Merchant's stores are all located in economically depressed areas where people will submit to working for free for weeks or months in the hopes of securing a position.

40. Seva is well aware of Merchant's training program and that it is the key to his success in the rural south. Seva fraudulently conceals that this level of employee training is necessary for a successful franchise. Certainly if franchisees were told they would need to convince people to pay the franchisee for months of full time training before earning a low-wage position

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

in order to succeed, hundreds of franchisees would not have paid the exceptional franchise fees. Merchant struck gold but Seva knows he is a complete outlier not to form the basis for their fraudulent misrepresentations.

41. Instead of the Merchant-model of months of training, Seva offered one hour of video instruction on threading.

42. Seva knows an hour of video instruction is insufficient to train someone in the art of eyebrow threading and nonetheless continues, until a court orders otherwise, to misrepresent that the franchises can be profitably operated with limited video training of employees.

43. Seva fraudulently omitted from the FDD that the stores had to open with at least one qualified threader.

44. Seva claimed that the employees could be trained in threading very easily. Threading is a very complex skill to develop and not everyone can get it. It takes three to six months for someone to develop the skill of how to hold the thread properly and pull the hairs out correctly. The skill to design the perfect eyebrows takes over another year to develop. Threaders work years to develop this skill. There is no way it can be taught in the time Seva promised the class it could be done.

**B. Misrepresentations of Profitability and Absentee Ownership**

45. Seva, through its principal and its employees, namely Comrov, made various representations to Plaintiffs about the profitability of Seva stores that induced Plaintiffs and the class to purchase the Franchises, including statements that the stores would break even or be profitable within a short period of time (1-3 months, 2-4 months, or 3-6 months) and that the class could easily earn at least $90,000 to $150,000 in profit per franchise in the franchise's second year of operations. Seva communicated this verbally throughout the sales process and in a brochure.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Seva knew few if any of their franchisees generated this sort of revenue and certainly not when they were paying someone to manage the stores and not training employees for months on end.

46. Seva's head of operations, Comrov, made the following representations during the Discovery Day in Chicago to potential franchisees while they were wined and dined as part of the final sales pitch:

A. "Each store will break even in the first six months and earning $100,000 + per store is easy";

B. "It's a turn-key business without needing any prior skill";

C. "It's very common for the owner to be an absentee owner";

D. "If you buy two franchises the third is practically free. All of our very successful store owners own three or more stores and that is formula for success"; and

E. "I think I'm on the wrong side of the business, I should be an owner of a store instead of being in operations. I would be making so much more if I were an owner instead."

47. These representations by Comrov are confirmed by at least a dozen Seva franchisees interviewed by counsel who heard the statements and reasonably relied on them.

48. Comrov made the same representations stated in paragraph 46 above at a meeting of the Seva President's Cabinet, a group of the largest franchisees, when that group was given a sales pitch on buying additional franchises in groups of three at a purported discount.

49. The statements in paragraph 46 are each false. In reality, few Seva franchisees make any profit at all, the stores can only be profitable if the owner serves as the manager without

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

additional compensation, and Comrov would not make more as an owner of these failing franchises than she did in operations at Seva.

50. Defendants knew these statements were false when made and failed to correct the misrepresentations.

51. Defendants continue to receive monthly royalties totaling over $30,000 from the class who was fraudulently induced into agreeing to pay the royalties.

**C. Misrepresentations Regarding Walmart**

52. Seva franchises primarily operate inside Walmart stores and rely on foot traffic from Walmart customers.

53. The only value Seva provided relative to its competing franchisors was that it had a relationship with Walmart.

54. All of Plaintiffs' franchises were located within Walmart stores and Seva, through Comrov, Vas Maniatis, made numerous representations to Plaintiffs and the class about a continued relationship with Walmart and that the relationship was solid. Meanwhile, the relationship was actually falling apart and Walmart was refusing to renew leases.

55. The reality is that at the same time Comrov and Seva's employees were saying everything was fine with Walmart it was refusing to enter into new agreements with Seva.

56. In or about 2018, Walmart cut ties with Seva. Walmart refused to enter into new leases, refused to extend existing leases, and terminated their leases with some class members leaving them in the lurch.

57. Seva never disclosed any of their agreements with Walmart to the class despite repeated requests.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

58. Seva misrepresented that Plaintiffs and Class Members could open the franchises in any Walmart location and that operation in any Walmart store would be profitable. Seva provided each Plaintiff a list of potential locations when they were sold on the franchise.

59. Seva knew these locations were not all available but would only commit to a location after Class Members paid their fees. Once Plaintiffs and the Class paid their fees the only locations left were far from their homes and far less profitable than what was promised.

60. After Plaintiffs and the Class purchased the franchises, Seva forced them to select a particular Walmart that was not in a profitable location and placed significant requirements and restrictions on Class Members in selecting a location. These requirements, restrictions, and prohibitions were not disclosed in Seva's FDD, and Seva did not disclose the effect of those requirements and restrictions on the class.

61. Seva fraudulently represented that the franchise agreement and the Walmart leases would be coterminous and fraudulently concealed their master lease with Walmart. But in reality Walmart terminated the leases prior to the end the of the franchise agreements.

62. Seva fraudulently represented that they were not taking a profit on the subleases with class members. The reality was that Seva was making money on the sublease arrangement and concealed their master lease with Walmart from Class Members.

63. Seva's business model is based primarily on handing out discount coupons to Walmart customers and Seva falsely promised that leafletting the store would ensure profitability.

64. After purchasing the Franchises, Plaintiffs and the Class discovered that Walmart store rules impose significant restrictions on approaching Walmart customers or advertising within Walmart or directly outside Walmart. Seva knew this and fraudulently concealed this fact. These restrictions and prohibitions were not disclosed in Seva's FDD, and Seva did not disclose the effect

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

the restrictions and prohibitions would have on the franchises. Seva did not disclose that the policy for leafletting varied from Walmart to Walmart.

65. Seva misrepresented to Class Members that no other business near the franchises would be allowed to perform facial threading. After purchasing the franchises, Plaintiffs learned that other businesses within the same Walmart were also performing facial threading, which diverted business away from Plaintiffs' and Class Members' franchises.

66. One Class Member was told by Comrov that his store would be the only one in the Walmart offering eyebrow waxing and eyelash extensions but, instead, there was one store doing eyelash extensions and two doing eyebrow waxing in the same Walmart Supercenter.

67. Seva fraudulently advertised online on Entrepreneur.com that Seva provided national media advertising, email marketing, and a loyalty program/app.

68. None of this is or ever was true. Seva did not offer national media advertising, email marketing, or a loyalty program/app. Seva fraudulently communicated these statements to induce people to buy a franchise.

69. Seva repeatedly represented that the Franchises could be "manager-managed" so that Plaintiffs would not be required to work in the store personally. However, after Class Members paid the fees, Seva staff including Comrov, insisted that franchise owners needed to spend at least 40 hours per week at the store in order to be successful.

70. Seva knows that under its franchise model the franchises cannot be financially profitable as a manager-managed model. Seva failed to disclose this information and its effect on the Class Members in its FDD and instead absentee ownership was the key to its sales pitch.

71. Many franchisees with absentee owners failed. They were later purchased by other franchisees with experience prior to Seva and their own operations system, such as Merchant.

72. Ultimately, the only thing of value Seva was selling was a ticket into Walmart, which Defendants lost years ago.

73. Seva speciously attempts to avoid liability for its fraudulent conduct by demanding franchisees sign releases for no consideration whenever there is the slightest change in operations of the franchise and threaten termination if a release is not signed. Seva never disclosed its fraudulent conduct prior to soliciting a subsequent release.

74. Any purported release of the fraudulent conduct will not prevent this Court from enjoining continuing violations or payments owed pursuant to the same conduct. *See Shanahan v. Schindler*, 63 Ill. App. 3d 82, 94 (1st Dist. 1978).

**D. Continuing Harms Suffered by the Class**

75. Were it not for Seva's misrepresentations, the Plaintiffs and the Class would not have an ongoing obligation to pay royalties to Seva.

76. Seva continues to charge royalties even when Class Members' stores are closed by government orders following Covid-19.

77. Seva would only allow a discounted royalty for franchisees shut down by government orders during the pandemic if Class Members signed an unconscionable general release.

78. Defendants will continue to profit from their fraudulent conduct if not enjoined.

**E. Individual Class Members Experiences**

79. On February 15, 2016, Ferguson entered into a franchise agreement with Seva.

80. On or about February 15, 2016, Ferguson visited Chicago where he heard Comrov's misrepresentations detailed in paragraph 46 and entered into a franchise agreement with Seva in Illinois.

FILED DATE: 8/3/2020 1:39 PM   2020CH05088

81.     Ferguson opened his franchise in a Walmart Supercenter in Bradenton, Florida, which has been a complete failure.

82.     Ferguson's franchise lost $57,146.18 in 2016, lost $36,691.94 in 2017, $13,000 in 2018,  and only turned a profit of $3,387.84 in 2019.

83.     In 2020, when the COVID-19 pandemic hit, Ferguson could not safely remain open and was prohibited by government orders to remain closed for two months. Nevertheless Seva continued to charge him rent and royalties despite not being able to operate that, as discussed herein, he was fraudulently induced into paying.

84.     On July 17, 2020, Seva sent Ferguson a notice of termination threatening that if he did not immediately pay what was purportedly owed, his store would be shut down and he would be assessed additional penalties in excess of $40,000.

85.     Ferguson risks irreparable injury if Seva is not enjoined from seeking payments and penalties based on its fraudulent conduct.

86.     At no time did Seva disclose the truth of its fraudulent representations to Ferguson. Ferguson first became aware of the fraudulent misrepresentations in 2019 when Seva settled eight individual claims alleging similar fraudulent representations by Seva for over $2,000,000.

87.     On March 4, 2016, Sashital entered into a franchise agreement with Seva.

88.     On or about March 3, 2016, Sashital traveled to Chicago where he heard Comrov's fraudulent statements detailed in paragraph 46 above and executed the franchise agreement in Chicago based on these statements.

89.     Sashital opened his franchise in a Walmart Supercenter in Richmond, Texas, which has been a complete failure.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

90. Sashital's franchise lost $48,830.00 in 2016, lost $53,143.00 in 2017, and lost $133,794.00 in 2018.

91. At no time did Seva disclose the truth of its fraudulent representations to Sashital. Sashital first became aware of the truth of Seva's fraudulent misrepresentations until 2019 when Seva settled eight individual claims alleging similar fraudulent representations by Seva for over $2,000,000.

92. Despite being fraudulently induced to purchase the franchise, Sashital continues to timely pay all amounts Seva claims it is owed.

93. On March 4, 2016, Davis entered into a franchise agreement with Seva.

94. On or about March 3, 2016, Davis traveled to Chicago where he heard Comrov's fraudulent statements along with Sashital, detailed in paragraph 46 above and executed the franchise agreement in Chicago based on these statements.

95. Davis opened his franchise in a Walmart Supercenter in Cypress, Texas, which has been a complete failure.

96. Davis's franchise lost $62,499.00 in 2016, lost $61,788 in 2017, and lost $20,717 in 2018.

97. At no time did Seva disclose the truth of its fraudulent representations to Davis. Davis first became aware of the truth of Seva's fraudulent misrepresentations in 2019 when Seva settled eight individual claims alleging similar fraudulent representations by Seva for over $2,000,000.

98. Despite being fraudulently induced to purchase the franchise, Davis continues to timely pay all amounts Seva claims it is owed.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## VI. CLAIMS

### FIRST CAUSE OF ACTION
### Illinois Uniform Deceptive Trade Practices Act
### (815CS 510/1 *et. seq.*)

99. Plaintiffs, individually and on behalf of the class, restate and reallege paragraphs 1 through 98, as though fully set forth herein as paragraph 99.

100. Plaintiffs, the Class Members, and Defendants are "persons" under the UDTPA, 815 ILCS 510/1(5), which defines a "person" as "an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity."

101. Under the UDTPA, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, that person:

a. "represents that products or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have." 815 ILCS 510/2(5).

b. "represents that products or services are of particular standard, quality, or grade or that products are of a particular style or model, if they are of another." 815 ILCS 510/2(7).

c. "advertises products or services with intent not to sell them as advertised." 815 ILCS 510/2(9)

d. "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2(12).

FILED DATE: 8/3/2020 1:39 PM   2020CH05088

102.     Through the means described herein above, Defendants have represented, expressly or by implication, in their advertising and promotional material conducted within the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United States, and Plaintiffs and the Class Members that: (a) the franchises were profitable; (b) the franchises could be operated profitably without the owner participating in day to day operations; (c) Seva provided adequate training and support for threaders; and (d) Seva had a business relationship with Walmart that enabled extensions of franchise agreements and on site marketing.

103.     Each representation set forth above is false, misleading, and/or confusing and was not substantiated at the time the representation was made. Therefore, the making of each representation as set forth above constitutes a deceptive act or practice, in violation of the UDTPA.

104.     Defendants intended that Plaintiffs and the Class Members rely on their deceptive practices in an attempt to induce them to purchase franchises from Seva.

105.     Defendants' deception occurred during the marketing and sale of the franchises and related services in the course of Defendants' business.

106.     Defendants have a duty arising from their superior knowledge of their true profitability and mechanics of operating a franchise and its partial representations, omissions, and/or misrepresentations to the contrary, to disclose at the point of sale and/or otherwise that the claims of profitability and ease of ownership were false.

107.     Defendants willfully and intentionally failed to disclose one or more important and material facts that were only known to them and that Plaintiffs and the Class Members could not have discovered; and/or Defendants actively concealed one or more important and material facts from Plaintiffs and the Class Members and/or prevented them from discovering such fact or facts.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

108. Defendants failed to disclose and concealed the true facts that the claims of profitability and ease of ownership were false. These omissions would be material to a reasonable consumer. Reasonable consumers are likely to be deceived and confused by Defendants' material misrepresentations and omissions.

109. Plaintiffs and Class Members suffered injury-in-fact, including the loss of money, as a result of Defendants' unlawful, unfair, and/or deceptive practices. Plaintiff and Class Members were directly and proximately injured by Defendants' conduct and lost money and incurred debt as a result of Defendants' wrongful conduct, misrepresentations, and material omissions because they would not have purchased or would not have paid as much for a Seva franchise and products had they known the truth. Consumers are likely to be damaged by Defendants' continuing deceptive trade practices.

110. Plaintiffs and Class Members are at a heightened and imminent risk of being financially unable to pay or default on loans and continue to incur charges and penalties from Defendants resulting from Defendants' wrongful and unlawful conduct.

111. Plaintiffs and the Class are suffering actual and imminent harm that is concrete and ongoing with each passing day. An actual dispute between Plaintiff and the other Class Members and Defendants exists, and the parties have genuine, direct, and substantial opposing interests for which a judicial determination will be final and conclusive.

112. Plaintiffs request that the Court: (a) enter an order declaring Defendants' conduct to be a false, misleading, and/or confusing and a willful violation of the UDTPA and applicable state laws; (b) enter an order declaring Defendants engaged in deceptive trade practices in violation of 815 ILCS 510(5), (7), (9), and (12) by, inter alia, misrepresenting the quality, characteristics, uses, and benefits of the franchises, and actively concealing, and causing others to conceal,

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

material information about the true nature of the franchises sold by Defendants; and (c) enter such other orders or judgments as may be necessary to enjoin Defendants from continuing their unfair and deceptive business practices, and to provide such other relief as set forth below and remedy the injury-in-fact resulting from Defendants unlawful conduct.

113. Plaintiffs are entitled to an award of reasonable attorneys' fees and costs under 815 ILCS 510/3 by any declaratory, injunctive, or other relief entered herein.

**SECOND CAUSE OF ACTION**
**Illinois Consumer Fraud And Deceptive Trade Practices Act**
**(815 ILCS 505, *et. seq*.)**

114. Plaintiffs, individually and on behalf of the class, restate and reallege paragraphs 1 through 99, as though fully set forth herein as paragraph 114.

115. The ICFA, 815 ILCS 505, *et. seq.* provides that Defendants may not employ "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2.

116. Through the means described herein above, Defendants have represented, expressly or by implication, in their advertising and promotional material conducted within the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United States, and Plaintiffs and the Class Members that: (a) the franchises were profitable; (b) the franchises could be operated profitably without the owner participating in day to day operations; (c) Seva provided adequate training and support for threaders; and (d) Seva had a business relationship with Walmart that enabled extensions of franchise agreements and on site marketing.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

117. Defendants intended that Plaintiffs and the Class Members rely on their deceptive practices and induced them to purchase a franchise and related services. Defendants' deception occurred during the marketing and sale of Defendants' business and related services in the course of trade and commerce in the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United States. As a result of Defendants' violations of the ICFA as described herein, Plaintiffs and the Class Members have been harmed and suffered actual damages and injury-in-fact caused by Defendants' deception.

118. Plaintiffs and Class Members are entitled to, and hereby seek, reasonable attorneys' fees and costs, injunctive relief, and any and all further equitable relief that this Court deems appropriate.

**THIRD CAUSE OF ACTION**
**Illinois Franchise Disclosure Act**
**(815 ILCS 705, *et. seq*.)**

119. Plaintiffs, individually and on behalf of the class, restate and reallege paragraphs 1 through 99, as though fully set forth herein as paragraph 119.

120. The IFDA, 815 ILCS 705, *et. seq*. provides that Defendants may not "(a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 815 ILCS 705/6.

121. Through the means described herein above, Defendants have represented, expressly or by implication, in their advertising and promotional material conducted within the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

States, and Plaintiff and the Class Members that: (a) the franchises were profitable; (b) the franchises could be operated profitably without the owner participating in day to day operations; (c) Seva provided adequate training and support for threaders; and (d) Seva had a business relationship with Walmart that enabled extensions of franchise agreements and on site marketing.

122. Defendants intended that Plaintiffs and the Class Members rely on their deceptive practices and induced them to purchase a franchise and related services. Defendants' deception occurred during the marketing and sale of Defendants' business and related services in the course of trade and commerce in the state of Illinois, and directed at its citizens, as well as other persons within Illinois and around the United States. As a result of Defendants' violations of the IFDA as described herein, Plaintiffs and the Class Members have been harmed and suffered actual damages and injury-in-fact caused by Defendants' deception.

123. Plaintiffs and Class Members are entitled to, and hereby seek, reasonable attorneys' fees and costs, injunctive relief, and any and all further equitable relief that this Court deems appropriate.

**FOURTH CAUSE OF ACTION**
**(Declaratory Relief)**

124. Plaintiffs, individually and on behalf of the class, incorporate by reference the foregoing allegations as if fully set forth herein.

125. A court may make binding declarations of the construction of any statutes, and a declaration of the rights of the parties interested by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well. 735 ILCS 5/2-701.

126. Plaintiffs and the Class Members are at a heightened and imminent risk of being financially unable to repay, and in default of, royalties and interest on loans taken to finance their

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

franchise purchase resulting from Defendants' wrongful and unlawful conduct. Royalty fees and interest on loans continue to accrue every day, whether such loans are in forbearance or default or not. Meanwhile Seva continues to charge fees and penalties based on their fraudulently induced agreements.

127. Plaintiffs and the Class Members are suffering actual and imminent harm that is concrete and ongoing with each passing day of interest and royalties. An actual controversy and dispute between Plaintiffs and the other Class Members and Defendants exists, and the parties have genuine, direct, and substantial opposing interests for which a judicial determination will be final and conclusive.

128. Plaintiffs and the Class are therefore entitled to a declaratory judgment that Defendants' acts and omissions as alleged herein violates applicable State law, including without limitation the UDTPA, ICFA, IFDA, as well as such other and further relief as may follow from the entry of such a judgment.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action as set forth in 735 ILCS 5/2-801, and certifying the proposed Class as defined herein;

B. Designating Plaintiffs as representative of the proposed Class, and Alexander N. Loftus, Esq. as Lead Counsel;

C. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

FILED DATE: 8/3/2020 1:39 PM   2020CH05088

D. An order temporarily and permanently enjoining Defendants from collecting any royalties or assessing penalties for non-payment of royalties from the Class;

E. A declaration that the acts, omissions, and practices described in this claim exist, are unfair, deceptive, unlawful, and a violation of applicable State law;

F. A declaration that the Franchise Agreement is an illegal contract and is void ab initio;

G. An order enjoining Defendants from engaging in further unfair and deceptive advertising, promotion, distribution and sales practices with respect to the franchises;

H. A permanent injunction prohibiting Defendants and their officers, agents, employees and successors, from engaging in the unlawful practices complained of herein in violation of applicable state law;

I. A mandatory injunction requiring Defendants to adopt business practices in conformity with the requirements of applicable laws;

J. An order requiring Defendants to notify Plaintiffs and members of the Class that the following statements are false and untrue: (a) the franchises were profitable; (b) the franchises could be operated profitably without the owner participating in day to day operations; (c) Seva provides adequate training and support for threading; and (d) Seva had a business relationship with Walmart that enabled extensions of franchise agreements and on site marketing;

K. An award of costs and attorneys' fees; and

L. Such other or further relief as may be appropriate.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

**MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS,**
Plaintiffs

By: /s/*Alexander N. Loftus*______
One of Their Attorneys

Alexander Loftus, Esq.
David Eisenberg, Esq.
Jeffrey Dorman, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
C: 312.772.5396
alex@loftusandeisenberg.com
david@loftusandeisenberg.com

Dated: July 23, 2020

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**VERIFICATION BY CERTIFICATION**

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in this VERIFIED COMPLAINT are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies that he verily believes the same to be true.

____*/s/Mark Ferguson*_____

____*/s/Mahesh Sashital*_____

____*/s/Michael Scott Davis*____

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS individually and on behalf of the class described below,

Plaintiffs,

v.

SEVA BEAUTY, LLC, and KARI COMROV,

Defendants.

Case No. 2020 CH 05088

**PLAINTIFFS' MOTION AND SUPPORTING MEMORANDUM FOR A PRELIMINARY INJUNCTION**

# EXHIBIT "B"

Case 2:17-cv-00547-TSZ Document 1 Filed 04/10/17 Page 1 of 17

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANNA A. DAVIS, a Washington resident; CHRISTIANA GRACE, LLC, a Washington limited liability company; PUNARDEEP SANDHU, a Washington resident; AMARJEET RANDHAWA, a Washington resident; PR SPAS & SALONS LLC, a Washington limited liability company; RYAN HOLLIS, a Washington resident; JASON BLEICK and KAREN BLEICK, Washington residents; BEAUTY IN SPOKANE, LLC, a Washington limited liability company; GREG KELLY and ROBIN KELLY, Michigan residents; AVATAR2026 HOLDINGS, INC., a Michigan corporation; THOMAS CUTHBERT, a Minnesota resident; LAURA CHARBONEAU, a Minnesota resident; MIDWEST BEAUTY, INC., a Minnesota corporation; ON CALL ENTERPRISES, INC., a Georgia corporation; and MIVAS, LLC, an Idaho limited liability company,

Plaintiffs,

v.

SEVA BEAUTY, LLC, an Illinois limited liability company; VASILIOS MANIATIS, an Illinois resident; SONAL MANIATIS, an Illinois resident; KARI COMROV, an Illinois resident; BREE VISCIA, an Illinois resident; and JONATHAN KITTNER, an Illinois resident,

Defendants.

Case No.

**COMPLAINT FOR RESCISSION AND DAMAGES**

JURY TRIAL DEMANDED

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Plaintiffs allege as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs purchased multiple franchises (the "Franchises") from Defendant Seva Beauty, LLC ("Seva").

2. Plaintiff Anna A. Davis ("Davis") is an individual residing in King County, Washington. Davis purchased three franchises from Seva on or about August 20, 2015.

3. Plaintiff Christiana Grace, LLC ("Christiana Grace") is a Washington limited liability company operating in Skagit County, Washington. Davis is the sole member of Christiana Grace. Davis assigned all rights and delegated all duties related to her Seva franchise to Christiana Grace on or about April 27, 2016, with Seva's consent.

4. Plaintiffs Punardeep Sandhu ("Sandhu") and Amarjeet Randhawa ("Randhawa") are individuals residing in Kitsap County, Washington. Sandhu and Randhawa jointly purchased three franchises from Seva around August 2013.

5. Plaintiff PR Spas & Salons, LLC ("PR Spas") is a Washington limited liability company operating in Kitsap County, Washington. Sandhu and Randhawa are the sole members of PR Spas. Sandhu and Randhawa assigned all rights and delegated all duties related to their Seva franchises to PR Spas, with Seva's consent.

6. Plaintiff Ryan Hollis ("Hollis") is an individual residing in King County, Washington. Hollis purchased three franchises from Seva on or about July 8, 2016.

7. Plaintiffs Jason Bleick and Karen Bleick (collectively, the "Bleicks") are individuals residing in Spokane County, Washington. The Bleicks jointly purchased a franchise from Seva on or about March 25, 2016.

8. Plaintiff Beauty in Spokane, LLC ("Beauty in Spokane") is a Washington limited liability company operating in Spokane County, Washington. The Bleicks are the sole members of Beauty in Spokane. The Bleicks assigned all rights and delegated all duties related to their Seva franchises to Beauty in Spokane, with Seva's consent.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

9. Plaintiffs Greg and Robin Kelly (collectively, the "Kellys") are individuals residing in Macomb County, Michigan.

10. Plaintiff Avatar2026 Holdings, Inc. ("Avatar2026") is a Michigan corporation with its principal place of business in Macomb County, Michigan. The Kellys are the sole shareholders of Avatar2026. The Kellys and Avatar2026 purchased several Seva franchises on or about January 15, 2016.

11. Plaintiffs Thomas Cuthbert ("Cuthbert") and Laura Charboneau ("Charboneau") are individuals residing in Ramsey County, Minnesota. Cuthbert and Charboneau jointly purchased three Seva franchises on or about March 25, 2016.

12. Plaintiff Midwest Beauty, Inc. ("Midwest Beauty") is a Minnesota corporation with its principal place of business in Ramsey County, Minnesota. Cuthbert and Charboneau are the sole shareholders of Midwest Beauty. Cuthbert and Charboneau assigned all rights and delegated all duties related to their franchises to Midwest Beauty, with Seva's consent.

13. Plaintiff On Call Enterprises, Inc. ("On Call Enterprises") is a Georgia corporation with its principal place of business in Gwinnett County, Georgia. Susan Call and Michael Call are the sole shareholders of On Call Enterprises. The Calls reside in Gwinnett County, Georgia. On Call Enterprises purchased three franchises from Seva on or about April 15, 2016.

14. Plaintiff Mivas, LLC ("Mivas") is an Idaho limited liability company operating in Ada County, Idaho. Travis Hawkes ("Hawkes") and Michael D. Payne ("Payne") are the sole shareholders of Mivas. Hawkes and Payne reside in Ada County, Idaho. Mivas purchased three franchises from Seva on or about March 26, 2016.

15. Defendant Seva is an Illinois limited liability company with its principal place of business in Lake County, Illinois. Seva sold the Franchises to Plaintiffs.

16. Defendants Vasilios Maniatis and Sonal Maniatis (collectively, the "Maniatises") are individuals residing in Lake County, Illinois. The Maniatises are the sole

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

members of Seva and directly or indirectly participated in or controlled Seva's unlawful actions described herein.

17. Defendant Kari Comrov ("Comrov") is an individual residing in Cook County, Illinois. Comrov is Seva's Chief of Staff and directly or indirectly participated in or controlled Seva's unlawful actions described herein.

18. Defendant Bree Viscia ("Viscia") is an individual residing in Cook County, Illinois. Viscia is Seva's Senior Director of Operations or Director of Spa Operations, and Viscia directly or indirectly participated in or controlled Seva's unlawful actions described herein.

19. Defendant Jonathan Kittner ("Kittner") is an individual residing in DuPage County, Illinois. Kittner was Seva's Director of Operations in 2015-16, and he directly or indirectly participated in or controlled many of Seva's unlawful actions described herein.

20. Diversity jurisdiction is proper pursuant to 28 U.S.C. §§ 1332 and 1441. Plaintiffs are residents of Washington, Michigan, Minnesota, Georgia, and Idaho. Defendants are citizens of Illinois. The amount in controversy exceeds $75,000.

21. Venue is proper in the U.S. District Court for the Western District of Washington pursuant to 28 U.S.C. § 1391. Plaintiffs' claims in this litigation arise out of Defendants' actions relating to sales of the Franchises to Plaintiffs, including sales of franchises to the majority of Plaintiffs residing and operating Franchises in the area encompassed by the U.S. District Court for the Western District of Washington.

## II. FACTUAL BACKGROUND

22. Seva sells "fast-casual spa" franchises that provide brow-shaping, facial "threading," lash extensions, facial treatments, and various forms of skincare and similar treatments.

23. Seva franchises primarily operate inside Walmart stores and rely on foot traffic from Walmart customers.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Case 2:17-cv-00547-TSZ Document 1 Filed 04/10/17 Page 5 of 17

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

24. In connection with the sale of the Franchises to Plaintiffs, Seva intentionally omitted financial information from its Financial Disclosure Document ("FDD") regarding a significant number of Seva franchises. Instead, Seva only provided limited financial information from a handful of its most profitable store locations. In addition, the circumstances and business practices at Seva's most profitable store locations were materially different than the circumstances and business practices encouraged by Seva in a typical Seva franchise and/or required by law. As a result, the financial information provided in Seva's FDD was misleading because it failed to provide a complete picture of what Plaintiffs should have expected when purchasing a Seva franchise.

25. Seva made various representations to Plaintiffs about the profitability of Seva stores that induced Plaintiffs to purchase the Franchises, including statements that the stores would break even or be profitable within a short period of time (1-3 months, 2-4 months, or 3-6 months, depending on the Plaintiff) and that Plaintiffs could easily earn at least $90,000 to $150,000 in profit per Franchise in the Franchises' second year of operations. After purchasing the Franchises, Plaintiffs learned that Seva franchises need at least 12 months to break even (if the franchises ever break even at all), and that even "successful" Seva franchises only make $36,000 of profit after three years of operations.

26. Seva has refused to allow Plaintiffs to increase the prices that Plaintiffs could charge customers, but Seva failed to disclose this prohibition and its effect on the Franchises in its FDD.

27. Seva refused to allow Plaintiffs to open their Seva Franchise stores without employing at least 4-5 licensed estheticians. Seva failed to disclose this requirement and its effect on the Franchises in its FDD.

28. Seva refused to allow Plaintiffs to change their business practices in any material way without signing a release of all claims against Seva. Seva failed to disclose this requirement and its effect on the Franchises in its FDD.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Case 2:17-cv-00547-TSZ Document 1 Filed 04/10/17 Page 6 of 17

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

29. Seva repeatedly represented that the Franchises could be "manager-managed" so that Plaintiffs would not be required to work in the store personally. However, after Plaintiffs purchased the Franchises, Seva staff insisted that Franchise owners needed to spend at least 40 hours per week at the store in order to be successful. Under Seva's franchise model, the Franchises cannot be financially profitable as a manager-managed model. Seva failed to disclose this information and its effect on the Franchises in its FDD.

30. Seva misrepresented that Plaintiffs could open the Franchises in any Walmart location and that operation in any Walmart store would be profitable. After Plaintiffs purchased the Franchises, Seva either forced Plaintiffs to select a particular Walmart that was not in a profitable location and/or placed significant requirements and restrictions on Plaintiffs in selecting a location. For some Plaintiffs, for instance, Seva prohibited opening a franchise more than 25 miles away from the owner's residence, and Seva limited Plaintiffs to opening a store smaller than 475 square feet with no spa rooms. These requirements, restrictions, and prohibitions were not disclosed in Seva's FDD, and Seva did not disclose the effect of those requirements and restrictions on the Franchises. In addition, Seva failed to provide material information about the Walmart stores where the Franchises would operate and failed to provide material information about Seva's business relationship with Walmart, as well as the effect on the Franchises of that omitted material information.

31. Seva's business model is based primarily on handing out discount coupons to Walmart customers. After purchasing the Franchises, Plaintiffs discovered that Walmart store rules impose significant restrictions on approaching Walmart customers or advertising within Walmart or directly outside Walmart. These restrictions and prohibitions were not disclosed in Seva's FDD, and Seva did not disclose the effect the restrictions and prohibitions would have on the Franchises.

32. Seva has required Plaintiffs to make certain minimum product purchases beyond the products required to operate the Franchises, and then Seva has suddenly switched to inferior

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

product lines without notice. These actions were not disclosed in Seva's FDD, and Seva did not disclose the effect that such actions would have on the Franchises.

33. Seva has unilaterally changed its rent structure to the disadvantage of Plaintiffs. Such a unilateral change was not disclosed in Seva's FDD, and Seva did not disclose the effect such a change would have on the Franchises.

34. Seva misrepresented that it would adequately train and support Plaintiffs. Seva has not provided adequate training and support to Plaintiffs in operating the Franchises. For instance, Seva's "support" often features inexperienced and unlicensed Seva representatives—who have never owned or operated a Seva franchise—calling in to Plaintiffs' stores via remote video call, interrupting Plaintiffs' services, and providing a critique of the Franchises' operations. Seva's planned conduct was not disclosed in Seva's FDD, and Seva did not disclose the effect that Seva's conduct would have on the Franchises.

35. Seva represented to some Plaintiffs that no other business near the Franchises would be allowed to perform facial threading. After purchasing the Franchises, those Plaintiffs learned that other businesses within the same Walmart were also performing facial threading, which diverted business away from the Franchises.

36. After some Plaintiffs purchased the Franchises, Seva allowed other franchises to open stores within a few miles of the location of the Franchises. This close proximity has diverted business away from the Franchises.

37. Seva represented that Plaintiffs did not need any experience in the spa industry to own a Seva franchise and that experienced employees working as skilled facial "threaders" were easy to find and train within a short period of time. Seva further represented that if Plaintiffs could not hire experienced "threaders," then Seva could easily train non-threaders in 10 days remotely via video. Yet Plaintiffs later learned that threaders are in high demand and are very difficult to find, and significant training and experience are required—including years of training to achieve a sufficient skill level to perform threading services on clients. Some states even require licenses for threaders. In addition, threaders generally are not trained in

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

other Seva practice areas, and threading is not taught in most beauty schools. As a result, at best, Plaintiffs have been forced to over-staff the Franchises in order to provide sufficient services to clients. The actual situation was not disclosed in Seva's FDD, and Seva did not disclose the effect the actual situation would have on the Franchises.

38. Seva represented that it would provide complete construction management, contractor bidding, detailed design, space planning, and other project support for Seva's "Spa-In-A-Box" program. Yet after at least one Plaintiff purchased a Franchise, Seva failed to provide the level of support that Seva represented it would provide. The actual situation was not disclosed in Seva's FDD, and Seva did not disclose the effect the actual situation would have on the Franchises.

39. Seva required Plaintiffs to sign waivers and releases of all claims against Seva in order to make any changes to operation of the Franchises. Seva's conduct and requirements were not disclosed in Seva's FDD, and Seva did not disclose the effect Seva's conduct and requirements would have on the Franchises. Further, such demands for waivers and releases are unfair and deceptive conduct, and prohibited by applicable franchise laws.

40. The Maniatises, Comrov, Viscia, and Kittner directly or indirectly participated in or controlled Seva's actions described herein, whether individually or by controlling the activities of Seva.

41. As a result of the foregoing actions, Plaintiffs have suffered significant financial losses in excess of $2,568,449.27. Specifically:

a. Defendants caused Davis and Christiana Grace to incur at least $540,431 in financial losses to invest in the Franchises, including: (i) $94,540 in franchise fees, entrance fees, and rent security deposit; (ii) $247,961 in net operating losses; (iii) $72,930 in construction costs; and (iv) $125,000 in lost wages due to forgoing other employment in order to manage the Franchise.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

b. Defendants caused Sandhu, Randhawa, and PR Spas to incur at least $365,000 in financial losses to invest in the Franchises, including: (i) $40,000 in franchise fees, entrance fees, and rent security deposit; (ii) $255,000 in net operating losses; and (iii) $70,000 in construction costs.

c. Defendants caused Hollis to incur at least $79,872.16 in financial losses to invest in the Franchises, including: (i) $78,000 in franchise fees; and (ii) $1,872.16 in travel expenses to meet with Seva and purchase the Franchises.

d. Defendants caused the Bleicks and Beauty in Spokane to incur at least $251,392 in financial losses to invest in the Franchises, including: (i) $59,000 in franchise fees, entrance fees, and rent security deposit; and (ii) $192,392 in net operating losses and construction costs, including loan fees and interest.

e. Defendants caused the Kellys and Avatar2026 to incur at least $237,064 in financial losses to invest in the Franchises, including: (i) $77,690 in franchise fees, entrance fees, and rent security deposit; and (ii) $159,374 in net operating losses and construction costs, including loan fees and interest.

f. Defendants caused Cuthbert, Charboneau, and Midwest Beauty to incur at least $421,200 in financial losses to invest in the Franchises, including: (i) $98,000 in franchise fees, entrance fees, and rent security deposit; (ii) $92,000 in net operational losses; (iii) $79,000 in construction costs; (iv) $140,000 in lost wages due to forgoing other employment in order to manage the Franchises; and (v) $12,200 in loan origination fees and other financial expenses to finance the purchase of the Franchises.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

g. Defendants caused On Call Enterprises to incur at least $458,559.91 in financial losses to invest in the Franchises, including: (i) $128,000 in franchise fees, entrance fees, and rent security deposit; (ii) $243,892.91 in net operating losses and construction costs, including loan fees and interest; and (iii) $86,667 in lost wages due to forgoing other employment in order to manage the Franchises.

h. Defendants caused Mivas to incur at least $214,930.20 in financial losses to invest in the Franchises, including: (i) $138,000 in franchise fees, entrance fees, and rent security deposit; (ii) $49,552.42 in net operating losses; and (iii) $27,377.78 in construction costs.

42. On March 21, 2017, Plaintiffs demanded rescission of their Franchises from Seva and return of all financial losses. Seva did not grant Plaintiffs their requested relief. Accordingly, Plaintiffs filed this lawsuit.

## III. RESCISSION AND DAMAGES FOR VIOLATIONS OF FRANCHISE ACTS

### A. Washington Franchise Act Violations.

43. Plaintiffs reallege the allegations set forth in paragraphs 1-42 above and incorporate those allegations herein.

44. The Franchises purchased by or assigned to Davis, Christiana Grace, Sandhu, Randhawa, PR Spas, Hollis, the Bleicks, and Beauty in Spokane (collectively, the "Washington Plaintiffs") are "franchises" governed by the Washington Franchise Investment Protection Act (the "Washington Franchise Act"), RCW 19.100.010 *et seq*.

45. The Washington Franchise Act provides that it is unlawful in connection with the offer, sale, or purchase of a franchise directly or indirectly to: (i) make any untrue statement of material fact; (ii) sell or offer to sell a franchise by means of an untrue statement of a material fact, or by omitting any material fact that would make the statements not misleading; (iii) employ any device, scheme, or artifice to defraud; or (iv) engage in any act, practice, or course of business to operate as a fraud or deceit upon the purchaser. RCW 19.100.170(1)-(4).

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

46. The Washington Franchise Act further states that it is unlawful to: (i) require a franchisee to purchase or lease particular goods or services, unless the franchisor can establish that the restrictions are reasonably necessary and do not substantially affect competition; (ii) require a franchisee to assent to a release or waiver to relieve any person from liability under the Washington Franchise Act; and (iii) impose any standard of conduct on the franchisee that is not reasonable and necessary. RCW 19.100.180(2)(b), (g), (h).

47. The Washington Franchise Act also provides that each franchisor must deal with franchisees in good faith. RCW 19.100.180(1).

48. Defendants willfully and knowingly made false, misleading, unfair, and deceptive statements to the Washington Plaintiffs in connection with the sale of the Franchises, including the statements described herein.

49. Since purchasing the Franchises, the Washington Plaintiffs have learned that Defendants' statements were false, misleading, unfair, and deceptive.

50. Defendants have refused to deal with the Washington Plaintiffs in good faith.

51. Defendants have improperly imposed purchase requirements and standards of conduct on Plaintiffs that were not reasonably necessary.

52. Defendants have improperly required the Washington Plaintiffs to assent to releases or waivers of liability under the Washington Franchise Act in order to make any operational changes to the Franchises. Such releases or waivers are unfair, deceptive, and invalid under the Washington Franchise Act. RCW 19.100.220.

53. Accordingly, Defendants have willfully and knowingly perpetrated numerous willful violations of the Washington Franchise Act, including violations of RCW 19.100.170 and RCW 19.100.180. The Maniatises, Comrov, Viscia, and Kittner are liable for directly or indirectly participating in violations of the Washington Franchise Act, whether individually or by controlling the activities of Seva.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

54. Pursuant to RCW 19.100.190, the Washington Plaintiffs are entitled to rescind all of their Franchises and recover damages against Defendants. The Washington Plaintiffs are entitled to at least $1,236,695.16 in damages.

55. The Washington Plaintiffs are entitled to recover treble damages and their attorneys' fees and costs. RCW 19.100.190(3).

**B. Michigan Franchise Act Violations.**

56. Plaintiffs reallege the allegations set forth in paragraphs 1-55 above and incorporate those allegations herein.

57. The Franchises purchased by or assigned to the Kellys and Avatar2026 (collectively, the "Michigan Plaintiffs") are "franchises" governed by the Michigan Franchise Investment Law (the "Michigan Franchise Act"), M.C.L.A. § 445.1501 *et seq*.

58. The Michigan Franchise Act provides that it is unlawful in connection with the offer, sale, or purchase of a franchise directly or indirectly to: (i) make any untrue statement of material fact; (ii) omit any material fact that would make any statements made not misleading; (iii) employ any device, scheme, or artifice to defraud; or (iv) engage in any act, practice, or course of business to operate as a fraud or deceit upon the purchaser. M.C.L.A. § 445.1505(5)(a)-(c).

59. Defendants willfully and knowingly made false, misleading, unfair, and deceptive statements to the Michigan Plaintiffs in connection with the sale of the Franchises, including the statements described herein.

60. Since purchasing the Franchises, the Michigan Plaintiffs have learned that Defendants' statements were false, misleading, unfair, and deceptive.

61. Seva has improperly required the Michigan Plaintiffs to assent to releases or waivers of liability under the Michigan Franchise Act in order to make any operational changes to the Franchises. Such releases or waivers are unfair, deceptive, and invalid under the Michigan Franchise Act. M.C.L.A. § 445.1527.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

62. Accordingly, Defendants have willfully and knowingly perpetrated numerous willful violations of the Michigan Franchise Act, including violations of M.C.L.A. § 445.1505. The Maniatises, Comrov, Viscia, and Kittner are liable for directly or indirectly participating in violations of the Michigan Franchise Act, whether individually or by controlling the activities of Seva.

63. Pursuant to M.C.L.A. § 445.1531, the Michigan Plaintiffs are entitled to rescind their Franchises and recover damages against Defendants. The Michigan Plaintiffs are entitled to at least $237,064 in damages.

64. The Michigan Plaintiffs are entitled to recover their damages, including punitive damages, and their attorneys' fees and costs. M.C.L.A. § 445.1531.

**C. Minnesota Franchise Act Violations.**

65. Plaintiffs reallege the allegations set forth in paragraphs 1-64 above and incorporate those allegations herein.

66. The Franchises purchased by or assigned to Cuthbert, Charboneau, and Midwest Beauty (collectively, the "Minnesota Plaintiffs") are "franchises" governed by the Minnesota Franchise Act (the "Minnesota Franchise Act"), M.S.A. § 80C.01 *et seq*.

67. The Minnesota Franchise Act provides that it is unlawful in connection with the offer, sale, or purchase of a franchise to: (i) make any untrue statement of material fact; or (ii) omit any material fact that would make any statements not misleading. M.S.A. § 80C.13.

68. Defendants willfully and knowingly made false, misleading, unfair, and deceptive statements to the Minnesota Plaintiffs in connection with the sale of the Franchises, including the statements described herein.

69. Since purchasing the Franchises, the Minnesota Plaintiffs have learned that Defendants' statements were false, misleading, unfair, and deceptive.

70. Seva has improperly required the Minnesota Plaintiffs to assent to releases or waivers of liability under the Minnesota Franchise Act in order to make any operational

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

changes to the Franchises. Such releases or waivers are unfair, deceptive, and invalid under the Minnesota Franchise Act. M.S.A. § 80C.21.

71. Accordingly, Defendants have willfully and knowingly perpetrated numerous willful violations of the Minnesota Franchise Act, including violations of M.S.A. § 80C.13. The Maniatises, Comrov, Viscia, and Kittner are liable for directly or indirectly participating in violations of the Minnesota Franchise Act, whether individually or by controlling the activities of Seva.

72. Pursuant to M.S.A. § 80C.17, the Minnesota Plaintiffs are entitled to rescind all of their Franchises and recover damages against Defendants. The Minnesota Plaintiffs are entitled to at least $421,200 in damages.

73. The Minnesota Plaintiffs are entitled to recover their damages, including punitive damages, and their attorneys' fees and costs. M.S.A. § 80C.17.

**D. Illinois Franchise Act Violations.**

74. Plaintiffs reallege the allegations set forth in paragraphs 1-73 above and incorporate those allegations herein.

75. The Franchises purchased by or assigned to On Call Enterprises and Mivas (collectively, the "Illinois-Governed Plaintiffs") are "franchises" governed by the Illinois Franchise Disclosure Act of 1987 (the "Illinois Franchise Act"), 815 ILCS 705/1 *et seq.*, because Seva sold the Franchises to the Illinois-Governed Plaintiffs in Illinois and pursuant to the choice-of-law clauses in their franchise agreements.

76. The Illinois Franchise Act provides that it is unlawful in connection with the offer or sale of a franchise to: (i) make any untrue statement of material fact; (ii) sell or offer to sell a franchise by means of an untrue statement of a material fact or by omitting any material fact that would make the statements not misleading; (iii) employ any device, scheme, or artifice to defraud; or (iv) engage in any act, practice, or course of business to operate as a fraud or deceit upon the purchaser. 815 ILCS 705/6.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

77. Defendants willfully and knowingly made false, misleading, unfair, and deceptive statements to the Illinois-Governed Plaintiffs in connection with the sale of the Franchises, including the statements described above in this Complaint.

78. Since purchasing the Franchises, the Illinois-Governed Plaintiffs have learned that Defendants' statements were false, misleading, unfair, and deceptive.

79. Seva has improperly required the Illinois-Governed Plaintiffs to assent to releases or waivers of liability under the Illinois Franchise Act in order to make any operational changes to the Franchises. Such releases or waivers are unfair, deceptive, and invalid under the Illinois Franchise Act. 815 ILCS 705/41.

80. Accordingly, Defendants have willfully and knowingly perpetrated numerous willful violations of the Illinois Franchise Act, including violations of 815 ILCS 705/6. The Maniatises, Comrov, Viscia, and Kittner are liable for directly or indirectly participating in violations of the Illinois Franchise Act, whether individually or by controlling the activities of Seva.

81. Pursuant to 815 ILCS 705/26, the Illinois-Governed Plaintiffs are entitled to rescind all of their Franchises and recover damages against Defendants. The Illinois-Governed Plaintiffs are entitled to at least $673,490.11 in damages.

82. The Illinois-Governed Plaintiffs are entitled to recover their damages, including punitive damages, and their attorneys' fees and costs. 815 ILCS 705/26.

## III. JURY DEMAND

83. Plaintiffs reallege the allegations set forth in paragraphs 1-82 above as though fully set forth herein.

84. Plaintiffs demand a trial by jury.

## IV. ATTORNEY'S FEES AND COSTS

85. Plaintiffs reallege the allegations set forth in paragraphs 1-84 above as though fully set forth herein.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

86. Plaintiffs are entitled to recover their reasonable attorneys' fees, expenses, and costs incurred herein pursuant to the state franchise acts cited above.

## VI. PRAYER FOR RELIEF

Plaintiffs pray for the following relief:

1. For rescission of Plaintiffs' Franchises.

2. For judgment against Defendants, jointly and severally, in favor of Davis and Christiana Grace for Defendants' violations of the Washington Franchise Act in an amount to be determined at trial, currently estimated at $540,431, plus treble damages and attorney's fees and costs.

3. For judgment against Defendants, jointly and severally, in favor of Sandhu, Randhawa, and PR Spas for Defendants' violations of the Washington Franchise Act in an amount to be determined at trial, currently estimated at $365,000, plus treble damages and attorney's fees and costs.

4. For judgment against Defendants, jointly and severally, in favor of Hollis for Defendants' violations of the Washington Franchise Act in an amount to be determined at trial, currently estimated at $79,872.16, plus treble damages and attorney's fees and costs.

5. For judgment against Defendants, jointly and severally, in favor of the Bleicks and Beauty in Spokane for Defendants' violations of the Washington Franchise Act in an amount to be determined at trial, currently estimated at $251,392, plus treble damages and attorney's fees and costs.

6. For judgment against Defendants, jointly and severally, in favor of the Kellys and Avatar2026 for Defendants' violations of the Michigan Franchise Act in an amount to be determined at trial, currently estimated at $237,064, plus punitive damages and attorney's fees and costs.

7. For judgment against Defendants, jointly and severally, in favor of Cuthbert, Charboneau, and Midwest Beauty for Defendants' violations of the Minnesota Franchise Act in

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

an amount to be determined at trial, currently estimated at $421,200, plus punitive damages and attorney's fees and costs.

8. For judgment against Defendants, jointly and severally, in favor of On Call Enterprises for Defendants' violations of the Illinois Franchise Act in an amount to be determined at trial, currently estimated at $458,559.91, plus punitive damages and attorney's fees and costs.

9. For judgment against Defendants, jointly and severally, in favor of Mivas for Defendants' violations of the Illinois Franchise Act in an amount to be determined at trial, currently estimated at $214,930.20, plus punitive damages and attorney's fees and costs.

10. For all of Plaintiffs' attorney's fees and costs incurred in this matter.

11. For interest on the entire amount of each judgment against Defendants at the statutory rate from and after the date of judgment until paid.

12. Any other relief the Court deems just and equitable.

DATED: April 10, 2017

LANE POWELL PC

By */s/ Daniel A. Kittle*

Randall P. Beighle, WSBA No. 13421
beighler@lanepowell.com
Daniel A. Kittle, WSBA No. 43340
kittled@lanepowell.com
Telephone: 206.223.7000
Facsimile: 206.223.7107
Attorneys for Plaintiffs

# EXHIBIT A-4

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# FRANCHISE DISCLOSURE DOCUMENT

## SEVA BEAUTY, LLC

An Illinois Limited Liability Company
1954 First Street, # 112
Highland Park, Illinois 60035
877-SEVA-BEAUTY
www.SevaBeauty.com
franchising@sevabeauty.com

®

We grant qualified franchisees the right to own and operate a fast-casual esthetic spa business that provides facial threading and waxing, eyelash extensions, eyebrow tinting and facials, using the trade name SEVA® as well as our business models and system.

SEVA has two main business formats, SEVA® Express and SEVA® Spa. The total estimated investment to begin operation of a SEVA® Express Studio is $140,050 to $234,800. This includes $89,000 that must be paid to us or our affiliates. The total estimated investment to begin operation of a SEVA® Spa Studio is $107,500 to $276,000. This includes $49,000 - $64,000 that must be paid to us or our affiliates.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale or grant. **Note, however, that no governmental agency has verified the information contained in this document.**

You may wish to receive your Disclosure Document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact SEVA Beauty LLC, Director of Franchise Development, 1954 First Street, # 112, Highland Park, Illinois 60035, telephone 877-SEVA-BEAUTY.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise", which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, Washington, D.C. 20580. You can also visit the FTC's home page at http://www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

**Issuance Date:** March 29, 2016

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**STATE COVER PAGE**

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state. REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS THE FRANCHISE OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in Exhibit A for information about the franchisor, or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES. YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS. BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following RISK FACTORS before you buy this franchise:

1. THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY ARBITRATION OR LITIGATION ONLY IN ILLINOIS. OUT-OF-STATE ARBITRATION AND LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO ARBITRATE AND LITIGATE WITH US IN ILLINOIS THAN IN YOUR OWN STATE.

2. IF YOU ARE A BUSINESS ENTITY, YOUR OWNERS WILL HAVE TO GUARANTY YOUR OBLIGATIONS AND BE BOUND BY THE PROVISIONS OF OUR FRANCHISE AGREEMENT. THE SPOUSES OF THE OWNERS MAY ALSO BE REQUIRED TO CONSENT TO THE GUARANTY, WHICH PLACES THE SPOUSES' MARITAL ASSETS AT RISK.

3. THE FRANCHISEE WILL BE REQUIRED TO MAKE AN ESTIMATED INITIAL INVESTMENT RANGING FROM $140,050 TO $276,000 DEPENDING ON WHICH OPTION IS SELECTED. THIS AMOUNT EXCEEDS THE FRANCHISOR'S STOCKHOLDERS EQUITY AS OF DECEMBER 31, 2015, WHICH IS $137,383.

THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

We may use the services of one or more FRANCHISE BROKERS or referral sources to assist us in selling our franchise. A franchise broker or referral source represents us, not you. We pay this person a fee for selling our franchise or referring you to us. You should be sure to do your own investigation of the franchise.

Effective Dates. See next page for state effective dates.

FILED DATE: 8/3/2020 1:39 PM   2020CH05088

## STATE EFFECTIVE DATES

The following states require that the Franchise Disclosure Document be registered or filed with the state or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington and Wisconsin.

This Franchise Disclosure Document is registered, on file or exempt from registration in the following states having franchise registration and disclosure laws, with the following effective dates:

| | |
|---|---|
| California | April 19, 2016 |
| Hawaii | April 5, 2016 |
| Illinois | March 30, 2016 |
| Indiana | March 29, 2016 |
| Maryland | April 14, 2016 |
| Michigan | March 29, 2016 |
| Minnesota | April 12, 2016 |
| New York | April 15, 2016 |
| North Dakota | April 11, 2016 |
| Rhode Island | March 31, 2016 |
| South Dakota | March 30, 2016 |
| Virginia | April 5, 2016 |
| Washington | Pending |
| Wisconsin | March 29, 2016 |

In all other states that do not require registration, the effective date of this Disclosure Document is the issuance date of March 29, 2016.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**THE FOLLOWING APPLY TO TRANSACTIONS GOVERNED BY**

**MICHIGAN FRANCHISE INVESTMENT LAW ONLY**

THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.

(a) A prohibition on the right of a franchisee to join an association of franchisees.

(b) A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in the Michigan Franchise Investment Act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(c) A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

(d) A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(e) A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(f) A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(g) A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(i) The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.

(ii) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(h) A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(i) A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisor shall, at the request of a franchisee, arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations to provide real estate, improvements, equipment, inventory, training, or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENFORCEMENT BY THE ATTORNEY GENERAL.

Any questions regarding this notice should be directed to:

State of Michigan
Consumer Protection Division
Attn: Franchise
670 G. Mennen Williams Building
525 West Ottawa
Lansing, Michigan 48933
Telephone Number: (517) 373-7117

Note: Despite subparagraph (f) above, we intend, and we and you agree to fully enforce the arbitration provisions of the Franchise Agreement. We believe that paragraph (f) is unconstitutional and cannot preclude us from enforcing these arbitration provisions. You acknowledge that we will seek to enforce this section as written.

**THE MICHIGAN NOTICE APPLIES ONLY TO FRANCHISEES WHO ARE RESIDENTS OF MICHIGAN OR LOCATE THEIR FRANCHISES IN MICHIGAN.**

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

TABLE OF CONTENTS

ITEM 1 THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES .......... 1
ITEM 2 BUSINESS EXPERIENCE .......... 3
ITEM 3 LITIGATION .......... 4
ITEM 4 BANKRUPTCY .......... 4
ITEM 5 INITIAL FEES .......... 4
ITEM 6 OTHER FEES .......... 5
ITEM 7 ESTIMATED INITIAL INVESTMENT .......... 10
ITEM 8 ESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES .......... 15
ITEM 9 FRANCHISEE'S OBLIGATIONS .......... 17
ITEM 10 FINANCING .......... 19
ITEM 11 FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING .......... 19
ITEM 12 TERRITORY .......... 19
ITEM 13 TRADEMARKS .......... 27
ITEM 14 PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION .......... 29
ITEM 15 OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS .......... 29
ITEM 16 RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL .......... 30
ITEM 17 RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION .......... 31
ITEM 18 PUBLIC FIGURES .......... 35
ITEM 19 FINANCIAL PERFORMANCE REPRESENTATIONS .......... 35
ITEM 20 OUTLETS AND FRANCHISEE INFORMATION .......... 40
ITEM 21 FINANCIAL STATEMENTS .......... 45
ITEM 22 CONTRACTS .......... 46
ITEM 23 RECEIPT .......... 46

**EXHIBITS**

Exhibit A LIST OF STATE ADMINISTRATORS / LIST OF STATE AGENTS FOR SERVICE OF PROCESS
Exhibit B FRANCHISE AGREEMENT
Exhibit C DEVELOPMENT RIGHTS RIDER
Exhibit D SUBLEASE AGREEMENT
Exhibit E FINANCIAL STATEMENTS
Exhibit F FORM OF GENERAL RELEASE
Exhibit G TABLE OF CONTENTS OF OPERATING MANUAL
Exhibit H LIST OF FRANCHISEES
Exhibit I STATE ADDENDA
Exhibit J ACH FORM
Exhibit K REPRESENTATIONS AND ACKNOWLEDGEMENT STATEMENT
Exhibit L RECEIPT

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## ITEM 1

## THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES

**The Franchisor**

To simplify the language in this franchise disclosure document (this "Disclosure Document"), we use the terms "SEVA", "we", "us" and "our" to refer to SEVA Beauty, LLC. "You" and "your" means the person or entity that buys the franchise. If you are a corporation, partnership, limited liability company or other entity, certain provisions of the Franchise Agreement (defined below) and related agreements will also apply to your owners.

We are an Illinois limited liability company formed on January 6, 2010. Our principal business address is 1954 First Street, # 112, Highland Park, Illinois 60035. We do business under our registered company name and "SEVA." We opened our first location in 2010 and began franchising in 2010; however, we no longer own or operate any Studios (as defined below). SEVA has not offered franchises in any other line of business, but may do so in the future.

Our agents for service of process are listed on Exhibit A to this Disclosure Document.

**Our Parents, Predecessors and Affiliates**

Our parent, SEVA Holdings, LLC ("SEVA Holdings"), was organized in Illinois on December 29, 2015, and shares our principal address. SEVA Holdings has never owned, offered or operated any Studio, nor has it offered franchises for Studios or any other concepts, but it may do so in the future.

Our affiliate, SEVA Beauty IP, Inc. ("SEVA IP"), incorporated in Illinois on September 29, 2010, and has the same principal address as us. SEVA IP owns and will provide trademark license rights in certain trademarks to us, enabling us to license trademark rights in those trademarks to franchisees. (See Item 13)

Our affiliate, SEVA Beauty Leasing, LLC ("SEVA Leasing"), was organized in Illinois on December 29, 2015, and shares our principal address. SEVA Leasing may provide a sublease and administer subleases for Studios (as defined below).

Neither (i) SEVA Holdings, (ii) SEVA IP, nor (iii) SEVA Leasing has offered franchises for Studios or any other concept.

**Description of Franchise**

We are the pioneer of the fast-casual spa, with nationwide locations that maximize one-stop-shop convenience and affordable price points. We sum this up by our mantra, Beauty to the People®. SEVA licenses the operation of SEVA® Studios, which are specialized and distinctive retailers of fast-casual esthetic spa services that offer consistent, affordable, high-quality fast-casual services and a limited set of retail products designated by SEVA for men and women in a distinctive retail environment. SEVA offers two main Studio formats, SEVA® Express Studios (an "Express Studio") and SEVA® Spa Studios (a "Spa Studio").

The franchise described in this disclosure document is a license to develop and operate either an Express Studio or a Spa Studio (each a "Studio" and together the "Studios") at a designated location (the "Authorized Location"). The Franchise Agreement authorizes you to use the SEVA® trade name and

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

service mark, and other marks we periodically authorize (the "Marks"), in connection with the operation of the Studio, and permits you to use the distinctive identity, trade dress, methods and system (the "System"), developed by us for operating the Studio.

An Express Studio is our quick-serve format offering our "Brows and Face" category of services, which include facial threading and waxing, eyelash extensions, eyebrow tinting and flash facials from salon chairs. An Express Studio is typically an open floor plan of approximately 250 to 550 square feet without a spa room. Express Studios must be located in Walmart® stores.

A Spa Studio is our larger, full-service format offering the Brows and Face category of services as well as our Spa services, which include body waxing and full facials, from one or more spa rooms. A Spa Studio is typically 1,200 to 1,500 square feet with multiple spa rooms. Spa Studios are typically stand-alone or in-line locations located within shopping centers, strip malls and traditional real estate venues.

**Franchise Agreement**

We offer the right to establish and operate a Studio under the terms of a single unit franchise agreement (the "Franchise Agreement"). The Franchise Agreement is attached as Exhibit B to this Disclosure Document.

**Development Rider**

In certain circumstances, we may offer to you the right to enter into a Development Rider in the form attached as Exhibit C to this Disclosure Document (the "Development Rider") to develop additional Studios. The Franchise Agreement for the first Studio would be signed at the same time as the Development Rider. For each additional Studio developed under the Development Rider, you must sign the form of Franchise Agreement that we are then offering to new franchisees. You may not open a Studio for business until a fully executed Franchise Agreement is in place for that Studio.

**Sublease**

You may be required to sign a sublease with us or SEVA Leasing. A copy of our current form of sublease is attached to this Disclosure Document as Exhibit D.

If you select a Walmart® site for the Studio, we or SEVA Leasing will sublease the premises to you subject to the terms and conditions of our master lease with Walmart® (the "Master Lease"). The Master Lease contains a provision allowing Walmart® or us to terminate a sublease after providing you 90-day written-notice. Attached as Attachment A to the Sublease are the Material Terms of the Master Lease.

**Market and Competition**

Your products and services will be marketed to the general public, although your primary customers will be girls and women between 13 and 60 years of age. You may be competing with other similar businesses, including other franchised operations, national chains and independently owned businesses offering similar products and services. You may also face competition from within the same retail environment where the Studio is located, including from businesses such as nail salons or hair salons offering the same or similar services. Changes in local and national economic conditions and local demographics also affect this industry and are difficult to predict. You will also need to contend with

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

normal business risks, including pricing policies of competitors, changes in laws and regulations, supply and demand and new technologies.

**Industry Regulations**

You must obtain and maintain any permits, licenses, certifications or other indications of authority necessary for the operation of the Studio. Some states require you to obtain a license to provide spa, salon and beauty related services. You are responsible for investigating the availability and requirements for obtaining all necessary licenses in your state and creating, as necessary, state specific versions of required policies and procedures that meet or exceed our System standards. Most states and local governments have enacted laws and regulations that are specific to our industry including requirements for permits, certificates or other licenses to operate a salon or spa and provide our services; general and cosmetology related standards, specifications and requirements for the construction, design and maintenance of business premises; and regulations affecting the health, safety and welfare of salon or spa customers. You and your employees may be required to obtain cosmetology, esthetician, salon, spa or other licenses to provide many or all of our services. You are also responsible to ensure that all regulations and requirements of the applicable cosmetology and state boards are met during the build out process.

You must know the laws and regulations applicable to the Studio and ensure that you and your employees comply with all such laws and regulations. You are also responsible for obtaining any licenses or permits required for operating the Studio and you and your employees must obtain any applicable certificates and licenses. You should consult with your own professional advisors, such as an attorney and accountant, regarding applicable laws and regulations.

## ITEM 2

## BUSINESS EXPERIENCE

**Chief Operating Officer - Vas Maniatis**.

Mr. Maniatis has been our Managing Member and Chief Operating Officer since January 2010.

**Chief of Staff - Kari Comrov**.

Ms. Comrov has been our Chief of Staff since January 2016. Prior to that, Ms. Comrov served as our Sr. Director of Spa Operations since January 2015. Ms. Comrov was our Director of Spa Operations from January 2013 to December 2014. From January 2012 to January 2013 she was the General Manager of Salon 1800 located in Chicago, Illinois. From January 2011 to January 2012 she was the Spa Director and Event Planner for The Spa on Oak located in Chicago, Illinois.

**Sr. Director of Information Technology - Rahul Patel**.

Mr. Patel has been our Sr. Director of Information Technology since January 2016. Prior to that, Mr. Patel served as our Sr. Director of Strategic Development for all of 2015 and our Director of Strategic Development since January 2011.

**Sr. Director of Training & Curricula Development - Sonal Maniatis**

Mrs. Maniatis has been our Sr. Director of Training & Curricula Development since January 2016. Prior to that, Mrs. Maniatis was our Sr. Director of SEVA Academy since 2010.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**Director of Spa Operations – Bree Ann Starr Viscia**

Ms. Viscia has been our Director of Spa Operations since September 2015. Prior to that, Ms. Viscia was our Associate Director of Spa Operations since January 2015. From September 2014 to January 2015 Ms. Viscia served as Spa Director of WTS International in Chicago, IL. From June 2012 to September 2014, Ms. Viscia served as Clinic Manager for American Laser Skin Care based out of Chicago, IL. From June 2012 through May 2014, Ms. Viscia served as General Manager of Elizabeth Arden Red Door Spas based out of San Francisco, CA and Richmond, VA. From January 2010 to May 2012, Ms. Viscia served as Assistant Manager of Dermalounge Medical Spa, Inc. based out of San Francisco, CA.

**Director of Franchise Development - Sarah Gihl**

Ms. Gihl has been our Director of Franchise Development since March 2016. Prior to that, Ms. Gihl was our Associate Director of Franchise Logistics since December 2015. From January 2012 to January 2015, Ms. Gihl served as the Executive Assistant to the CEO of Echo Global Logistics in Chicago, IL. From January 2010 to December 2011, Ms. Gihl served as Sales Coordinator to Ira T. Nevel and Associates Law Firm in Chicago, IL.

**Director of Franchise Operations - Jonathan Kittner**

Mr. Kittner has been our Director of Franchise Operations since March 2016. Prior to that, Mr. Kittner was our Associate Director of Spa Operations since August 2015. From January 2013 to December 2014, Mr. Kittner was the Director of Training for Monarc in Chicago, IL. From January 2010 to January 2013, Mr. Kittner was the Director of Training for Tom Jones in Chicago, IL.

## ITEM 3

## LITIGATION

No litigation is required to be disclosed in this Item.

## ITEM 4

## BANKRUPTCY

No bankruptcy is required to be disclosed in this Item.

## ITEM 5
## INITIAL FEES

**Initial Franchise Fee**

The Initial Franchise Fee to purchase a Studio is $39,000 ("Initial Franchise Fee"). The Initial Franchise Fee is paid in a lump sum when you sign the Franchise Agreement and is not refundable under any circumstances.

**Leasehold Administration Fee**

In the event we or SEVA Leasing sublease the premises of the Studio to you, you will pay us a $15,000 leasehold administration fee ("Leasehold Fee"), which is payable upon signing a letter of intent with us or our affiliate for a sublease, in consideration of us or our affiliate's managing a master lease. You must

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

sublease the premises of the Studio from us or our affiliate if you purchase a franchise for an Express Studio. The Leasehold Fee is fully earned upon receipt and is not refundable under any circumstance.

**Pre-Opening Administration Fee**

You will pay us a pre-opening administration fee of $10,000 ("Pre-Opening Fee"), which is payable upon your signing a letter of intent with us or our affiliate to enter into the real estate site selection process, and is fully earned and not refundable under any circumstance. The Pre-Opening Fee is in consideration for us or our affiliate's guidance through the site selection process, Spa-in-a-box program and your orientation into the system.

**Development Rights Fee**

In the event you enter into a Development Rider, you will pay us a "Development Rights Fee" of $19,500 for each additional Studio you choose to open under the Development Rider. The Development Rights Fee is not refundable under any circumstances.

## ITEM 6

## OTHER FEES

| Column 1<br>Type of fee[1] | Column 2<br>Amount | Column 3<br>Due Date | Column 4<br>Remarks |
|---|---|---|---|
| Royalty | 6% of Gross Sales or $250 per week, whichever is greater. | Payable weekly by Tuesday for the preceding week | "Gross Sales" means all revenue from the sale of services and products and all other income related to the Studio, except sales taxes. Royalty Fees are payable by automatic withdrawal. See Note 2. |
| Rent | If you operate an Express Studio, we will charge the greater of $550 per month in rent or 16% of your gross sales.[3] | Monthly | If you purchase a franchise for an Express Studio, you will sublet the Studio premises from us or our affiliate. You will also be responsible for any and all fees assessed against us, including by taxing authorities and/or the landlord, on account of rental payments and other amounts paid to us and/or the landlord pursuant to the Master Lease. See Note 3. |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Column 1 Type of fee[1] | Column 2 Amount | Column 3 Due Date | Column 4 Remarks |
|---|---|---|---|
| Brand Fund Contribution | 2% to 5% of Gross Sales | Payable at the same time and in the same manner as the Royalty | Currently, you must contribute 2% of Gross Sales to the Brand Fund. We may collect up to 5% of Gross Sales at any time upon 30 days' notice to you. See Item 11 |
| Late Fees | $100 per instance | Upon demand | For failure to make payments or file reports on time. |
| Interest | 18% per annum of balance due or highest commercial contract interest rate law allows, but not less than $100 | With payment of past due amount | Due on all overdue amounts. Interest accrues from the original due date until payment is received in full. |
| Initial training for Additional or Replacement Manager | Our then-current training fee per person, plus expenses. Our current rate charged for ongoing training is $1,000 per person. | Upon demand | We train 3 people at no charge. If you request that we provide additional training at your Franchised Business to you and/or your employees you must pay our current training fee and you must also reimburse any expenses we may incur in providing the additional training. |
| Additional Training/Support | As determined by us. We may charge an hourly rate, or a flat fee (including a virtual training fee) for the additional training/support services. Currently, the hourly rate is $150 per hour. | Upon demand | We may require you to undergo additional training, including through a virtual, Internet or mobile application based platform, during the term of your franchise agreement. We may also, at our option, provide additional support services to you during the term. If we require additional training or provide additional support services, we have the right to charge you a fee for the services, which may be at our then-current hourly rates for such services, or a flat fee. |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Column 1<br>Type of fee[(1)] | Column 2<br>Amount | Column 3<br>Due Date | Column 4<br>Remarks |
|---|---|---|---|
| Transfer | Transfer Fee of $19,500 and Training Fee of $3,000. | Payable at time of transfer | These fees are only payable when you sell your franchise to a third person. The training fee is for training 3 people in connection with the transfer. |
| Renewal Fee | 25% of then-current initial Franchise fee | Upon execution of new Franchise Agreement | Charge for renewing the franchise after expiration of term. |
| Audit | Cost of audit, 15% of underpayment, plus 18% interest from date of underpayment | Upon demand | Payable only if audit shows an understatement of at least 3% of gross sales for any period. |
| Insurance | Our actual costs of insurance for the period of coverage, plus a service charge equal to 25% of the cost of new required insurance for the period of coverage | Upon demand | A service charge of 25% of the annual cost of new insurance is payable to us if you fail to carry the insurance we require and if we decide to purchase it on your behalf (although we are not obligated to do so). |
| SEVA University™ Certification Fee | Up to $250 per lead technician as determined by us. | Upon the completion of SEVA University by you or any of your staff members. | We may require mandatory training certification and recertification of you and your staff. |
| Inoperative Equipment Fee | $100 per day | As incurred | If any component of your POS system, including but not limited to your IP camera, iPad, receipt printer, credit card terminal, or other equipment is inoperative, we may charge you a per-day fee until fixed in addition the Tech Coordination Fee or other fees. |
| Conventions or franchisee meetings | Up to $1,000 | Upon demand | See Note 4. |
| Finance Approval Fee | $500 per instance | As incurred | In the event you seek debt financing used to fund the development of the Studio, we will charge, if required a Finance Approval Fee to subordinate any of our rights. |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Column 1<br>Type of fee[1] | Column 2<br>Amount | Column 3<br>Due Date | Column 4<br>Remarks |
|---|---|---|---|
| Third Party Costs | Will vary under circumstances | As incurred | As part of the System, we may require you to the engage the services or purchase the products of a third-party vendor, and we may require to you make the payment for such services or products to us, which we will use to pay the vendor. |
| Entity Conversion Fee | $500 per instance | As incurred | If you are an individual and assign your interest in this Agreement to an entity such as a limited liability company, corporation, or partnership, in which you are the sole owner, you must pay us an Entity Conversion Fee of $500.00 in consideration for our processing the paperwork to assign this Agreement to the converted entity. |
| Indemnification and Defense | Will vary under circumstances | As incurred | You must reimburse us for losses that we suffer resulting from the operation of the Studio. We may retain our own legal counsel. You must reimburse us for our legal and other professional expenses in connection with the claim. |
| Costs and Attorneys' Fees | Will vary under circumstances | As incurred | Payable only if you do not comply with the Franchise Agreement and we are the prevailing party in any relevant litigation or arbitration. |
| Gift Card Program | Will vary. We do not currently charge a fee for participation in the Gift Card Program, but may do so in the future. | | You must participate in our gift card program. Gift cards are available for sale through our website and at all Studios in the System. Gift cards may be redeemed at any Studio in the System, regardless of where they were purchased. |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Column 1<br>Type of fee[1] | Column 2<br>Amount | Column 3<br>Due Date | Column 4<br>Remarks |
|---|---|---|---|
| Customer Satisfaction Evaluations | Up to $100 per month | As incurred | Payable to our approved supplier. You must participate in the mystery shop program. |
| Liquidated Damages | Aggregate Royalty Fees and Brand Fund contributions due to us during the 36 month period immediately preceding termination | Upon termination | See Note 5. |
| Lease Acceleration Fee | Will vary | Upon termination of the Sublease | In the event you enter into a sublease with us for the premises of the Studio, and an event of default occurs which leads to the termination of your sublease, we may declare the entire principal sum of then unpaid rent for the remaining Term (as defined in your sublease) immediately due and payable |

Notes:

(1) Except when otherwise noted, all fees are uniformly imposed, payable to us and are not refundable. You will be required to sign an Automated Clearing House (ACH) Authorization form (attached to this Disclosure Document as Exhibit J) permitting us to electronically debit your designated bank account for payment of all fees payable to us or our affiliates, including rent and any other amounts that you owe to us or our affiliates for the purchase of goods or services.

(2) Gross Sales includes all revenue except sales taxes, use or gross receipts taxes and bona fide refunds. If you fail to report your Gross Sales by the Tuesday of the week for the prior week, we can withdraw $500 from your account as an estimated royalty fee and make adjustments once we receive the missing report. During the Studio's first year of operation, you must achieve at least $150,000 in Gross Sales. During the Studio's second year of operation, and for every rolling 12-month period thereafter, you must achieve at least $250,000 in Gross Sales. If you fail to achieve these minimum Gross Sales, then (i) you must pay to us the difference between the royalties actually paid and the amount of royalties you would have paid if you had met the minimum Gross Sales; and (ii) we may terminate your Franchise Agreement.

(3) Under the terms of a sublease, Express Studios located within Walmart® locations are currently required to pay the greater of $550 or 16% of their monthly gross sales. The rent you pay under a sublease is the same amount of rent that we or affiliate pay to Walmart®. In the event you sublease the premises from us for a Spa Studio, you will pay the same amount we pay under the master lease with a third party.

(4) If we hold an annual or semi-annual meeting for franchisees (whether national or regional), attendance is mandatory. For the annual meeting, we may charge a registration fee to recoup our costs. If we hold a meeting and you do not attend, we may assess a fee of up to $1,000. We

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

expect to hold any conventions or franchisee meetings in the Chicago, Illinois area, but we may elect to hold the conventions and/or meetings elsewhere in the United States and its Territories. You are responsible for travel and accommodation expenses in attending any conventions and/or franchisee meetings.

(5) If the Franchise Agreement is terminated as a result of a default by you, you must pay us liquidated damages from the date of termination to the scheduled expiration of the then-current term of Franchise Agreement (the "Measurement Period"). Damages will be calculated by multiplying (1) the number of calendar months in the Measurement Period by (2) the average monthly Gross Sales of the Studio during the 12 full calendar months immediately preceding the termination date; however, if as of the termination date, the Studio has not been operating for at least 12 months, Damages will be calculated based on the average monthly Gross Sales during our previous fiscal year immediately preceding the termination date of all Studios operating under the Marks during the entirety of that fiscal year.

## ITEM 7

## ESTIMATED INITIAL INVESTMENT

| YOUR ESTIMATED INITIAL INVESTMENT FOR A SEVA EXPRESS STUDIO FORMAT[1] | | | | |
|---|---|---|---|---|
| **Column 1**<br><br>**Type of Expenditure** | **Column 1**<br><br>**Amount** | **Column 3**<br><br>**Method of Payment** | **Column 4**<br><br>**When Due** | **Column 5**<br><br>**To Whom Payment is to be Made** |
| Initial Franchise Fee | $39,000 | Lump Sum | At signing of Franchise Agreement | Us |
| Leasehold Administration Fee | $15,000 (Note 3) | Lump Sum | Upon signing a letter of intent with us or our affiliate | Us (Note 3) |
| Pre-Opening Administration Fee | $10,000 | Lump Sum | Upon signing a letter of intent with us or our affiliate | Us |
| Training | $0 to $2,000 (Note 4) | As incurred | During your initial training | Your employees |
| Real Estate Improvements /Spa in a Box | $10,000 to $40,000 (Note 5) | Lump Sum | Before construction begins | Third party suppliers |
| Furniture, Fixtures & Equipment | $10,000 to $40,000 (Note 5) | Lump Sum | Before Opening | Third party suppliers |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| **YOUR ESTIMATED INITIAL INVESTMENT FOR A SEVA EXPRESS STUDIO FORMAT[1]** | | | | |
|---|---|---|---|---|
| **Column 1**<br><br>**Type of Expenditure** | **Column 1**<br><br>**Amount** | **Column 3**<br><br>**Method of Payment** | **Column 4**<br><br>**When Due** | **Column 5**<br><br>**To Whom Payment is to be Made** |
| Rent | $550 to $2,800 (Note 5) | As arranged | Monthly | Us or our affiliate |
| Security Deposit | $25,000 (Note 5) | Lump Sum | Upon signing sublease | Us or our affiliate |
| Computer System | $2,000 to $4,000 (Note 6) | Lump Sum | Before Opening | Third party suppliers |
| Grand Opening Promotion | $1,500 to $3,000 (Note 7) | Lump Sum | Before Opening | Third party suppliers |
| Opening Inventory | $2,000 to $4,000 | As purchased | As purchased | Third party suppliers |
| Insurance Premiums | $1,000 to $4,000 | As purchased | As purchased | Third party suppliers |
| Additional Funds (3-6 months) | $24,000 to $46,000 (Note 8) | As incurred | As incurred | Various employees, vendors, etc. |
| **TOTAL** | **$140,050 to $234,800** | | | |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| **YOUR ESTIMATED INITIAL INVESTMENT FOR A SEVA SPA STUDIO FORMAT[1]** | | | | |
|---|---|---|---|---|
| **Column 1**<br><br>**Type of Expenditure** | **Column 1**<br><br>**Amount** | **Column 3**<br><br>**Method of Payment** | **Column 4**<br><br>**When Due** | **Column 5**<br><br>**To Whom Payment is to be Made** |
| Initial Franchise Fee | $39,000 | Lump Sum | At signing of Franchise Agreement | Us |
| Leasehold Administration Fee | $0 - $15,000 (Note 3) | Lump Sum | Upon signing a letter of intent with us or our affiliate | Us or our affiliate |
| Pre-Opening Administration Fee | $10,000 | Lump Sum | Upon signing a letter of intent with us or our affiliate | Us or our affiliate |
| Training Expenses | $0 to $2,000 (Note 4) | As incurred | During your initial training | Your employees |
| Real Estate Improvements /Spa in a Box | $10,000 to $60,000 (Note 5) | Lump Sum | Before construction begins | Third party suppliers |
| Furniture, Fixtures & Equipment | $10,000 to $60,000 (Note 5) | Lump Sum | Before Opening | Third party suppliers |
| Rent | $2,000 to $6,000 per month (Note 5) | As arranged | Monthly | Landlord, us or our affiliate |
| Security Deposit | $6,000 to $18,000 (Note 5) | Lump Sum | Upon signing sublease | Landlord, us or our affiliate |
| Computer System | $2,000 to $5,000 (Note 6) | Lump Sum | Before Opening | Third party suppliers |
| Grand Opening Promotion | $1,500 to $3,000 (Note 7) | Lump Sum | Before Opening | Third party suppliers |
| Opening Inventory | $2,000 to $8,000 | As purchased | As purchased | Third party suppliers |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| **YOUR ESTIMATED INITIAL INVESTMENT FOR A SEVA SPA STUDIO FORMAT[1]** | | | | |
|---|---|---|---|---|
| **Column 1**<br><br>**Type of Expenditure** | **Column 1**<br><br>**Amount** | **Column 3**<br><br>**Method of Payment** | **Column 4**<br><br>**When Due** | **Column 5**<br><br>**To Whom Payment is to be Made** |
| Insurance Premium | $1,000 to $4,000 | As purchased | As purchased | Third party suppliers |
| Additional Funds (3-6 months) | $24,000 to $46,000 (Note 8) | As incurred | As incurred | Various employees, vendors, etc. |
| **TOTAL** | **$107,500 to $276,000** | | | |

Notes:

(1) The first table represents the estimated initial investment for an Express Studio ("Express Table") and the second table represents the estimated initial investment of a Spa Studio ("Spa Table").

(2) Except as agreed upon by third party suppliers, none of these expenditures are refundable.

(3) In the event we or our affiliate sublease the premises of the Studio to you, we may charge a $15,000 Leasehold Administration Fee, payable upon signing your sublease with us.

(4) The Initial Franchise Fee includes training for 3 individuals before opening the Studio. Training of additional employees will cost $1,000 for each additional employee. While training is free for 3 individuals, there may be circumstances where you will have to pay for your employed lead technician to assist with your initial and manager training.

(5) Rent will vary depending on whether you operate an Express or Spa Studio. With respect to Express Studios, we charge you the greater of $550 or 16% of your monthly gross revenue. The estimate in the Express Studio assumes that you will lease approximately 500 square feet for the operation of the Express Studio. The higher number contained in the Express Table is based on the Studio earning $209,983 in annualized total sales, which was the 2015 average annual gross sales of Studios disclosed in Item 19 of this Disclosure Document. Rent for a Spa Studio will vary based on several factors, including size, condition, location, and various market conditions. The estimate in the Spa Table assumes that you will lease approximately 1,500 square feet for the operation of a Spa Studio. The figures contained in the Spa Table are based on the payment of the first month's rent and an initial 3 month security deposit. Any sublease will be subject to the terms and conditions of our lease of the space. If we or our affiliate sublease the premises to you, all rents, deposits and other lease fees will be paid to us. Our subleases of spaces generally provide that you do not pay rent until the earlier of (a) the opening date of the Studio, or (b) 90 days after we provide you possession of the premises.

(6) This estimate includes the computer equipment and software described in Item 11.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(7) You are required to spend a minimum of $1,500 on grand opening marketing and promotion. This estimate may include advertising, brochures, flyers, coupons, banners, and similar materials.

(8) This estimates the working capital required during the first 6 months of operation. It includes payroll expenses, ongoing advertising expenses, initial insurance premiums, utility payments, high speed internet charges, rent, royalty fee payments, brand fund payments, and miscellaneous expenses. This estimate does not include any financing costs associated with the purchase of the franchise. This estimate does not include an owner's salary or draw. We cannot guarantee that your expenses will not be greater. Your costs will depend on factors such as: how well you follow our operating system, your management skill, market conditions, lease rates, wage rates, media rates, the economy, your competition, and your initial sales levels.

(9) In compiling these estimates we have relied on our experience in establishing and operating Studios.

The estimates may vary significantly dependent upon additional factors, such as the size of your market area, local economic conditions, the number of employees, your choice of optional equipment, availability of labor and materials in your area, freight and delivery costs, taxes and interest rates. If your business is located in a major urban center, the initial investment may be significantly higher.

These figures do not take into account financing charges, inflation, compensation for your personal time or labor, rent or interest expenses payable before the Studio opens or similar costs. There are many variables in these costs and expenses, and your actual experience may be lower or higher than the estimates given. You should not plan to draw income from the operations during the start-up and development of your business, which period may vary considerably from Studio to Studio and cannot be accurately predicted by us. You should have additional financial resources available to cover any additional expenses and any operating losses that you may experience. The amount of reserves will vary greatly and will depend upon many factors, including the rate of growth and success of your business.

Your initial investment will also depend upon such factors as demographic and local economic conditions, public awareness of our marks in particular and the nature of your business in the local area, your ability to operate efficiently and in accordance with our System and local competition. Neither we nor any of our affiliates offer direct or indirect financing for any part of the initial investment. We strongly urge you to utilize the services of experienced accountants or financial advisors to evaluate our franchise program and to develop your own business plan and financial projections for your particular operations. Neither we nor any of our affiliates offer direct or indirect financing for any part of the initial investment.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## ITEM 8

## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

**Approved/ Designated Suppliers**

We require you to purchase certain products, services, signs, furnishings, supplies, fixtures, inventory, computer hardware and software, and equipment from distributors and vendors that we have approved. We provide you with a list of approved manufacturers, suppliers and distributors ("Approved Suppliers List") and approved inventory products, supplies and other items or services necessary to operate the Studio ("Approved Supplies List"). The Approved Suppliers List may specify the manufacturer of a specific product or piece of equipment and you may purchase the item from any source that carries the specific approved item. From time to time we, a related party, or a third party vendor or supplier may be the only approved supplier for certain products. You are not currently required to buy any products from us or our affiliates. We may revise the Approved Suppliers List and Approved Supplies List. We give you the approved lists as we deem advisable.

As of the issuance date of this Disclosure Document, you are required to purchase facial products for use in the provision of spa services and a selection of facial products you are required to offer for sale at retail from one exclusive designated supplier. We may change this supplier at any time.

If you want to purchase or use any item which has not been specifically approved by us in writing, you must first notify us in writing and submit to us sufficient specifications, photographs, drawings and other information or samples for us to determine whether the proposed item complies with our specifications and standards, and the supplier meets our approved supplier criteria, which determination will be made and communicated in writing to you within a reasonable time, typically within 30 days after receipt of the information from you or from the proposed supplier.

We apply the following general criteria in approving a proposed supplier: 1) ability to make product in conformity with our specifications; 2) willingness to protect the secrets behind the uniqueness of a product without dissemination to others; 3) production and delivery capability for the System; 4) reputation and integrity of supplier; and 5) financial condition and insurance coverage of the supplier. We may revoke our approval of a supplier at any time by providing you 30 days' written-notice.

We develop the specifications and standards, but we will not issue to you or to our approved suppliers (except as we deem necessary for purposes of production) the specifications and standards for products and services. We will communicate the approved products and services to you in the Operating Manual and otherwise in writing.

**Derived Revenue**

We and our affiliates may derive revenue and other material consideration, including through mark-ups, on account of franchisee purchases and leases. We may also derive revenue on account of franchisee purchases from us, our affiliates and any other supplier without limitation. The amount of the mark-up and pricing for required purchases is subject to our absolute discretion. Any products or services that you purchase from us will be at our then-current price. We did not receive any revenues from any required purchases during our fiscal year that ended December 31, 2015.

There is no approved supplier in which any of our officers has an ownership interest.

FILED DATE: 8/3/2020 1:39 PM    2020CH05088

**Your Premises**

If you are operating an Express Studio, you must sublease the premises from us or our affiliate. If you are operating a Spa Studio, you must obtain our approval of the site for the Studio before you acquire the site. You must also obtain our approval of any contract of sale or lease for the Studio before you sign the contract or lease. You and your landlord must sign a Collateral Assignment of Lease (Exhibit A to Attachment A of the Franchise Agreement) with us, which permits that your lease can be assigned to us on expiration or termination of your Franchise Agreement.

**Development and Construction**

In connection with the construction and opening of the Studio, you must use our designated supplier during our "Spa-in-a-Box" logistics process under which we help you coordinate the design, construction and contracting duties. You must construct and equip the Studio according to our then-current approved design, specifications and standards and you must use a licensed architect and contractor. You must also purchase signage, products, ingredients, supplies, advertising materials, equipment, including the computer system and electronic register/point of sale (POS) system, which we designate or otherwise approve in writing from designated suppliers.

**Insurance**

You must obtain and maintain, at your own expense, insurance coverage that we specify in the Franchise Agreement or the Operating Manual. We may regulate the types, amounts, terms and conditions of insurance coverage required for the Studio, and standards for underwriters of policies providing required insurance coverage.

We prescribe the types and minimum insurance coverage that you must carry. You need to evaluate if your business will require greater coverage or other types of insurance. You also may need different types or additional insurance if required by the lease. All liability policies must name us and our affiliates as additional named insureds. Our mandatory minimum insurance requirements for each Studio are as follows:

| Required Coverage | Minimum Limits of Coverage |
|---|---|
| General Aggregate | $4,000,000 |
| Per Occurrence | $2,000,000 |
| Beauticians/Salon Professional Liability | $1,000,000 |
| Employee Benefits Liability (applies if you provide Employment Benefits) | $1,000,000 |
| Products/Completed Operations Aggregate | $1,000,000 |
| Personal and Advertising Injury | $1,000,000 |
| Employer's Practices Liability | $1,000,000 |
| Each Occurrence | $1,000,000 |
| Tenant Legal Liability | $300,000 |
| Medical Expense (any one person) | $10,000 |

Policies must be written by an A.M. Best "A" or better rated insurance company satisfactory to us and must meet our specifications, including types and amounts of coverage, and the dollar limits and deductibles levels, among other things. You must promptly deliver to us insurance policies or certificates of coverage which designate the name and address of the issuer, the policy number, amount and

FILED DATE: 8/3/2020 1:39 PM   2020CH05088

provisions thereof, all policies will contain a provision that the policy may not be canceled, terminated, or materially or adversely modified without 30 days prior notice from the insurance company to us. You agree that at least 10 days before the expiration of any insurance policy, you will deliver to us either written evidence that the policy has been renewed or a certificate of coverage from another company. All policies will provide that the insurance companies waive subrogation or consent to waiver of right of recovery against us. We, at our option, may make any necessary payments to keep any insurance required in this agreement in force if you fail to do so, and you will immediately reimburse us for such payments plus a 25% service charge. Your obligation to carry insurance will not be reduced because of any insurance we may carry, nor will any insurance carried by us relieve your indemnification obligation.

We may identify additional types of insurance that you must carry upon reasonable notice. We may periodically modify all minimum amounts to reflect inflation, general industry standards or our future experience with claims.

**Other Revenue To Us**

As described above, we may receive revenue from your purchases or leases from us of subleased premises, custom millwork and other custom-designed elements of a Studio, and your purchases of SEVA-branded products, salon and spa products for retail sale and salon and spa products for the performance of services.

Although we do not currently receive any rebates, we and our affiliates may receive rebates and/or other consideration (including promotional allowances and volume discounts) from suppliers in connection with your purchase of goods, products and services. During the year ended December 31, 2015, neither we nor our affiliates earned any revenues based on sales of products or services to our franchisees.

We may, but are not obligated to, negotiate prices for numerous products for the benefit of the System but not on behalf of individual franchisees. Presently, there are no purchasing or distribution cooperatives that you are required to join.

The estimated proportion of the required purchases and leases (whether from us or from other approved suppliers, or in accordance with our specifications) to all purchases and leases by you is approximately 90% in establishing the business and 55% to 90% in the operation of the franchised business.

We do not provide material benefits to you based on purchases through the sources we designate or approve.

We or our affiliates may negotiate purchase arrangements, including prices and terms, with designated and approved suppliers for Agencies.

## ITEM 9

## FRANCHISEE'S OBLIGATIONS

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

In the table below, the following abbreviations have these meanings: FA means the Franchise Agreement, S means Sublease and D means Development Rights Rider.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| | Obligation | Section in Agreement | Disclosure Document Item |
|---|---|---|---|
| a. | Site selection and acquisition/lease | FA: 1.01 and 3.01<br>S: 2 | Items 7 and 11 |
| b. | Pre-opening purchases/leases | FA: 3.01, 4.02<br>S: 9 | Items 7, 8, 11 |
| c. | Site development and other pre- opening requirements | FA: 3.01 - 3.05 | Items 7 and 11 |
| d. | Initial and ongoing training | FA: 3.03 and 4.22 | Items 6 and 11 |
| e. | Opening | FA: 3.04 | Item 11 |
| f. | Fees | FA: 1, 2, 4 and 6<br>S: 8, 9, 12 and 17<br>D: 3 | Items 5, 6, 7 |
| g. | Compliance with standards and policies/Operating Manual | FA: 4 | Item 11 |
| h. | Trademarks and proprietary information | FA: 5 | Items 13 and 14 |
| i. | Restrictions on products/ services offered | FA: 4<br>S: 6 | Items 8 and 16 |
| j. | Warranty and customer service requirements | None | Not applicable |
| k. | Territorial development and sales quotas | FA: 4.23 | Item 6 |
| l. | Ongoing product/service purchases | FA: 4.03 | Item 8 |
| m. | Maintenance, appearance and remodeling requirements | FA: 3.02 and 4.01<br>S: 5 | Items 6 and 11 |
| n. | Insurance | FA: 4.17<br>S: 14 | Items 7 and 8 |
| o. | Advertising | FA: 2.04, 2.05, 4.08 and 4.12 | Items 7 and 11 |
| p. | Indemnification | FA: 4.18<br>S: 15 | Item 11 |
| q. | Owners participation/ management/staffing | FA: 4.09 and 4.10 | Items 11 and 15 |
| r. | Records and reports | FA: 4.13 | Item 11 |
| s. | Inspections/audits | FA: 4.14 and 4.15 | Item 11 |
| t. | Transfer | FA: 6 | Items 6,17 |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| | Obligation | Section in Agreement | Disclosure Document Item |
|---|---|---|---|
| u. | Renewal | FA: 1.04<br>S: 4 | Item 17 |
| v. | Post-termination obligations | FA: 8 | Item 17 |
| w. | Non-competition covenants | FA: 5.06<br>S: 12 | Item 17 |
| x. | Dispute resolution | FA: 10<br>S: 17 | Item 17 |

## ITEM 10

## FINANCING

We do not offer direct or indirect financing. We do not guarantee your note, lease or any other obligation. We do not have any agents or affiliates who offer financing directly or indirectly to you.

## ITEM 11

## FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING

**Except as listed below, we are not required to provide you any assistance.**

### Pre-Opening Obligations

Before you open the Studio, we will provide you with the following assistance

1. Approve the site of the Studio. (Franchise Agreement – Section 3.1)

2. Provide you with an approved fixture layout plan and a list of fixtures, equipment and supplies needed to establish the Studio. (Franchise Agreement - Section 3.02)

3. Provide our "Spa-in-the-Box" development support. (Franchise Agreement - Section 3.02)

4. Provide you with a list of approved suppliers and supplies. (Franchise Agreement - Section 4.02)

5. Provide you, your Business Manager (defined below), and one other person with our initial training program. (Franchise Agreement - Section 3.03)

6. Loan to you one copy of our Operating Manual that contains specifications, standards, policies, and procedures relating to the establishment and operation of the Studio. (Franchise Agreement - Section 4.01)

7. Provide you with the on-site assistance for one day in connection with opening of the Studio. (Franchise Agreement - Section 3.05)

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**Continuing Obligations**

During the operation of the Studio, we will provide the following assistance and services:

1. Provide you with updates to the Operating Manual. (Franchise Agreement - Sections 4.01 and 4.02)

2. Allow you to participate in our web site. (Franchise Agreement - Section 4.06)

3. Administer the Brand Fund. (Franchise Agreement - Section 2.04)

4. Inspect the Studio from time to time. (Franchise Agreement - Section 4.14)

5. Conduct training and certification, hold meetings, and sponsor conferences from time to time as we deem appropriate. (Franchise Agreement - Sections 4.04, 4.09 and 4.22)

**Site Selection and Opening of the Studio**

You must locate, obtain and occupy the site for the Studio, on your own initiative and at your own expense. You must advise us in writing of your proposed site and you must submit to us a complete site report (containing demographic, commercial and other information we may reasonably require). Our prior approval is required in writing. We will approve or disapprove your proposed site within 30 days after we receive all of the materials you are required to provide to us. Our approval of a site will be by delivery of written notice to you. If you do not receive a written notice of approval within 30 days after receipt of the requisite materials to approve or disapprove a proposed site, your proposed site is considered disapproved. You must secure an approved location within 90 days following the date you sign the Franchise Agreement. If you do not secure an approved site within this time period, we may terminate the Franchise Agreement.

We estimate that the typical length of time between the signing of the Franchise Agreement and the opening of an Express Studio will range from 2 to 3 months. We estimate that the typical length of time between the signing of the Franchise Agreement and the opening of a Spa Studio will range from 6 to 12 months. You must open to the public within the earlier of (i) if you enter a sublease with us or our affiliate, 90 days after we provide possession of the premises of the Studio, or (ii) 365 days after signing the Franchise Agreement

**Advertising:**

**Brand Fund**

Currently, we require you to contribute 2% of Gross Sales to the Brand Fund. We may require you to contribute the up to 5% of your Gross Sales on a monthly basis to the Brand Fund ("Brand Fund Cap") at any time upon 30 days' prior notice to you. The Brand Fund Cap does not include the Local Advertising Contribution (as defined below). We will direct all advertising and marketing programs and have the right to make all decisions over all creative concepts, materials and endorsements, website development and the geographic, market and media placement of all programs. We do not promise that we will spend the Brand Fund in any given geographic region or that the benefits you receive will be in proportion to your contributions. We are not required to spend any amount on advertising in your geographic area. Any Studio owned by us or an affiliate will contribute to the Brand Fund on the same basis as franchised Studios.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

We may terminate, and resume, the Brand Fund periodically during your franchise term. Any decision to terminate or resume the Brand Fund will apply to all franchisees equally. We will not terminate the Brand Fund before making arrangements to spend or distribute any remaining balances in the Brand Fund after payment of all expenses.

We may use the Brand Fund to pay for the cost to prepare and produce advertising materials; purchase media space or time; administer local, regional and national advertising programs, including buying direct mail and other media advertising; develop and operate our website and point of sale system; conduct Internet and electronic advertising promoting the System and Marks; employ advertising, public relations and media buying agencies to assist us in these activities; support public relations, market research, other advertising and marketing activities and hiring activities; and updates to the POS system. Additionally, we may use the Brand Fund to furnish our franchisees with marketing items, advertising and promotional formats and materials, like advertising art, radio and television commercials, musical jingles, print advertisements, point of sale materials, promotional graphics, take-away graphic menus, various coupons, outdoor advertising art, direct mail pamphlets and literature, and electronic listings in white and yellow page websites in our judgment.

We did not collect any Brand Fund contributions, nor did we make any Brand Fund expenditures, during our fiscal year ended December 31, 2015. We began collecting the Brand Fund on January 1, 2016.

We are not required to maintain a separate account for the Brand Fund. The Brand Fund will not be held in a trust or escrow account. The Brand Fund is not a trust. We have no fiduciary obligation to you for administering the Brand Fund or for any other reason. We will not use contributions to the Brand Fund principally to develop materials and programs to solicit franchisees. Media, materials and programs prepared using Brand Fund contributions may describe our franchise program, reference the availability of franchises and related information and process franchise leads.

Out of the Brand Fund, we may pay ourselves for the direct costs, salaries, travel expenses, administrative costs and other direct overhead we incur to administer the Brand Fund including the cost of preparing the annual accounting, expenses to collect Brand Fund Fees from delinquent franchisees, costs to develop and execute specific marketing and advertising programs (including costs for market research and production) and costs to fund the annual meeting of franchisees if we elect to hold one. In any given year, we may spend more or less than the total amount we collect for that year. We may carry-forward any Brand Fund surplus or deficit to a future fiscal period. We treat interest paid on Brand Fund balances as additional Brand Fund revenue. An unaudited accounting of the receipts and disbursements of the Brand Fund will be available on request 60 days after the end of each calendar year.

We may structure the Brand Fund's organization and administration in any way that we determine. We may organize or reorganize the Brand Fund into a separate entity as we deem appropriate and we may transfer all Brand Fund contributions and assets to the entity. We may require you to pay the Brand Fund contributions directly to the entity. We anticipate that all franchises offered pursuant to this disclosure document will be required to contribute to the Brand Fund at the same rate; however, we may negotiate different rates and payment terms as we deem necessary or appropriate.

**Franchise Advisory Council**

We do not currently have any franchise advisory council.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**Local Advertising Cooperative**

We may establish or direct the establishment of a local advertising cooperative ("Local Advertising Cooperative") in geographical areas (as determined by us) in which 2 or more Studios are operating. The Local Advertising Cooperative will be organized and governed by written documents in a form and manner, and begin operating on a date, that we determine in advance. Such written documents will be available for participating franchise owners to review. We may change, dissolve, merge and reinstate any Local Advertising Cooperatives. Each Local Advertising Cooperative's purpose is, with our approval, to administer advertising programs and develop advertising, marketing and promotional materials for the area that the Local Advertising Cooperative covers. If we have established a Local Advertising Cooperative for the geographic area in which the Studio is located, as of the time you sign this Agreement, or if we establish a Local Advertising Cooperative during the Franchise Agreement's term, we may require you become a member of the Local Advertising Cooperative and participate in the Local Advertising Cooperative.

If we establish a Local Advertising Cooperative in your geographic area, you will contribute your share to such Local Advertising Cooperative ("Local Advertising Cooperative Contribution"). The amount of your Local Advertising Cooperative Contribution will be determined at the time the Local Advertising Cooperative is established, but will not exceed 2% of your Gross Sales. Your Local Advertising Cooperative Contribution will be payable in the same manner as the Royalty. Your Local Advertising Cooperative Contribution may also be capped based on the provisions of the by-laws adopted by the Local Advertising Cooperative, subject to our approval.

Each Studio contributing to a Local Advertising Cooperative will have 1 vote on matters involving the activities of the particular Local Advertising Cooperative. The Local Advertising Cooperative may not use any advertising, marketing or promotional plans or materials without our prior written consent. The Local Advertising Cooperative will have discretion over the creative concepts, materials and endorsements used by it. We will assist you in the formulation of marketing plans and programs, which will be implemented under the direction of the Local Advertising Cooperative. The Local Advertising Cooperative Contributions may be used to pay the costs of preparing and producing video, audio and written advertising and direct sales materials for Studios in your area; purchasing direct mail and other media advertising for Studios in your area; implementing direct sales programs; and employing marketing, advertising and public relations firms to assist with the development and administration of marketing programs for Studios in your area.

The Local Advertising Cooperative Contributions will be accounted for separately by us from our other funds and will not be used to defray any of our general operating expenses. You will submit to us and the Local Advertising Cooperative any reports that we or the Local Advertising Cooperative may require.

The Studio might not benefit directly or in proportion to their Local Advertising Cooperative Contribution. Local Advertising Cooperatives for Studios will be developed separately and no Local Advertising Cooperative will be intended to benefit the others. We will have the right, but not the obligation, to use collection agents and to institute legal proceedings to collect a Local Advertising Cooperative Contributions on behalf of and at the expense of the Local Advertising Cooperative and to forgive, waive, settle and compromise all claims by or against the Local Advertising Cooperative. We assume no direct or indirect liability or obligation to you with respect to the maintenance, direction or administration of the Local Advertising Cooperative.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**Membership Program**

We may establish a membership program (the "Membership Program"), under which certain customers will pay a monthly fee to become members ("Members") of any Studio in the System. In the event we establish a Membership Program, each Studio is required to participate in and provide certain products and services we designate to Members. Studios will be compensated monthly for services rendered to Members in accordance with our then existing Membership Program guidelines.

**Grand Opening**

You will spend a minimum of $1,500 to advertise and promote the grand opening of the Studio during the period commencing 1 month prior to the store opening and ending 1 month after Studio opening. Before you begin initial training you must deposit with our designated third party supplier $1,500 to be applied to your grand opening promotional expenses. We must approve of any grand opening advertising materials prior to your use of the materials. We strongly recommend, but do not require, that you also spend at least 1% of Gross Sales for ongoing local advertising and promotion.

**Computer System**

You must purchase, use and maintain at your cost a point-of-sale (POS) system that we designate. We currently mandate the use of iPOS™ - a 3rd party, iPad-based POS system that was customized for SEVA. The overall POS system includes the point of sales application and software and all of the peripheral hardware and software elements that in aggregate allow for the daily operation of the Studio. The peripheral hardware and software includes but is not necessarily limited to the cash drawer, receipt printer, IP camera, Bluetooth speakers, point of sale processing hardware and software, credit card processing hardware and software, membership processing hardware and software, gift card processing hardware and software, 3rd-party Software as a Service (SaaS) applications such as our Hiring, Training, Marketing and other portals, an LCD screen and other components (although purchased separately). Currently, the specified equipment includes: three iPad 4th generation (or later versions) with built-in Wifi + 4G cellular service with iOS 8+, 32+ GB Hard Drive; APG Vasario-series cash drawer; Star Micronics Receipt Printer; 3 iPOS for iPad software applications; a wireless IP security camera; Internet modem and router; Wireless Bluetooth speakers; and a 40" LCD screen TV with Internet connectivity.

The primary functions of iPOS is the daily operation of the Studio including customer check-in and check-out, day-to-day sales recording and reports and generating financial statements.

There are no contractual limitations on the frequency or cost of upgrades or changes in the computer system that we may impose. The estimated cost of the computer system at an Express Studio is $2,000 to $4,000 while the estimated cost of the computer system at a Spa Studio is $2,000 to $5,000. The estimated annual cost of any required or optional computer maintenance, updating, upgrading and support services is $500 at the Studios.

Unless stated otherwise, we require you to purchase computer hardware and software applications meeting our specifications from any approved third party vendor. You must pay for all costs to acquire and install the equipment and software, and for ongoing maintenance of software licenses and hardware, and all upgrades that we require. Your iPOS system, including IP camera must always be online and accessible to clients and to us at all times. We may coordinate qualified IT technicians at your expense to maintain the operability and online connection of any component of iPOS at all times. For example, if any component of iPOS such as the IP camera goes offline for an extended period of time (typically more than 24 hours) and you are unable to resolve the inoperability within the prescribed timeframe, we may use GeekSquad or a similar technical service to analyze and correct the problem on your behalf and at

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

your expense. There is no limit to the number of deployments we may authorize in order to correct any deficiencies in the operation of the iPOS system, including but not limited to the IP camera or any other essential components of the Studio's iPOS system.

We will have independent access to the information generated and stored in your computer system. Nothing limits our right to access or use the data we retrieve.

**Website / Intranet / Social Media**

We may establish, maintain, modify or discontinue all internet, worldwide web and electronic commerce activities pertaining to the System. We may establish one or more websites accessible through one or more uniform resource locators ("URLs") and, if we do, we may design and provide for the benefit of the Studio a "click through" subpage at our website for the promotion of the Studio. If we establish one or more websites or other modes of electronic commerce and if we provide a "click through" subpage at the website(s) for the promotion of the Studio, you must routinely provide us with updated copy, photographs and news stories about the Studio suitable for posting on your "click through" subpage. We may specify the content, frequency and procedure you must follow for updating your "click through" subpage.

Any websites or other modes of electric commerce that we establish or maintain may – in addition to advertising and promoting the products, programs or services available at Studios – also be devoted in part to offering Studio franchises for sale and be used by us to exploit the electronic commerce rights which we alone reserve.

In addition to these activities, we may also establish an intranet through which downloads of operations and marketing materials, exchanges of franchisee e-mail, System discussion forums and System-wide communications (among other activities) can be done. You may not maintain your own website; otherwise maintain a presence or advertise on the internet or any other mode of electronic commerce in connection with the Studio; establish a link to any website we establish at or from any other website or page; or at any time establish any other website, electronic commerce presence or URL which in whole or in part incorporates the "SEVA Studio" name or any name confusingly similar to the Proprietary Marks.

You are prohibited from using the Marks and listing, marketing, advertising or otherwise promoting the Studio on or through the Internet, any social media site, mobile application, networking site, electronic media or any emerging or future developed media outlet or platform, including, but not limited to Facebook, LinkedIn, Instagram, Groupon, Living Social, YouTube, Pinterest, Google, Yahoo or Twitter, without our prior written consent in each instance. In the event we approve your use of social media, you must comply with our then current social media policy. We may withhold our consent for any reason and we may condition our consent, if granted, on your compliance with our designated methods, standards, procedures, rules and regulations. You may not post any content on the Internet, electronic media, mobile applications, social media or any future developed media outlet relating to the Studio without (i) obtaining our prior written consent (which we may grant or refuse in our sole and absolute discretion) and (ii) complying with any and all restrictions, terms and conditions we impose. We may provide access to branded social media pages/handles/assets, and we may require you to update these regularly. We may conduct collective/national campaigns via local social media on your behalf.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**Operating Manual**

The table of contents of our Operating Manual is attached to this disclosure document as Exhibit G. Our Operating Manual consists of approximately 262 total pages.

**Training**

Our initial training program as of the date of this Disclosure Document is as follows:

**TRAINING PROGRAM**

| Column 1<br><br>Subject | Column 2<br><br>Hours of Classroom Instruction[1] | Column 3<br><br>Hours of On-the-Job Training[2] | Column 4<br><br>Location |
|---|---|---|---|
| Introduction to SEVA University | 1 | 1 | Online |
| Marketing | 2 | 1 | Online |
| Information Technology | 3 | 1 | Online |
| Human Resources | 3 | 1 | Online |
| Products and Services | 22 | 1 | Online |
| Studio Operations | 3 | 1 | Online |
| Accounting | 2 | 1 | Online |
| Final Evaluation | 3 | 1 | Online |
| Graduation | 2 | 1 | Online |
| **TOTALS** | **41** | **9** | |

1. Unless otherwise noted, the numbers in this column represent the estimated amount of time it will take you to complete the required online courses we provide through SEVA University. You will complete the online portion of SEVA University remotely.

2. Unless otherwise noted, the numbers in this column represent the time you will spend on the telephone, via online call or through a webinar with a SEVA team member.

Initial Training is conducted in an online environment via webinar. The cost of this training is included in your Initial Franchise Fee, but there may be circumstances where you will have to pay for your employed lead technician to assist with your initial training. You, if you are an individual, or your 'Named Partner' (if you are an entity), a manager designated by you ("Business Manager"), and a third individual designated by your are required to complete the training to our satisfaction outlined above before you open the Studio (your Business Manager, Named Partner and designated third individual are collectively referred to as your "Training Team"). Your Training Team must complete the training within 45 days after choosing a site for the Studio. Your Training Team must complete the initial training program to our satisfaction before opening during the time periods we designate. We may also suggest that your

FILED DATE: 8/3/2020 1:39 PM    2020CH05088

Training Team complete an internship of 1 additional day at a Studio. The need, location, time, and schedule of the internship will be mutually agreed upon by you, us and the owner of the Studio in which the internship will take place.

The training curricula, which is subject to modification at any time, is currently composed of self-guided eLearning curricula, videos, webinars, presentations and collateral materials along with course testing and examinations all of which is contained within our web-based Training Portal. In addition, we offer proprietary methodologies of virtual hands-on evaluation to facilitate the understanding of the content. This collection of e-Learning and virtual hands-on, evaluation methodologies is referred to as SEVA University™.

In addition to the training that we provide, 1 or more representatives from an approved spa vendor may provide approximately 5 or more hours of training relating to facials and related goods and services. This portion of the training program may be provided at the Studio shortly before your grand opening.

Our initial training program is conducted by Bree Viscia, our Director of Spa Operations as well as her Spa Operations Coaches. Our instructor has at least 5 years of experience relevant to the subject being taught, and at least 1 year of experience with us and/or our affiliate. We may make changes in our training staff as we deem necessary and advisable without prior notice.

You and your associates may be required to attend additional training meetings and refresher courses including periodic webinars, video conferences, and virtual hands-on instructional courses that may take place from time-to-time at our corporate offices, online, or at another location we designate. We also will require that all of your lead technicians (which may include your Business Manager) that performs services for clients need to complete training courses and receive Certification (at a cost of $5 to $250 per person) in accordance with our requirements and your individual state rules and regulations. The additional training and refresher courses currently may include the requirement that you, your designated manager and your employees will be required to retake and recertify every 6 months or as deemed necessary by SEVA to uphold our brand and service standards. We may require additional retraining or re-certification at any time as we deem appropriate (such as in response to poor social media reviews and customer complaints).

## ITEM 12

## TERRITORY

**Franchise Agreement**

Under the Franchise Agreement we grant you the right to operate a Studio at a specific location. You will select the site for the Studio subject to our approval and using our site submittal forms and/or criteria. The Franchise Agreement does not grant you any territorial rights beyond whatever geographic radius is listed in an exhibit to the Franchise Agreement.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we may control. You may also face competition from competing salons and spas located within the same retail location as the Studio (such as a nail salon or hair salon that offers competing services). However, we will not locate another Studio within the same retail location as the Studio.

You may not relocate the Studio without our prior written permission, which we can withhold for any reason. At a minimum, any proposed relocation must meet all of the criteria for a new location. You do

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

not have any options, rights of first refusal or similar rights to acquire additional franchises under the Franchise Agreement. You will not sell products or services through any other channel or method of distribution (including the Internet or any other existing or future form of electronic commerce) or to any person or entity for resale or further distribution. All such rights, whether related to products and services offered under the System and Marks or otherwise, are reserved to us.

We and our affiliates may distribute products, including products with trademarks, service marks, trade names and symbols licensed in the Franchise Agreement, through other methods of distribution, and to undertake other business activities, including salon and spa and related businesses, without compensation to its franchisees.

During the Studio's first year of operation (from the date of opening until the day before the first anniversary thereof), you must achieve at least $150,000 in Gross Sales. During the Studio's second year of operation, and for every rolling 12-month period thereafter, you must achieve at least $250,000 in Gross Sales. If you fail to achieve these minimum Gross Sales, then (i) you must pay to us the difference between the Royalties actually paid and the amount of Royalties you would have paid if you had met the minimum Gross Sales; and (ii) we may terminate the Franchise Agreement for your breach of this obligation.

There are no restrictions placed on you, us, or other franchisees from promoting, advertising, soliciting, establishing, servicing, and maintaining customers and potential customers in the communities surrounding the Studios owned by you, us, or other franchisees.

You may sell our proprietary products and related merchandise to retail customers and prospective retail customers who live anywhere but who choose to shop in your Franchise. You may not engage in any promotional activities or sell our proprietary products or similar products or services, whether directly or indirectly, through or on the Internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system (collectively, the "Electronic Media"); through catalogs or other mail order devices sent or directed to customers or prospective customers located anywhere; or by telecopy or other telephonic or electronic communications, including toll-free numbers, directed to or received from customers or prospective customers located anywhere. You may not place advertisements in printed media and on television and radio that are targeted to customers and prospective customers located outside of your retail location. You have no options, rights of first refusal, or similar rights to acquire additional franchises. You may not sell our proprietary products to any business or other customer for resale.

We have not yet established other franchises or company-owned outlets or another distribution channel selling or leasing similar products or services under a different trademark, but may do so in the future.

Neither we nor any parent or affiliate has established, or presently intends to establish, other franchised or company-owned Studios which sell our proprietary products or services under a different trade name or trademark, but we may to do so in the future.

## ITEM 13

## TRADEMARKS

The Franchise Agreement licenses you the non-exclusive right to use the SEVA service mark, as well as other trademarks, service marks, trade names and a commercial symbols we authorize, which are owned by our affiliate, SEVA IP.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

The following is a description of the service mark and trademark registrations on the principal register of the United States Patent and Trademark Office ("USPTO"):

| Mark | Application Date | Serial Number | Registration Date | Registration Number |
|---|---|---|---|---|
| SEVA brow shaping * waxing * threading | February 23, 2010 | 77943116 | December 7, 2010 | 3885296 |
| SEVA and Design | October 28, 2010 | 85163273 | August 9, 2011 | 4008759 |
| SEVA | October 28, 2010 | 85163266 | August 9, 2011 | 4008758 |
| Fulfill Your Beauty Destiny | October 30, 2012 | 85766606 | June 18, 2013 | 4353993 |
| Take Some Face Time | September 16, 2013 | 86065185 | February 10, 2015 | 4683520 |
| Beauty To The People | December 26, 2013 | 86152377 | April 28, 2015 | 4726184 |

Your use of the Marks and any goodwill is to our exclusive benefit and you retain no rights in the Marks. You also retain no rights in the Marks upon expiration or termination of your Franchise Agreement. You are not permitted to make any changes or substitutions of any kind in or to the use of the Marks unless we direct in writing. We may change the System presently identified by the Marks including the adoption of new Marks, new products, new services, new equipment or new techniques and you must adopt the changes in the System, as if they were part of the Franchise Agreement at the time of its execution. You must comply within a reasonable time, at your expense, if we notify you to discontinue or modify your use of any Mark. We will have no liability or obligation as to your modification or discontinuance of any Mark.

As discussed in Item 1, our affiliate, SEVA IP, owns the trademarks. It has filed all required affidavits. We have entered into an amended and restated Trademark License Agreement with Holdings dated February 2, 2016 which grants us the right to use and sublicense to our franchisees the right to use the Marks. The term of this License Agreement is for 20 years and after that it is renewed for successive 10 year periods unless either party gives notice of termination before the end of such extension. The License Agreement can also be terminated for failure to maintain quality standards, breach of the License Agreement or bankruptcy.

We do not know of either superior prior rights or infringing uses that could materially affect the franchisee's use of the Marks in the state where the franchised business will be located. You must immediately notify us of any apparent infringement of the Marks or challenge to your use of any of the Marks or claim by any person of any rights in any of the Marks. You and your principal owners, including Named Partner, are not permitted to communicate with any person other than us, or any designated affiliate, our counsel and your counsel involving any infringement, challenge or claim. We can take action and have the right to exclusively control any litigation or USPTO or other administrative or agency proceeding caused by any infringement, challenge or claim or otherwise relating to any of the

DocuSign Envelope ID: C2B6A76B-1DB5-48A9-9ED6-A8F8496F8AA6

FILED DATE: 8/3/2020 1:39 PM    2020CH05088

Marks. You must sign any and all documents, and do what may, in our counsel's opinion, be necessary or advisable to protect our interests in any litigation or USPTO or other administrative or agency proceeding or to otherwise protect and maintain our interests and the interests of any other person or entity (including any affiliate) having an interest in the Marks.

We will indemnify you against and reimburse you for all damages for which you are held liable for your use of any of the Marks, provided that the conduct of you and your principal owners, including the Named Partner, are in the proceeding and use of the Marks is in full compliance with the terms of the Franchise Agreement.

## ITEM 14

## PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION

### Patents and Copyrights

We do not have an ownership interest in any patents or copyrights that are material to the franchise although we do claim copyright ownership and protection in our Franchise Agreement, the Operating Manual, the SEVA website, SEVA University, SEVA Academy, iPOS, and various other manuals, videos, CD's, DVD's, eLearning content, training programs, sales promotional and other material published from time to time.

### Confidential Information

You must keep confidential during and after the term of the Franchise Agreement all trade secret and proprietary information, including but not limited to any sales techniques and procedures and processes, vendor and supplier information, pricing information, System software, iPOS system components and software, the contents of the Operating Manual and all subparts and related writings. Upon termination of your Franchise Agreement you must return to us all proprietary information, including but not limited to any writing relating to our sales techniques, operating procedures and processes, the Operating Manual and all other copyright material. You must notify us immediately if you learn about an unauthorized use of proprietary information. We are not obligated to take any action and have the sole right to decide the appropriate response to any unauthorized use of proprietary information. You must comply with all changes to the Operating Manual and related writings at your cost.

All ideas, concepts, techniques, or materials concerning the SEVA concept, whether or not protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the System, and works made-for-hire for us. To the extent any item does not qualify as a "work made-for-hire" for us, you must assign ownership of that item, and all related rights to that item, to us and must take whatever action (including signing an assignment agreement or other documents) we request to show our ownership or to help us obtain intellectual property rights in the item.

## ITEM 15

## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION
## OF THE FRANCHISE BUSINESS

You must designate one of your owners as the "Named Partner." The Named Partner must hold at least a 25% ownership interest in the franchise or the franchise entity (if the franchise is owned by an entity) and successfully complete our initial training program (see Item 11) and any other training programs as we deem appropriate. The Named Partner must be the primary manager of the Studio. He or she may not engage in any other business or other activity, directly or indirectly, that requires significant management

29

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

responsibility or time commitments, or that may otherwise conflict with the Named Partner's obligations under the Franchise Agreement.

You must also designate a "Business Manager" of the Studio. We do not require that the Business Manager have an ownership interest in the franchise. The Named Partner may serve as the Business Manager. The Business Manager will exert full-time efforts to fulfill your obligations under the Franchise Agreement and will not engage in any other business or other activity, directly or indirectly, that requires any significant management responsibility or time commitments, or that may otherwise conflict with your obligations under the Franchise Agreement. If the relationship of the Business Manager with you terminates or materially changes, you must promptly designate a replacement Business Manager, and the Named Partner must assume all of the obligations of the Business Manager during the interim period. The initial Business Manager must successfully complete our initial training program and any other training programs as we deem appropriate before the Studio opens for business. Any replacement Business Manager must complete our initial training program and any other training programs as we deem appropriate before engaging in any business pertaining to the Studio.

If you are a business entity, each owner, and each spouse and/or domestic partner of each owner, will be required to sign personal guarantees in the form attached to the Franchise Agreement. If you are an individual, your spouse or domestic partner will be required to sign a personal guarantee in the form attached to the Franchise Agreement.

Each franchisee, manager, and associate must sign a written agreement to maintain confidentiality of the proprietary information and trade secrets described in Item 14 and to conform with the covenants not to compete described in Item 17.

## ITEM 16

## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer and sell only the products and services that we designate are part of the System. You must offer all of the products and services that we designate are part of the System, and nothing else, except with our prior written approval. We may add, delete or change approved products and services that you are required to offer from time to time. There are no limits on our right to do so. If you have a smaller format unit, such as a Express Studio the product and service menu that you will offer may be different than the full menu required in our Spa Studios. You may not sell our proprietary products to any business or other customer for resale. You must observe all applicable laws and regulations that govern your business.

In the event we establish the Membership Program, each Studio is required to participate in and provide certain products and services we designate to Members. Studios will be compensated monthly for services rendered to Members in accordance with our then existing Membership Program guidelines.

Except as disclosed in this Item, we do not impose any restrictions regarding the customers to whom you may sell authorized products and services.

We may determine the minimum and/or maximum prices for the goods, products and services offered from the Studio, as permitted by applicable law.

FILED DATE: 8/3/2020 1:39 PM    2020CH05088

**ITEM 17**

**RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION**

**THE FRANCHISE RELATIONSHIP**

**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this Disclosure Document.**

**FRANCHISE AGREEMENT**

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| a. | Length of the franchise term | 1.03 | 5 years from the earlier of (i) 90 days after we provide you possession of the premises or (ii) the grand opening of the Studio. |
| b. | Renewal or extension of the term | 1.04 | If you are in good standing and meet other requirements, you can add an additional 5 year term. |
| c. | Requirements for you to renew or extend | 1.04 | You are not in default, obligations are current, sign the then current form of franchise agreement (which may contain materially different terms and conditions from your original agreement), pay renewal fee, remodel and sign release. |
| d. | Termination by you | 7.01 | You may terminate if we materially breach the Agreement, and we fail to cure the breach within 30 days of receiving notice from you. |
| e. | Termination by us without cause | None | Not applicable. |
| f. | Termination by us with cause | 7.02 | We can terminate only for good cause. |
| g. | "Cause" defined - curable defaults | 7.02(t) | You have 15 days to cure any breach of the Franchise Agreement, other than a breach listed in Section 7.02, after we deliver written-notice of the failure to you |

SEVA Beauty, LLC
Franchise Disclosure Document
1253.001.001/147286.5

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| h. | "Cause" defined -non-curable defaults | 7.02 | Non-curable defaults include: criminal acts, unauthorized transfer, bankruptcy or similar proceedings, abandonment or closing the Studio, disclosure of confidential information, conduct which materially impairs our trademarks, use of the Studio for any unauthorized purpose, liens, your insolvency, your repeated breaches, misrepresentation or fraud, violation of law, understated Gross Sales, loss of your premises, failing to open the Studio within the agreed period, your violation of the law, failure to achieve minimum Gross Sales, violation of your non-compete or your non-payment of amounts due to us or our affiliates. |
| i. | Your obligations on termination/non- renewal | 8 | Obligations include complete de-identification, transfer of telephone numbers, and payments of amounts due. |
| j. | Assignment of contract by us | 6.01 | No restriction on our right to assign. |
| k. | "Transfer" by you - defined | 6.02 | Includes transfer of contract or assets or ownership change. |
| 1. | Our approval of transfer by you | 6.03 | We have the right to approve all transfers but will not unreasonably withhold approval. |
| m. | Conditions for our approval of transfer | 6.03 | New franchisee qualifies, transfer fee paid, purchase agreement approved, training arranged, release signed by you and current agreement signed by new franchisee. |
| n. | Our right of first refusal to acquire your business | 6.04 | We can match any offer for your business. |
| o. | Our option to purchase your business | 8.02 | We have the right to purchase your business assets for fair market value upon the expiration or termination of your franchise agreement. |
| p. | Your death or disability | 6.06 | Franchise must be assigned by estate to approved buyer in 6 months. |
| q. | Non-competition covenants during the term of the franchise | 5.06 | No involvement in competing or similar business. No sharing of proprietary information. |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| | Provision | Section in Franchise Agreement | Summary |
|---|---|---|---|
| r. | Non-competition covenants after the franchise is terminated or expires | 5.06 | No competing business for 2 years at your former Studio location, within 25 mile radius of your Studio or within 25 miles any other Studio in operation or under construction as of the date your franchise agreement terminates or expires. |
| s. | Modification of the Franchise Agreement | 11.02 | No modifications generally but the Operating Manual subject to change. |
| t. | Integration/merger clause | 11.02 | Only the terms of the Franchise Agreement are binding (subject to state law). Any representations or promises made outside the Disclosure Document and Franchise Agreement may not be enforceable. |
| u. | Dispute resolution by arbitration or mediation | 10 | All disputes must be arbitrated where our corporate headquarters are then located (currently in Highland Park, Illinois). |
| v. | Choice of forum | 11.07 | Litigation, if applicable, must be conducted in Illinois (subject to state law). |
| w. | Choice of Law | 11.06 | Illinois (subject to state law). |

**SUBLEASE AGREEMENT**

| | Provision | Section in Sublease Agreement | Summary |
|---|---|---|---|
| a. | Length of Term | 4 | You can only renew if we can renew or extend master lease. |
| b. | Renewal or extension of the term | 4 | You can only renew if we can renew or extend master lease. |
| c. | Requirements for you to renew or extend | 4 | You must remodel and upgrade the premises. |
| d. | Termination by you | None | Not applicable. |
| e. | Termination by us without cause | None | Not applicable. |
| f. | Termination by us with cause | 11 | We or our affiliate can only terminate the sublease if you default. |
| g. | "Cause" defined -- curable defaults | 11 | Curable defaults include failure to pay rent and violation of any provision of master lease. |
| h. | "Cause" defined -- non-curable defaults | 3 | Expiration or termination of the Franchise Agreement. |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| | Provision | Section in Sublease Agreement | Summary |
|---|---|---|---|
| i. | Your obligations on termination/non-renewal | 11 | Surrender premises and pay our costs resulting from your default. |
| j. | Assignment of contract by us | 7 | No restriction on our right to assign. |
| k. | "Transfer" by you -- defined | Not defined | Not applicable. |
| l. | Our approval of transfer by you | 7 | You may not assign your rights without our prior written approval. |
| m. | Conditions for our approval of transfer | None | Not applicable. |
| n. | Our right of first refusal to acquire your business | None | Not applicable. |
| o. | Our option to purchase your business | None | Not applicable. |
| p. | Your death or disability. | None | Not applicable. |
| q. | Non-competition covenants during the term of the franchise. | None | Not applicable. |
| r. | Non-competition covenants after the franchise is terminated or expires. | None | Not applicable. |
| s. | Modification of the Franchise Agreement | 17 | No modifications. |
| t. | Integration/merger clause | 17 | Only the terms of the sublease binding (subject to state law). Any other representations or promises made outside the Disclosure Document and sublease may not be enforceable. |
| u. | Dispute resolution by arbitration | 17 | All disputes must be arbitrated where our corporate headquarters are located (currently in Lake County, Illinois). |
| v. | Choice of forum | 17 | Any litigation must be brought in a court with competent jurisdiction in the State of Illinois. |
| w. | Choice of Law | 17 | Illinois law (subject to state law). |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## ITEM 18

## PUBLIC FIGURES

We do not use any public figure to promote our franchise.

## ITEM 19

## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

The average sales, expenses and cash flows of the Studios were obtained from operating statements submitted to SEVA by its franchisees. Most franchisees use a cash versus accrual system for producing their financial statements, which may produce slight differences between the actual date of occurrence of expenses and the date such expenses are reported on the franchisee's financial statements.

## SECTION A

## AVERAGE REVENUES, EXPENSES AND OPERATING CASH FLOW OF CERTAIN STUDIOS

The following Section contains the average total revenues, expenses, and operating cash flow from 47 Express Studios which, at a minimum, were open the entire calendar year ending December 31, 2015, and remain open as of the date of this Disclosure Document ("Item 19 Studios").[1] There were a total of 67 Express Studios open for the entire 2015 calendar year, and all remain open as of the date of this Disclosure Document, but 20 of the 67 Studios did not submit sufficient and reliable sales data and were therefore excluded from this Section. The information contained in this Item 19 relates solely to historical data and was taken from actual Item 19 Studios' operating statements. For the purposes of these Item 19 disclosures, unless otherwise indicated, "total revenues" was calculated in the same manner as "Gross Sales" (as defined in Item 6).

For the purposes of the table below, (a) Year 1 refers to a subset of 15 Item 19 Studios which were in operation for at least 1 full calendar year prior to December 31, 2015; (b) Year 2 refers to a subset of 26 Item 19 Studios which were in operation for at least 2 full calendar years prior to December 31, 2015; and (c) Year 3 refers to a subset of 6 Item 19 Studios which were in operation for at least 3 full calendar years prior to December 31, 2015.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

1. Please note this Item 19 only contains information from Express Studios. There were not any Spa Studios that were in operation for a full calendar year prior to December 31, 2015.

**Average Operating Cash Flow Statement** (per unit)

| | Year 1 | | Year 2 | | Year 3+ | |
|---|---|---|---|---|---|---|
| Revenues | | | | | | |
| Service Sales | $ 189,152 | 97.09% | $ 203,276 | 97.48% | $ 251,109 | 98.78% |
| Product Sales | $ 5,672 | 2.91% | $ 5,248 | 2.52% | $ 3,095 | 1.22% |
| Total Revenues | $ 194,824 | 100.00% | $ 208,524 | 100.00% | $ 254,204 | 100.00% |
| Expenses | | | | | | |
| Labor | $ 71,659 | 36.78% | $ 72,956 | 34.99% | $ 85,315 | 33.56% |
| Occupancy | $ 25,540 | 13.11% | $ 29,381 | 14.09% | $ 27,438 | 10.79% |
| Products | $ 14,505 | 7.45% | $ 13,292 | 6.37% | $ 18,456 | 7.26% |
| Continuing Franchise Fees | $ 15,132 | 7.77% | $ 15,554 | 7.46% | $ 17,921 | 7.05% |
| Advertising | $ 2,499 | 1.28% | $ 2,879 | 1.38% | $ 2,559 | 1.01% |
| Total Expenses | $ 129,335 | | $ 134,062 | | $ 151,689 | |
| Operating Cash Flow | $ 65,489 | 33.61% | $ 74,462 | 35.71% | $ 102,515 | 40.33% |

All Item 19 Studios

Overall, the average total revenues of the Item 19 Studios were $209,983. A total of 23 Item 19 Studios (49%) exceeded this average. Item 19 Studios averaged a total of $134,804 in expenses. A total of 24 Item 19 Studios (51%) totaled expenses lower than $134,804. The average operating cash flow of Item 19 Studios was $75,179. A total of 22 Item 19 Studios (47%) had an operating cash flow in excess of $75,179.

Year 1 -15 Studios

The average total revenues for this group of 15 Studios were $194,824. A total of 7 Studios, or 47% exceeded this average. The average total expenses for this group of 15 Studios were $129,335. A total of 8 Studios or 53% have total expenses lower than the average figure of $129,335. The average operating cash flow for this group of 15 Studios is $65,489. A total of 7 Studios, or 47%, had total average operating cash flow in excess of the average of $65,489.

Year 2 - 26 Studios

The average total revenues for this group of 26 Studios were $208,524. A total of 12 Studios, or 46% exceeded this average. The average total expenses for this group of 26 Studios were $134,063. A total of 13 Studios or 50% had total expenses lower than the average figure of $134,063. The average operating cash flow for this group of 26 Studios was $74,461. A total of 12 Studios, or 46%, had total average operating cash flow in excess of the average of $74,461.

Year 3 - 6 Studios

The average total revenues for this group of 6 Studios were $254,205. A total of 4 Studios, or 67% exceeded this average. The average total expenses for this group of 6 Studios were $151,691. A total of 2 Studios or 33% had total expenses lower than the average figure of $151,691. The average operating cash flow for this group of 6 Studios was $102,514. A total of 4 Studios, or 67%, had total average operating cash flow in excel of the average of $102,514.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## SECTION B

### AVERAGE REVENUE, EXPENSES AND OPERATING CASH FLOW OF CERTAIN FRANCHISEES WITH MORE THAN 1 STUDIO.

Many SEVA franchisees operate more than one Studio. The following Section contains the average revenues, expenses, and operating cash flow from 33 Item 19 Studios, which are owned by franchisees who each own more than 1 Studio ("Multi-Unit Studios"). For the purposes of the table below, (a) Year 1 refers a subset of 12 Multi-Unit Studios which were in operation for at least 1 full calendar year prior to December 31, 2015; (b) Year 2 refers to a subset of 16 Item 19 Multi-Unit Studios which were in operation for at least 2 full calendar years prior to December 31, 2015; and (c) Year 3 refers to a subset of 5 Multi-Unit Studios which were in operation for at least 3 full calendar years prior to December 31, 2015.

**Average Operating Cash Flow Statement (per unit)**
**Multi-Unit Partners Only**

| | Year 1 | | Year 2 | | Year 3+ | |
|---|---|---|---|---|---|---|
| Revenues | | | | | | |
| Service Sales | $ 219,812 | 98.12% | $ 238,353 | 98.09% | $ 284,747 | 98.74% |
| Product Sales | $ 4,205 | 1.88% | $ 4,638 | 1.91% | $ 3,639 | 1.26% |
| Total Revenues | $ 224,017 | 100.00% | $ 242,991 | 100.00% | $ 288,386 | 100.00% |
| Expenses | | | | | | |
| Labor | $ 78,160 | 34.89% | $ 84,340 | 34.71% | $ 96,501 | 33.46% |
| Occupancy | $ 26,518 | 11.84% | $ 30,874 | 12.71% | $ 29,421 | 10.20% |
| Products | $ 16,533 | 7.38% | $ 15,825 | 6.51% | $ 21,758 | 7.54% |
| Continuing Franchise Fees | $ 16,900 | 7.54% | $ 17,197 | 7.08% | $ 20,590 | 7.14% |
| Advertising | $ 2,570 | 1.15% | $ 2,684 | 1.10% | $ 2,289 | 0.79% |
| Total Expenses | $ 140,681 | | $ 150,920 | | $ 170,559 | |
| Operating Cash Flow | $ 83,336 | 37.20% | $ 92,071 | 37.89% | $ 117,827 | 40.86% |

All Multi-Unit Studios

The average total revenues for the Multi-Unit Studios were $242,970. A total of 17 Multi-Unit Studios, or 52% exceeded this average. The average total expenses for the Multi-Unit Studios were $150,173. A total of 16 Multi-Unit Studios or 48% have total expenses lower than the average figure of $150,173. The average operating cash flow for this group of 33 Multi-Unit Studios was $92,797. A total of 16 Multi-Unit Studios, or 48%, had total average operating cash flow in excess of the average of $92,797.

Year 1 - 12 Studios

The average total revenues for this group of 12 Studios were $224,017. A total of 7 Studios, or 42% exceeded this average. The average expenses for this group of 12 Studios were $140,681. A total of 8 Studios or 67% had total expenses lower than the average figure of $140,681. The average operating cash flow for this group of 12 Studios was $83,336. A total of 5 Studios, or 42%, had total average operating cash flow in excess of the average of $83,336.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Year 2 - 16 Studios

The average total revenues for this group of 16 Multi-Unit Studios were $242,992. A total of 8 Multi-Unit Studios, or 50% exceeded this average. The average total expenses for this group of 16 Multi-Unit Studios were $150,921. A total of 7 Multi-Unit Studios or 44% had total expenses lower than the average figure of $150,921. The average operating cash flow for this group of 16 Multi-Studios was $92,071. A total of 9 Multi-Unit Studios, or 56%, had total average operating cash flow in excess of the average of $92,071.

Year 3 - 5 Studios

The average total revenues for this group of 5 Multi-Unit Studios were $288,386. A total of 3 Multi-Unit Studios, or 60% exceeded this average. The average total expenses for this group of 5 Multi-Unit Studios were $170,560. A total of 4 Multi-Unit Studios or 80% had total expenses lower than the average figure of $170,560. The average operating cash flow for this group of 5 Multi-Unit Studios was $117,826. A total of 2 Multi-Unit Studios, or 40%, had total average operating cash flow in excess of the average of $117,826.

Notes:

1) Revenues. Average revenues were obtained from the franchisee income statements.

2) Labor. Includes all employee-related expenses including: wages, salary, bonus, commission, and payroll taxes as reported by franchisees to SEVA (including the owners of the Franchise).

3) Occupancy. Includes all rent and other amounts under the lease.

4) Products. Includes the cost of all products purchased for resale or used in connection with the performance of services. as reported by franchisees to SEVA

5) Continuing Franchise Fees. All Studios in the system pay identical continuing franchise fees of 6%.

6) Advertising. Includes discretionary advertising on a local or regional basis as reported by franchisees to SEVA

7) Operating Cash Flow. Operating cash flow is revenues minus labor, occupancy, products, continuing franchise fees and advertising (collectively " Total Expenses"). The figure does not include any provision for income taxes or for non-cash expenses such as depreciation or amortization. It also does not include other expenses, such as any reserve for future capital expenditures, insurance, interest expense, legal & professional fees, travel and meals, merchant fees, office expenses, phone and internet expense, postage, and training expenses as reported by franchisees to SEVA.

8) Occupancy Costs. For the calendar year ending December 31, 2015, the occupancy costs of the Studios contained in Item 19 was 12% of the Studio's gross revenue. Currently, it is the higher of $550 per month or 16% of the Studio's gross revenue.

You are responsible for developing your own business plan for your Studio, including capital budgets, pro forma financial statements, sales and expense projections and other elements appropriate to the particular circumstances of the proposed Studio. In developing the business plan, you are cautioned to make necessary allowance for changes in financial results that may occur due to any of the factors listed above,

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

for any and all ranges of general economic conditions that may exist now or in the future, or for any other circumstances that may impact the operation and performance of the business.

Written substantiation for the financial performance representations will be made available to you on reasonable request. This analysis is intended to be used as a reference when you conduct due diligence before signing our Franchise Agreement. We recommend that you make your own independent investigation to determine whether or not a SEVA Studio franchise may be profitable, and that you consult with legal, accounting and other business advisors before signing our Franchise Agreement. No certified public accountant has audited these figures or expressed his or her opinion with regard to the content or form.

Your individual results may differ. There is no assurance that you'll achieve as much. A new franchisee's financial results are likely to differ from the results stated in the financial performance representation. Each franchisee's experience is unique and the results may vary, depending on a number of factors, such as the quality of individual management skills, experience and business acumen; the effectiveness of sales and marketing efforts; demographics of the territory; and other local economic and market conditions, including competition.

Except as disclosed in this Item 19, we do not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you receive any other financial performance information or projections of your future income, you should report it to the franchisor's management by contacting Kari Comrov at SEVA Beauty LLC, 1954 First Street, # 112, Highland, Illinois 60035, telephone 877-SEVA-BEAUTY, the Federal Trade Commission, and the appropriate state regulatory agencies.

[*Remainder of page intentionally left blank*]

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## ITEM 20

## OUTLETS AND FRANCHISEE INFORMATION

**Table No. 1**
**System-wide Outlet Summary**
**For Years 2013, 2014, 2015[1]**

| Column 1 Outlet Type | Column 2 Year | Column 3 Outlets at the Start of the Year | Column 4 Outlets at the End of the Year | Column 5 Net Change |
|---|---|---|---|---|
| Franchised Outlets | 2013 | 21 | 61 | +40 |
| | 2014 | 61 | 74 | +13 |
| | 2015 | 74 | 90 | +16 |
| Company-Owned* | 2013 | 3 | 5 | +2 |
| | 2014 | 5 | 1 | -4 |
| | 2015 | 1 | 0 | -1 |
| **Total Outlets** | **2013** | **24** | **66** | **+42** |
| | **2014** | **66** | **75** | **+11** |
| | **2015** | **75** | **90** | **+15** |

1. The numbers contained in this Item 20 are as of December 31 of each calendar year.

**Table No. 2**
**Transfers of Outlets From Franchisees to New Owners**
**(Other than the Franchisor or an Affiliate)**
**For Years 2013, 2014, 2015[1]**

| Column 1 State | Column 2 Year | Column 3 Number of Transfers |
|---|---|---|
| California | 2013 | 1 |
| | 2014 | 0 |
| | 2015 | 1 |
| Illinois | 2013 | 0 |
| | 2014 | 0 |
| | 2015 | 1 |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Column 1<br>State | Column 2<br>Year | Column 3<br>Number of Transfers |
|---|---|---|
| Indiana | 2013 | 0 |
| | 2014 | 1 |
| | 2015 | 0 |
| New Jersey | 2013 | 0 |
| | 2014 | 1 |
| | 2015 | 0 |
| Ohio | 2013 | 0 |
| | 2014 | 1 |
| | 2015 | 0 |
| Texas | 2013 | 0 |
| | 2014 | 1 |
| | 2015 | 1 |
| **Total** | **2013** | **1** |
| | **2014** | **4** |
| | **2015** | **3** |

1. The numbers contained in this table are as of December 31 of each calendar year.

**Table No. 3**
**Status of Franchised Outlets 2013, 2014 and 2015[1,2]**

| Col 1<br>State | Col 2<br>Year | Col 3<br>Outlets at Start of Year | Col 4<br>Outlets Opened | Col 5<br>Termina-tions | Col 6<br>Non-Renewals | Col 7<br>Reacquired by Franchisor | Col 8<br>Ceased Operations – Other Reasons | Col 9<br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Arizona | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| California | 2013 | 2 | 5 | 0 | 0 | 0 | 0 | 7 |
| | 2014 | 7 | 1 | 0 | 0 | 0 | 0 | 8 |
| | 2015 | 8 | 2 | 0 | 0 | 0 | 0 | 10 |
| Connecticut | 2013 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2014 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2015 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Florida | 2013 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | 2014 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2015 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| Georgia | 2013 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2014 | 3 | 2 | 0 | 0 | 1 | 0 | 4 |
| | 2015 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Col 1<br>State | Col 2<br>Year | Col 3<br>Outlets at Start of Year | Col 4<br>Outlets Opened | Col 5<br>Termina-tions | Col 6<br>Non-Renewals | Col 7<br>Reacquired by Franchisor | Col 8<br>Ceased Operations – Other Reasons | Col 9<br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Illinois | 2013 | 6 | 14 | 0 | 0 | 0 | 0 | 20 |
| | 2014 | 20 | 4 | 0 | 0 | 0 | 0 | 24 |
| | 2015 | 24 | 4 | 0 | 0 | 0 | 0 | 28 |
| Indiana | 2013 | 2 | 3 | 0 | 0 | 0 | 0 | 5 |
| | 2014 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2015 | 5 | 1 | 0 | 0 | 0 | 0 | 6 |
| Massachusetts | 2013 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2014 | 2 | 0 | 0 | 0 | 1 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Maryland | 2013 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| | 2014 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| | 2015 | 4 | 1 | 0 | 0 | 0 | 0 | 5 |
| Michigan | 2013 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2014 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Mississippi[3] | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 1 | 0 | 0 | 0 | 1 | 1 |
| North Carolina | 2013 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2014 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| New Jersey | 2013 | 3 | 2 | 0 | 0 | 0 | 0 | 5 |
| | 2014 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2015 | 5 | 1 | 0 | 0 | 0 | 0 | 6 |
| New York | 2013 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2014 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Ohio | 2013 | 0 | 2 | 0 | 0 | 1 | 0 | 1 |
| | 2014 | 1 | 1 | 0 | 0 | 1 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Tennessee | 2013 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2014 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2015 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| Texas[3] | 2013 | 3 | 6 | 0 | 0 | 3 | 0 | 6 |
| | 2014 | 6 | 2 | 0 | 0 | 0 | 0 | 8 |
| | 2015 | 8 | 2 | 0 | 0 | 0 | 1 | 9 |
| Virginia | 2013 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2014 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| Washington | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Col 1<br>State | Col 2<br>Year | Col 3<br>Outlets at Start of Year | Col 4<br>Outlets Opened | Col 5<br>Termina-tions | Col 6<br>Non-Renewals | Col 7<br>Reacquired by Franchisor | Col 8<br>Ceased Operations – Other Reasons | Col 9<br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| **Total** | **2013** | **21** | **44** | **0** | **0** | **4** | **0** | **61** |
| | **2014** | **61** | **16** | **0** | **0** | **3** | **0** | **74** |
| | **2015** | **74** | **18** | **0** | **0** | **0** | **0** | **90** |

1. The numbers contained in this table are as of December 31 of each calendar year.

2. From January 1, 2016 through the date of this Disclosure Document, 10 Studios have opened in the following States: (a) 1 Studio in Alabama; (b) 3 Studios in California; (c) 2 Studios in Georgia; (d) 1 Studio in Indiana; (e) 1 Studio in Kansas; (f) 1 Studio in Maryland; and (g) 1 Studio in Texas.

3. A franchisee in Mississippi and a franchisee in Texas left their Studios during the calendar year ending December 31, 2015, but two new franchisees took over operations of those Studios, and are accounted for in Column 4 above.

**Table No. 4**
**Status of Company-Owned Outlets For**
**Years 2013, 2014, 2015[1]**

| Col 1<br>State | Col 2<br>Year | Col 3<br>Outlets at Start of Year | Col 4<br>Outlets Opened | Col 5<br>Outlets Reacquired from Franchisee | Col 6<br>Outlets Closed | Col 7<br>Outlets Sold to Franchisee | Col 8<br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Florida | 2013 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2014 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2015 | 1 | 0 | 0 | 0 | 1 | 0 |
| Georgia | 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 0 | 1 | 1 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois | 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana | 2013 | 2 | 0 | 0 | 0 | 2 | 0 |
| | 2014 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 2013 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 0 | 1 | 1 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio | 2013 | 0 | 0 | 1 | 0 | 0 | 1 |
| | 2014 | 1 | 0 | 1 | 1 | 1 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Col 1 State | Col 2 Year | Col 3 Outlets at Start of Year | Col 4 Outlets Opened | Col 5 Outlets Reacquired from Franchisee | Col 6 Outlets Closed | Col 7 Outlets Sold to Franchisee | Col 8 Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Texas | 2013 | 0 | 0 | 3 | 0 | 0 | 3 |
| | 2014 | 3 | 0 | 0 | 3 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **2013** | **3** | **0** | **4** | **0** | **2** | **5** |
| | **2014** | **5** | **0** | **3** | **6** | **1** | **1** |
| | **2015** | **1** | **0** | **0** | **0** | **1** | **0** |

1. The numbers contained in this table are as of December 31 of each calendar year.

**Table No. 5**
**Projected Openings**
**As of December 31, 2015**

| Column 1 State | Column 2 Franchise Agreements Signed But Outlet Not Open | Column 3 Projected New Franchised Outlets In The Next Fiscal Year | Column 4 Projected New Company-Owned Outlets In The Next Fiscal Year |
|---|---|---|---|
| Alabama | 1 | 2 | 0 |
| Arizona | 0 | 1 | 0 |
| Arkansas | 0 | 2 | 0 |
| California | 15 | 24 | 0 |
| Colorado | 3 | 7 | 0 |
| Connecticut | 0 | 2 | 0 |
| Florida | 5 | 9 | 0 |
| Georgia | 5 | 8 | 0 |
| Illinois | 13 | 22 | 0 |
| Indiana | 1 | 5 | 0 |
| Kansas | 2 | 4 | 0 |
| Maryland | 3 | 7 | 0 |
| Massachusetts | 1 | 3 | 0 |
| Michigan | 0 | 3 | 0 |
| Minnesota | 2 | 2 | 0 |
| Mississippi | 0 | 0 | 0 |
| Missouri | 1 | 2 | 0 |
| Nevada | 1 | 2 | 0 |
| New Jersey | 0 | 3 | 0 |
| New York | 1 | 2 | 0 |

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Column 1<br><br>State | Column 2<br><br>Franchise Agreements Signed But Outlet Not Open | Column 3<br><br>Projected New Franchised Outlets In The Next Fiscal Year | Column 4<br><br>Projected New Company-Owned Outlets In The Next Fiscal Year |
|---|---|---|---|
| North Carolina | 1 | 6 | 0 |
| Ohio | 1 | 1 | 0 |
| Pennsylvania | 0 | 2 | 0 |
| Puerto Rico | 1 | 1 | 0 |
| Tennessee | 4 | 7 | 0 |
| Texas | 8 | 15 | 0 |
| Virginia | 3 | 6 | 0 |
| Washington | 2 | 3 | 0 |
| **TOTAL** | **74** | **151** | **0** |

Included in this Disclosure Document as Exhibit H is a list of all operational and non-operational SEVA franchisees as of December 31, 2015. Also included on Exhibit H is a list of the names, cities and last known telephone numbers or each franchisee who had a franchise terminated, canceled or not renewed, or voluntarily or involuntarily ceased to do business under the franchise agreement through a transfer or otherwise during the most recently completed fiscal year. No franchisee has failed to communicate with us within the 10 weeks of the date of this Disclosure Document. If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

Certain franchisees have signed confidentiality clauses during the last 3 fiscal years. In some instances, current and former franchisees sign provisions restricting their ability to speak openly about their experience with SEVA. You may wish to speak with current and former franchisees, but be aware that not all such franchisees will be able to communicate with you.

We do not currently have a franchisee advisory council or association. There are no trademark-specific franchisee organizations associated with the franchise being offered in this Franchise Disclosure Document.

## ITEM 21

## FINANCIAL STATEMENTS

Attached as Exhibit E, are our audited financial statement for the years ended December 31, 2013, December 31, 2014 and December 31, 2015.

Our fiscal year end is December 31st.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## ITEM 22

## CONTRACTS

The following contracts are attached as exhibits to this Disclosure Document:

| | |
|---|---|
| Exhibit B | Franchise Agreement |
| Exhibit C | Development Rider |
| Exhibit D | Sublease Agreement |
| Exhibit F | Form of General Release |
| Exhibit I | State Addenda |
| Exhibit J | ACH Form |
| Exhibit K | Representations and Acknowledgement Statement |

## ITEM 23

## RECEIPT

Attached as Exhibit L to this Disclosure Document are detachable receipts acknowledging your receipt of this Disclosure Document. You must sign one copy and give it to us. The other copy is for your records.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# EXHIBIT A

## LIST OF STATE AGENTS/AGENTS FOR SERVICE OF PROCESS

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**EXHIBIT A**

**STATE AGENCIES/AGENTS FOR SERVICE OF PROCESS**

Listed here are the names, addresses and telephone numbers of the state agencies having responsibility for the franchising disclosure/registration laws. We may not yet be registered to sell franchises in any or all of these states. There may be states in addition to those listed below in which we have appointed an agent for service of process. There may also be additional agents appointed in some of the states listed.

**CALIFORNIA**

Department of Business Oversight:
1 (866) 275-2677

***Los Angeles***

Suite 750
320 West 4th Street
Los Angeles, California 90013
(213) 576-7505

***Sacramento***

1515 K Street, Suite 200
Sacramento, California 95814-4052
(916) 445-7205

***San Diego***

1350 Front Street
San Diego, California 92101
(619) 525-4044

***San Francisco***

One Sansome Street, Suite 600
San Francisco, California 94104
(415) 972-8559

**HAWAII**

(agent for service of process)

Commissioner of Securities of the Department of Commerce and Consumer Affairs
Business Registration Division
Securities Compliance Branch
335 Merchant Street, Room 203
Honolulu, Hawaii 96813
(808) 586-2722

(for other matters)
Business Registration Division
Securities Compliance Branch
Department of Commerce and Consumer Affairs
P.O. Box 40
Honolulu, Hawaii 96810
(808) 586-2722

**ILLINOIS**

Franchise Bureau
Office of the Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-4465

**INDIANA**

(state administrator)

Indiana Secretary of State
Securities Division, E-111
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-6681

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(agent for service of process)

Indiana Secretary of State
201 State House
200 West Washington Street
Indianapolis, Indiana 46204
(317) 232-6531

**MARYLAND**

(state administrator)

Office of the Attorney General
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202-2021
(410) 576-6360

(agent for service of process)

Maryland Securities Commissioner
at the Office of the Attorney General
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202-2021
(410) 576-6360

**MICHIGAN**

(state administrator)

Michigan Attorney General's Office
Consumer Protection Division
Attn: Franchise Section
G. Mennen Williams Building, 1st Floor
525 West Ottawa Street
Lansing, Michigan 48933
(517) 373-7117

(agent for service of process)

Michigan Department of Commerce,
Corporations and Securities Bureau
P.O. Box 30054
6546 Mercantile Way
Lansing, Michigan 48909

**MINNESOTA**

Commissioner of Commerce
Minnesota Department of Commerce
85 7th Place East, Suite 500
St. Paul, Minnesota 55101
(651) 296-6328

**NEW YORK**

(state administrator)

Office of the New York State Attorney General
Investor Protection Bureau
Franchise Section
120 Broadway, 23rd Floor
New York, New York 10271-0332
(212) 416-8236 Phone
(212) 416-6042 Fax

(agent for service of process)

Attn: New York Secretary of State
New York Department of State
One Commerce Plaza
99 Washington Avenue, 6th Floor
Albany, New York 12231-0001
(518) 473-2492

**NORTH DAKOTA**

North Dakota Securities Department
600 East Boulevard Avenue
State Capitol - Fifth Floor
Bismarck, North Dakota 58505
(701) 328-4712

**OREGON**

Department of Insurance and Finance
Corporate Securities Section
Labor and Industries Building
Salem, Oregon 97310
(503) 378-4387

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**RHODE ISLAND**

Division of Securities
1511 Pontiac Avenue
Cranston, Rhode Island 02920
(401) 462-9582

**SOUTH DAKOTA**

Department of Labor and Regulation
Division of Securities
124 S. Euclid Street, Suite 104
Pierre, South Dakota 57501
(605) 773-4823

**VIRGINIA**

(state administrator)

State Corporation Commission
Division of Securities
and Retail Franchising
1300 East Main Street, Ninth Floor
Richmond, Virginia 23219
(804) 371-9051

(agent for service of process)

Clerk, State Corporation Commission
1300 East Main Street
Richmond, Virginia 23219
(804) 371-9672

**WASHINGTON**

(state administrator)

Department of Financial Institutions
Securities Division
P.O. Box 9033
Olympia, Washington 98507-9033
(360) 902-8760

(agent for service of process)
Director
Department of Financial Institutions
Securities Division
150 Israel Road, S.W.
Tumwater, Washington 98501

**WISCONSIN**

Securities and Franchise Registration
Wisconsin Securities Commission
345 West Washington Avenue, 4th Floor
Madison, Wisconsin 53703
(608) 266-3431

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6 Case: 1:20-cv-04692 Document #: 1-1 Filed: 08/10/20 Page 155 of 241 PageID #:162

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**EXHIBIT B**

**FRANCHISE AGREEMENT**

SEVA Beauty, LLC
2016 FDD | Ex. B - Franchise Agreement
1253.001.001/147287.5

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6 Case: 1:20-cv-04692 Document #: 1-1 Filed: 08/10/20 Page 156 of 241 PageID #:163

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

seva

**SEVA BEAUTY, LLC**

**Franchise Agreement**

______________________________

**FRANCHISEE**

______________________________

**DATE**

SEVA Beauty, LLC
2016 FDD | Ex. B - Franchise Agreement
1253.001.001/147287.5

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**TABLE OF CONTENTS**

**1. GRANT, TERM, AND RENEWAL OF FRANCHISE ..... 2**
1.01 Grant and Acceptance. ..... 2
1.02 Reservation of Rights ..... 2
1.03 Term ..... 3
1.04 Renewal ..... 3
1.05 Relocation ..... 3
1.06 Ownership ..... 3
**2. FINANCIAL OBLIGATIONS ..... 4**
2.01 Initial Franchise Fee ..... 4
2.02 Leasehold Administration Fee ..... 4
2.03 Pre-Opening Administration Fee ..... 4
2.04 Royalty Payments ..... 4
2.05 Brand Fund ..... 5
2.06 Advertising Requirement and Funding ..... 6
2.07 Late Fees and Interest ..... 6
2.08 Other Fees ..... 7
2.09 Taxes ..... 7
**3. ESTABLISHMENT OF BUSINESS ..... 7**
3.01 Site Selection ..... 7
3.02 Construction and Development ..... 8
3.03 Initial Franchisee and Manager Training ..... 9
3.04 Approval To Open ..... 9
3.05 Pre-Opening Operational Assistance ..... 10
3.06 Financing; Maximum Borrowing Limits; Liquidity ..... 10
3.07 Opening Timeline ..... 10
**4. OPERATIONS AND PROCEDURES ..... 10**
4.01 Operations Manual; System Standards ..... 10
4.02 Products and Services; Vendors and Supplies ..... 11
4.03 Continuous Operation of Business. ..... 11
4.04 Meetings ..... 12
4.05 Compliance with Law ..... 12
4.06 Participation in an Internet Website or Other Online Communications ..... 13
4.07 Pricing Policies; Memberships ..... 13
4.08 Promotion ..... 14
4.09 Management ..... 14
4.10 Staff ..... 15
4.11 Franchise Advisory Council ..... 15
4.12 Local Advertising Cooperative ..... 15
4.13 Reports, Records, Bookkeeping and Financial Statements ..... 16
4.14 Inspections ..... 17
4.15 Audits ..... 17
4.16 Payment of Obligations ..... 18
4.17 Insurance ..... 18
4.18 Indemnification ..... 19
4.19 Variances ..... 19
4.20 Customer Satisfaction and Franchise Compliance Programs ..... 20
4.21 Non-Cash Payment Systems. ..... 20
4.22 SEVA University ..... 20
4.23 Minimum Gross Sales ..... 21
4.24 Business Telephone Numbers and Listings ..... 21

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

4.25 Compliance with System Standards....21
4.26 Non-Disparagement....22
**5. PROTECTION OF RIGHTS AND INFORMATION....22**
5.01 Ownership of Marks....22
5.02 Protection of Marks....22
5.03 Use of Marks in Advertising....23
5.04 Change of Marks....23
5.05 Protection of Information....23
5.06 Covenants Not To Compete....24
5.07 Improvements....25
**6. SALE OR TRANSFER....25**
6.01 Transfer by SEVA....25
6.02 Transfer by You....25
6.03 Conditions for Consent to Transfer....26
6.04 Our Right of First Refusal....27
6.05 Ownership Changes....27
6.06 Death or Disability....27
**7. DEFAULT AND TERMINATION**....27
7.01 Termination by You....28
7.02 Termination by Us....28
**8. RIGHTS AND DUTIES UPON TRANSFER OR TERMINATION**....29
8.01 Obligations....29
8.02 Our Purchase Right....31
**9. RELATIONSHIP**....32
9.01 Relationship of Parties....32
9.02 Security Interest....32
9.03 Legal Entity of Franchisee....32
**10. DISPUTE RESOLUTION**....33
**11. GENERAL PROVISIONS**....34
11.01 Severability....34
11.02 Waiver/Integration....35
11.03 Notices....35
11.04 Injunctive Relief....36
11.05 Successors/Assigns....36
11.06 Interpretation of Rights and Obligations....36
11.07 Consent To Jurisdiction....37
11.08 Jury Waiver, Class Action Bar....37
11.09 Waiver of Punitive Damages....37
11.10 Limitation of Action....38
11.11 Costs and Attorneys' Fees....38
11.12 Adaptations and Variances....38
11.13 Notice of Potential Profit....38
11.14 Submission of Agreement....38
11.15 Acknowledgments....38

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6 Case: 1:20-cv-04692 Document #: 1-1 Filed: 08/10/20 Page 159 of 241 PageID #:166

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**ATTACHMENTS**

A – ADDENDUM TO FRANCHISE AGREEMENT FOR SEVA SPA STUDIOS

B – AUTHORIZED LOCATION, STUDIO TYPE & OWNERSHIP INTERESTS

C – CONFIDENTIALITY & NON-COMPETITION AGREEMENT

D – GUARANTY AND ASSUMPTION OF OBLIGATIONS

iii

SEVA Beauty, LLC
2016 FDD | Ex. B - Franchise Agreement
1253.001.001/147287.5

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**SEVA BEAUTY, LLC**

**FRANCHISE AGREEMENT**

**THIS FRANCHISE AGREEMENT** (the "Agreement") is made and entered into on this date _______________ (the "Effective Date") by and between SEVA Beauty, LLC, an Illinois limited liability company having its principal place of business at 1954 First Street, #112, Highland Park, Illinois 60035 ("we", "us" or "our") and ________________________________________________________________ ________________________________________________________, having its principal place of business at ________________________________________________________________________________ ("you" or "your").

**RECITALS**

A. We have developed a brand, business system, concept, methodology and format to provide fast-casual esthetic spa services and products within distinctive retail environments to the general public ("System") identified by the SEVA® service mark and other trademarks and service marks licensed by us. The System includes, but is not limited to: store design, layout and fixture schemes, advertising, merchandising, purchasing and sales techniques, customer and community relations, operations policies and procedures, and training programs.

B. Our affiliate owns the rights to the name SEVA® and certain trademarks, service marks, and trade names which will be used in connection with the business contemplated by this Agreement ("Marks").

C. We have the right to promote and use the System and Marks and the right to authorize others, including franchisees, to promote and use the System and Marks.

D. We grant licenses for the right to develop and operate either a SEVA® Express Studio or a SEVA® Spa Studio at a designated location.

E. SEVA® Express Studios are our quick-service offering located inside Walmart® stores ("Express Studio"). Express Studios offer our brows and face category of services: facial threading and waxing, eyelash extensions, eyebrow tinting and flash facials ("Express Services"). In certain circumstances, our Spa Services also may be available in certain Express Studios.

F. SEVA® Spa Studios are our larger, full-service format, inside shopping centers and strip malls ("Spa Studio"). Spa Studios offer our brows and face category of services: facial threading and waxing, eyelash extensions, eyebrow tinting and express facials from within the salon chairs. Spa Studios also offer spa services, which include body waxing and full facials from within the spa room (the "Spa Services").

G. You have applied for one SEVA Franchise ("Franchise") to operate either a SEVA Express Studio or a SEVA Spa Studio (unless otherwise indicated herein, each referred to as a "SEVA Studio"), as identified on Attachment A attached to this Agreement (the "Studio"), pursuant to the terms and conditions of this Agreement. We have approved your application in reliance on your representations that you represented that you have the financial capacity, organizational ability, marketing experience, health, facilities and interest to promote the image and goodwill of the Marks and the System, and the desire and commitment to meet the standards of performance in areas such as sales, promotion, personnel, training, financing, payment of obligations and other areas set forth in this Agreement.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

H. You have had a full and adequate opportunity to be advised thoroughly of the terms and conditions of this Agreement by legal counsel and other advisors, and have had sufficient opportunity to evaluate and investigate the System, the financial investment requirements, and the business risks associated with owning and operating a SEVA Studio.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the delivery, receipt, and sufficiency of which are hereby acknowledged; and according to the terms, conditions, promises, warranties, and representations found in this Agreement, the parties mutually agree as follows:

## 1. GRANT, TERM, AND RENEWAL OF FRANCHISE

### 1.01 Grant and Acceptance.

We hereby grant to you, subject to the terms and conditions of this Agreement, the non-exclusive right and license to open and operate the Studio which shall be located the Authorized Location ("Authorized Location") indicated on Attachment B.

You accept the license and undertake the obligation to operate the Studio faithfully, honestly and diligently, using the System in compliance with our standards and requirements for the System and this Agreement. You may not open the Studio until you successfully complete our training program and we have approved the opening. You must open the Studio on the construction completion date, provided that you have received our approval, or such other date designated by us.

We will not locate another SEVA Studio within the Authorized Location. However, you acknowledge and agree that you may face competition from within the same retail environment where the Studio is located. For example, there may be other non-SEVA nail or hair salons offering some of the same services that you will be offering.

### 1.02 Reservation of Rights

You receive no exclusive territory or area rights. Except for our agreement to not locate another SEVA Studio in your Authorized Location, we reserve all other rights, including, without limitation, the following:

(a) the right to operate and grant others the right to operate other SEVA Studios at any location, regardless of the proximity to your Authorized Location, and on such conditions as we deem appropriate;

(b) the right to engage in wholesale operations;

(c) the right to distribute or license the manufacture or distribution of products, regardless of whether such products are authorized for SEVA Studios, under the Marks, through other channels of distribution, including catalog and internet sales;

(d) the right to develop, operate and franchise similar or dissimilar systems, under trademarks, service marks and commercial symbols other than the Marks, without offering them to you; and

(e) the right to acquire, be acquired by or merge with franchisors or non-franchisors that operate in competitive or similar lines of business to SEVA Studios.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### 1.03 Term

In the event we sublease the premises of the Studio to you, this Agreement shall become effective on the Effective Date and shall continue for a term of 5 years from the Rent Commencement Date (as defined in Section 3.01) (the "Term"). In all other instances, the term shall become effective on the Effective Date and shall continue for a term of 5 years from the Studio's grand opening.

### 1.04 Renewal

At the end of the Term, you may request that we renew your Franchise for an additional period of 5 years. If we sublet the Authorized Location to you, any renewal will be subject to our having the right to renew under the underlying lease on the Authorized Location and shall be subject to the terms and conditions, including rent and other requirements, of the underlying lease. In order to renew, you must meet all of the following conditions:

(a) you give SEVA written notice of renewal not less than 90 days, nor more than 180 days, before the expiration of the Term;

(b) you sign our then-current form of franchise agreement, the terms of which may differ from this Agreement, including higher fees (certain terms of the franchise agreement also may be modified to reflect that the agreement is for a renewal term);

(c) you update and upgrade the Studio to our satisfaction at the time of renewal, including the adoption and implementation of new methods, programs and techniques for the SEVA Studios;

(d) you are not in default of this Agreement or any other agreement pertaining to the franchise granted, and you have been in substantial compliance with the terms and conditions of this Agreement during the initial Term;

(e) you have provided written proof of your ability to remain in possession of the Studio premises throughout the renewal;

(f) you comply with our then-current franchise qualification standards and training requirements;

(g) you pay to us a renewal fee equal to 25% of the then-current Initial Franchise Fee; and

(h) you and your owners execute a general release of claims in a form we prescribe.

We will give you written notice not more than 30 days after we receive your notice, of our decision whether to grant you a successor franchise, including a description of any existing deficiencies that must be corrected as a condition of receiving the successor Franchise.

### 1.05 Relocation

You may only operate the Studio at the Authorized Location. You may not relocate the Studio, except with our prior written consent.

### 1.06 Ownership

If you are entity, you represent that Attachment B lists all of your owners.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## 2. FINANCIAL OBLIGATIONS

### 2.01 Initial Franchise Fee

You must pay us an initial franchise fee ("Franchise Fee") of $39,000. The Franchise Fee must be paid to us when you sign this Agreement. The Franchise Fee is fully earned upon receipt and is not refundable under any circumstances.

### 2.02 Leasehold Administration Fee

In the event we or our affiliate sublease the premises of the Studio to you, we may charge a $15,000 Leasehold Administration Fee, payable upon signing a letter of intent with us to enter into a sublease, and is fully earned and not refundable under any circumstance.

### 2.03 Pre-Opening Administration Fee

You must pay us a Pre-Opening Administration fee of $10,000 ("Pre-Opening Fee"), which is payable upon your signing a letter of intent to enter with us, and is fully earned and not refundable under any circumstance. The Pre-Opening Fee is in consideration for our guidance through site selection, our Spa-in-a-box program and your orientation into the system.

### 2.04 Royalty Payments

(a) On or before Tuesday of each week, you must submit to us (i) a report of your Gross Sales for the preceding calendar week, and (ii) a royalty fee ("Royalty Fee") equal the greater of (X) 6% of Gross Sales for the prior calendar week or (Y) $250. The Royalty Fee must be available for electronic transfer into our account on the due date. If you fail to timely report your Gross Sales to us, we will be entitled to withdraw $500 from your account as an "Estimated Royalty Fee." An adjustment between the Estimated Royalty Fee and the actual Royalty Fee owed will be made as soon as the missing report is delivered to us.

(b) "Gross Sales" means the receipts from all business conducted upon, from or through the Studio together with the amount of all orders taken or received at the premises. Gross Sales do not include the amount of any sales tax, use, or gross receipts tax imposed by any federal, state, municipal or governmental authority directly on sales and collected from customers, provided that the amount thereof is added to the selling price or absorbed therein, and paid by you to such governmental authority. Further, Gross Sales do not include sales of merchandise for which cash has been refunded, and there shall be deducted from Gross Sales the price of merchandise returned by customers for exchange provided that the price of the merchandise returned was originally included in Gross Sales and provided also that the sales price of merchandise delivered to the customer in exchange shall be included in Gross Sales.

(c) If you sublease the premises of the Studio from us, we shall electronically debit your designated bank account for payment of royalties (including minimums) the earlier of (i) 90 days after we provide you possession of the premises where the Studio will be located or (ii) the grand opening of the Studio.

(d) If you enter this Agreement to operate a Spa Studio, we shall electronically debit your designated bank account for payment of royalties (including minimums) upon the grand opening of your Spa Studio.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### 2.05 Brand Fund

(a) You must contribute to the Brand Fund (the "Brand Fund"). You agree to pay us, or our designee, by Tuesday of each week, a Brand Fund Fee ("Brand Fund Fee") equal to the percentage of Gross Sales for the preceding calendar week that we specify, up to a maximum of 5%. We will provide you with not less than 30 days prior written notice of our intent to change the full amount of the Brand Fund Fee.

(b) You shall pay the Brand Fund Fee via electronic transfer and shall ensure that the funds are available and transferred into our account by the first day of each calendar week for the preceding week. If you fail to report your Gross Sales to us by the first day of the week for the preceding week, we shall be entitled to withdraw $500 from your account as an "Estimated Brand Fund Fee." An adjustment between the Estimated Brand Fund Fee and the actual Brand Fee owed will be made as soon as the missing report is delivered to us.

(c) We, or our designee, will direct all advertising and marketing programs and have the right to make all decisions over all creative concepts, materials and endorsements, website development and the geographic, market and media placement of all programs. We do not promise that we or our designee will spend the Brand Fund in any given geographic region or that the benefits you receive will be in proportion to your contributions. We are not required to spend any amount on advertising in your geographic area. We, or our designee, may terminate, and resume, the Brand Fund periodically during the Term of this Agreement. We, or our designee, may use the Brand Fund contributions and fees as we determine in our or its sole and absolute discretion, including, without limitation, to: create, produce and distribute advertising materials; purchase media space or time; administer local, regional and national advertising programs, including buying direct mail and other media advertising; develop, implement, enhance and operate our website and point of sale systems, software systems, various modules, including learning management system software, marketing assist management system software, applicant tracking system software, membership software, loyalty and reward software, gift card software; conduct Internet and electronic advertising and marketing promoting and enhancing the SEVA System and Marks; conduct market research; employ advertising, public relations and media buying agencies to assist us in these activities; support public relations, market research, other advertising and marketing activities and hiring activities; update the POS system; create, produce, develop, implement and enhance our website, point of sale systems, software systems. Additionally, we or our designee may use the Brand Fund in our sole and absolute discretion to furnish our franchisees with marketing items, advertising and promotional formats and materials, like advertising art, radio and television commercials, musical jingles, print advertisements, point of sale materials, promotional graphics, take-away graphic menus, various coupons, outdoor advertising art, direct mail pamphlets and literature, and electronic listings in white and yellow page websites in our judgment.

We are not required to maintain a separate account for the Brand Fund. The Brand Fund will not be held in a trust or escrow account. The Brand Fund is not a trust. We have no fiduciary obligation to you, including in connection with administering the Brand Fund or for any other reason. We will not use contributions to the Brand Fund principally to develop materials and programs to solicit franchisees, however, media, materials and programs prepared using Brand Fund contributions may describe our franchise program and reference the availability of franchises and related information. Brand Fund contributions may also be used to process franchise leads. We will make available, upon your reasonable written request, an unaudited accounting of the Brand Fund receipts and disbursements for the previous calendar year on or after the date that is 120 days after the end of such calendar year.

Without limiting our discretion over Brand Fund expenditures, you hereby acknowledge and agree that out of the Brand Fund, we, or our designee, may pay ourselves (or itself) for the direct costs, salaries, travel expenses, administrative costs and other direct overhead we (or it) incur(s) to administer the Brand Fund, including the cost of preparing the annual accounting, expenses to collect Brand Fund Fees from delinquent

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

franchisees, costs to develop and execute specific marketing and advertising programs (including costs for market research and production) and costs to fund the annual meeting of franchisees if we elect to hold one. Brand Fund Fees may also be used to pay for accounting, bookkeeping, reporting, legal and other expenses incurred in administering the Brand Fund and for any taxes incurred on the Brand Fund. In any given year, we may spend more or less than the total amount we collect for that year. We may carry-forward any Brand Fund surplus or deficit to a future fiscal period. We may treat interest paid on Brand Fund balances as additional Brand Fund revenue.

We may structure the Brand Fund's organization and administration in any way that we determine. We may organize or reorganize the Brand Fund into a separate entity as we deem appropriate and we may transfer all Brand Fund contributions and assets to the entity. We may require you to pay the Brand Fund contributions directly to the entity.

### 2.06 Advertising Requirement and Funding

(a) Grand Opening. You must spend at minimum $1,500 to advertise and promote the grand opening of the Studio during the period commencing one month prior to the store opening and ending one month after Studio opening. We must approve of any grand opening advertising materials prior to your use of the materials. Before you begin initial training you must deposit with our designated third party supplier $1,500 to be applied to your grand opening promotional expenses.

(b) Ongoing Advertising. You acknowledge that the regular, consistent advertising and promotion of your SEVA Studio is an essential requirement for your success. Accordingly, we strongly recommend that you spend (in addition to the Brand Fund Fee described above) at least 1% of Gross Sales for advertising and promotion.

(c) Advisory Association Fees. If we establish an Advisory Association, you agree to pay, in addition to all other fees required by this Agreement, those fees set by the Advisory Association. Fees paid to the Advisory Association which are directly used for local advertising and promotions may be used to meet the ongoing advertising requirement described above.

(d) Local Advertising Cooperative Fees. We may require that a local advertising cooperative ("Local Advertising Cooperative") be established in the Area of Dominant Influence ("ADI") in which the Studio is located. You agree to join and participate in such organization, and to pay weekly fees agreed to by a majority of members of the Local Advertising Cooperative, not to exceed 2% of Gross Sales.

### 2.07 Late Fees and Interest

(a) Late Fees: In the event that you fail to report your Gross Sales by the first day of any calendar week or if there are insufficient funds for us to debit your account, you must pay a late fee of $100 per instance. For each failure to submit other reports, files, backups, surveys, questionnaires, etc., (whether in verbal, written, printed, electronic, or other form) at the time and in the manner reasonably requested by us, you must also pay to us a late fee of $100. Late fees will be paid to SEVA by Automated Clearing House (ACH) withdrawal on the day after such payment or item is due.

(b) Interest: Unpaid Royalty Fees, Brand Fund Fees, Advertising Fund Fees, initial late fees or other sums due and owing to us and our affiliates shall bear interest on the unpaid balance at the rate of 18% per annum of balance due, or the highest rate allowed by law in the state in which the Studio is located, whichever is higher, but not less than $100. We may apply and allocate payments received from you for sums due and owing to us, our affiliates and the Brand Fund as we deem appropriate.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### 2.08 Other Fees.

(a) Inoperative Equipment. We may charge you a $100 per day fee for any time period during which equipment we deem important to the Studio (including cameras) is inoperative.

(b) SEVA University Certification Fee. You must pay us a SEVA University Certification Fee in the amount we specify if we require mandatory training certification and/or re-certification of you and/or any of your staff members.

(c) Convention or Franchisee Meeting Fees. You must attend any and all meetings we designate as mandatory, which may include semi-annual meetings (whether regional or national), and annual meetings. You shall pay to us or our designee all required registration fees in the amount we specify, not to exceed $1,000 per registration fee.

(d) Entity Conversion Fee. If you are an individual and assign your interest in this Agreement to an entity such as a limited liability company, corporation, or partnership, in which you are the sole owner, you must pay us an Entity Conversion Fee of $500.00 in consideration for our processing the paperwork to assign this Agreement to the converted entity.

(e) Finance Approval Fee. In the event you seek debt financing used to fund the development of the Studio, we will charge a Finance Approval Fee to subordinate any of our rights in accordance with Section 3.06 contained herein.

(f) Third Party Costs. As part of the System, we may require you to the engage the services or purchase the products of a third-party vendor, and we may require to you make the payment for such services or products to us, which we will use to pay the vendor.

### 2.09 Taxes

You must promptly pay to us an amount equal to all taxes levied or assessed, including, but not limited to, unemployment taxes, sales taxes, use taxes, withholding taxes, excise taxes, personal property taxes, intangible property taxes, gross receipts taxes, taxes on Royalties, or any similar taxes or levies imposed upon or required to be collected or paid by us by reason of the furnishing of products, intangible property (including trademarks or trade names) or services by us to you through the sale, license or lease of property or property rights provided by this Agreement.

## 3. ESTABLISHMENT OF BUSINESS

### 3.01 Site Selection

You must locate, obtain and occupy the site for the Studio, on your own initiative and at your own expense. You must advise us in writing of your proposed site and you must submit to us a complete site report (containing demographic, commercial and other information we may reasonably require). Our prior approval is required in writing. The site must meet our confidential site evaluation criteria. In accepting or rejecting a proposed site, we will consider such matters as we deem material, including demographic characteristics, traffic patterns, parking, the predominant character of the neighborhood, competition from other businesses providing similar services within the area, the proximity to other businesses (including other SEVA Studios), the nature of other businesses in proximity to the site and other commercial characteristics and the size of the premises, appearance, and other physical characteristics of the premises. We will approve or disapprove your proposed site within 30 days after we receive all of the materials you are required to provide to us. Our approval of a site will be by delivery of written notice to you. If you do not receive a written notice of

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

approval within 30 days after receipt of the requisite materials to approve or disapprove a proposed site, your proposed site is considered disapproved. You must secure an approved location within 90 days following the date you sign this Agreement. If you do not secure an approved site within this time period, we have the right to terminate this Agreement.

You acknowledge and agree that our approval of the Site does not constitute a representation or warranty of any kind, express or implied, of the suitability of the site for a Studio or any other purpose. Our approval of the site indicates that we believe that the site meets our then acceptable criteria. Without limiting the foregoing, you acknowledge and agree that we are not responsible of the site fails to meet your or our expectations.

If we require, you shall, at your sole cost and expense, use only our designated exclusive real estate agents when pursuing sites.

In the event you select an Express Studio, we or our affiliate will sublease the Express Studio premises to you. The Master Lease contains a provision that provides for Walmart having the ability to terminate the Sublease, and there is a further right that we have to terminate the Sublease as well. This provision allows either Walmart, us, or our affiliate to provide you with a 90 day written notice to terminate the Sublease according to the terms and conditions in the Master Lease. In the event Walmart terminates the Master Lease, we reserve the right to terminate this Agreement.

When we or our affiliate sublease the Studio premises to you, we shall electronically debit your designated bank account for the designated amount the earlier of (i) 90 days after we provide you possession of the premises or (ii) the grand opening of the Studio (the "Rent Commencement Date").

**3.02 Construction and Development**

(a) You must participate in our "Spa-in-a-Box" program. Under this program, we and/or our designated supplier will help you coordinate the design, general contracting work, furniture, equipment, technology, supplies, signage, uniforms, and initial inventory of cosmetics and beauty supplies for the Studio. Some of the suppliers in the "Spa-in-a-Box" program are mandated, but for some aspects you may select among multiple approved suppliers or select your own supplier. We may require, however, at your sole cost and expense, that you use only our designated suppliers in connection with the Spa-in-a-Box program. You must at all times cooperate and assist us and the vendors and suppliers. You are responsible for paying all fees, costs and expenses due to vendors and suppliers in connection with the Spa-in-a-Box program, including payment of a Spa-in-a-Box fee, in a timely manner.

(b) We may require you to purchase some or all fixtures, furniture, equipment, technology, supplies, signage, uniforms, inventory, and other items necessary to open the Studio from or through us, our affiliate, and/or our designated or approved suppliers.

(c) If we permit you (in our sole discretion) to coordinate the design and development of the Studio in lieu of participating in the Spa-in-a-Box program, then we will provide you with a sample fixture layout plan, a fixture list, a supply list, and an equipment list, which shall describe the number, type and configuration of the fixtures, equipment, and supplies that you must purchase and install or use in the Studio.

(d) The following provisions apply to the construction of the Studio:

(i) A registered architect or draftsman must prepare plans and specifications for constructing, remodeling, or decorating the premises and which comply with all federal, state, and local regulations including health, sanitation, sign, utility, and building codes;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(ii) A licensed general contractor must file plans and construct, remodel, or decorate the premises according to the plans and specifications in a professional and first-class workmanlike manner; and

(iii) You must purchase or lease and install all fixtures, equipment, carpet, signage, and other items identified in the Operating Manual, or otherwise necessary for the operation of the Studio.

(e) We currently require you to pay a Spa-In-A-Box fee in an amount determined by our designated third-party supplier directly to such designated supplier.

### 3.03 Initial Franchisee and Manager Training

Prior to opening the Studio to offer services or products to the public:

(a) You must designate a qualified "Business Manager" (as hereinafter defined) who shall be responsible for the day-to-day operations of the Studio, in accordance with Section 4.09. If we approve, you (or your Named Partner) may be the Business Manager.

(b) Your Named Partner (as hereinafter defined) and your Business Manager (as hereinafter defined) are to complete our initial training program to our satisfaction within 45 days after you select a site for the Studio. You must designate a third person to attend initial training as well. There is no charge for training but there may be circumstances where you will have to pay for your employed lead technician to assist you with training. We charge One Thousand Dollars ($1,000) per person to train additional people from your organization. Training is conducted in a virtual online environment and at such times as we designate.

### 3.04 Approval To Open

You may not open the Studio to the public until you have satisfied all of our pre-opening requirements specified in the Operations Manual or elsewhere by us, which requirements include, without limitation, that you:

(a) complete our required training and certification of your Named Partner and your Business Manager;

(b) obtain and provide proof of required insurance;

(c) complete all construction and development;

(d) obtain all required governmental permits;

(e) hire and train the required staff;

(f) purchase and display required inventory;

(g) prepare and implement your grand opening marketing plan;

(h) pay all amounts due to us and our designated and approved vendors;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(i) complete the "Send to SEVA" pre-opening checklist as the final step in our Spa-in-a Box process; and

(j) receive our written approval to open (which will not be unreasonably withheld).

### 3.05 Pre-Opening Operational Assistance

You may contact us during our regular business hours for advice on operational issues prior to the grand opening. Our representative will also be on-site to assist you on the day of your grand opening.

### 3.06 Financing; Maximum Borrowing Limits; Liquidity

You must, at all times, maintain sufficient working capital as necessary and appropriate to comply with your obligations under this Agreement. On our request, you will provide us with evidence of available working capital. We reserve the right, from time to time, to establish certain levels of working capital reserves, and you will comply with such requirements. We may from time to time designate the maximum amount of debt that the Studio may service, and you will ensure that you will comply with such limits. Any debt financing used to fund the development of the Studio is subject to our prior written-approval. We are under no obligation to subordinate any of our rights to a Studio, but if we do, it will be subject to executing a general release. While we may allow the Assets (as defined in Section 8.02) to be used as collateral to secure third-party financing, we are not required to, and will not, allow the franchise and license rights to be used as collateral.

### 3.07 Opening Timeline

You must open the Studio to the public within the earlier of (i) 90 days after we provide you possession of the premises (if you sublease the premises of the Studio from us), or (ii) 365 days after the Effective Date (the "Opening Deadline"). TIME IS OF THE ESSENCE. If you fail to open the Studio on or before the Opening Deadline, we have the right to immediately terminate this Agreement.

## 4. OPERATIONS AND PROCEDURES

### 4.01 Operations Manual; System Standards

(a) To help protect our reputation and goodwill and to maintain uniform operating standards under the Marks, we will make 1 copy of our manual available to you for the operation of the Studio, which may include other manuals, proprietary software or computer data files created for use in the operation of a SEVA Studio (the "Operations Manual"). The Operations Manual contains mandatory specifications, standards, operating procedures and rules that we periodically prescribe ("System Standards"), suggested procedures and information on your other obligations under this Agreement. We may modify the Operations Manual periodically to reflect changes in System Standards. If there is a dispute over its contents, our master copy of the Operations Manual shall control. Any required standards exist to protect our interest in the System and the Marks and not for the purpose of establishing any control, or the duty to take control, over those matters that clearly are reserved to you.

(b) You acknowledge that the appearance of and operating processes used by SEVA Studios may evolve over time and that, therefore, we may, in our discretion, change the policies and procedures contained in the Operations Manuals throughout the Term. You will immediately adopt all revisions to the System Standards except that, if we determine that a particular revision either is not, or by its nature required to be made immediately or requires significant expenditures, we will allow a reasonable time, not to exceed 30 days after you receive notice of the revision, to complete the implementation of such revision.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(c) You acknowledge having received one copy of the Operations Manual on loan from us for the term of this Agreement. You agree to keep the Operations Manual confidential and only provide access to employees we approve. If we elect to post some or all of the Operations Manual on a restricted website or intranet to which you have access, you agree to monitor and access the website or extranet for any updates to the Operations Manual or System Standards. Any passwords or other digital identifications necessary to access the Operations Manual on a website or intranet will be deemed to be part of our confidential information.

### 4.02 Products and Services; Vendors and Supplies

You may market and sell to customers only the products and services that we have approved in writing (collectively, "Products and Services"). These Products and Services must meet standards and specifications prescribed by us, which we may modify from time to time. You must conform to all quality and customer service standards we prescribe in writing. You must offer all Products and Services that we require. You may not sell any of our proprietary products to any business or other customer for resale.

Unless we otherwise specify in writing, you must use approved vendors and supplies for all services and products that we determine meet our standards and specifications of quality required to protect the valuable goodwill and uniformity symbolized by and associated with the Marks and our business ("Approved Suppliers"). Approved Suppliers are companies that are approved for a specific service or product they provide. You must comply with all billing and service provision policies of Approved Suppliers. You acknowledge that we may designate a single vendor or source of supply, and that we and/or an affiliate may be that vendor/source. We also may have a single designated vendor for certain services. You will pay the then-current price in effect for products and services that you are required to purchase from us or a designated vendor, and the cost to you for these products and services may be higher than comparable products and services on the market.

We and our affiliates reserve the right to derive revenue and other material consideration, including through mark-ups and rebates, on account of your and/or other franchisees' purchases and leases. We may also derive revenue on account of your and other franchisee purchases from us, our affiliates and any other supplier without limitation. The amount of the mark-up, pricing and/or rebates for required and/or permissible purchases is subject to our sole and absolute discretion.

ALTHOUGH APPROVED AND/OR SUPPLIED BY US, WE MAKE NO WARRANTY AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO PRODUCTS, SERVICES, EQUIPMENT, SUPPLIES, FIXTURES, FURNISHINGS OR OTHER APPROVED OR REQUIRED PURCHASES OR LEASES. SEVA, HOWEVER, WILL PASS THROUGH ANY APPLICABLE MANUFACTURER WARRANTIES ON PRODUCTS AND SERVICES THAT YOU PURCHASE FROM US, SUBJECT TO ALL WARRANTY TERMS AND CONDITIONS IMPOSED BY THE MANUFACTURER.

### 4.03 Continuous Operation of Business.

After you open the Studio, you, or if you are an entity, your Named Partner (as defined in Section 4.09), must operate the Studio on a full-time basis for the duration of the Term. You do not have the right cease doing business before the end of the Term.

FILED DATE: 8/3/2020 1:39 PM    2020CH05088

### 4.04    Meetings

You recognize that in order to be a successful SEVA franchisee, you must continuously train, study, and learn more about the industry, the characteristics of your market, and customers. In the future, we may hold an annual meeting ("Annual Meeting") and/or regional meetings ("Regional Meetings") for our franchisees. You will be notified in advance of any such meetings. We may invest significant time, effort, and money in the development and presentation of our Annual Meeting and Regional Meetings and active participation in these meetings aims to improve the Studio's performance by sharpening your retail skills and providing networking with other Studio owners. Accordingly, if you are notified of any Annual or Regional Meeting, you agree to:

(a)    Attend, at your expense, the Annual Meeting at the location and during the time of our choosing for up to five days each year. We reserve the right to change an attendance fee for the Annual Meeting and to impose a fee of up to $1,000 for failure to attend (or charge you the attendance fee regardless of attendance).

(b)    Attend, at your expense, at least one Regional Meeting at a location and during a time of our choosing for up to 3 days each year. There shall be no additional charge for the training conducted by us at the Regional Meetings.

### 4.05    Compliance with Law

You must at all times operate the Studio in compliance with all applicable laws, regulations, codes and ordinances. You must secure and maintain in force all required licenses, permits and certificates relating to the operation of the Studio. You acknowledge that you are an independent business and are solely responsible for control and management of the Studio, including such matters as hiring and discharging your employees. You acknowledge that we have no power, responsibility or liability with respect to employee relations issues including hiring, discharge and discipline, and related matters. You are responsible and will assume liability for all hiring decisions and compliance with all applicable federal and state employment practices, including, but not limited to, overtime pay requirements and OHSA training,

You agree to comply and assist us in our compliance efforts, as applicable, with any and all laws, regulations (including, without limitation, government regulations relating to truth in lending, companion care, safety and sanitation, home and personal care, truth in advertising, occupational hazards, health and anti-discrimination laws), Executive Orders or otherwise relating to anti-terrorist activities (including the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury and/or other regulations). In connection with such compliance efforts, you agree not to enter into any prohibited transactions and to properly perform any currency reporting and other activities relating to the Studio as may be required by us or by law. You confirm that you are not listed in the Annex to Executive Order 13224 and agree not to hire any person so listed or have any dealing with a person so listed (the Annex Is currently available at http://www.treasury.gov). You are solely responsible for ascertaining what actions must be taken by you to comply with all such laws, orders and/or regulations, and specifically acknowledge and agree that your indemnification responsibilities as provided in Section 4.18 pertain to your obligations hereunder.

The Studio must in all dealings with its members, suppliers, us and the public adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which may be injurious to our business and the goodwill associated with the Marks and other Studios. You must notify us in writing within 5 days of the threat or commencement of (i) any action, suit or proceeding, and the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect your operation or financial condition of the Studio; and (ii) any notice of violation of any law, ordinance, or regulation relating to the Studio.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### 4.06 Participation in an Internet Website or Other Online Communications

You must participate in our website and no other website related to the Studio. We also may require you, at your expense, to participate in our intranet system. We have the right to determine the content and use of any website and our intranet system and will establish the rules under which franchisees may participate. You may not separately register any domain name or operate any website containing any of the Marks without our written approval. We will retain all rights relating to our website and our intranet system and may alter or terminate our website or our intranet system without prior notice to you. Your general conduct on our website, our intranet system or on other online communications and specifically your use of the Marks or any advertising on any website or other online communications is subject to the provisions of this Agreement. In the event that you use or download any unauthorized software, you will be liable for all damages and problems caused by the unauthorized software in addition to the other remedies provided under this Agreement. You acknowledge that certain information obtained through your participation in our website and our intranet system may be considered Confidential Information, including access codes and identification codes. Your right to participate in our website and our intranet system or otherwise use the Marks or System on the Internet or other online communications will terminate when this Agreement expires or terminates.

You are not permitted to promote the Studio or use any of the Marks in any manner on any social or networking websites, such as Facebook, LinkedIn or Twitter, without our prior written consent. If we consent to your using Social Media, you must first sign our Social Media Policy. We will control all social media initiatives. You must comply with our System Standards regarding the use of social media in the Studio's operation, including prohibitions on your and the Studio's employees posting or blogging comments about the Studio or the System, other than on a website established or authorized by us ("social media" includes personal blogs, common social networks like Facebook and MySpace, professional networks like LinkedIn, live-blogging tools like Twitter, virtual worlds, file, audio and video-sharing sites, and other similar social networking or media sites or tools). You shall regularly update any branded social media pages/handles/assets to which we have provided you access. We reserve the right to conduct collective/national campaigns via local social media on your behalf.

### 4.07 Pricing Policies; Memberships

(a) Unless prohibited by applicable law, we may periodically set a maximum or minimum price that you may charge for products and services offered by the Studio. If we impose such a maximum or minimum price for any product or service, you may charge any price for the product or service up to and including our designated maximum price or down to and including our designated minimum price. The designated maximum and minimum prices for the same product or service may, at our option, be the same. For any product or service for which we do not impose a maximum or minimum price, we may require you to comply with an advertising policy adopted by us which will prohibit you from advertising any price for a product or service that is different than our suggested retail price. Although you must comply with any advertising policy we adopt, you will not be prohibited from selling any product or service at a price above or below the suggested retail price unless we impose a maximum price or minimum price for such product or service.

(b) We may establish a membership program (the "Membership Program"), under which certain customers will pay a monthly fee to become members ("Members") of any Studio in the System. In the event we establish a Membership Program, your Studio will be required to participate in and provide certain products and services we designate to Members. Your Studio will be compensated monthly for services rendered to Members in accordance with our then existing Membership Program guidelines. You must ensure that every membership agreement you use complies with all System standards and all applicable laws and regulations.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(c) We reserve the right to sell, directly, through an affiliate, and/or through a third party, the Membership Program and other fee arrangements or packages we designate (i) to national, regional, and local organizations and accounts, and (ii) to individuals via the internet, mobile applications, call center, or other existing or future developed marketing systems. We may receive fees and payments for such sales. You shall participate in, and comply with the terms, rules and regulations we designate for each such program. We and/or our designee have the unrestricted right to retain certain fees from any customer. If you receive an inquiry regarding a group account which would reasonably be expected to be serviced by two or more Studios, you must forward the inquiry to us.

(d) You shall fully honor all gift cards that are in the form provided or approved by us regardless of whether a gift card was issued by you or another Studio. You shall sell, issue, and redeem (without any offset against any Royalty Fees) gift cards in accordance with procedures and policies specified by us in the Operations Manual or otherwise in writing, including those relating to procedures by which you shall request reimbursement for gift cards issued by other Studios and for making timely payment to us, other operators of Studios, or a third-party service provider for gift cards issued from the Studio that are honored by us or other Studio operators.

### 4.08 Promotion

You agree to conduct your business ethically, in good faith, and in a manner that will promote good relations with your customers and the community. You agree to use your best efforts to promote, advertise, solicit to, establish, maintain and service customers for the Studio. You shall accurately and truthfully characterize, promote and market the services and products sold in the manner designated by us, and shall not make any representations, statements, warranties or guarantees in conflict therewith or in addition thereto. In the event that you make representations, statements, warranties, or guarantees in conflict with or in addition to those set forth by us in the Operations Manual or in other communications, you shall be solely responsible for the resulting liability and shall reimburse and hold us harmless for any losses, costs, expenses, attorneys' fees or other liabilities incurred by us as a result thereof.

You shall use the marketing, advertising, and promotional materials, tools and services prepared and/or furnished by us to promote the Studio. They may include designs for business cards, envelopes, letterhead, bags, ads, posters, in-store signs, window displays, banners, radio and television spots and miscellaneous point-of-sale items. You will receive one copy or facsimile of a copy or item at no charge. For additional copies you must pay duplication costs. These materials, tools and services shall be developed and produced by our in-house advertising department, or by a local, regional or national advertising agency with which we, in our sole determination, may contract.

If you wish to use marketing, advertising, and promotional materials, tools and services that are not furnished by us, you must first submit such items to us, and receive our written approval before using them. If we do not approve of the materials within 30 days of our receipt of such materials, then they shall be deemed disapproved. You also agree to pay all costs, including production, of any marketing, advertising, and promotional materials, tools, and services that are not furnished by us.

### 4.09 Management

You must designate one of your owners as the "Named Partner." The Named Partner must hold at least a 25% ownership interest in the franchise or the franchise entity (if the franchise is owned by an entity) and successfully complete our initial training program (see Item 11) and any other training programs as we deem appropriate. The Named Partner must be the primary manager of the Studio. He or she may not engage in any other business or other activity, directly or indirectly, that requires significant management responsibility or time commitments, or that may otherwise conflict with the Named Partner's obligations under the

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Franchise Agreement. The Named Partner will continuously exert best efforts to promote and enhance the Studio and the goodwill associated with the Marks.

You must also designate a "Business Manager" of the Studio. The Named Partner may serve as the Business Manager but we do not require that the Business Manager have an ownership interest in the Franchise. The Business Manager will exert full-time efforts to fulfill your obligations under the Franchise Agreement and will not engage in any other business or other activity, directly or indirectly, that requires any significant management responsibility or time commitments, or that may otherwise conflict with your obligations under the Franchise Agreement. If the relationship of the Business Manager with you terminates or materially changes, you agree to promptly designate a replacement Business Manager, and the Named Partner must assume all of the obligations of the Business manager during the interim period. The initial Business Manager must successfully complete our initial training program and any other training programs as we deem appropriate before the Studio opens for business. Any replacement Business Manager must complete our initial training program and any other training programs as we deem appropriate before engaging in any business pertaining to the Studio.

### 4.10 Staff

You must employ and train sufficient number of competent staff who are familiar with, or who are capable and willing to become familiar with the features and advantages of the SEVA products and services, and can effectively demonstrate and explain such features and advantages to potential customers and vendors. You must require that your staff (i) attend and complete training sessions provided by you in accordance with training standards and procedures prescribed by us from time to time and (ii) attend and complete training sessions provided by us or our designees, if any, at such times and places and for such duration as we determine. You shall not allow employees to provide services to the public unless they have completed such training as we may require and been certified by us. We may charge fees for any training and certification. You agree that all staff must comply with all applicable state licensing laws and observe the highest standards of professionalism, prompt service, and courtesy to existing and potential customers and vendors, and shall be attired as designated in the Operations Manual.

You must enter into a written agreement with each of your staff members which:

(a) prohibits each from selling or promoting the sale of products and services other than those approved by us; and

(b) prohibits them from divulging any trade secrets, and requires that they keep confidential all proprietary information and marketing information, including the Operations Manual, as defined by this Agreement, and comply with the terms of the covenant not to compete.

### 4.11 Franchise Advisory Council

In the event we form an Advisory Council ("Advisory Council"), which will consist of representatives we approve, you agree to be a participating member of the Advisory Council upon our request. The primary purpose of the Advisory Council shall be to advise us how to utilize the Brand Fund to the best advantage of all the sales operating in the SEVA System. The Advisory Council serves in an advisory capacity only and has no decision-making authority.

### 4.12 Local Advertising Cooperative

You agree that we may establish or direct the establishment of a local advertising cooperative ("Local Advertising Cooperative") in geographical areas (as determined by us) in which 2 or more Studios are

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

operating. The Local Advertising Cooperative will be organized and governed by written documents in a form and manner, and begin operating on a date, that we determine in advance. Such written documents will be available for participating franchise owners to review. We may change, dissolve, merge and reinstate any Local Advertising Cooperatives. Each Local Advertising Cooperative's purpose is, with our approval, to administer advertising programs and develop advertising, marketing and promotional materials for the area that the Local Advertising Cooperative covers. If we have established a Local Advertising Cooperative for the geographic area in which the Studio is located, as of the time you sign this Agreement, or if we establish a Local Advertising Cooperative in that area during this Agreement's term, you agree to sign the documents we require to become a member of the Local Advertising Cooperative and to participate in the Local Advertising Cooperative as we require.

If we establish a Local Advertising Cooperative in your geographic area pursuant to this Section 4.12, you agree to participate and contribute your share to such Local Advertising Cooperative ("Local Advertising Cooperative Contribution"). The amount of your Local Advertising Cooperative Contribution will be determined at the time the Local Advertising Cooperative is established. Your Local Advertising Cooperative Contribution will be payable in the same manner as the Royalty. Your Local Advertising Cooperative Contribution may also be capped based on the provisions of the by-laws adopted by the Local Advertising Cooperative, subject to our approval.

Each Studio contributing to a Local Advertising Cooperative will have 1 vote on matters involving the activities of the particular Local Advertising Cooperative. The Local Advertising Cooperative may not use any advertising, marketing or promotional plans or materials without our prior written consent. However, you acknowledge and agree that, subject to our approval and subject to availability of funds, the Local Advertising Cooperative will have discretion over the creative concepts, materials and endorsements used by it. We agree to assist in the formulation of marketing plans and programs, which will be implemented under the direction of the Local Advertising Cooperative. You agree that the Local Advertising Cooperative Contributions may be used to pay the costs of preparing and producing video, audio and written advertising and direct sales materials for Studios in your area; purchasing direct mail and other media advertising for Studios in your area; implementing direct sales programs; and employing marketing, advertising and public relations firms to assist with the development and administration of marketing programs for Studios in your area.

The Local Advertising Cooperative Contributions will be accounted for separately by us from our other funds and will not be used to defray any of our general operating expenses. You agree to submit to us and the Local Advertising Cooperative any reports that we or the Local Advertising Cooperative require.

You understand and acknowledge that the Studio might not benefit directly or in proportion to their Local Advertising Cooperative Contribution. Local Advertising Cooperatives for Studios will be developed separately and no Local Advertising Cooperative will be intended to benefit the others. We will have the right, but not the obligation, to use collection agents and to institute legal proceedings to collect a Local Advertising Cooperative Contributions on behalf of and at the expense of the Local Advertising Cooperative and to forgive, waive, settle and compromise all claims by or against the Local Advertising Cooperative. Except as expressly provided in this Section 4.12, we assume no direct or indirect liability or obligation to you with respect to the maintenance, direction or administration of the Local Advertising Cooperative.

### 4.13 Reports, Records, Bookkeeping and Financial Statements

You must promptly and accurately complete such reports, forms, and establish a bookkeeping, accounting and record system as may be prescribed by us in the Operations Manual or elsewhere in writing, and shall deliver all such reports, forms, and records to us in the manner and to the places specified by us. You agree

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

to utilize the reporting periods and methods prescribed by us in reporting financial and other information, and specifically agree to report to us:

(a) all operational, financial, inventory, or sales, marketing, or other information requested by us from time to time. You specifically grant to us independent access to such data or information in such manner (including remote electronic access) at any time we reasonably request; and

(b) such other financial reports and other reports required by us.

You must prepare all financial reports in accordance with generally accepted accounting principles, consistently applied, and in a form approved by us. You must use the chart of accounts we prescribe. You must periodically deliver to us accounting, tax and other information (or copies of documents), as we request including a monthly financial statement with profit and loss and balance sheet delivered to us within 10 days after each month. You will provide us with a copy of your annual financial statements including a profit and loss statement and a balance sheet. Such annual statements will be prepared in accordance with generally accepted accounting principles, consistently applied, and be delivered to us within 90 days after your fiscal year end.

### 4.14 Inspections

In order to assist you in maintaining the standards of operation established by us and to insure your compliance with this Agreement, you grant us and our representatives, the right at any time and without prior notice to you to inspect the Studio, the offices, places of business and assets, and all business records, including, but not limited to, sales reports, billings, account records, customer lists, potential customer lists, financial statements, tax returns, purchase orders, invoices, payroll records, check stubs, tax records and other records and documents of all types, and to take a physical inventory of the assets of the Studio. Such inspections may be conducted by a virtual walkthrough utilizing the Studio's iPad, IP camera or other devices. You shall comply with and accommodate a virtual inspection if such inspection is requested by SEVA. Inspections shall be made at our expense; provided that if we are required to make two inspections in connection with your failure to comply with this Agreement, we have the right to charge you for the costs of making all further inspections in connection with such failure to comply, including, without limitation, the charges of any independent certified public accountants and the travel expenses, room, board and compensation of us, our agents and other representatives involved therewith.

### 4.15 Audits

We or our representatives have the right to audit and copy or cause to be audited or copied all business records, including, but not limited to, sales reports, inventory records, other reports, customer lists, potential customer lists, financial statements, tax returns, purchase orders, invoices, payroll records, check stubs, tax records, reports, statements and returns required, and other records and documents of all types. For this purpose, all such business records (including state and local sales tax reports and federal, state, and local income tax returns) shall be made available to us or our representatives upon request. In the event any such audit discloses an understatement of your Gross Sales for any period or periods, you shall pay to us within 2 days after receipt of the audit report, all amounts due plus late fees and interest due thereon. In the event that such understatement for any period or periods shall be 3% or more of your Gross Sales for such period or periods, you shall reimburse us for the cost of the audit, including all charges of any independent certified public accountants and the travel expenses, room, board and compensation of us and our representatives involved therewith.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**4.16 Payment of Obligations**

You will pay promptly when due and be responsible for all expenses, costs, taxes, licenses, accounts payable, and indebtedness of any kind incurred or suffered by you in the conduct of the Studio including, without limitation, business expenses related to: living, relocating, traveling, entertaining, clothing, marketing, advertising, administration, operations, utilities, rent, insurance, associates, employees, benefits, law, accounting, computers, and other obligations of indebtedness.

**4.17 Insurance**

You must obtain and maintain, at your own expense, insurance coverage that we specify in the Franchise Agreement or the Operating Manual. We may regulate the types, amounts, terms and conditions of insurance coverage required for the Studio, and standards for underwriters of policies providing required insurance coverage.

We prescribe the types and minimum insurance coverage that you must carry. You need to evaluate if your business will require greater coverage or other types of insurance. You also may need different types or additional insurance if required by the lease. All liability policies must name us and our affiliates as additional named insureds. Our mandatory minimum insurance requirements for each Studio are as follows:

| Required Coverage | Minimum Limits of Coverage |
|---|---|
| General Aggregate | $4,000,000 |
| Per Occurrence | $2,000,000 |
| Beauticians/Salon Professional Liability | $1,000,000 |
| Employee Benefits Liability (applies if you provide Employment Benefits) | $1,000,000 |
| Products/Completed Operations Aggregate | $1,000,000 |
| Personal and Advertising Injury | $1,000,000 |
| Employer's Practices Liability | $1,000,000 |
| Each Occurrence | $1,000,000 |
| Tenant Legal Liability | $300,000 |
| Medical Expense (any one person) | $10,000 |

Policies must be written by an A.M. Best "A" or better rated insurance company satisfactory to us and must meet our specifications, including types and amounts of coverage, and the dollar limits and deductibles levels, among other things. You must promptly deliver to us insurance policies or certificates of coverage which designate the name and address of the issuer, the policy number, amount and provisions thereof, all policies

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

will contain a provision that the policy may not be canceled, terminated, or materially or adversely modified without 30 days prior notice from the insurance company to us. You agree that at least 10 days before the expiration of any insurance policy, you will deliver to us either written evidence that the policy has been renewed or a certificate of coverage from another company. All policies will provide that the insurance companies waive subrogation or consent to waiver of right of recovery against us. We, at our option, may make any necessary payments to keep any insurance required in this agreement in force if you fail to do so, and you will immediately reimburse us for such payments plus a 25% service charge. Your obligation to carry insurance will not be reduced because of any insurance we may carry, nor will any insurance carried by us relieve your indemnification obligation.

We may identify additional types of insurance that you must carry upon reasonable notice. We may periodically modify all minimum amounts to reflect inflation, general industry standards or our future experience with claims.

### 4.18 Indemnification

You hereby waive all claims against us for damages to property or injuries to persons arising out of the operation of the Studio. You must fully protect, indemnify and hold us (and our owners, directors, officers, employees, agents, members, successors and assigns) and our affiliates (and their owners, directors, officers, employees, agents, members, successors and assigns) (the "Indemnified Parties") harmless from and against, and to reimburse any one or more of the Indemnified Parties for, any and all claims, demands, damages, obligations and liabilities of any nature whatsoever arising in any manner, directly or indirectly, out of or in connection with or incidental to the operation of the Studio (regardless of cause or any concurrent or contributing fault or negligence of us or our affiliates), the business you conduct pursuant to this Agreement, or any breach by you or your failure to comply with the terms and conditions of this Agreement, including, without limitation, those alleged to be caused by the Indemnified Party's negligence, unless (and then only to the extent that) the claims, obligations or damages are determined to be caused solely by the Indemnified Party's gross negligence or willful misconduct in a final, unappealable ruling issued by a court with competent jurisdiction. For purposes of this indemnification, "claims" include all obligations, damages (actual, consequential, or otherwise), and costs that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration, or alternative dispute resolution is commenced. Each Indemnified Party may defend any claim against it at your expense and agree to settlements or take any other remedial, corrective, or other actions. This indemnity will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you under this subparagraph. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you under this paragraph. Without limiting the foregoing, if we, or any of the Indemnified Parties, are made a party to a legal proceeding subject to this indemnification provision, including any proceeding in connection with your act or omission, we and the Indemnified Party, as applicable, may hire counsel to protect our interests and bill you for all costs and expenses incurred by us and the Indemnified Party. You must pay all such bills immediately upon receipt of the invoice.

### 4.19 Variances

We may approve exceptions or changes from the standards which we, in our sole determination, believe necessary or desirable under particular circumstances. You understand that you have no right to object to or

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

obtain such variances, and that any exception or change from the standards for your activities must be approved in advance by us in writing.

### 4.20 Customer Satisfaction and Franchise Compliance Programs

You must participate at your own expense in programs required from time to time by us regarding customer satisfaction and/or your compliance with the System, which may include (but are not limited to) a guest feedback system, guest survey programs, and mystery shopping. You must meet or exceed any minimum score requirements we set for such programs. We may share with you the results of these programs pertaining to the Studio. Additionally, you shall participate in any complaint resolution and other programs as we may reasonably establish for the System, which programs may include, without limitation, providing discounts or refunds to customers.

### 4.21 Non-Cash Payment Systems.

You must accept from customers debit cards, credit cards, stored value gift cards, prepaid SEVA-branded cards, membership cards, and/or other non-cash systems specified by us, on such terms and conditions as we determine. You must obtain at your own expense all necessary hardware and/or software used in connection with these non-cash systems.

### 4.22 SEVA University

Our training system, including all training content and evaluation methods, is known as SEVA University™. SEVA University includes:

(a) New Franchisee Initial Training. Initial training is described in Section 3.04.

(b) Owner, Manager, and Employee Training and Evaluation Programs. We may conduct or make available various training, testing, evaluation and certification programs ("SEVA Training Programs"), which may at any location and in any format we choose, and which may be live in-person, live conducted remotely, including through the Internet or mobile application based platform, and/or pre-recorded. We may designate whether any such SEVA Training Programs are optional or mandatory for you, your Named Partner, your Business Manager, any of your other managers, and/or other employees. With respect to mandatory SEVA Training Programs, we may make them mandatory System-wide or mandatory only for certain persons or in certain circumstances in our discretion. We may charge a fee for each of the SEVA Training Programs. You must complete and cause your Named Partner, Business Manager, other managers and other employees, as we designate, to participate in and complete, to our satisfaction, such SEVA Training Programs as we may reasonably require from time to time. You shall pay to us or our designee any and all SEVA training fees we impose, which may be at an hourly rate or a flat fee, as we determine in our sole and absolute discretion. We may require to you conduct SEVA Training Programs for your employees.

(c) Training Studios. In our sole discretion, we may designate and certify one or more SEVA Studios as training Studios, which are authorized to provide training to other franchisees. We have the right to determine the qualifications, terms and conditions necessary to achieve and maintain such status.

(d) Instruction Offered To The Public. In our sole discretion, we may authorize one or more SEVA Studios and/or online methods to provide instructional classes to the public in SEVA methods and processes. We have the right to determine the qualifications, terms and conditions necessary to achieve and maintain such status, and the terms and conditions upon which class may be offered to the public. Our terms and condition may include additional fees to be paid to us. If you have not been authorized by us in writing, you shall not provide any instructional classes to the public.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### 4.23 Minimum Gross Sales

During the Studio's first year of operation (from the date of opening until the day before the first anniversary thereof), you must achieve at least $150,000 in Gross Sales. During the Studio's second year of operation, and for every rolling 12-month period thereafter, you must achieve at least $250,000 in Gross Sales. If you fail to achieve these minimum Gross Sales, then (i) you must pay to us the difference between the Royalties actually paid and the amount of Royalties you would have paid if you had met the minimum Gross Sales; and (ii) we may terminate this Agreement for your breach of this obligation.

### 4.24 Business Telephone Numbers and Listings

You agree that, as between us and you, we have the sole rights to all telephone numbers, facsimile numbers, directory listings and Internet addresses that you use in the operation or promotion of the Studio (collectively, the "Contact Information"). The Contact Information may be used only for the Studio and for no other purpose. Upon the expiration or termination of this Agreement, you will stop using the Contact Information and execute all documents required by the telephone service providers and website domain hosts to transfer them to us or our designee. You irrevocably appoint us, with full power of substitution, as your true and lawful attorney-in-fact, which appointment is coupled with an interest, to execute such directions and authorizations as may be necessary to accomplish the transfer of the Contact Information. You must also execute the form of Collateral Assignment of Telephone Numbers, Telephone Listings and Internet Addresses which is attached hereto as Exhibit A to Attachment A.

### 4.25 Compliance with System Standards

You have the sole responsibility for the day-to-day management and operation of the Studio and acknowledge that operating and maintaining the Studio according to our System Standards are essential to preserve the goodwill of the Marks and the goodwill of all Studios. Therefore, you agree at all times to operate and maintain the Studio according to each and every System Standard, as we modify and supplement them from time to time. System Standards may regulate any aspect of the operation and maintenance of the Studio; including any one or more of the following:

(a) sales, marketing, advertising and promotional programs, materials and media;

(b) staffing levels and employee qualifications, training, uniforms, dress and appearance (although you have sole responsibility and authority concerning employee selection and promotion, termination scheduling and hours worked, rates of pay and other benefits, work assigned and working conditions);

(c) use and display of the Marks;

(d) days and hours of operation;

(e) methods of payment that the Studio may accept from customers;

(f) participation in market research and testing and product and service development programs;

(g) bookkeeping, accounting, data processing and record keeping systems and forms; formats, content and frequency of reports to us of sales, revenue, and financial performance and condition; and giving us copies of tax returns and other operating and financial information concerning the Studio;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(h) types, amounts, terms and conditions of insurance coverage required for the Studio, including criteria for your insurance carriers;

(i) types and quantity of equipment and other items used in the operation of the Studio;

(j) pricing information and requirements; and

(k) any other aspects of operating and maintaining the Studio that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Studios.

System Standards may be incorporated from time to time in the Operations Manual and form a part of this Agreement as if fully set forth herein. All references to this Agreement include all System Standards as we may modify them. Our periodic modification of the System Standards, which may accommodate regional or local variations, may obligate you to invest additional capital in the Studio and incur higher operating costs.

### 4.26 Non-Disparagement

You agree not to (and to use your best efforts to cause your current and former owners, officers, directors, principals, agents, partners, employees, representatives, attorneys, spouses, affiliates, successors and assigns not to) disparage or otherwise speak or write negatively, directly or indirectly, of us, our affiliates, any of our or our affiliates' owners, directors, officers, employees, representatives or affiliates, the SEVA brand, the System, any Studio, any business using the Marks, or which would subject the SEVA brand to ridicule, scandal, reproach, scorn, or indignity, or which would negatively impact the goodwill of us or the SEVA brand.

## 5. PROTECTION OF RIGHTS AND INFORMATION

### 5.01 Ownership of Marks

Nothing in this Agreement shall be construed as an assignment or grant to you of any right, title or interest in or to the Marks, it being understood that all rights relating thereto are reserved by us and/or our affiliate. You recognize the great value of the goodwill associated with the Marks and acknowledge that the Marks and all rights therein and goodwill pertaining thereto belongs exclusively to us and/or our affiliate. You agree that your every use of the Marks shall inure to the benefit of us and/or our affiliate and that you shall not at any time acquire rights in the Marks by virtue of any use you make of the Marks. You shall use each Mark only in full compliance with such rules as we may from time to time prescribe. You shall not use any Mark as part of any corporate or other business name, whether with any prefix, suffix or other modifying words, terms, designs or symbols, nor may you use any Marks in connection with the sale of any unauthorized product or service or in any other manner not explicitly authorized in writing by us. Any consent or authorization given under the preceding sentence shall be deemed revoked upon termination of the Agreement. You agree that you will not, while this Agreement is in effect and thereafter, attack the title or any of our rights in and to the Marks, or attack the validity of this license for the use of the Marks or do anything which would jeopardize or diminish our rights to or the value of the Marks.

### 5.02 Protection of Marks

You must immediately notify us of any infringement of or challenge to your or our use of any Marks or claim by any person or entity of any rights in any Mark. We will have sole right to determine what action we deem appropriate and sole right to exclusively control any litigation or Patent and Trademark Office proceedings or other proceeding arising out of any such infringement, challenge or claim relating to such Marks, you agree to execute any and all instruments and documents, render such assistance and do such acts and things as may,

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

in the opinion of counsel for us, be necessary or advisable to protect any interests in any such litigation or proceeding or to otherwise protect and maintain our interest in the Marks.

### 5.03 Use of Marks in Advertising

You agree that during the term of this Agreement:

(a) the Studio shall be operated under the name used in the Marks and that all signs and advertising shall prominently display the Marks;

(b) all real and fictitious names under which you do business must be approved in writing by us before use. In conjunction with the Marks, your own name must be displayed conspicuously on all licenses and permits required for the operation of the Franchise, on all tax returns, on all stationery and business cards and on all contractual agreements you enter into. The format for the display of your own name in conjunction with the Marks must be approved in writing by us before use. You may not use the word "SEVA" as part of your entity name; and

(c) all stationery, business cards and contractual agreements entered into by you must conspicuously state "This SEVA Studio is Independently Owned and Operated."

### 5.04 Change of Marks

You agree that if it becomes advisable at any time, in our sole judgments, to modify or discontinue the use of any or all of the Marks and/or use one or more additional Marks to substitute for any or all of the Marks, you agree to do so without any obligation on our part with respect thereto.

### 5.05 Protection of Information

(a) You acknowledge that we possesses and shall possess in the future certain proprietary information, consisting of the Operations Manual as well as all concepts, methods, techniques, training systems, formats, specifications, procedures, information, systems, marketing approaches, ideas, research, improvements, materials, owned or developed by us and not otherwise publicly available, whether or not published or suitable for registration or copyright, and the goodwill associated with them, which is used in the operation of SEVA franchises ("Proprietary Information"). Proprietary Information also includes certain marketing information, consisting of names, addresses, telephone numbers, contact persons, purchase orders and other identifying information relating to customers and vendors, financial information with respect to the Studio, other Studios and the Studio, confidential information contained in verbal or audio communication, files, interoffice documents, and other internal and external documents and correspondence prepared by or for you and us, which marketing information is not otherwise publicly available. We may disclose the Proprietary Information to you in the Operations Manual, in training, and in providing guidance and assistance to you in the operation of the Studio.

(b) You acknowledge and agree that you will not acquire any interest in the Proprietary Information during or after the Term of this Agreement, other than the right to utilize it in the development and operation of the Studio during the Term thereof, and that the use or duplication of the Proprietary Information in any other business would constitute an unfair method of competition, that such information could be used to compete with and significantly injure us, that such information has significant value to our competitors, and that the relationship between such information, you, and us involves elements of personal service and trust. You acknowledge and agree that the Proprietary Information is our trade secret and is disclosed to you on the condition that you:

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(i) will not use the Proprietary Information in any other business or capacity during the Term of this Agreement or at any time thereafter;

(ii) will maintain the absolute confidentiality of the Proprietary Information during the term of this Agreement and thereafter;

(iii) will not make unauthorized copies of any portion of the Proprietary Information or disclosed or held in written, audio, video, or computer form; and

(iv) will adopt and implement all reasonable procedures prescribed from time to time by us to prevent the unauthorized use or disclosure, as described in parts (1) through (3) above, of the Proprietary Information including, without limitation, restrictions on disclosure thereof to and by your agents and the use of nondisclosure and noncompetition clauses in employment agreements with each of such persons who have access to the Proprietary Information.

**5.06 Covenants Not To Compete**

You acknowledge and agree that we would be unable to protect our trade secrets against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among its franchisees if its franchisees were permitted to hold interests in any competitive businesses (as described below). You also acknowledge that we have granted you the Franchise in consideration of, and in reliance upon, your agreement to deal exclusively with us. You therefore agree to the following noncompetition covenants:

(a). Unless otherwise specified, the term "you" as used in this Section includes, collectively and individually, you, any of your owners, principal officers, or directors, and the immediate family members of each of the foregoing.

(b). You covenant that during the term of this Agreement, you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any Competitive Business other than as authorized by this Agreement or any other agreement between us and you. For purposes of this Agreement, "Competitive Business" means any business that sells or provides services that include facial threading, waxing, eyelash extensions, eyebrow tinting or facials, which are typically offered in a spas or beauty salons

(c). You covenant that you will not, for a period of 2 years after the expiration or termination of this Agreement, regardless of the cause of termination, or within 2 years of the sale of the Studio or any interest in you, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in a business engaging in a Competitive Activity: (a) at the Authorized Location; or (b) within a 25 mile radius of the Authorized Location ; or (c) within a 25 mile radius of any other SEVA Studio in operation or under construction as of the date of termination or expiration, as applicable.

(d). You expressly agree that the two-year period and geographical restrictions are the reasonable and necessary time and geographic scope needed to protect SEVA, its franchisees and the SEVA System if the Agreement expires or is terminated. You also agree that the length of time in subpart (3) will be tolled for any period during which you are in breach of the covenants or any other period during which we seek to enforce this Agreement. The parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### 5.07 Improvements

You must promptly disclose to us all ideas, concepts, techniques, or materials concerning the SEVA concept, whether or not protectable intellectual property and whether created by or for you or your owners or employees ("Improvements"), which will be deemed to be our sole and exclusive property, part of the System, and works made-for-hire for us. To the extent any item does not qualify as a "work made-for-hire" for us, you must assign ownership of that item, and all related rights to that item, to us and must take whatever action (including signing an assignment agreement or other documents) we request to show our ownership or to help us obtain intellectual property rights in the item. In the event that the foregoing provisions are held to be invalid or otherwise unenforceable, you hereby grant to us an irrevocable, worldwide, perpetual, exclusive, royalty-free license, with the right to sublicense such Improvements.

## 6. SALE OR TRANSFER

### 6.01 Transfer by SEVA

You have not signed this Agreement in reliance on any particular manager, owner, director, officer, or employee remaining with us in any capacity. We may change our ownership or form or assign this Agreement and any other agreement to a third-party without restriction. We may also delegate the performance of any portion or all of our obligations under this Agreement to third-party designees, whether these designees are our agents or independent contractors with whom we have contracted to perform these obligations.

### 6.02 Transfer by You

You may not transfer this Agreement or the Studio without our prior written approval. The rights and duties under this Agreement are personal to you (or to your owners if you are an entity). We have granted you the Franchise in reliance upon our perceptions of your (or your owners') individual or collective character, skill, aptitude, attitude, business ability, and financial capacity. Accordingly, neither this Agreement (or any interest in this Agreement), the Studio or substantially all of its assets, any direct or indirect ownership interest in you (regardless of its size), nor any ownership interest in any of your owners (if such owners are legal entities) may be transferred without our prior written approval, which approval will not be unreasonably withheld or delayed. You will also not enter into any proposed mortgage, pledge, hypothecation, encumbrance or giving of a security interest in or which affects the Studio, this Agreement or your rights under this Agreement without our prior written consent. A transfer of the Studio's ownership, possession, or control, or substantially all of its assets, may be made only with a transfer of this Agreement approved by us.

The term "Transfer" includes a voluntary, involuntary, direct, or indirect assignment, sale, gift, or other disposition of any interest in you and includes:

(a) the transfer or the offer of any such interest in you by means of a private sale, a public offering or a private offering which requires that the prospective purchaser be provided a disclosure document, a divorce, a disposition on or resulting from death, an insolvency or dissolution proceeding, or otherwise by operation of law;

(b) a merger or consolidation or issuance of additional securities or other forms of ownership interest;

(c) any sale of a security convertible to an ownership interest;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(d) the grant of a mortgage, pledge, collateral assignment or other transaction designed to create a lien or other encumbrance, and a transfer which results therefrom; and

(e) any other transfer, surrender, or loss of the possession, control, or management of the Studio.

If you intend to list the Studio for sale with any broker or agent, you shall do so only after obtaining our written approval of the broker or agent and of the listing agreement. You may not use or authorize the use of any Mark in advertising the transfer or other disposition of the Studio or of any ownership in you without our prior written consent. You shall not use or authorize the use of, and no third party shall on your behalf use, any written materials to advertise or promote the transfer of the Studio or of any ownership interest in you without our prior written approval of such materials.

### 6.03 Conditions for Consent to Transfer

We will not unreasonably withhold our consent to transfer provided that we determine that all of the conditions described below have been satisfied. We will condition our consent to any proposed transfer, whether to an individual, a corporation, a partnership or any other entity upon the following:

(a) Assignee Requirements. The assignee (i) must meet all of our then-current requirements for new franchisees of a SEVA Studio, including educational, managerial, business and financial standards; and must have one individual who qualifies to be the Manager for the Studio; (ii) must have sufficient equity capital to operate the Studio; and (iii) must not have any other interest in a business competitive with the Studio.

(b) Payment of Amounts Owed. All amounts owed by you to us or any of our affiliates, your suppliers or any landlord for the Authorized Location, or upon which we or any of our affiliates have any contingent liability, must be paid in full.

(c) Transfer Fee. Unless the transfer is of ownership interests among one or more of the owners listed in Attachment B, you must pay to us a transfer fee of $19,500.

(d) No Default. You must not be in default of any provision of this Agreement or any other agreement with us or our affiliates or suppliers.

(e) New Franchise Agreement. The assignee must sign our then standard form of Franchise Agreement, together with any ancillary agreements we may require, for the term ending on the expiration date and with such renewal term as provided by this Agreement. The then standard form of Franchise Agreement may contain different terms and conditions, including higher and/or additional fees.

(f) Guarantee. All persons having an ownership interest in the new franchisee entity must sign a personal guarantee, as well as each owner's spouse or domestic partner, as applicable.

(g) General Release. You and each owner must sign a general release releasing us and our affiliates of all claims arising out of or relating to this Agreement, the Studio or the parties' business relationship, with a separate agreement maintaining the obligations of nondisclosure, non-compete and indemnification, all in the form we designate.

(h) Training. You must pay the assignee's training fees of $3,000.00 for training for up to 3 people as part of such assignment and transfer of the Franchise.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(i) Financial Reports and Data. We have the right to require you to prepare and furnish to assignee and/or us such financial reports and other data relating to the Studio and its operations as we deem reasonably necessary or appropriate for the assignee and/or us to evaluate the Studio and the proposed transfer. You agree that we have the right to confer with proposed assignees and furnish them with information concerning the Studio and proposed transfer without being held liable to you, except for intentional misstatements made to an assignee. Any information furnished by us to proposed assignees is for the sole purpose of permitting the assignees to evaluate the Studio and proposed transfer and must not be construed in any manner or form whatsoever as earnings claims or claims of success or failure.

### 6.04 Our Right of First Refusal

Notwithstanding anything in this Article 6 to the contrary, if you or any of your owners propose to sell the Studio or part or all of the ownership of the Franchise, you or the owners shall obtain and deliver a bona fide executed written offer to purchase the Studio to us, which shall, for a period of 4 weeks from the date of delivery of such offer, have the right, which may be exercised by written notice to you, to purchase the Studio or such ownership for the price and on the terms and conditions contained in such offer; provided that we may substitute equivalent cash for any form of payment proposed in such offer. If we do not exercise this right of first refusal, the offer may be accepted by you, subject to our prior written approval as provided in Section 6.03. If we do not exercise our right of first refusal as described above and the contract contained in such offer is not consummated within 60 days of the date of the offer, we shall again have the right of first refusal described herein.

### 6.05 Ownership Changes

If you are a partnership, limited liability company or corporation, you agree to notify us of any change of partnership, membership, or stock ownership interests while this Agreement is in effect, which, together with all prior changes, constitutes a change of 10% or more. Any such change that, together with all prior changes, constitutes a change of 50% or more shall be considered a transfer subject to the provisions of Sections 6.02, 6.03, and 6.04 hereof.

### 6.06 Death or Disability

In the event that you or any Named Partner dies or becomes permanently disabled, the administrator, executor, conservator or other personal representative of such person shall transfer his or her interest within a reasonable time, not to exceed 6 months from the date of death or permanent disability, to a third party approved by us. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to all of the terms and conditions for assignments and transfers contained in Section 6.03 of this Agreement and unless transferred by gift, devise or inheritance, subject to the terms of Section 6.04 of this Agreement. Failure to so dispose of such interest within said period of the time shall constitute a breach of this Agreement. Our consent to an assignment of any interest, subject to the restrictions of this Section, shall not constitute a waiver of any claims it may have against the assignor, nor shall it be deemed a waiver of our rights to demand exact compliance with any of the terms or conditions of the Franchise by the assignee. Pending assignment, the Franchise shall be operated by a competent and trained Manager appointed by the assignee or the executor, administrator, conservator or other personal representative of the deceased or permanently disabled owner or guarantor and approved by us. If a competent and trained Manager is not so appointed and approved within 60 days after the death or permanent disability of you or a guarantor, then you shall be deemed in breach of this Agreement.

## 7. DEFAULT AND TERMINATION

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### 7.01 Termination by You

If you are in compliance with this Agreement, you may terminate this Agreement for a material breach or a material default of the Agreement by us 30 days after giving us notice of such intent, specifying the breach or default, if the breach or default remains uncured at the end of the 30 day period; provided, however, that if the nature of our breach or default is such that more than 30 days are reasonably required for performance or cure, then we shall not be in breach or default if we commence performance within the 30 day period and thereafter diligently continue and cure the breach or default.

### 7.02 Termination by Us

If you breach this Agreement, we have all rights and remedies permitted by law or equity, including the right of termination and we may terminate this Agreement immediately upon notice without giving any opportunity to cure for any of the following breaches or defaults:

(a) Criminal Acts. The criminal conviction or plea of guilty or no contest by your, one of your owners or your manager to fraudulent conduct, a felony, or misdemeanor involving moral turpitude.

(b) Unauthorized Transfer. Any transfer or attempted transfer in violation of Article 6 of this Agreement.

(c) Bankruptcy. Voluntary or involuntary bankruptcy or insolvency of you or any guarantor.

(d) Abandonment or Ceasing Operations. You abandon or fail, without prior written approval, to actively operate the Studio for 3 or more consecutive business days.

(e) Confidential Information. Any unauthorized use of the Proprietary Information.

(f) Marks. Any conduct by you which materially impairs the goodwill associated with the Marks or the System.

(g) Authorized Location. Any use of the Studio or the Authorized Location for any illegal or unauthorized purpose.

(h) Liens. Levy of a writ of attachment or execution or the placement of other liens against you or any guarantor or any of their assets which is not released or bonded against within 30 days.

(i) Insolvency. You make an assignment for the benefit of creditors or you or any of your Named Partner(s) admit in writing your insolvency or inability to pay your debts generally as they become due; you or your Named Partner(s) consent to the appointment of a receiver, trustee, or liquidator of all or the substantial part of your property; the Studio is attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant, or levy is vacated within 30 days; or any order appointing a receiver, trustee, or liquidator of you or the Studio is not vacated within 30 days following the order's entry; or you (or any of your owners) file a petition in bankruptcy or a petition in bankruptcy is filed against you.

(j) Repeated Breaches. Breach, default or failure to comply with this Agreement, (including, but not limited to requirements relating to proper use of the POS System, compliance with system standards, timely delivery of reports, financial statements or payment of fees to us) by you on three or more occasions within any 12 month period during the Term, whether or not any of such breaches, defaults or failures to

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

comply are corrected after notice thereof is delivered to you and whether or not they are the same, similar or different.

(k) Misrepresentations or Fraud. Any misrepresentation, material omission, or false representation, statement, warranty, guaranty, report, or claim, or fraudulent, unethical or dishonest conduct, distortion, act of concealment, or attempt at any of the foregoing, made by you in connection with obtaining the Franchise or this Agreement, or with respect to this Agreement or performance hereunder to us, other SEVA franchisees, your customers, vendors, and suppliers, and the general public, whether or not injury or loss results.

(l) Violation of Law. Violation by you of any law relating to the operation of the Studio.

(m) Understated Gross Sales. Submission within any two year period of three or more weekly, monthly, quarterly, or annual financial statements, reports, sales, income tax returns, or other reports to us that understate by 3% or more the Gross Sales or other material information they contain.

(n) Failure To Obtain the Authorized Location. You fail to secure the Authorized Location within 90 days following the execution of this Agreement or fail to execute Attachment B within such time period.

(o) Premises. You lose the right to occupy the Authorized Location for any reason.

(p) Failure To Open. You do not open the Studio for business within the time period specified in Section 3.05.

(q) Minimum Sales. You do not achieve the minimum Gross Sales as specified in Section 4.24.

(r) Violation of Covenants Not To Compete. You violate Section 5.06, or if you are entity, any of your owners violates any covenant against competition contained in any agreement with us.

(s) Nonpayment. Failure to pay when due any sum owed to us, our affiliates or your landlord or vendors under this Agreement or any other agreement and do not correct the failure within 10 days after written notice of that failure.

(t) Failure to Cure. You (or any of your owners) fail to comply with any other provision of this Agreement or any other System Standard, and do not correct the failure within 15 days after we deliver written-notice of the failure to you.

## 8. RIGHTS AND DUTIES UPON TRANSFER OR TERMINATION

### 8.01 Obligations

You agree that upon termination of this Agreement or upon the sale, transfer, or assignment of the Franchise or this Agreement by you, the following shall occur:

(a) Acceleration of Payments to us and Others. All money owed by you to us, our affiliates, the Brand Fund, and to any other of your creditors arising from or related to the Franchise business, shall be immediately due and payable.

(b) Franchise Revoked. All rights and licenses granted to you under this Agreement shall terminate.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(c) Use of Marks. You shall cease using the Marks, including use of any Mark as part of any corporate or other name, and all confidential information relating to the Franchise (including Proprietary Information), and shall cease doing business or in any manner identifying or advertising yourself as a SEVA franchisee.

(d) Products and Supplies. You shall cease using and shall, upon our instructions, destroy or deliver to us (or another party designated by us) all copyrighted material, Operations Manual, and all other items which are our property.

(e) Signs. You shall immediately remove or destroy all signs, posters, sheets, placards, cards, nameplates, names or similar items which designate you as an authorized franchisee or which include any Mark.

(f) Telephone. You shall cease using all telephone numbers and listings used in connection with the Franchise, transfer all such numbers and listings to us or other party designated by us, and promptly direct and authorize the telephone company to make such transfers or, if we direct, to disconnect the numbers completely.

(g) Publications. You shall immediately notify and instruct publications and persons who may publish your name as an authorized franchise of our, to discontinue such listings.

(h) Registrations. You must take such action as may be required to cancel all of your assumed name, business name, corporate name, trade name, trademark, service mark or all equivalent registrations which use the Marks, in part or in whole.

(i) Modify Property. If you retain possession of any business properties, you shall make such alterations and modifications as are necessary to prevent identification as a franchise of ours.

(j) Power of Attorney. You hereby irrevocably appoint us as your attorney-in-fact to execute in your name and on your behalf all documents necessary to discontinue your use of the Marks.

(k) Noncompetition. You shall continue to be bound by all of the provisions of Sections 5.05 and 5.06 hereof and other provisions which are intended to survive termination.

(1) Execution of Documents. You shall comply with all applicable laws and shall execute and deliver all documents necessary to vest title and ownership in us or our nominee, free and clear of all liens and encumbrances, except those assumed by us.

(m) Delivery of Documents. You shall deliver promptly to us or any party designated by us, all files, memoranda, research, forms, tapes, videos, Proprietary Information, marketing materials and other documents and information supplied to or developed or created by you in connection with the Franchise (including all copies of the foregoing) in your possession or control, with all such documents and information being acknowledged by you to be and remain our sole and exclusive property.

(n) Liquidated Damages. If we terminate this Agreement because of your breach, or if you terminate this Agreement without cause, you and we agree that it would be difficult, if not impossible, to determine the amount of damages that we would suffer due to the loss or interruption of the revenue stream we otherwise would have derived from your continued payment of Royalties and that the Brand Fund and Local Advertising Cooperative (if established) would have otherwise derived from your continued contributions to those funds, less any cost savings, through the remainder of the Term (the "Damages"). You and we agree that a reasonable estimate of the Damages is, and you agree to pay us as compensation for the

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Damages, an amount equal to the then net present value of the Royalty fees, Brand Fund contributions and Local Advertising Cooperative (if established) contributions that would have become due had the Agreement not been terminated, from the date of termination to the scheduled expiration of the then-current Term of this Agreement (the "Measurement Period"). For this purpose, Damages shall be calculated by multiplying (1) the number of calendar months in the Measurement Period by (2) the average monthly Gross Sales of the Studio during the 12 full calendar months immediately preceding the termination date; however, if as of the termination date, the Studio has not been operating for at least 12 months, Damages will be calculated based on the average monthly Gross Sales during our previous fiscal year immediately preceding the termination date of all Studios operating under the Marks during the entirety of that fiscal year. You and we agree that the calculation described in this Section is a calculation only of the Damages and that nothing herein shall preclude or limit us from proving and recovering any other damages caused by your breach of the Agreement.

If this Agreement is terminated as a result of your default or your wrongful termination, you shall pay to us liquidated damages in an amount equal to the aggregate Royalty Fees and Brand Fund fees and contributions you owed to us under this Agreement during the 36 full calendar months during which the Studio was open and operating immediately before the termination date. If the Studio has not been open and operating for at least 36 months before the termination date, liquidated damages shall be equal to (x) the average monthly Royalty Fees and Brand Fund fees and contributions owed under this Agreement for all months during which the Studio was open and operating, multiplied by (y) 36. You shall pay the liquidated damage fees to us no later than 10 days following the date this Agreement is terminated. The parties hereto acknowledge and agree that it would be impractical to determine precisely the damages we would incur from this Agreement's termination and the loss of cash flow from the Royalty Fees due to, among other things, the complications of determining what costs, if any, we might have saved and how much the Royalty Fees would have grown over what would have been this Agreement's remaining term. The parties hereto consider this liquidated damages provision to be a reasonable, good faith pre-estimate of those damages. The liquidated damages provision only covers our damages from the loss of cash flow from the Royalty Fees and Brand Fund fees and contributions. It does not cover any other damages, including damages to our reputation with the public and landlords, and damages arising from a violation of any provision of this Agreement other than your Royalty Fee and Brand Fund fee payment obligations. You and each of your owners agree that this liquidated damages provision does not give us an adequate remedy at law for any default under, or for the enforcement of, any provision of this Agreement other than your Royalty Fee and Brand Fund payment obligations.

(o) Other Rights. We shall have all other appropriate rights and remedies permitted by this Agreement, law and equity, including, but not limited to, damages, injunctions, and restraining orders.

### 8.02 Our Purchase Right

Upon expiration or termination of this Agreement, we shall have the right (but not the obligation) to purchase any or all of the furnishings, equipment, signs, fixtures, supplies, materials and other assets related to the operation of the Studio (the "Assets"). The purchase price for your Assets will be the net realizable value of the Assets in accordance with the liquidation basis of accounting (not the value of the Studio as a going concern) ("Liquidation Value"). You must assign to us any lease or sublease for the Authorized Premises. If you dispute our calculation of the purchase price, the within a reasonable time, the purchase price will be determined by an independent appraiser reasonably acceptable to both parties. We will share equally the fees and expenses of the appraiser. The appraisers shall be obligated complete their appraisal within 30 days after appointment. With respect to our option under this Section, we shall purchase assets only and shall assume no liabilities. Our election to purchase the Assets must be exercised by written notice to you within 30 days after termination or expiration of this Agreement, and is subject to the parties agreeing on a purchase price, or the appraiser determining a purchase price acceptable to us. If we elect to exercise any such option, we shall have

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

the right to set off from the purchase price all amounts due from you to us or any of our affiliates. We shall have the unrestricted right to assign this option to any other party, without your consent.

## 9. RELATIONSHIP

### 9.01 Relationship of Parties

The parties acknowledge that the relationship created under this Agreement is that of independent contractors. This Agreement does not create the relationship of principal and agent or employer and employee between the parties, and under no circumstances shall either party or their agents be considered the agents of the other party. Neither party shall act or represent itself, directly or by implication, as agent or employee of the other, or in any manner assume or attempt to assume or create any obligation or make a contract, agreement, representation or warranty on behalf of or in the name of the other, except to the extent authorized in writing by the other, and except as otherwise specified in this Agreement. Except as provided in this Agreement, neither party shall guarantee the obligations of the other or become obligated for the debts or expenses of the other.

Except as otherwise provided in this Agreement, you shall be responsible for the success, management and control of the Franchise business, including, without limitation, directing its daily operations, determining the specific means of achieving performance guidelines, directing and managing your agents, paying all costs and expenses associated with the business, purchasing all necessary supplies, samples, inventory, products, materials and other items, obtaining necessary financing and other matters.

In all public and private records, documents, relationships, and dealings, you will indicate that you are an independent contractor operating pursuant to this Agreement.

You will maintain your records and accounts to clearly indicate that you and your employees are not our employees. You will be solely responsible to hire your own employees, including determinations about a prospective person's background, experience, character and immigration status.

### 9.02 Security Interest

As security for the performance of your obligations under this Agreement, including payments owed to us for purchases by you, you hereby collaterally assign to us the Lease and grant us a security interest in all of the Assets and all other assets of the Studio, including inventory, accounts, supplies, contracts, and proceeds and products of all those assets. You agree to execute such other documents as we may reasonably request in order to further document, perfect and record our security interest. If you default in any of your obligations under this Agreement, we may exercise all rights of a secured creditor granted to us by law, in addition to our other rights under this Agreement and at law. This Agreement shall be deemed to be as Security Agreement and Financing Statement, and we may file it or make such other filings in the records of any county and state that we deem appropriate to protect our interests.

### 9.03 Legal Entity of Franchisee

If you are at any time a corporation, limited liability company, partnership, or other business entity (each an "Entity") you agree and represent that:

(a) you will have the authority to execute, deliver and perform your obligations under this Agreement and all related agreements and be bound jointly and severally by all the provisions it contains;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(b) you will throughout the Tem, remain validly existing and in good standing under the laws of the state of your formation;

(c) Attachment B to this Agreement completely and accurately describes all of your owners and their interests in you as of the Effective Date and that any changes to the information reflected on Attachment B require our prior written consent as described in Section 6.05;

(d) warrant that they are all of the persons required to sign this Agreement pursuant to this Section and the rules governing their respective entities;

(e) shall conduct no business other than the Franchise;

(f) Each of your direct and indirect owners during the Term and your and their spouses will execute a guaranty ("Guaranty") in the form we prescribe undertaking to guaranty your performance and to personally be bound, jointly and severally, by all provisions of this Agreement and any ancillary agreements between you and us. Our current form of Guaranty is attached as Attachment D. A spouse who owns no direct interest in you will be required to sign the Guaranty, not as a guarantor, but solely to acknowledge and consent to the execution of the Guaranty by his or her spouse and to bind the assets of the marital estate as described therein; and

(g) provide us with the partnership or joint venture agreement, operating agreement, articles of incorporation, bylaws and other organizational documents of such partnerships, joint ventures, limited liability companies and corporations, which shall, to the extent permitted by law, recite that the issuance and transfer of any interest therein is subject to the restrictions of Article 6 hereof, and all issued and outstanding partnership certificates, membership certificates, stock certificates of such entities shall bear a legend referring to the restrictions contained in this Agreement.

## 10. DISPUTE RESOLUTION

Any dispute between you and us or any of our or your affiliates arising under, out of, in connection with or in relation to (a) this Agreement, (b) the parties' relationship, (c) the events leading up to the entry into this Agreement, (d) the Studio, (e) the scope or validity of the arbitration obligation under this Section 10 shall be submitted to binding arbitration under the authority of the Federal Arbitration Act and must be determined by arbitration administered by the American Arbitration Association pursuant to its then-current commercial arbitration rules and procedures.

Any arbitration must be on an individual basis and the parties and the arbitrator will have no authority or power to proceed with any claim as a class action, associational claim, or otherwise to join or consolidate any claim with any other claim or any other proceeding involving third parties. The arbitration must take place in Lake County, Illinois and the arbitration proceedings will be conducted by 1 arbitrator. The arbitrator must follow the law and not disregard the terms of this Agreement. The arbitrator must have at least 5 years of significant experience in franchise law. A judgment may be entered upon the arbitration award by any state or federal court in Lake County, Illinois.

The decision of the arbitrator will be final and binding on all parties to the dispute; however, the arbitrator may not under any circumstances: (a) stay the effectiveness of any pending termination of this Agreement; (b) assess punitive or exemplary damages; (c) certify a class or a consolidated action; or (d) make any award which extends, modifies or suspends any lawful term of this Agreement or any reasonable standard of business performance that we set. The arbitrator shall have the right to make a determination as to any procedural matters that court of competent jurisdiction would be permitted to make in the state in which our main office is located. Further, the arbitrator shall decide all factual, procedural, or legal questions relating in

FILED DATE: 8/3/2020 1:39 PM   2020CH05088

any way to the dispute between the parties, including, without limitation, questions relating to whether Section 10 is applicable and enforceable as against the parties; the subject matter, timeliness, and scope of the dispute; any available remedies; and the existence of unconscionability and/or fraud in the inducement.

The arbitrator has the right to award or include in his or her award any relief which he or she deems proper, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief, and attorneys' fees and costs, provided that the arbitrator may not declare any of the trademarks owned by us or our affiliates generic or otherwise invalid or, except as expressly provided in this Section 10, award any punitive, exemplary, or multiple damages against any party to the arbitration proceeding (we and you hereby waiving to the fullest extent permitted by law any such right to or claim for any punitive, exemplary, or multiple damages against any party to the arbitration proceedings).

We and you agree to be bound by the provisions of any applicable contractual or statutory limitations provision, whichever expires earlier. We and you further agree that, in any arbitration proceeding, each party must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding. Any claim which is not submitted or filed as required will be forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us.

Despite our and your agreement to arbitrate, we and you each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that we and you must contemporaneously submit our dispute, controversy or claim for arbitration on the merits as provided in this Section.

The arbitrator shall have subpoena powers limited only by the laws of the State of Illinois.

The parties ask that the arbitrator limit discovery to the greatest extent possible consistent with basic fairness in order to minimize the time and expense of arbitration. The parties to the dispute shall otherwise have the same discovery rights as are available in civil actions under the laws of the State of Illinois.

All other procedural matters shall be determined by applying the statutory, common laws, and rules of procedure that control a court of competent jurisdiction in the State of Illinois.

Other than as may be required by law, the entire arbitration proceedings (including, without limitation, any rulings, decisions or orders of the arbitrator), shall remain confidential and shall not be disclosed to anyone other than the parties to this Agreement.

The judgment of the arbitrator on any preliminary or final arbitration award shall be final and binding and may be entered in any court having jurisdiction.

We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so shall not be deemed to have waived or relinquished our right to seek recovery of those costs against you.

## 11.      GENERAL PROVISIONS

### 11.01   Severability

If one or more clauses of this Agreement is held to be void or unenforceable for any reason by any court of competent jurisdiction, such clause or clauses will be deemed to be separable in such jurisdiction and the remainder of this Agreement is valid and in full force and effect and the terms of this Agreement must be

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

equitably adjusted so as to compensate the appropriate party for any consideration lost because of the elimination of such clause or clauses. It is the intent and expectation of each of the parties that each provision of this Agreement will be honored, carried out and enforced as written. Consequently, each of the parties agrees that any provision of this Agreement sought to be enforced in any proceeding must, at the election of the party seeking enforcement and notwithstanding the availability of an adequate remedy at law, be enforced by specific performance or any other equitable remedy.

### 11.02 Waiver/Integration

No waiver by us of any breach by you, nor any delay or failure by us to enforce any provision of this Agreement, may be deemed to be a waiver of any other or subsequent breach or be deemed a failure to enforce our rights with respect to that or any other or subsequent breach. Subject to our rights to modify Appendices and/or standards and as otherwise provided herein, this Agreement may not be waived, altered or rescinded, in whole or in part, except by a writing signed by the parties. This Agreement together with the addenda and appendices hereto, constitutes the entire, full and complete agreement and understanding between the parties and supersedes any and all prior agreements, no other representations, promises, warranties or agreements having induced you to execute this Agreement with us. Both parties acknowledge and agree that there are no oral or written representations, promises, assurances, warranties, covenants, "side-deals", rights of first refusal, options or understandings other than those expressly contained in this Agreement. This Agreement supersedes all prior agreements, no other representations, promises, warranties, assurances, covenants, "side-deals", rights of first refusal, options or understandings having induced you to execute this Agreement. The parties agree that, in entering into this Agreement, they are each relying on their own judgment, belief and knowledge as to any claims and further acknowledge that no promise, inducement or agreement or any representations and warranties not expressed herein have been made to procure their agreement hereto. Without limiting the foregoing, you acknowledge and agree that you have not received any warranty or guarantee, express or implied, as to the potential revenue, volume, profits or success of your business. The parties further acknowledge that they have read, fully understand and fully agreed to the terms of this Agreement. Nothing in this Agreement or in any related agreement is intended to negate the representations contained in our Franchise Disclosure Document.

### 11.03 Notices

Except as otherwise provided in this Agreement, any notice, demand or communication provided for herein must be in writing and signed by the party serving the same and either delivered personally, by facsimile, by e-mail, or by a reputable overnight service or deposited in the United States mail, service or postage prepaid, and addressed as follows:

Notices to Franchisor: SEVA Beauty, LLC

1954 First Street, # 112

Highland Park, Illinois 60035

Attention: Director of Franchise Development

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

With a copy to: ____________________________

____________________________

____________________________

Attention:___________________

Facsimile:___________________

Notices to Franchisee and

the Controlling Principals: ____________________________

____________________________

____________________________

Attention:___________________

Facsimile:___________________

Any notice shall be deemed to have been given at the time of personal delivery or, in the case of facsimile, upon transmission (provided confirmation is sent as described above) or, in the case of expedited delivery service or registered or certified mail, three (3) business days after the date and time of mailing.

**11.04 Injunctive Relief**

Nothing in this Agreement bars our right to obtain specific performance of the provisions of this Agreement and injunctive relief against the conduct that threatens to injure or harm us, the Marks, or the System, under customary equity rules, including applicable rules for obtaining restraining orders and preliminary injunctions. You agree that we may obtain such injunctive relief and will not be required to post a bond to obtain injunctive relief and that your only remedy if an injunction is entered against you will be the dissolution of that injunction, if warranted, upon due hearing, and you hereby expressly waive any claim for damages caused by such an injunction.

**11.05 Successors/Assigns**

This Agreement is binding upon and inures to the benefit of the administrators, executors, heirs, successors and assigns of the parties.

**11.06 Interpretation of Rights and Obligations**

The following provisions apply to and govern the interpretation of this Agreement, the parties' rights under this Agreement, and the relationship between the parties:

(a) Applicable Law and Waiver. Subject to our rights under federal trademark laws and the parties' rights under the Federal Arbitration Act, the parties' rights under this Agreement, and the relationship between the parties is governed by, and will be interpreted in accordance with, the laws (statutory and otherwise) of the State of Illinois, except that Illinois laws relating to franchisees, franchise relationships and business opportunities will not apply unless the jurisdictional requirements of such laws are satisfied

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

independently of this provision. You waive, to the fullest extent permitted by law, the rights and protections that might be provided through the laws of any state relating to franchises or business opportunities, other than those of the state in which the Studio is located.

(b) Our Rights. Whenever this Agreement provides that we have a certain right, that right is absolute and the parties intend that our exercise of that right will not be subject to any limitation or review. We have has the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by the provisions of this Agreement.

(c) Our Reasonable Business Judgment. Whenever we reserve discretion in a particular area or where we agree to exercise our rights reasonably or in good faith, we will satisfy our obligations whenever we exercise reasonable business judgment in making our decision or exercising its rights. Our decisions or actions will be deemed to be the result of reasonable business judgment, even if other reasonable or even arguably preferable alternatives are available, if our decision or action is intended, in whole or significant part, to promote or benefit the System generally even if the decision or action also promotes our financial or other individual interest. Examples of items that will promote or benefit the System include, without limitation, enhancing the value of the Marks, improving customer service and satisfaction, improving product quality, improving uniformity, enhancing or encouraging modernization and improving the competitive position of the System.

### 11.07 Consent To Jurisdiction

Subject to the obligation under Section 10 of this Agreement, any cause of action, claim, suit or demand allegedly arising from or related to the terms of this Agreement or the relationship of the parties must be brought in the Federal District Court for the District of Illinois. Both parties hereto irrevocably submit themselves to, and consent to, the jurisdiction of said courts. The provisions of this subparagraph will survive the termination of this Agreement. You are aware of the business purposes and needs underlying the language of this subparagraph, and with a complete understanding thereof, agree to be bound in the manner set forth.

### 11.08 Jury Waiver, Class Action Bar

All parties hereby waive any and all rights to a trial by jury in connection with the enforcement or interpretation by judicial process of any provision of this Agreement, and in connection with allegations of state or federal statutory violations, fraud, misrepresentation or similar causes of action or any legal action initiated for the recovery of damages for breach of this Agreement.

Any proceeding will be conducted on an individual, not a class-wide basis, and a proceeding between us and you or your owners may not be consolidated with another proceeding between us and any other person or entity, nor may any claims of another party or parties be joined with any claims asserted in any action or proceeding between us and you. No association, such as a franchise association, may bring a claim or arbitration demand on your behalf. No previous course of dealing shall be admissible to explain, modify or contradict the terms of this Agreement. No implied covenant of good faith and fair dealing shall be used to alter the express terms of this Agreement

### 11.09 Waiver of Punitive Damages

The parties and their affiliates agree to waive, to the fullest extent permitted by law, the right to or claim for any punitive or exemplary damages against the other and agree that in the event of any dispute between them, each will be limited to the recovery of actual damages sustained.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

### 11.10 Limitation of Action

Except for claims arising from your non-payment or underpayment of amounts you owe to us, any and all claims arising out of or related to this Agreement or the relationship of the parties shall be barred unless a judicial or arbitration proceeding, as required under this Agreement, is commenced within 1 year from the date on which the party asserting such claim knew or should have known of the facts giving rise to such claims, and that any action not so brought shall be barred, whether as a claim, counterclaim, defense or setoff.

### 11.11 Costs and Attorneys' Fees.

We shall be entitled to recover from you all of our costs and expenses, including attorneys' fees, accounting fees, expert witness fees, and any other reasonably incurred fees, if we are the prevailing party in any action, including arbitration, litigation, any motion to compel arbitration, and/or any action on appeal, with you and/or any of your owners or Guarantors, including, without limitation, any action: (a) to enforce the terms of this Agreement; (b) for violation of this Agreement; or (c) for violation of the Lanham Act or other state or federal statutes. Without limiting the generality of the foregoing, if we incur costs and expenses due to your failure to pay when due amounts owed to us our affiliates, to submit when due any reports, information, or supporting records, or otherwise comply with this Agreement, you agree, whether or not we initiate a formal arbitration or legal proceeding, to reimburse us for all of the costs and expenses that we incur including, without limitation, reasonable accounting, attorneys' and related fees and costs.

### 11.12 Adaptations and Variances

Complete and detailed uniformity under many varying conditions may not always be possible, practical, or in the best interest of the System. Accordingly, we have the right to vary the standards, specifications, and requirements for any franchised business or franchisee based upon the customs or circumstances of a particular franchise or operating agreement, site or location, population density, business potential, trade area population, existing business practice, competitive circumstance or any other condition that we deem to be of importance to the operation of such Studio, franchisee's business or the System. We are not required to grant to you a like or other variation as a result of any variation from standard menus, specifications or requirements granted to any other franchisee.

### 11.13 Notice of Potential Profit

We and our affiliates may from time to time make available to you goods, products and/or services for use in the Studio on the sale of which we or our affiliates may make a profit. Further, we and our affiliates may from time to time receive consideration from suppliers and/or manufacturers in respect to sales of goods, products or services to you or in consideration of services rendered or rights licensed to such persons. You agree that we and our affiliates are entitled to said profits and/or consideration.

### 11.14 Submission of Agreement

The submission of this Agreement does not constitute an offer and this Agreement will become effective only upon the execution by you and us. THIS AGREEMENT WILL NOT BE BINDING ON US UNLESS AND UNTIL IT WILL HAVE BEEN ACCEPTED AND SIGNED BY OUR MANAGING MEMBER.

### 11.15 Acknowledgments

You acknowledge that you received our Franchise Disclosure Document (the "FDD") at least fourteen (14) calendar days prior to the date on which this Agreement was executed and that you have read the FDD. You

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

acknowledge that the FDD is a disclosure document, not a contract, and that this Agreement embodies the entire contractual agreement between the parties.

You acknowledge that you have read and understood this Agreement, the attachments hereto and all agreements relating thereto, if any. You acknowledge that we have accorded you ample time and opportunity to consult with advisors of your own choosing about the potential benefits and risks of entering into this Agreement. You further acknowledge that we have advised you to seek franchise counsel to review and evaluate this Agreement.

You acknowledge that you are relying solely on with regard to our financial and other obligations under this Agreement, and no employee or other person speaking on behalf of, or otherwise representing us has made any statements or promises to the effect that any affiliated entities or parent companies guarantee our performance or financially back us.

You understand that neither we, nor any of our representatives and/or agents with whom you have met have made, and are not making, any guarantees, express or implied, as to whether or not the Studio shall break even, be successful or profitable. You accept all risks, including the risk of loss of your entire investment. You acknowledge that neither we nor any of its representatives and/or agents with whom you have met or corresponded with, have, in any way, represented or promised any specific amounts of earnings or profits in association with the Studio or any other Studio.

You represent to us, as an inducement to our entry into this Agreement, that all statements that you have made and all materials you have submitted to us in connection with your purchase of this franchise are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the franchise. We have approved of your purchasing of a franchise in reliance upon all of your representations.

[*Signature Page Follows*]

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

IN AGREEMENT WHEREOF, the parties hereto have signed this SEVA Franchise Agreement.

**FRANCHISEE:**

[If an entity:]

By: ______________________________

Name: ____________________________

Title: _____________________________

Date: _____________________________

[If an individual or individuals:]

Signature: ________________________

Name: ____________________________

Date: _____________________________

Signature: ________________________

Name: ____________________________

Date: _____________________________

Signature: ________________________

Name: ____________________________

Date: _____________________________

Signature: ________________________

Name: ____________________________

Date: _____________________________

**FRANCHISOR:**

SEVA BEAUTY, LLC

By: ______________________________

Name: Vas Maniatis

Title: Managing Member

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## ATTACHMENT A

## ADDENDUM TO FRANCHISE AGREEMENTFOR SEVA® SPA STUDIO

**THIS ADDENDUM TO THE FRANCHISE AGREEMENT** (the "**Amendment**") is made as of _______________, between **SEVA BEAUTY, LLC** an Illinois limited liability company, with its principal business address at 1954 First Street, #112, Highland Park, Illinois 60035 ("**we**," "**us**," or "**our**"), and _________________ ("**Franchisee**", "**you**" or "**your**"). This Amendment amends that certain Franchise Agreement _____________ (the "**Franchise Agreement**"), under which we granted you a franchise, and you undertook the obligations to operate, a SEVA® Spa Studio (the "**Studio**"), located in _____________. Capitalized terms that are used but not defined in this Amendment will have the meanings ascribed to them in the Franchise Agreement.

**FOR AND IN CONSIDERATION** of the foregoing, the covenants set forth herein and other valuable consideration, receipt and sufficiency of which are acknowledged, we and you agree as follows

You must present to us for our approval any lease for the Studio. You must cause your landlord to sign the Collateral Assignment of the Lease that is attached to this Agreement as Exhibit A to this Addendum. The Collateral Assignment of the Lease includes important provisions that protect our interests. If your landlord refuses to sign the Collateral Assignment of the Lease in the form attached to this Agreement, we may reject your proposed site for the Studio.

We will not withhold consent arbitrarily, but each lease by which you occupy the Studio must provide that we may, at our sole option, upon the termination, expiration or proposed transfer of this Agreement, take an assignment of your interest in the lease, without the payment of additional consideration (other than a reasonable assignment fee), and without liability for obligations you accrued as of the date of the assignment of the lease. Our review of the lease prior to its execution will not be for the purpose of approving the legal aspects, economics, or rental terms of the lease. Accordingly, we will have no responsibility to you with regard to the economics, legality or enforceability of the lease. At all times during the term of this Agreement, you will promptly pay all rents and charges required by the lease for the Studio and shall not be in default under the terms of the lease. You are required to provide us with a copy of your fully executed lease for the Studio and any amendments or renewals to the lease to ensure that at all times we have a copy of the then-current lease.

| **FRANCHISEE:** | **FRANCHISOR:** |
|---|---|
| [If an entity:] | SEVA BEAUTY, LLC |
| By: ______________________________ | By: ______________________________ |
| Name: ___________________________ | Name: Vas Maniatis |
| Title: ____________________________ | Title: Managing Member |
| Date: ____________________________ | |

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# EXHIBIT A TO ADDENDUM

## COLLATERAL ASSIGNMENT OF LEASE

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**FOR VALUE RECEIVED**, the undersigned ("Assignor") assigns, transfers and sets SEVA Beauty, LLC, an Illinois limited liability company ("Assignee"), all of Assignor's right and title to and interest in that certain "Lease" a copy of which is attached as Attachment A respecting premises commonly known as ______________________________________________. This assignment is for collateral purposes only and except as specified in this document Assignee will have no liability or obligation of any kind whatsoever arising from or in connection with this assignment or the Lease unless and until Assignee takes possession of the premises the Lease demises according to the terms of this document and assumes Assignor's obligations under the Lease.

Assignor represents and warrants to Assignee that it has full power and authority to assign the Lease and that Assignor has not previously assigned or transferred and is not otherwise obligated to assign or transfer any of its interest in the Lease or the premises it demises.

Upon Assignor's default under the Lease or under the "Franchise Agreement" for a SEVA Studio between Assignee and Assignor or in the event Assignor defaults under any document or instrument securing the Franchise Agreement Assignee has the right to take possession of the premises the Lease demises and expel Assignor from the premises. In that event Assignor will have no further right and title to or interest in the Lease but will remain liable to Assignee for any past due rental payments or other charges Assignee is required to pay Lessor to effectuate the assignment this document contemplates.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without Assignee's prior written consent. Throughout the term of the Franchise Agreement Assignor agrees that it will elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days before the last day upon which the option must be exercised unless Assignee agrees otherwise in writing. Upon Assignee's failure to agree otherwise in writing and upon Assignor's failure to elect to extend or renew the Lease as required Assignor appoints Assignee as its true and lawful attorney-in-fact with the authority to exercise the extension or renewal options in the name, place and stead of Assignor for the sole purpose of effecting the extension or renewal.

[Signature page to follow]

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6 Case: 1:20-cv-04692 Document #: 1-1 Filed: 08/10/20 Page 203 of 241 PageID #:210

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**ASSIGNEE:**

[If an entity:]

By: ______________________________

Name: ____________________________

Title: ____________________________

Date: ____________________________

[If an individual or individuals:]

Signature: ________________________

Name: ____________________________

Date: ____________________________

Signature: ________________________

Name: ____________________________

Date: ____________________________

Signature: ________________________

Name: ____________________________

Date: ____________________________

Signature: ________________________

Name: ____________________________

Date: ____________________________

**ASSIGNOR**

SEVA BEAUTY, LLC

By: ______________________________

Name: Vas Maniatis_____________

Title: Managing Member___________

2

SEVA Beauty, LLC
Franchise Agreement – 2016
1253.001.001/147287_5

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

## CONSENT TO COLLATERAL ASSIGNMENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the Lease:

(a) Agrees to notify Assignee in writing of and upon Assignor's failure to cure any default by Assignor under the Lease;

(b) Agrees that Assignee will have the right, but not the obligation, to cure any default by Assignor under the Lease within thirty (30) days after Lessor's delivery of notice of the default under section (a) above;

(c) Consents to the Collateral Assignment and agrees that if Assignee takes possession of the premises the Lease demises and confirms to Lessor that it has assumed the Lease as tenant, Lessor will recognize Assignee as tenant under the Lease, provided that Assignee cures within the thirty (30) day period noted in section (b) above Assignor's defaults under the Lease; and

(d) Agrees that Assignee may further assign the Lease to or enter into a sublease with a person, firm or corporation who agrees to assume the tenant's obligations under the Lease and is reasonably acceptable to Lessor and that upon that assignment Assignee will have no further liability or obligation under the Lease as assignee, tenant or otherwise, other than to certify that the additional assignee or sublessee operates the premises the Lease demises as a SEVA® Studio.

Dated:______________________

____________________________________

____________________________________, Lessor

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# ATTACHMENT B TO FRANCHISE AGREEMENT

## AUTHORIZED LOCATION, STUDIO TYPE & OWNERSHIP INTERESTS

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

1. AUTHORIZED LOCATION

Pursuant to Section 1.01 of the Franchise Agreement, the Studio shall be located at the following described location ("Authorized Location"):

(Indicate City, County or Area within which the Studio shall be located.)

If the Authorized Location has not been determined as of the Effective Date of this Agreement, Franchisee shall secure the Authorized Location in accordance with the terms and conditions of the Franchise Agreement within the general area described as follows:

(Indicate City, County or Area within which the Studio shall be located.)

If (b) above is selected, the parties shall amend this Attachment B to reflect the address of the Authorized Location, once the Authorized Location is secured by Franchisee in accordance with the terms of the Franchise Agreement.

2. Studio Type:

☐ SEVA® Express Studio

☐ SEVA® Spa Studio

3. Form of Owner.

(a) **Individual Proprietorship**. Your owner(s) (is) (are) as follows:

__________________________

__________________________

**Corporation, Limited Liability Company, or Partnership.** You were incorporated or formed on , under the laws of the State of ______________. You have not conducted business under any name other than your corporate, limited liability company, or partnership name and __________________________.

(b)

**Owners**. The following identifies the owner that you have designated as, and that we approve to be, the Named Principal and the Business Manager, and lists the full name of each person who is one of your owners (as defined in the Franchise Agreement), or an owner of one of your owners, and fully describes the nature of each owner's interest (attach additional pages if necessary).

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| | Owner's Name | Type/Percentage of Interest |
|---|---|---|
| Named Partner: | ___________________________ | ____________________% |
| Business Manager: | _________________________ | ____________________% |
| Other Owners: | ___________________________ | ____________________% |

Each of the individuals listed above shall execute the Confidentiality Agreement and Ancillary Covenants Not to Compete substantially in the form set forth in Attachment C to the Franchise Agreement (see Sections 5.04 and 5.05 of the Franchise Agreement).

[Signature page to follow]

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**FRANCHISEE:**

[If an entity:]

By: ______________________________

Name: ____________________________

Title: _____________________________

Date: _____________________________

[If an individual or individuals:]

Signature: ________________________
Name: ____________________________
Date: _____________________________

Signature: ________________________
Name: ____________________________
Date: _____________________________

Signature: ________________________
Name: ____________________________
Date: _____________________________

Signature: ________________________
Name: ____________________________
Date: _____________________________

**FRANCHISOR:**

SEVA BEAUTY, LLC

By: ______________________________

Name: Vas Maniatis

Title: Managing Member

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6 Case: 1:20-cv-04692 Document #: 1-1 Filed: 08/10/20 Page 209 of 241 PageID #:216

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# ATTACHMENT C TO FRANCHISE AGREEMENT

# CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

SEVA Beauty, LLC
2016 FDD | Ex. B - Franchise Agreement
1253.001.001/147287.5

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(for trained employees, shareholders, officers, directors,

general partners, members and managers of Franchisee)

In consideration of my being a ______________________________________________ of ____________________________________________________________________ ("Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

1. Pursuant to a Franchise Agreement dated ______________________ (the "Franchise Agreement"), Franchisee has acquired the right and franchise from SEVA Beauty, LLC (the "Company") to establish and operate a SEVA Studio (the "Franchised Business") and the right to use in the operation of the Franchised Business the Company's trade names, service marks, trademarks, logos, emblems, and indicia of origin (the "Proprietary Marks"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and Accepted Location as indicated on Attachment B to the Franchise Agreement (the "Accepted Location").

2. The Company, as the result of the expenditure of time, skill, effort and resources has developed and owns a distinctive format and system (the "System") relating to the establishment and operation of franchised businesses specializing in esthetic spa services and products, under the trade name and service mark, SEVA®. The Company possesses certain proprietary and confidential information relating to the operation of the System, which includes certain proprietary trade secrets, marketing information, consisting of names, addresses, telephone numbers, contact persons, purchase orders and other identifying information relating to customers and vendors, financial information, confidential information contained in verbal or audio communication, files, interoffice documents, and other internal and external documents and correspondence prepared by or for Franchisee, vendor relationships, methods, techniques, formats, specifications, systems, procedures, methods of business practices and management, sales and promotional techniques and knowledge of, and experience in, the operation of the Franchised Business (the "Confidential Information").

3. Any and all information, knowledge, know-how, and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

4. As ____________________________ of the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me training programs, the Company's Confidential Operations Manuals and other general assistance during the term of the Franchise Agreement.

5. I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term of the Franchise Agreement, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

6. The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential. Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties as ____________________________ of the Franchisee, and will continue not to disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

7. Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, either directly or indirectly for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, operate, engage in, act as a consultant for, perform services for, or have any interest in any Competitive Business (as defined below) for a continuous uninterrupted period commencing upon the cessation or termination of my position with Franchisee, regardless of the cause for termination, or upon the expiration, termination, transfer, or assignment of the Franchise Agreement, whichever occurs first, and continuing for two (2) years thereafter, either directly or indirectly, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, operate, engage in, act as a consultant for, perform services for, or have any interest in any Competitive Business that is, or is intended to be, located at: (b) within a 25 mile radius of the Authorized Location ; or (c) within a 25 mile radius of any other SEVA Studio in operation or under construction as of the date of termination or expiration, as applicable.

For purposes of this Agreement, "Competitive Business" means any business that sells or provides services that include facial threading, waxing, eyelash extensions, eyebrow tinting or facials, which are typically offered in a spas or beauty salons

The prohibitions in this Paragraph 7 do not apply to my interests in or activities performed in connection with a Franchised Business. This restriction does not apply to my ownership of less than five percent (5%) beneficial interest in the outstanding securities of any publicly held corporation.

8. I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

9. I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof; and I agree to comply forthwith with any covenant as so modified.

10. The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee. I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me. Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

11. This Agreement shall be construed under the laws of Illinois. The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

[Signature page to follow]

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

______________________________

Signature

______________________________

Name

______________________________

Address

______________________________

Title

ACKNOWLEDGED BY FRANCHISEE

By:

Name:______________________________

Title:______________________________

By:

Name:______________________________

Title:______________________________

By:

Name:______________________________

Title:______________________________

By:

Name:______________________________

Title:______________________________

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# ATTACHMENT D TO FRANCHISE AGREEMENT

## GUARANTY AND ASSUMPTION OF OBLIGATIONS

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

The undersigned hereby execute this GUARANTY AND ASSUMPTION OF OBLIGATIONS (this "Guaranty"), as of the last date written below, in order to, among other things, induce SEVA Beauty, LLC ("Franchisor") to enter into, or permit the transfer of, that certain SEVA® Franchise Agreement, dated ______________________________ (the "Franchise Agreement"), with __________________________________________________________________ ("Franchisee").

RECITALS

WHEREAS, the undersigned constitute all of the: (a) shareholders, members, partners, and owners of Franchisee, and (b) other persons or entities interested in effecting the grant or transfer of the Franchise Agreement by Franchisor to Franchisee; and

WHEREAS, Franchisor is relying on this Guaranty to ensure that there are sufficient assets to operate the franchised business and to protect Franchisor in the event Franchisee commits a under the Franchise Agreement; and

WHEREAS, Franchisor is only willing to enter into the Franchise Agreement if each of the undersigned personally guaranty Franchisee's obligations thereunder.

AGREEMENT

NOW, THEREFORE, the undersigned, in consideration of the undertakings and commitments of each such party set forth in this Guaranty, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

1. The undersigned hereby represent and warrant that they constitute [check all that apply]:

☐ the holders of one hundred percent (100%) of the originally issued and outstanding capital stock of Franchisee, a corporation;

☐ one hundred percent (100%) of the members of Franchisee, a limited liability company ("LLC");

☐ one hundred percent (100%) of the partners of Franchisee, a partnership ("Partnership"); and/or

☐ Franchisee's spouse or domestic partner, as applicable, and/or the spouses or domestic partners of the shareholders, members or partners of Franchisee, as applicable.

2. Each of the undersigned individuals personally, jointly and severally, agrees to be bound by all the terms and conditions of the Franchise Agreement, including any amendments thereto, whenever made, and absolutely, irrevocably and unconditionally guarantees to Franchisor, and its successors and assigns, that all of Franchisee's obligations under the Franchise Agreement will be punctually paid and performed.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

3. The undersigned acknowledges and agrees that Franchisor has entered into the Franchise Agreement with Franchisee solely on the condition that each owner of Franchisee, and each owner's spouse, be personally obligated and jointly and severally liable with Franchisee (and with each other owner of Franchisee) for the performance of each and every obligation of Franchisee (and its owners) under: (i) the Franchise Agreement, including any amendments thereto or extensions or renewals thereof, and (ii) each and every other agreement entered into by Franchisee in connection with the Franchise Agreement, including any lease agreement (all aforementioned agreements are collectively referred to as the "SEVA Agreements"). Without limiting the generality of the foregoing, the undersigned acknowledge and agree that each individual is personally bound by the confidentiality restrictions and the covenant against competition set forth in the Franchise Agreement.

4. Without affecting the obligations of the undersigned under this Guaranty, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee.

5. This Guaranty is effective until all terms of the SEVA Agreements have been fully and completely performed by Franchisee, to the satisfaction of Franchisor. No release of Franchisee or discharge of Franchisee under bankruptcy law, or any other law, shall impair or effect the obligations of Guarantor(s) to Franchisor hereunder.

6. The undersigned jointly and severally agree to pay all attorneys' fees, costs and expenses incurred by Franchisor in enforcing this Guaranty, whether or not suit or action is filed, and if suit or action is filed, then through trial and all appeals, and also in any proceedings or matter in Bankruptcy Court, and to assume all liability for all losses, costs, attorney's fees, and expenses that Franchisor incurs as a result of a default by Franchisee, including those fees and expenses incurred in a bankruptcy proceeding involving Franchisee.

7. The undersigned hereby waives the following:

(i) notice of amendment of the SEVA Agreements and notice of demand for payment or performance by Franchisee of any obligation under the SEVA Agreements;

(ii) presentment or protest of any instrument and notice thereof, and notice of default or intent to accelerate with respect to the indebtedness or nonperformance of any of Franchisee's obligations under the SEVA Agreements;

(iii) any right the undersigned may have to require that an action be brought against Franchisee or any other person as a condition of liability;

(iv) the defense of statute of limitations in any action hereunder or for the collection or performance of any obligation;

(v) any and all rights to payments, indemnities and claims for reimbursement or subrogation that the undersigned may have against Franchisee arising from the undersigned's execution of and performance under this Guaranty;

(vi) any defense based on any irregularity or defect in the creation of any of the obligations or modification of the terms and conditions of performance thereof;

(vii) any defense based on the failure of Franchisor or any other party to take, protect, perfect or preserve any right against and/or security granted by Franchisee or any other party; and

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(viii) any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

8. Upon default by Franchisee or notice from Franchisor, the undersigned will immediately make each payment and perform each obligation required of Franchisee under the SEVA Agreements. Without limiting the generality of the foregoing, the undersigned acknowledges that Franchisor is not required to proceed first against the Franchisee, but may proceed first against the undersigned or any of them alone or concurrent with proceeding against Franchisee. The obligations of the undersigned hereunder are absolute and unconditional.

9. Governing Law; Jurisdiction; Venue.

(i) Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act; 15 U.S.C. §1050 et seq.) or other federal law, this Guaranty and any claims related thereto, shall be governed by, interpreted and construed under the laws of the state of Illinois, which laws shall prevail in the event of any conflict of law.

(ii) The undersigned hereby acknowledge and agree that Illinois shall be the sole and exclusive venue and exclusive proper forum in which to adjudicate any case or controversy arising out of, in connection with, or related to, either directly or indirectly, this Guaranty. The undersigned agree that the undersigned are subject to personal jurisdiction in the State of Illinois, and further agree that, in the event of litigation, they will not contest or challenge the in personam jurisdiction or venue in Illinois.

(iii) The undersigned agrees to be bound by the arbitration obligations under Section 10 of the Franchise Agreement, including without limitation, the obligation to submit to binding arbitration the claims described in Section 10 of the Franchise Agreement in accordance with its terms.

10. The undersigned hereby waive any right to trial by jury that they may have in any action brought by Franchisor related, directly or indirectly, to this Guaranty and/or the SEVA Agreements, or the negotiation of the Guaranty and/or the SEVA Agreements.

11. If one or more provisions contained in this Guaranty shall be invalid, illegal or unenforceable, in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

12. Each of the undersigned acknowledges that: (i) it is a condition to the granting of the Franchise Agreement to Franchisee that each of the undersigned shall execute and deliver this Guaranty to Franchisor; (ii) that Franchisor has entered into the Franchise Agreement with Franchisee in reliance upon the agreement of the undersigned to do so; and (iii) that, as owners of the Franchisee, or spouses and domestic partners, as applicable, of such owners, the undersigned have received adequate consideration to support their execution of this Guaranty. This Guaranty does not grant or create in the undersigned any interests, rights or privileges in the SEVA Agreements, or any other franchise or franchise agreement.

13. Each of the undersigned waives all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her signature on the same day and year as the Agreement was executed.

GUARANTOR(S)

Sign: ____________________________

Name: ____________________________

Title: ____________________________

Date: ____________________________

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# EXHIBIT C

## DEVELOPMENT RIGHTS RIDER

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# DEVELOPMENT RIGHTS RIDER

THIS DEVELOPMENT RIGHTS RIDER (the "Rider") is made and entered into as of _________, ____ (the "Effective Date") by and between SEVA Beauty, LLC, an Illinois limited liability company having its principal place of business at 1954 First Street, #112, Highland Park, Illinois 60035 ("we", "us" or "our") and ________________________________________, having its principal place of business at ________________________________________ ("you" or "your"). We and you may be individually referred to as "Party" or together as "Parties."

## RECITALS

1. The Parties entered into that certain franchise agreement dated ________, 20__ (the "Initial Franchise Agreement").

2. In addition to the franchise granted under the Initial Franchise Agreement, you would like to develop [_____] additional franchises.

3. We agree to grant you the right to establish and operate the additional franchises subject to the terms and conditions contained in this Rider.

## AGREEMENT

Now, therefore, the parties hereby agree as follows:

1. **Development Rights.** Subject to the provisions of this Rider, we hereby grants to you the option to develop [_____] additional franchises (the "Development Rights"). The operation of each franchise shall be governed by the then current franchise agreement signed by us and you, subject to the terms and conditions specified in this Rider (together with the Initial Franchise Agreement, the "Franchise Agreements"). The Parties acknowledge and agree that the Development Rights do not include (a) any territorial rights or (b) any rights to license others to operate a franchise or use the System or the Marks.

2. **Development Schedule.** At the dates set forth below, you agrees to have executed an individual Franchise Agreement and have open and in operation the franchise governed by the Initial Franchise Agreement and the additional franchises as indicated on the following schedule (the "Development Schedule"):

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

| Site # | Franchise Agreement Executed by: | Studio Must be Open by: |
|---|---|---|
| 1* | Executed on ______, 20__ | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

*"Site 1" is the franchise governed by the Initial Franchise Agreement.

3. **Development Fee.** Simultaneously with the execution of this Rider, you shall pay us the full initial franchise fee under the Initial Franchise Agreement to which this Rider is attached, plus a fee of $19,500 for each additional Studio contained in the Development Schedule (the "Development Rights Fee") as consideration for the Development Rights. The Development Rights Fee is not refundable under any circumstances. If you are in compliance with the Rider and the Initial Franchise Agreements, we shall waive the initial franchisee fee for each Franchise Agreement signed pursuant to the Development Schedule after the date hereof; provided that you must pay any and all other fees due to us under each Franchise Agreement.

4. **Term and Termination.** The Development Rights shall commence as of the date of execution hereof and shall end on the earlier of the date by which the last franchise must open pursuant to the Development Schedule or the date the Parties sign a Franchise Agreement for the last franchise to be opened pursuant to the Development Schedule. We may terminate this Rider, effective immediately upon delivery of termination notice to you, if any of the following occurs: (i) you fail to meet a Development Schedule deadline; (ii) you make any material misrepresentation or omission on any application, report, claim, financial statement or similar document submitted to us; or (iii) any Franchise Agreement executed by you for the operation of a franchise is terminated for any reason. Upon termination of this Rider, we shall have no obligation to refund the Development Rights Fee.

5. **Miscellaneous.** This Rider is incorporated in and made a part of the Initial Franchise Agreement and future Franchise Agreements by this reference. To the extent of any inconsistency between a Franchise Agreement and this Rider, the terms of this Rider shall control. The recitals to this Rider are hereby incorporated this reference. All capitalized terms used by not otherwise defined herein shall have the meaning set forth in the Initial Franchise Agreement.

DATED THIS ____________ day of __________________, 20__.

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6 Case: 1:20-cv-04692 Document #: 1-1 Filed: 08/10/20 Page 221 of 241 PageID #:228

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**SEVA BEAUTY, LLC**

By:_________________________________
Name: Vas Maniatis
Title: Managing Member

**FRANCHISEE:**

By:_________________________________
Name:_______________________________
Title:________________________________

SEVA Beauty, LLC
2016 FDD | Ex. C – Development Rights Rider
1253.001.001/150496.2

DocuSign Envelope ID: C2B6A76B-1DB5-48A3-9ED6-A8F8496F8AA6 Case: 1:20-cv-04692 Document #: 1-1 Filed: 08/10/20 Page 222 of 241 PageID #:229

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**EXHIBIT D**

**SUBLEASE AGREEMENT**

SEVA Beauty, LLC
2016 FDD | Ex. D – Sublease
1253.001.001/147300

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**FRANCHISEE SUBLEASE AGREEMENT**

THIS SUBLEASE is entered into as of ______________________________, 20___ by SEVA BEAUTY/LEASING, LLC ("Franchisor") and ______________________________________________ ("Franchisee") for certain space within a retail store located at ___________________________ ____________________________________________, store #_______ ("Premises").

**1.** **Sublease**. Franchisor hereby leases to Franchisee and Franchisee hereby accepts and leases from Franchisor, the Premises, on the terms set forth herein. Franchisee accepts the Premises in its "as-is, where-is" basis. FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS MADE NO REPRESENTATIONS OR WARRANTIES CONCERNING THE CONDITION OF THE PREMISES OR THEIR FITNESS FOR ANY PARTICULAR USE AND FRANCHISEE SHALL RELY SOLELY ON ITS OWN INVESTIGATIONS AND INSPECTIONS TO DETERMINE THE SUITABILITY OF THE PREMISES FOR ITS INTENDED USE.

**2.** **Master Lease or Sublease**. Franchisor has entered into a lease agreement with Walmart®/________ ("Lessor") for approximately ___________ square feet of space at the address described above (the "Master Lease"). Except as expressly provided in this Sublease, Franchisee agrees to all of the terms, conditions and obligations contained in the Master Lease as though Franchisee were in the place of the Franchisor who is designated as either "Tenant" or "Lessee" in the Master Lease. Whenever there is a conflict between this Sublease and the Master Lease, the Master Lease controls. Franchisee shall do no act or failure to act that would constitute a violation of the Master Lease. The term of this Sublease and Franchisee's right to possession of the Premises shall terminate upon the termination of the Master Lease for any reason.

**3.** **Franchise Agreement**. Franchisee must, as an additional condition of its tenancy in the Premises and as a condition of this Sublease, have entered into a Franchise Agreement with Franchisor to own and operate a SEVA Studio ("Studio"), and must at all times during its tenancy in the Premises be in complete compliance with the requirements of the Franchise Agreement. If for any reason, Franchisee's Franchise Agreement expires or is terminated, such expiration or termination automatically terminates this Sublease and subjects Franchisee to eviction proceedings under this Sublease.

**4.** **Term**. The initial term of this Sublease begins on the later of (i) the Effective Date or (ii) when Franchisor provides Franchisee possession of the Premises (the "Commencement Date"). The initial term of this Sublease ends on the Master Lease Expiration Date specified by Franchisor, subject to earlier termination as provided herein. Franchisee has the option to renew or extend this Sublease for the same period provided in the Master Lease only to the extent the Franchisor can and actually does renew or extend its tenancy in the Master Lease. If Franchisor chooses not to renew or extend its tenancy under the Master Lease, for whatever reasons and in its sole determination, then Franchisee may not renew or extend its tenancy under this Sublease. Franchisee has no right to exercise any renewal options under the Master Lease.

**5.** **Remodel**. Franchisee agrees to re-paint the entire Studio interior within 30 days of each renewal period, if any. Franchisee shall replace or upgrade all Studio fixtures every 5 years during the term of this Sublease. Franchisee will not make or permit anyone to otherwise make any alterations, decorations, additions or improvements, structural or otherwise, in or to the Premises without the prior written consent of Franchisor, which consent shall not be unreasonably withheld. Any such alterations shall be made at Franchisee's sole expense and subject to the Master Lease. All such work shall be done in a good and workmanlike manner, free of mechanics' liens and in accordance with all ordinances, codes and other governmental requirements. If any mechanic's lien is filed against any part of the Premises for

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

work claimed to have been done for, or materials claimed to have been furnished to, Franchisee, such mechanic's lien shall be discharged by Franchisee in accordance with all of the provisions of the Master Lease but in no event later than fifteen (15) days thereafter, at Franchisee's sole cost and expense, by the payment thereof or by making any deposit required by law. All alterations, decorations, additions or improvements in or to the Premises made by Franchisee shall become the property of Franchisor upon expiration of the term hereof and shall remain upon and be surrendered with the Premises as a part thereof without disturbance or injury, unless such alterations, decorations, additions or improvements have been designated for removal by Franchisor. Upon the expiration or termination of this Sublease, Franchisee at its sole cost and expense shall remove any alterations, decoration, additions or improvements designated for removal by Franchisor, shall repair any damage resulting therefrom, and shall surrender the Premises to Franchisor in the same condition that Management delivered the Premises to Franchisee, reasonable wear and tear excepted.

**6. Use of Premises**. The Premises shall be used solely to operate the Studio and authorized by the Franchise Agreement. No other business, other than expressly provided by the Franchise Agreement, may be conducted on or in the Premises. Franchisee's use of the Premises at all times shall conform to all applicable laws, ordinances, regulations and codes.

**7. Subletting; Assignment**. Franchisee is not permitted or authorized to sublet all or any portion of the Premises or otherwise assign this Sublease or any rights under this Sublease by operation of law or otherwise.

**8. Rental Amount**. If Franchisee subleases the Premises for a Studio located inside a Walmart® store (an "Express Studio"), the initial rental amount shall be the greater of $550 per month or 16% of the Express Studio's monthly gross sales ("Express Rent"). If Franchisee subleases the Premises for a Studio located in non-Walmart® store location, Franchisee will pay Franchisor [$_______] for rent, which is in accordance with the same terms and conditions Franchisor pays under the Master Lease ("Spa Rent"). Together, Express Rent and Spa Rent are both referred to herein as "Basic Rent." The obligation to pay Basic Rent will begin on the first to occur of (i) the opening date of the Studio, or (ii) ninety (90) days after the Commencement Date ("Rent Commencement Date"). If the Lessor increases the rental amount charged with respect to the Premises for any reason under the Master Lease, the Basic Rent hereunder shall increase proportionately. In addition to the Basic Rent, Franchisee must pay natural rental breakpoints, common area maintenance, share of taxes and utilities, and all other amounts payable under the Master Lease. "Gross Sales" means all revenue from the sale of services and products and all other income related to the Studio, except sales taxes

**9. Security Deposit**. Upon signing this Sublease (or such later date as Franchisor determines), Franchisee shall pay the first month's rent and provide Franchisor with a security deposit of $[_____]. With the respect to Express Studios, the security deposit is $25,000. In addition, the following terms and conditions apply to Franchisee's security deposit:

(a) Franchisor may apply, retain, or use (at its sole option) the whole or any part of the security deposit to the extent required for payment of:

(i) Basic Rent;

(ii) Other sums that Franchisee is obligated to pay Franchisor under this Sublease;

(iii) Sums that Franchisor may expend or may be required to expend by reason of Franchisee's breach of this Sublease;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(iv) Loss or damage that Franchisor suffers by reason of Franchisee's breach of this Sublease including, but not limited to, any damages incurred by Franchisor or deficiency resulting from the re-letting of the Premises; whether such damages or deficiency accrues before or after summary proceedings or other re-entry by Franchisor; or

(v) Costs Franchisor incurs in connection with the cleaning or repair of the Premises after the expiration or earlier termination of this Sublease as to the applicable the Premises.

(b) Franchisor is not obligated to apply, retain, or use the security deposit and any payment by the security deposit in no way relieves Franchisee of its obligations under this Sublease to pay Basic Rent or other charges.

(c) Franchisor's right to bring an action or special proceeding to recover damages, or otherwise obtain possession of the applicable the Premises, before or after Franchisor's delivery of notice to Franchisee of the termination of this Sublease as to the Premises for non-payment of Basic Rent, or for any other reason, is not affected because Franchisor holds the security deposit.

(d) The security deposit does not limit Franchisor's available rights and remedies under this Sublease, at law, or in equity nor is it a payment of liquidated damages.

(e) Franchisee, no more than 15 days following Franchisor's notice to Franchisee, shall replace the security deposit when payments by the security deposit equal or exceed the sum of the security deposit. Failure to timely replace the security deposit is a material breach of this Sublease.

(f) Except as required by applicable law, Franchisor is not required to keep security deposits separate from Franchisor's own funds and may commingle security deposits with its own funds.

(g) If Franchisee fully and faithfully complies with all the terms and conditions of this Sublease, Franchisor will return to Franchisee any part of the security deposit that Franchisor does not apply, retain, or use in accordance with this Lease no later than 30 days following Franchisee fully discharging all of its obligations under this Sublease, unless applicable law requires a shorter or extended time.

**10.** **Method of Rental Payments**. All payments for rent, penalties and any other charges are to be paid directly to Franchisor and not to Lessor or any of its agents without notice, demand, deduction or offset, in the same manner as Franchisee makes payments to Franchisor under the Franchise Agreement. Any payment not timely paid shall bear interest and late charges as provided in the Franchise Agreement.

**11.** **Taxes and Other Charges**. All personal property taxes assessed on Franchisee's personal property located on the Premises by a local governmental taxing authority are the sole responsibility of Franchisee. If any such taxes are paid by Lessor or by Franchisor on behalf of Franchisee, Franchisee agrees to immediately reimburse Franchisor for such taxes. Franchisee must also pay to Franchisor any and all taxes assessed by any taxing authority or the landlord on account of Franchisee's rental payments. Any charges imposed on Lessor or Franchisor by any utility, governmental authorities, or others because of services rendered for or on behalf of Franchisee or resulting from actions


FILED DATE: 8/3/2020 1:39 PM 2020CH05088

of Franchisee not otherwise expressly covered in the Basic Rent are to be paid by Franchisee or are to be reimbursed to Franchisor by Franchisee upon payment of such charges by Franchisor.

**12. Eviction; Termination**. The occurrence of any one or more of the following shall constitute an "Event of Default" under this Sublease:

(a) Franchisee fails to pay any rent when due;

(b) Franchisee creates or suffers a default under the Master Lease and Franchisee has not cured such default at least 10 days prior to the expiration of any applicable cure period with respect to such default under the Master Lease;

(c) Franchisee shall default under any provision of this Sublease, and if such default shall continue and shall not be remedied by Franchisee within 20 days after Franchisor provides Franchisee notice specifying the same, or, in the case of such a default which for causes beyond Franchisee's control cannot with due diligence be cured within said 20 day period, if Franchisee fails to proceed with due diligence within such 20 days to commence to cure the same and thereafter to prosecute the curing of such default with due diligence, or fails to complete such cure within 90 days.

If an Event of Default occurs under this Sublease, Franchisee does hereby authorize and fully empower Franchisor at any time to (a) terminate this Sublease and initiate eviction proceedings as allowed by the laws of the jurisdiction where the Premises are located, (b) re-enter and take possession of the Premises without such re-entering working a termination or forfeiture of this Sublease or the rents to be paid and the covenants to be kept by Franchisee for the full term of this Sublease, (c) exercise any right or remedy at law or in equity, (d) exercise any right or remedy provided under the Master Lease with respect to any default thereunder, and/or (e) declare the entire principal sum of then unpaid rent for the remaining Term immediately due and payable. Franchisor may (but shall not be obligated so to do) cure any default by Franchisee hereunder without waiving or releasing Franchisee from any of its obligations relative thereto. All sums paid or costs incurred by Franchisor to cure such default, together with reasonable attorneys' fees and interest thereon at a rate per annum equal to the lesser of eighteen percent (18%) and the maximum rate permitted by law, from the date each such payment was made or such cost incurred by Franchisor, shall be payable by Franchisee to Franchisor on demand.

**13. Reporting**. Franchisee shall provide to Franchisor any information that the Master Lease requires Franchisor to report to the Lessor.

**14. Insurance**. In addition to the insurance requirements of the Franchise Agreement, Franchisee also agrees to comply with any additional insurance requirements of Lessor. Franchisee will be responsible for any insurance coverage for Franchisee's fixtures, furnishings, inventory and business losses. Franchisor and Franchisee hereby release one another from any and all liability or responsibility (to the other or anyone claiming through or under them by way of subrogation or otherwise) for any loss or damage covered or coverable by any casualty insurance required hereunder, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible.

**15. Indemnity and Waiver**. The Master Lease requires that Franchisor indemnify Lessor from any liability caused by Franchisor or from any use of the Premises by Franchisor or its Franchisee. In a like manner as set forth in the Master Lease, Franchisee agrees to indemnify Franchisor for any damages, liability, claims, causes of action or costs (including attorneys' fees and costs of suit) incurred by Franchisor for any actions of Franchisee or arising out of Franchisee's use of occupancy of the Premises.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**16. Abandonment**. If Franchisee removes or attempts to remove property from the Premises other than in the usual course of continuing occupancy, without having first paid Franchisor all monies due, the Premises may be considered abandoned, and Franchisor shall have the right without notice, to store or dispose of any property remaining on the Premises by Franchisee. Franchisor shall also have the right to store or dispose of any of Franchisee's property remaining on the premises after the termination of this Sublease. Any such property shall be considered Franchisor's property and the title thereto shall vest in Franchisor.

**17. Attorneys' Fees**. Should either party be required to enforce any provision of this Sublease, the prevailing party shall be entitled to costs and reasonable attorneys' fees, regardless of whether or not such enforcement includes litigation.

**18. Dispute Resolution**. Any dispute between the Parties arising under, out of, in connection with or relation to this Sublease shall be submitted to binding arbitration under the authority of the Federal Arbitration Act and must be determined by arbitration administered by the American Arbitration Association pursuant to its then-current commercial arbitration rules and procedures. The arbitration must take place in Lake County, Illinois and the arbitration proceedings must be conducted by 1 arbitrator. The decision of the arbitrator will be final and binding on all parties to the dispute. We and you agree to be bound by the provisions of any applicable contractual or statutory limitations provision, whichever expires earlier. Despite Franchisor and Franchisee's agreement to arbitrate, the parties have the right to seek temporary restraining orders, temporary and injunctive relief and initiate eviction proceedings from a court of competent jurisdiction in the State of Illinois. The parties agree that the law of the State of Illinois should govern any dispute between the parties.

**19. Entire Agreement**. Except for the Franchise Agreement, the terms set forth herein represent the entire agreement between the parties and no other terms shall be of any force or effect.

**20. Notices**. Any notices required by this Sublease shall be in writing and shall be delivered to the same address, and in the same manner, as specified in the Franchise Agreement.

**21. Severability; Binding Effect**. Each provision herein shall be deemed separate and distinct from all other provisions, and if any one of them shall be declared illegal or unenforceable, the same shall not affect the legality or enforceability of the other terms, conditions, and provisions hereof, which shall remain in full force and effect. This Sublease shall extend, apply to and firmly bind the heirs, executors, administrators, successors and assigns of the respective parties hereto as fully as the respective parties are themselves bound, but this provision shall not authorize the assignment of this Sublease or sublease of the Premises contrary to the provisions herein contained.

**22. Representations and Warranties of Franchisee**. Franchisee represents and warrants that neither it nor any of its affiliates or sublessees are:

(a) A person or entity designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SON List"), as maintained by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at http://www.ustreas.gov/offices/enforcement/ofac/sdn, with which a U.S. person or entity cannot deal or otherwise engage in business transactions;

(b) A person or entity who is otherwise the target of U.S. economic sanctions and trade embargoes enforced and administered by OFAC, such that a U.S. person or entity cannot deal or otherwise engage in business transactions with such Franchisee or its sublessees;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(c) Either wholly or partly owned or wholly or partly controlled by any person or entity on the SDN List, including, without limitation, by virtue of such person being a director or owning voting shares or interests in an entity on the SDN List;

(d) A person or entity acting, directly or indirectly, for or on behalf of any person or entity on the SDN List; or

(e) A person or entity acting, directly or indirectly, for or on behalf of a foreign government that is the target of the OFAC sanctions regulations such that the entry into this Master Lease would be prohibited under U.S. law.

**23. Condition of the Premises**. Franchisor makes no representations covenants, or warranties of any kind or character whatsoever, express or implied, with respect to the following:

(a) The quality, condition, or title of the applicable the Premises;

(b) The suitability of the applicable the Premises for any activity and use that the Franchisee may conduct in the Premises according to this Master Lease;

(c) Compliance of the applicable the Premises with any applicable law;

(d) The habitability, merchantability, or fitness for a particular purpose of the applicable the Premises;

(e) The environmental condition of the applicable the Premises; or

(f) Franchisee ability to lawfully use or occupy the Premises.

Franchisee shall accept possession of the applicable the Premises when delivered by Franchisor even if Franchisor is unable to deliver possession during the Delivery Window or on the anticipated Delivery Date. FRANCHISEE WAIVES ALL RIGHTS WITH RESPECT TO ANY DEFECT IN THE PREMISES OR OTHER CONDITIONS OF THE PREMISES, AND IF FRANCHISEE FAILS TO NOTIFY FRANCHISOR OF ANY DEFECT AS OF THE DELIVERY DATE, FRANCHISEE SHALL BE DEEMED TO HAVE CONCLUSIVELY ACCEPTED THE PREMISES IN ITS "AS IS" CONDITION, WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES AND WITH ALL DEFECTS, LATENT, PATENT OR OTHERWISE.

[*Signature page follows*]

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

This Sublease is executed as of the date first above appearing.

**FRANCHISEE:**

***[If an entity:]***

_______________________________

By: ___________________________
Name: _________________________
Title: _________________________
Date: _________________________

***[If an individual or individuals:]***

Signature: ______________________
Name: _________________________
Date: _________________________

**FRANCHISOR:**

SEVA BEAUTY, LLC

By: ___________________________
Name: Vas Maniatis
Title: Managing Member

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

# ATTACHMENT A

## MATERIAL MASTER LEASE TERMS

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

**1. Tenant's Obligations to Prepare the Leased Premises to Open for Business.**

A. Tenant shall complete all Improvements and install all Trade Fixtures in accordance with this Section and in accordance with the plans and specifications previously approved by Landlord in a timely manner.

B. Tenant shall submit to Landlord and obtain Landlord's approval of the floor plans and specifications and layouts of the Leased Premises, including dimensions, elevations, Improvements, intended colors, Trade Fixtures and plans and specifications for any proposed rooftop or other mechanical equipment, such approval not to be unreasonably withheld, conditioned or delayed.

C. Tenant shall obtain Landlord's approval of the floor plans and layouts of the Leased Premises prior to seeking and obtaining any permits, licenses, certifications, or other documents necessary to complete the Improvements in the Leased Premises and install Trade Fixtures in the Leased Premises in accordance with this Master Lease.

D. Tenant may not vary from or add to the previously approved plans and specifications and layouts without Landlord's prior, written consent, which Landlord may not unreasonably withhold or delay. Landlord's approval of Tenant's plans and specifications is solely based on Landlord's review. Landlord's approval of the plans and specifications and layouts does not represent government approval or suitability of the plans and specifications and layouts for Tenant's intended purposes.

E. All Trade Fixtures and Improvements installed must be of high-quality materials and workmanship, comparable to or better than the storefront, improvements and trade fixtures used by other retailers in the vicinity of the Store and, specifically, used at Tenant's most recent prototype, and must be conducted and installed in a good and workmanlike manner in accordance with all applicable laws and in accordance with obligations and requirements of this Master Lease including, but not limited to, insurance, licensing, and regulatory compliance requirements.

F. Prior to any roof penetrations caused by Tenant's Improvements, Tenant shall obtain from Landlord's Leasing Operations Department the contact information for the contractor approved to work on Landlord's roof.

G. If Tenant's rooftop heating, ventilating, and air-conditioning unit, or other rooftop equipment, requires steel supports in addition to the steel framing erected by Landlord, then Tenant will pay the cost of labor and materials for the installation thereof.

H. Tenant shall construct Improvements and install Trade Fixtures without interfering with other construction in progress at the Store or with the transaction of Landlord's business or the business of any of Landlord's other lessees. Tenant shall repair any damage that results from cutting, drilling or other defacing of the Leased Premises. Additionally, for any Leased Premises for which Improvements are being conducted or Trade Fixtures installed in a Store already open to the public for business,

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

I. Tenant, prior to commencing Improvements or installing Trade Fixtures, shall erect a dust wall across the entrance to the Store from the Leased Premises. The dust wall required above must keep dust out of the Store and must minimize any noise or other disruption of Store operations but may not be plastic or canvas, and must be maintained in place throughout the construction.

J. If Landlord requests, Tenant will secure a bond or other security reasonably satisfactory to Landlord against any liens, loss, liability or damage to persons or property related to the Improvements.

K. Tenant's contractors must be licensed, carry worker's compensation coverage as required by law, and comply with all applicable laws including, but not limited to, obtaining any required permit, license, or other documentation necessary to perform the construction work in connection with this Master Lease. At Landlord's request, Tenant will provide Landlord with a list of all contractors and subcontractors Tenant is using.

**2. Signs.**

A. Tenant may not install on the exterior of any Store any sign, light, decoration, painting, awning, canopy or any other identifying mark or like item (collectively, "Signs").

B. Tenant may, with the prior, written consent of Landlord, which consent will not be unreasonably withheld, conditioned or delayed, and in accordance with the Lease, install a Sign on the exterior bulkhead of the applicable Leased Premises, which is inside the Store in which a Leased Premises is located, with Tenant's trade name and Tenant's logo.

C. Tenant may not install any Sign containing images or words that may offend the ordinary, reasonable person including, but not limited to, words or images that are cloaked in other words or images, phrases with double meanings, and words or images commonly considered to be vulgar, swear, or curse words. If Tenant's business or trade name violates this provision, Tenant may not use the name in any signage in or around the Leased Premises.

**3. Common Area Maintenance and Utility Reimbursement Fees.**

A. To the extent required in the applicable Attachment A, Tenant shall pay, as additional Rent, the Common Area Maintenance Fee and the Utility Reimbursement Fee to Landlord without offset, notice, or demand on a monthly basis by the Due Date, to be paid with Tenant's payment of Base Rent.

**4. Taxes.**

A. In addition to Tenant's reimbursement obligations set forth below and any other obligations of Tenant under this Master Lease, Tenant shall pay all taxes and assessments:

(1) Levied against any improvements located within or upon any Leased Premises, and any of Tenant's inventory, personal property, and Trade Fixtures;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(2) Assessed, imposed, or levied against Landlord in relation to either Landlord's interest in this Master Lease or the Rent or other charges required under this Master Lease including, but not limited to, increases or additional, special, regular, unforeseen, foreseen, extraordinary, or ordinary, taxes and assessments, whether occurring wholly or partially during the Lease Term of the specific Leased Premises from which the taxes or assessments arise;

(3) For increases, that are billed or assessed during the Lease Term that are attributable to Tenant's Improvements or occupancy of the Leased Premises; and

(4) Imposed against Landlord because of Landlord's interest in this Master Lease as a substitute, or in lieu of, in whole or in part, for any General Taxes or other real estate tax or assessment.

B. Tenant shall reimburse Landlord, upon demand, for Tenant's Pro Rata Share of General Taxes assessed or levied during the Lease Term, as prorated to account for any period of partial occupancy of the applicable Leased Premises, and for any other tax, assessment, or excise that was imposed, assessed, or levied against Landlord that Landlord paid but for which Tenant is liable under this Master Lease.

**5. Insurance Reimbursement Fee.**

A. Tenant shall pay, as additional Rent, the Insurance Reimbursement Fee, if any, to Landlord without offset, notice or demand, on a monthly basis by the Due Date, to be paid with Tenant's payment of Base Rent.

**6. Continuous Operation.**

A. Tenant, other than as expressly permitted by this Master Lease, and during the applicable Lease Term, shall operate the applicable Leased Premises continuously during the Hours of Operation designated in Appendix-I, in accordance with the Permitted Uses designated in Appendix-I and subject to the terms and provisions of this Master Lease.

B. Tenant, other than as expressly permitted by this Master Lease, shall not vacate the applicable Leased Premises during the applicable Lease Term or cease operations in the applicable Leased Premises and shall conduct its business, at a minimum, in an efficient, first-rate, and reputable manner.

C. Other than closing the Leased Premises to repair, update, and upgrade the Trade Fixtures, the Improvements, and the Leased Premises in accordance with Section 7.3B below, Tenant may close the applicable Leased Premises for repair or renovation only with the prior, written consent of Landlord, which Landlord may not unreasonably withhold, condition or delay.

D. Failure to comply with this provision or any representation by Tenant that during the applicable Lease Term the Tenant, or one of its Sublessees, will not comply with this provision or will vacate the applicable Leased Premises materially breaches this Master Lease.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

E. Tenant shall post its Hours of Operation in a conspicuous location within the Leased Premises, subject to and in accordance with the requirements set forth in the Master Lease.

**7. Customer Service.**

A. Tenant shall operate the Leased Premises in conformity with Landlord's reputation as the operator of discount retail stores dedicated to customer satisfaction and prompt quality customer service featuring a broad assortment of quality merchandise at low, competitive prices.

B. Tenant, at its sole cost and expense, shall post, in a conspicuous location that customers can see when the Leased Premises is open and when the Leased Premises is closed, a telephone number and an address for Tenant's customers to contact. The telephone number must be either toll free or a number local to the applicable Leased Premises.

**8. Encumbrances and Liens.**

A. Tenant may not cause any encumbrance to attach to or upon the Leased Premises, the Store, the Common Area, the land underlying any of the foregoing, or Tenant's interest in this Master Lease because of any act or omission of Tenant, its contractors, agents, employees, or representatives. Failure to discharge or bond/insure over any encumbrance within fifteen (15) business days following its filing is a material breach. In addition to any right or remedy Landlord may have for the material breach, Landlord may bond or pay the encumbrance for Tenant's account without inquiring into the validity of the encumbrance. If Landlord elects to pay the encumbrance, Tenant will reimburse Landlord, upon demand by Landlord, the amount Landlord paid, plus an additional ten percent (10%) administrative fee, plus interest. Interest will accrue at the lesser of one and five percent (5%) per annum or the maximum amount allowed by law beginning on the day Landlord bonds or pays the encumbrance and continuing until Tenant reimburses Landlord the entire amount Landlord paid, plus the administrative fee and any interest accrued.

**9. Restrictions on Tenant's Activities.**

A. In addition to any easement, covenant, or restriction that affects or applies to the Leased Premises or the Common Area, Tenant, and its Sublessees, shall not:

(1) Use the sidewalk adjacent to or any other space outside the Leased Premises for display, sale, or any other similar undertaking;

(2) Use a loudspeaker system that may be heard from outside the Leased Premises; place or permit any radio, television, loudspeaker, or amplifier on the roof, inside the Leased Premises, or anywhere that the radio, television , loudspeaker, or amplifier can be seen or heard from outside of the Leased Premises; or solicit or distribute any handbills or other advertising in the parking lot, Store, or Common Areas, unless otherwise protected by law;

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(3) Use the plumbing facilities of the Leased Premises or the Store for any purpose other than that for which they were constructed. Neither Tenant nor its Sublessees, nor the invitees of either Tenant or its Sublessees, may use the plumbing facilities of the Leased Premises to dispose of any foreign substances. The expense of any breakage, stoppage, or damage resulting from a breach of this paragraph will be born by Tenant;

(4) Place on any floor a load that exceeds the load per square foot that the floor was designed to carry. Tenant may only install, operate, and maintain heavy equipment in the Leased Premises if installed in such manner as to achieve a proper distribution of weight;

(5) Use any forklift truck, tow truck, or any other machine or equipment in the Store, in the Common Areas, or on any of the underlying ground, unless necessary to complete Tenant's obligations under Section 2.4 or unless otherwise agreed to in Appendix-I;

(6) Use the Leased Premises to conduct illegal business or for illegal purposes or for any purpose that may increase the premium cost of or invalidate any insurance policy carried on the Leased Premises, Common Areas, or the Store. If insurance premiums for insurance policies carried on the Leased Premises, Common Areas, or the Store increase in connection with Tenant's use of the Leased Premises, Tenant will reimburse Landlord for the increase;

(7) Unreasonably interfere with Landlord's business or the business of another tenant of Landlord or act in such a way that reasonably may be expected to injure Landlord's business relationship including, but not limited to, acting in any way that diminishes the access to or the visibility of any portion of the Store or any other tenant's premises or that impedes the free circulation of customer traffic within the Store;

(8) Receive, retain, or store in the Leased Premises any "Controlled Substances" except for any Controlled Substances included in an emergency medical kit. For the purposes of this Master Lease, "controlled substances" means materials containing any quantity of a substance with a stimulant, depressant or hallucinogenic effect on the higher functions of the central nervous system, and having the tendency to promote abuse or physiological or psychological dependence, as designated in state and federal controlled Tenant must have the work order number provided by the Wal-Mart Maintenance Hotline at the time the repair is reported in order to check on the status of the repair.

**10. Tenant's Repairs, Maintenance, Handling Hazardous Substances.**

A. Except those items to be maintained by Landlord pursuant to the terms of this Master Lease, Tenant, at its sole cost and expense, shall maintain the Leased Premises in compliance with applicable law and in good order and condition, ordinary wear and tear excepted. Tenant shall effect, at Tenant's sole cost and expense and according to applicable law, all repairs to the Leased Premises (except for those specifically enumerated above) that are commercially necessary or desirable to maintain the Leased Premises in a safe, dry, and tenantable condition including, without limitation, repairs to:

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(1) Any portion of the pipes, lines, ducts, wires, or conduits, used solely by Tenant;

(2) Plate glass, windows, door frames, and special store fronts that serve Tenant solely;

(3) Molding, locks and hardware, lighting, plumbing, Trade Fixtures, Signs, and interior painting and treatment; and

(4) Any Improvements or Trade Fixtures installed in the Leased Premises, including any rooftop heating, ventilation, or air-conditioning unit or other rooftop equipment. Any repairs to the rooftop heating, ventilating, and air-conditioning unit or other rooftop equipment must be made by a Landlord-approved contractor.

B. Tenant, at no expense to Landlord, shall handle, manage, store, transport, and dispose of all Hazardous Substances created by Tenant, its Sublessees, agents, employees or representatives in any process, action, or inaction in connection with the Leased Premises and in accordance with all applicable Federal, State and local laws and regulations. Tenant shall not use any of Landlord's property or equipment in using, handling, managing, storing, transporting, and disposing of Hazardous Substances. Evidence of Tenant's compliance with all applicable Federal, State and local laws concerning the use, handling, management, storage, transportation, and disposal of Hazardous Substances must be provided to Landlord upon Landlord's request.

C. Tenant, at no expense to Landlord, shall maintain the Leased Premises in a clean and sanitary condition, free from debris or offensive odor, and in compliance with all laws affecting the Leased Premises, Tenant's use of the Leased Premises, or Tenant's business.

(1) Tenant shall not allow the accumulation or burning of any rubbish or garbage in, on, or about the Leased Premises and shall keep all entrances, doors, or loading areas in the Leased Premises or immediately adjoining the Leased Premises free from trash, litter, or other obstruction.

(2) Tenant shall bear the expense of garbage and rubbish collection and disposal. If Landlord's Leasing Operations Department permits Tenant to use any part of the Store (other than the Leased Premises), Common Area, or land underlying the foregoing to store garbage and refuse generated by Tenant's use of the Leased Premises, Tenant and its Sublessees, at the expense of Tenant or its Sublessee, will keep all such garbage and refuse in the location designated by Landlord and in the kind of container, including the use of interior refrigerated garbage containers and compactors, Landlord specifies in its commercially reasonable opinion.

(3) Tenant will maintain air pressure in the Leased Premises necessary to keep offensive odors from emanating from the Leased Premises.

(4) Any odor-producing function of Tenant's operations must be mechanically vented to the exterior of the Store to eliminate the dissipation of such odors into the Store or into the interior or exterior of any other tenant's space. Exhaust hoods may not project above the roof deck higher than that allowed by local governmental authorities or code requirements.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

(5) At Landlord's written request, Tenant will install any equipment or procedures necessary to comply with Section 10.C(3) and Section 10.C(4). If Tenant fails to comply with Landlord's request, within twenty (20) days after receiving notice, Landlord may take remedial action for Tenant, and Tenant will pay, as additional Rent, the cost of such remedial action plus an administrative charge of ten percent (10%) of the cost thereof

D. If Tenant fails to commence, and thereafter pursue diligently any repairs required by this Section within ten (10) days of receiving notice from Landlord of the repair, Landlord may repair the Leased Premises as necessary to maintain it in a good, clean, safe, dry, and tenantable condition. If Landlord makes such repair, Tenant will reimburse Landlord for its costs, plus an additional ten percent (l0%) administrative fee when Tenant pays the next month's Rent.

**11. Store Relocation, Renovation and Closing.**

A. Landlord, from time to time, may remodel, re-arrange, renovate, or expand (collectively and individually "Store Renovations") the Store, without relocating the Store to another physical address. During Store Renovations, Tenant will repair, update, and upgrade the Trade Fixtures, the Improvements and the Leased Premises unless Tenant repaired, updated, and upgraded the Trade Fixtures, the Improvements and the Leased Premises within the three (3) consecutive preceding years. All repairs, updates, and upgrades Tenant contemplates must be previously approved by Landlord, which approval will not be unreasonably withheld, conditioned or delayed.

B. In connection with any Store Renovations, Landlord may either temporarily or permanently relocate Tenant to another location within the Store that is of like size and configuration as the Leased Premises and is in a reasonable condition from which Tenant shall operate if Landlord, in its commercially reasonable judgment, determines the relocation necessary to complete Store Renovations. Landlord will bear the cost of moving Tenant's Trade Fixtures in the event of a temporary relocation, but Landlord is not responsible for any expense associated with Tenant 's repairs, updates, and upgrades of the relocated Leased Premises, whether the relocation is temporary or permanent. If the relocation is of a permanent nature and Tenant reasonably determines that the new location will materially impair its operations in the applicable Leased Premises or is not of like size and configuration as the original Leased Premises, Tenant may terminate this Master Lease as to the applicable Leased Premises by providing written notice to Landlord. If the relocation is temporary and Tenant reasonably determines that the new location of the Leased Premises will materially impair its business or that the Store Renovations are materially impairing its operations in the Leased Premises, Tenant may, with Landlord's written consent, not to be unreasonably withheld, conditioned or delayed, close the applicable Leased Premises until Landlord and Tenant agree that the Store Renovations no longer impair the operations of the applicable Leased Premises.

C. If in connection with the Store Renovations, Landlord closes the Store for more than three (3) consecutive days, Tenant may, with Landlord's written consent, not to be unreasonably withheld, conditioned or delayed, either close the applicable Leased Premises while the Store is closed in connection with the Store Renovations and conduct the repairs, updates, and upgrades of the Leased Premises as required by this Section or terminate this Master Lease as to the applicable Leased Premises.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

D. If in connection with Store Renovations, Landlord determines (in its sole desertion) that there will not be space available for Tenant upon completion of the Store Renovations, Landlord, may terminate this Master Lease and related Attachment A as to the applicable Leased Premises. In the event such termination occurs during the first five (5) years of the Lease Term for the applicable Leased Premises, Landlord will reimburse Tenant for the unamortized portion of the cost of Tenant's initial Improvements to the particular Leased Premises, calculated on a straight line depreciation basis over five years, not to exceed $100,000. Landlord will not be liable for any other cost or expense of Tenant ceasing operations in the applicable Leased Premises.

E. If Leased Premises closes in accordance with this Section 7.3, Rent due during the time in which the Leased Premises is closed will abate. The Leased Premises must re-open once the Store Renovations and the operations of the Leased Premises no longer materially impair each other, as determined by mutual agreement of the parties.

**12. Rules and Regulations**

Tenant shall observe all rules and regulations established from time to time by Landlord upon notice to Tenant, through publication in the Landlord/Tenant Handbook or otherwise, including, but not limited to:

A. Tenant and Sublessee, and any agent, employee, or representative of either Tenant or Sublessee, should remove immediately from the Store any merchandise purchased from Landlord.

(1) Tenant and Sublessee,and any agent, employee, or representative of either Tenant or Sublessee, may not bring into the Leased Premises any merchandise purchased from Landlord unless the merchandise is purchased for use by Tenant and Sublessee, and any agent, employee, or representative of either Tenant or Sublessee, in the operation of its business in the Leased Premises or unless the merchandise is purchased for immediate consumption by Tenant, or its Sublessee, or any agent, employee, or representative of either Tenant or Sublessee.

(2) Tenant and Sublessee, and any agent, employee, or representative of either Tenant or Sublessee, must keep a receipt for the merchandise purchased with the merchandise at all times while the merchandise is in either the Leased Premises or the Store.

(3) No merchandise for which Tenant or Sublessee, or any agent, employee, or representative of either Tenant or Sublessee, has not paid may be removed from the Store or brought into the Leased Premises.

(4) Any purchase by Tenant and Sublessee, and any agent, employee, or representative of either Tenant or Sublessee, is subject to search according to Landlord's security procedures applicable to other customers of Landlord. Anyone removing, or involved in the removal of, merchandise, either from the Store or into the Leased Premises, without first paying for the merchandise may be evicted from the Store or all of Landlord's property, may be treated as a shoplifter, or both. Shoplifters may be subject to prosecution.

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

B. Each of Tenant and Sublessee, and any agent, employee, or representative of either Tenant or Sublessee, shall conduct him or herself while in the Store or in the Leased Premises in a professional and courteous manner, appropriately attired, trained, and groomed, and in accordance with commercially reasonable standards in Landlord's industry.

C. Tenant and Sublessee, and any agent, employee, or representative of either Tenant or Sublessee, shall abide by Landlord's procedures in responding to media inquiries as such inquiries relate to the Leased Premises, Landlord, or any relationship between Tenant and Landlord.

D. Neither Tenant nor Sublessee, nor any agent, employee, or representative of either Tenant or Sublessee shall act in a manner which may discredit Landlord's business or reputation, including, without limitation, any indictment, conviction or plea of nolo contendere to a crime that involves moral turpitude or that Landlord reasonably believes has had or may have a materially detrimental effect on Landlord's business or reputation. Failure to comply with this provision constitutes a material breach of this Master Lease.

**13. Compliance.**

A. Tenant, in its use, occupancy and operation of the Leased Premises, shall comply with all federal, state, and local laws, rules, orders, directives, and regulations.

B. Landlord has absolutely no responsibility, obligation, or liability for Tenant's hiring and other employment practices. Tenant warrants and represents that it has a policy to:

(1) Comply in all respects with all immigration laws and regulations;

(2) Properly maintain all records required by the United States Citizenship and Immigration Services (the "USCIS") including, without limitation, the completion and maintenance of the Form I-9 for each party's employees;

(3) Respond in a timely fashion to any inspection requests related to such I-9 Forms;

(4) Cooperate fully in all respects with any audit, inquiry, inspection, or investigation the USCIS may conduct of such party or any of Tenant's employees;

(5) Conduct annual audit of the I-9 Forms for its employees;

(6) Promptly correct any defects or deficiencies the audit reveals; and

(7) Require all subcontractors performing any work for Tenant to comply with the covenants set forth in this Section.

C. Tenant shall comply with the provisions of the Americans with Disabilities Act ("ADA") as it relates to its operation of the Leased Premises.

(1) If, after Landlord delivers to Tenant the applicable Leased Premises, the presence of any ADA violation on the applicable Leased Premises requires remedial work on the Leased Premises and such ADA violation was not caused by Landlord's actions or failure to act as required with respect to Store (other than the Leased

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Premises), Tenant will promptly take all actions at its sole expense as are required by any federal, state, or local government agency or political subdivision to comply with the ADA; provided that Landlord's consent to such actions is first obtained, which consent Landlord may not unreasonably withhold, condition or delay.

(2) In addition to Tenant's obligations under Article XIII, Tenant shall indemnify, defend and hold harmless the Indemnitees from any Claim including, without limitation, diminution in value of the Leased Premises, damages for the loss or restriction of use of rentable or usable space or of any amenity of the Leased Premises, damages arising from any adverse impact on marketing of space of the Leased Premises, and sums paid in settlement of claims, attorney's fees, consultation fees and expert fees arising during or after the applicable Lease Term as a result of such violation. Tenant's obligations in the preceding sentence include, without limitation, costs incurred in connection with any investigation of site conditions or any remedial work required by any federal, state, or local government agency or political subdivision because of any ADA violation present on or about the Leased Premises not caused by Landlord's actions or failure to act as required with respect to the Store (other than the Leased Premises).

(3) If after Landlord delivers to Tenant the applicable Leased Premises, the presence of any ADA violation exists in the Store (other than the Leased Premises) which requires remedial work on the Leased Premises, Landlord, at its sole cost and expense, will take all necessary actions required by any federal, state or local government agency or political subdivision to comply with the ADA.

**14. Landlord's Right to Access**

A. Landlord may enter the Leased Premises:

(1) Upon reasonable notice to Tenant (except in the case of emergency, in which case no notice will be required) to either inspect the Leased Premises, enforce any of Landlord's rules and regulations or enforce the terms and conditions of this Master Lease;

(2) Upon reasonable notice to Tenant, either to effect repairs it is obligated to perform or to add, alter, improve, repair, or otherwise construct or maintain any part of the Store adjacent to the Leased Premises; and

(3) With twenty four (24) hours' advance notice to Tenant to show the Leased Premises to a prospective lender, lessee, or purchaser.

B. "For Rent" or "For Lease." Landlord may post "For Rent" or "For Lease" signs on the Leased Premises during the last ninety (90) days of the Leased Term if, in accordance with this Master Lease, Landlord and Tenant do not extend the Lease Term.

**15. Estoppel Certificates**

A. Tenant, within ten (10) days of Landlord's request, shall deliver to Landlord an executed, written statement addressed to the party designated in Landlord's request and identifying

FILED DATE: 8/3/2020 1:39 PM 2020CH05088

Tenant and this Master Lease and certifying and confirming, in addition to any information or confirmation Landlord may reasonably require, the following:

(1) That this Master Lease is either unmodified since its execution and in full force and effect, or modified since its execution but still in full force and effect as modified;

(2) That Landlord either is not in default of any of its obligations under this Master Lease or is in default, specifying the default;

B. Tenant's obligations and restrictions concerning subordination and attornment; and

C. The Lease Term, Rent Commencement Date, and Expiration Date as to the Leased Premises for which the estoppel certificate applies.

**16. Insurance**

A. Tenant shall cause Insurer to issue an endorsement to any policy Tenant procures in satisfaction of its obligations in this paragraph providing per location per occurrence limits or with per location aggregate limits for each Leased Premises leased under this Master Lease and listing as Additional Insured Wal-Mart Stores, Inc., its subsidiaries and its affiliates and any party Landlord requires.