UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAHESH SASHITAL, MARK FERGUSON, and MICHAEL SCOTT DAVIS, individually and on behalf of the class described below,<br>          Plaintiffs,<br><br>          v.<br><br>SEVA BEAUTY, LLC, and KARI COMROV,<br>          Defendants. | No. 20 C 4692<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

This lawsuit concerns beauty service franchises that allegedly were destined to fail. Plaintiffs Mahesh Sashital, Mark Ferguson, and Michael Scott Davis allege that Defendant Seva Beauty, LLC—a franchisor of beauty spas throughout the United States—and one of its former employees, Defendant Kari Comrov, induced them to enter franchise agreements by misrepresenting or omitting material information about the business. Plaintiffs sue Defendants on behalf of themselves and a putative class of similarly situated franchisees. As the court understands things, the parties are engaged in arbitration proceedings to resolve certain claims that clearly fall within the franchise agreements' arbitration clauses. In this forum, Plaintiffs seek injunctive and declaratory relief. Plaintiffs have moved for a temporary restraining order or a preliminary injunction that prohibits Defendant Seva from terminating their franchise agreements for nonpayment of weekly royalty fees. Defendants have moved to dismiss Plaintiffs' complaint under Rules 12(b)(1) and 12(b)(6), or, in the alternative, to compel arbitration. As explained here, the court denies Plaintiffs' motion and strikes Defendants' motion without prejudice to renewal.

## BACKGROUND

Plaintiffs filed this lawsuit on July 23, 2020 in the Circuit Court of Cook County, Illinois, Chancery Division. (*See* Verified Class Action Compl. ("Compl.") [1-1].) Defendants filed a notice

of removal in this court on August 10, 2020, on the basis of diversity between the parties, *see* 28 U.S.C. § 1332(a). (Notice [1].) Plaintiffs then filed an emergency motion for a temporary restraining order (TRO), preliminary injunction, and/or declaratory judgment [5] on August 10, 2020. The court held a telephone hearing on the TRO motion on August 14, 2020. Soon after, Defendants filed a motion to dismiss the complaint or compel arbitration [16]. The following background is taken from the Verified Class Action Complaint, except where otherwise stated.

**A.     The Fast-Casual Spa Business and the Alleged Fraud**

Defendant Seva is an Illinois limited liability company with its principal place of business in Puerto Rico. (Compl. ¶ 10.)[1] Seva is a franchisor of "a system of fast casual spas" located throughout the United States. (*Id.* ¶ 1.) Seva's franchises provide beauty services like eyebrow threading, eyebrow waxing, and eyelash extensions. (*Id.* ¶¶ 42, 66.)[2] By agreement between Seva and Walmart, Seva's franchises "primarily operate inside Walmart stores and rely on foot traffic from Walmart customers." (*Id.* ¶ 52.)[3] Defendant Comrov was the director of operations at Seva at all relevant times. (*See* Pls.' TRO Mot. [5] ¶ 8.) She left her employment at Seva in April 2019 to join a competing franchisor. (*See id.* ¶ 38.) Defendant Comrov is a resident of Nevada. (Compl. ¶ 11.)

Plaintiffs Sashital and Davis are current Seva franchisees. (*Id.* ¶ 6.) They are residents of Texas. (*Id*. ¶¶ 7, 9.) Plaintiff Ferguson is a former Seva franchisee. (*See, e.g.*, Defs.' Mot. to Dismiss or Compel Arbitration ("Defs.' Mot.") [16] at 5.) Ferguson is a resident of Florida.

---

[1]     When Seva executed the franchise agreements with Plaintiffs, it had its principal place of business in Highland Park, Illinois. (*Id.* ¶ 10.)

[2]     In their opposition to Plaintiffs' motion for a TRO or preliminary injunction (hereinafter, "Plaintiffs' TRO Motion"), Defendants state that licensed estheticians perform these services. (*See* Defs.' Opp. to Mot. for TRO ("Defs.' TRO Opp.") [12] at 2.)

[3]     The terms of the agreement between Seva and Walmart are unclear. Plaintiffs allege that Seva refused their repeated requests to see the agreement, though Plaintiffs do not state when they made the requests. (*See, e.g., id.* ¶ 57.)

2

(Compl. ¶ 8.) Plaintiffs allege that Defendants used fraudulent sales pitches to induce them (and others similarly situated) to sign franchise agreements with Seva. (*See, e.g.*, *id.* ¶¶ 1-4.) Seva then earned millions of dollars in royalties from its franchisees, Plaintiffs allege. (*See id.* ¶ 4.) Defendants allegedly "present the 'Seva Beauty' franchise as a no-lose investment opportunity for significant passive income when, in reality, the business model is a no-win, except for a select few experienced retailers who have no need for franchise support." (*Id.* ¶ 1.) Plaintiffs allege that to sell franchises, Defendants "intentionally omitted financial information from its Franchise Disclosure Document (FDD)[4] regarding the failures of the vast majority of Seva franchises and instead only provided limited financial information from a handful of its most profitable store locations." (*Id.* ¶ 26; *see also id.* ¶ 46 (alleging that Defendant Comrov told Plaintiffs that "[e]ach store will break even in the first six months" and that "earning $100,000+ per store is easy").) In addition, Defendants allegedly failed to disclose that it is challenging to run successful franchises in rural locations—where trained estheticians are in short supply—and misrepresented the amount of training required for novices. (*See, e.g.*, *id.* ¶¶ 31-33, 42-44.) According to Plaintiffs, Defendants also failed to inform prospective franchisees that the handful of profitable franchises use fraudulent labor practices to avoid paying employee benefits and overtime. (*See, e.g.*, *id.* ¶¶ 34-35.)

      Plaintiffs allege, too, that Defendants misrepresented the nature of Seva's relationship with Walmart. According to Plaintiffs, that relationship was "[t]he only value Seva provided relative to its competing franchisors." (*Id.* ¶ 53.) As referenced above, Seva's franchises are typically located within Walmart stores. Defendants allegedly told potential franchisees that Seva's relationship with Walmart was "solid" when in fact it was "falling apart" and Walmart was "refusing to renew [franchisees'] leases." (*Id.* ¶ 54.) Furthermore, Defendants allegedly promised potential

---

[4]     The court understands that prospective franchisees review this document before signing a franchise agreement.

franchisees that they could "ensure profitability" by distributing leaflets to Walmart customers—but concealed that Walmart rules restrict franchisees from approaching customers or advertising in or near Walmart stores. (*Id.* ¶¶ 63-64.) Besides omitting material information from the franchise agreements and making intentional misstatements, Plaintiffs allege, Defendants prevented prospective franchisees from discovering what they were signing up for by handpicking the current franchisees with whom they could speak and coaching those handpicked franchisees on what to say. (*See, e.g.*, *id.* ¶¶ 28-30.)

According to Plaintiffs, "few Seva franchisees make any profit at all." (*Id.* ¶ 49.) Meanwhile, they "have an ongoing obligation to pay royalties to Seva." (*Id.* ¶ 75.) The Franchise Disclosure Document requires the franchisee to pay Seva a royalty of "6% of Gross Sales or $250" per week, "whichever is greater." (2016 FDD, Ex. A-4 to Compl. [1-1] at PageID #:116.) "Were it not for Seva's misrepresentations," Plaintiffs allege, "Plaintiffs and the Class would not have an ongoing obligation to pay" the royalties. (Compl. ¶ 75.) The COVID-19 pandemic has exacerbated the situation, Plaintiffs allege. Government shut-down orders have required many franchisees to shutter their stores, yet Seva continues to charge royalties. (*Id.* ¶ 76.) Seva allegedly provides a "discounted royalty for franchises shut down by [the COVID-related] orders" only if franchisees sign what Plaintiffs call "an unconscionable general release" of liability. (*Id.* ¶ 77.) The court has not found the general release in the record. In an affidavit provided with Plaintiffs' TRO motion, Plaintiff Sashital states that the general release bars claims for fraud. (*See* Sashital Aff., Ex. D to Pls.' TRO Mot. [5-3] ¶¶ 11-12.)

**B.    Named Plaintiffs' Franchises**

Plaintiffs Sashital, Ferguson, and Davis allege that they entered into franchise agreements with Seva after hearing Defendant Comrov make representations that franchises break even quickly; easily earn more than $100,000 per store; and commonly succeed with "absentee" owners, *i.e.*, owners that do not run day-to-day operations. (Compl. ¶¶ 46, 79-80, 87-88, 93-94, 102.) According to Plaintiffs, they "first became aware of [Defendants'] fraudulent

4

misrepresentations in 2019 when Seva settled eight individual claims alleging similar fraudulent representations by Seva for over $2,000,000." (*Id.* ¶¶ 86, 91, 97.) It appears that these settlements were reached in arbitration proceedings. (*See, e.g.*, Pls.' TRO Mot. at 2 ("Seva has paid over $2,000,000 to franchises making similar claims in individual arbitrations.").)

### 1. Ferguson

Plaintiff Ferguson entered into a franchise agreement with Seva in February 2016. (Compl. ¶ 79; *see* Ferguson Franchise Agreement, Ex. 6 to Defs.' TRO Opp. [12-6] at PageID #:958.) He opened his franchise in a Walmart located in Florida. (Compl. ¶ 81.) Ferguson's franchise allegedly lost money in 2016, 2017, and 2018, but made a modest profit of just $3,300 in 2019. (*Id.* ¶ 82.) Ferguson had to close his store for at least two months in 2020 because of COVID-19-related government orders. (*Id.* ¶ 83.) During that time, Seva continued charging royalties. (*Id.*) In an affidavit provided with Plaintiffs' motion for a TRO, Ferguson avers that between April and July 2020, he paid employees and rent from gross revenue. (Ferguson Aff., Ex. H to Mot. for TRO [5-6] ¶ 4 (PageID #:744).) After doing so, according to Ferguson, he had nothing left to pay the "fraudulently induced royalty." (*Id.*) On July 17, 2020, "Seva sent Ferguson a notice of termination threatening" to shut down his store and charge penalties exceeding $40,000 "if he did not immediately pay" what Seva represented he owed. (Compl. ¶ 84.) Ferguson refused Seva's demand. (Ferguson Aff. ¶ 6 (PageID #:745).) Ferguson states that Seva then "shut down [his] point of sale system,[5] noted on Google that [his] store was closed, and shut off [his] access to [the franchise's] Facebook page." (*Id.* ¶ 8.) Defendants, for their part, acknowledge that Seva terminated the franchise agreement in July 2020 but assert that Seva "has not taken any actions to collect the amounts owed . . . ." (Defs.' Mot. at 5.) Ferguson avers that "[w]hile [his] business suffers, he continues to accrue interest on a loan" (presumably for funds to maintain the franchise) "from his brother for $50,000 . . . and a line of credit for

---

[5] Plaintiffs do not define a "point of sale system."

$49,000 . . . ." (Ferguson Aff. ¶ 9 (PageID #:745).)

### 2. Sashital

Plaintiff Sashital entered into a franchise agreement with Seva in March 2016 and opened his franchise in a Walmart store in Texas. (Compl. ¶¶ 87, 89; see Sashital Franchise Agreement, Ex. 1 to Defs.' TRO Opp. [12-1] at PageID #813.) The franchise "has been a complete failure", Plaintiffs allege. (Compl. ¶ 89.) It lost more than $48,800 in 2016, $53,100 in 2017, and $133,700 in 2018. (Id. ¶ 90.) Plaintiffs allege that Sashital "continues to timely pay all amounts Seva claims it is owed," despite "being fraudulently induced to purchase the franchise." (Id. ¶ 92.) Sashital avers that he had to close his store temporarily because of COVID-19 shut-down orders but does not specify how long the store was closed. (Sashital Aff. ¶ 12.) Seva kept charging the $250 weekly royalty during that time, Sashital says. (Id.) Sashital states that Seva offered him a discounted royalty during the COVID-19-related shutdown in exchange for a general release of liability, but he refused because he considered the terms of the release to be unconscionable. (Id. ¶¶ 11, 13.) Sashital also states that he took out loans to open and operate his franchise, and that he "continue[s] to pay interest" on them. (Id. ¶ 14.) He adds that he used $120,000 of his own retirement funds to open the franchise and does not expect to recoup the investment. (Id. ¶ 15.)

### 3. Davis

Plaintiff Davis entered into a franchise agreement with Seva in March 2016. (Compl. ¶ 93; see also Davis Franchise Agreement, Ex. 3 to Defs.' TRO Opp. [12-3] at PageID #:885.) Davis opened his franchise in a Walmart located in Texas. (Compl. ¶ 95.) It, too, "has been a complete failure." (Id.) According to Plaintiffs, the franchise lost more than $62,400 in 2016, $61,700 in 2017, and $20,700 in 2018. (Id. ¶ 96.) Davis "continues to timely pay all amounts Seva claims it is owed," despite his belief that Defendants fraudulently induced him to purchase the franchise, and despite government orders that shuttered his store for an unspecified amount of time during the COVID-19 pandemic. (Id. ¶ 98; see Davis Aff., Ex. G to Pls.' TRO Mot [5-6] ¶¶ 3-4 (PageID

#:740.) Like Plaintiff Sashital, Davis avers that he refused to sign a release in exchange for a discounted royalty during the pandemic. (*See* Davis Aff. ¶¶ 5-6.) Davis states that his "business is in shambles and the royalty pushes [him] over the breaking point." (*Id.* ¶ 7.) He says that during the COVID-19 pandemic, the franchise's monthly gross revenues have been approximately $8,000 (March 2020), $0 (April and May 2020), and $2,600 (June 2020). (*Id.*) At the same time, he says, he "continue[s] to pay interest on [his] debts incurred to open and operate the franchise[,] including a $120,000 loan" that he took against his retirement fund. (*Id.* ¶ 8.)

* * *

In their opposition to Plaintiffs' TRO motion, Defendants state that Ferguson assigned his rights under the franchise agreement in April 2016 to a Florida corporation called Amlex LLC. (Defs.' TRO Opp. at 5; *see* Ferguson Assignment Agreement, Ex. 7 to Defs.' TRO Opp. [12-7].) Likewise, Defendants state that Davis assigned his rights in the franchise to a company called "Alexion Corp." in May 2016. (Defs.' TRO Opp. at 4; *see* Davis Assignment Agreement, Ex. 4 to Defs.' TRO Opp. [12-4] at PageID #:937.) The court notes that the assignment agreements show that Ferguson is the sole owner of Amlex and Davis is the sole owner of Alexion. (*See* Ferguson Assignment Agreement § 5 (PageID #:1011); *id.* at PageID #:1014; Davis Assignment Agreement § 5 (PageID #:938); *id.* at PageID #:941.) Additionally, the assignment agreements provide that the assignments do not release Davis or Ferguson from their obligations to Seva under the Franchise Agreement. (*See* Ferguson Assignment Agreement at § 5 (PageID #:1011) (stating that Ferguson, "as the sole owner of Assignee, hereby affirms his/her obligations under the Guaranty to guarantee and be personally be [sic] bound by the terms of the Franchise Agreement as they apply to Assignee"); *see also* Davis Assignment Agreement § 5 (PageID #:938) (same).)

Unlike Plaintiffs Ferguson and Davis, Defendants say, Plaintiff Sashital signed the franchise agreement at the outset on behalf of a corporation: "Sahiya Enterprises, Inc." (Defs.' TRO Opp. at 3; *see* Sashital Franchise Agreement at PageID #:813.) But the court notes that according to the Franchise Agreement, Sashital is the sole owner of Sahiya and has a "direct

7

interest" in the corporation. (Sashital Franchise Agreement at PageID #:850.) Plaintiffs point out that the Franchise Agreements are binding (jointly and severally) on "[a]ll individuals, . . . corporations and their officers, directors and controlling shareholders, limited liability companies and their members" that execute the agreement. (Pls.' TRO Reply [13] at 7; *see, e.g.*, Ferguson Franchise Agreement § 9.02 (PageID #:987).)

**C.     Plaintiffs' Claims**

Plaintiffs bring this lawsuit on behalf of themselves and a putative class. (*See* Compl. ¶ 17.) They propose the following class definition: "All persons who purchased a Seva franchise from January 1, 2015 to December 31, 2019 who currently owe monthly royalties to Seva . . . ." (*Id.*)

Plaintiffs allege that "Defendants have chosen and consented to the choice of Illinois law in their franchise agreement with each Class Member." (*Id.* ¶ 25.) Defendants do not dispute this point. In their complaint, Plaintiffs seek a declaration that Defendants' conduct violates the Illinois Franchise Disclosure Act, 815 ILCS 705 *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.*, and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510 *et seq*. (*See* Compl., Count IV.) They also assert independent claims under each statute but request only injunctive and equitable relief in connection with those claims. (*See id.*, Counts I-III.)

In their TRO motion, Plaintiffs initially asked the court to "maintain the status quo of operating franchise businesses by preventing assessment of additional fees, interest, penalties, and termination of the franchise agreements between Plaintiffs and Seva until this matter can be resolved on the merits." (Pls.' TRO Mot. at 1.) They also asked the court to enjoin Defendants' allegedly illegal business practices, declare invalid any COVID-19-related release agreement between Seva and any putative class member, and declare that Defendants have violated the Illinois consumer protection laws referenced above. (*See id.* at 24-25.) During a telephone hearing on August 14, 2020, Plaintiffs agreed to narrow their request to the following: an order

8

prohibiting Defendant Seva from terminating franchise agreements for the non-payment of the weekly $250 royalty, until a preliminary injunction issues or until the parties resolve their other claims in arbitration.

Plaintiffs' Franchise Agreements contain an arbitration clause. Relevant here, it provides:

> Except as qualified below and in Section 10.03, any dispute between you and us or any of our or your affiliates arising under, out of, in connection with or in relation to (a) this Agreement, (b) the parties' relationship, (c) the events leading up to the entry into this Agreement, (d) your Studio, (e) the scope or validity of the arbitration obligation under this Section 10.02, shall be submitted to binding arbitration under the authority of the Federal Arbitration Act and must be determined by arbitration administered by the American Arbitration Association pursuant to its then-current commercial arbitration rules and procedures.

(*See, e.g.*, Sashital Franchise Agreement § 10.02.) As the quoted language states, there are exceptions. They appear in Section 10.03, which provides, in relevant part:

> Notwithstanding Section 10.01 or Section 10.02, the parties agree that the following claims will not be subject to mediation or arbitration:
>
> 1. any action for declaratory or equitable relief, including, without limitation, seeking preliminary or permanent injunctive relief, specific performance, other relief in the nature of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder.

(*Id.* § 10.03.)[6]

## DISCUSSION

### A. Plaintiffs' Motion for a TRO or Preliminary Injunction

Plaintiffs request a temporary restraining order or preliminary injunction that prohibits Defendant Seva from terminating franchise agreements for non-payment of the weekly royalty fee, until the parties resolve their related claims in arbitration. Plaintiffs seek this relief on a class-

---

[6] The court noticed that the copy of the franchise agreement that Plaintiffs attached to their Verified Class Action Complaint does not contain the "exceptions to arbitration" clause (Section 10.03). (*See* Franchise Agreement (Template), Ex. A-4 to Compl. [1-1] at PageID #:199-200.) But the Franchise Agreement for each named Plaintiff contains the clause, as Defendants acknowledge in their opposition to Plaintiffs' motion for a TRO. (*See* Defs.' TRO Opp. at 12.) Neither side discusses this discrepancy. Because Defendants discuss Section 10.03 in their TRO opposition as if it is present in every Franchise Agreement, the court will assume that it is.

wide basis. Even construing the request as limited to the three named Plaintiffs, the court concludes that Plaintiffs have not shown that they are entitled to this extraordinary remedy.

"A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 2021 WL 852227, at *3 (7th Cir. 2021) (internal quotation marks omitted); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (a court may not grant a request for a preliminary injunction "unless the movant, *by a clear showing*, carries the burden of persuasion" (internal quotation marks omitted)). The party seeking such relief "must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Cassell*, 990 F.3d at ___, 2021 WL 852227 at *3 (internal quotation marks omitted) (quoting, inter alia, *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)). If the moving party "fails to meet any of these threshold requirements, the court must deny the injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (internal quotation marks omitted). If the moving party establishes the threshold requirements, a court must then "weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction." *Id.* (internal quotation marks omitted). Additionally, the court must consider whether the injunction is in the public interest. *See id.* The standards governing a request for a TRO are the same. *See, e.g.*, *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) (collecting cases).

Before addressing the merits of Plaintiffs' request, the court considers Defendants' arguments that Plaintiffs are bound by the Franchise Agreements to arbitrate their claims and lack prudential standing.[7] Regarding forum, Defendants admit that the Franchise Agreements "allow

---

[7] Defendants present the standing issue as an obstacle to Plaintiffs' ability to show likelihood of success on the merits, but the court treats it as a threshold issue. Defendants also present the issue as one of Article III standing, but as explained below, their concern is matter of prudential standing.

for a petition in this Court for equitable or injunctive relief outside of arbitration." (Defs.' TRO Opp. at 1-2.) At the same time, they argue that Plaintiffs' claims arise out of or are related to the Franchise Agreements, and therefore must be arbitrated as provided in those agreements. (*See id*. at 9.) In advancing this theory, Defendants discuss only one claim: the request for a declaratory judgment that Defendants violate Illinois consumer protection laws. (*See id.* at 12-14 (arguing that the declaratory judgment claim improperly circumvents the arbitration clause).) Defendants' argument is unpersuasive because it fails to grapple with (1) the plain language of Section 10.03 of the Franchise Agreements and (2) their admission that Section 10.03 permits franchisees to bring declaratory judgment actions in court. Furthermore, as noted above, Plaintiffs agreed to narrow their request for emergency relief. Plaintiffs now ask the court only for a temporary injunction prohibiting Seva from terminating franchise agreements for non-payment of weekly royalty fees. This request for injunctive relief appears to fall cleanly within the "exceptions to arbitration" clause in the Franchise Agreements. (*See, e.g.*, Sashital Franchise Agreement § 10.03 (franchisee need not arbitrate an action for "equitable relief, including, without limitation, seeking preliminary or permanent injunctive relief . . . to enjoin any harm or threat of harm to such party's tangible or intangible property . . . ."); *see also* Pls.' TRO Reply at 8 (arguing same).) Defendants offer no explanation why this interpretation is incorrect. Instead, they simply ignore the implications of Section 10.03 as it relates to Plaintiffs' request for injunctive relief. The court concludes that Plaintiffs' request for a TRO or preliminary injunction is properly before it.

Whether Plaintiffs have standing to assert their claims is a closer call. As referenced above, Plaintiff Sashital signed the Franchise Agreement on behalf of Sahiya Enterprises; Plaintiff Davis signed the agreement on his own behalf but assigned his rights to Alexion in May 2016; and Plaintiff Ferguson signed the agreement on his own behalf but assigned his rights to Amlex in April 2016. Defendants characterize Plaintiffs as officers or shareholders of the franchises and argue that they lack standing under the shareholder standing rule. (*See* Defs.' TRO Opp. at 8-9 (citing *Elsasser v. DV Trading, LLC*, 444 F. Supp. 3d 916, 922 (N.D. Ill. 2020) (stating that "a

11

shareholder generally cannot sue for indirect harm he suffers as a result of an injury to the corporation," such as a diminished individual income attributable to the corporation's losses (quoting *Korte v. Sebelius*, 735 F.3d 654, 668 (7th Cir. 2013) (internal quotation marks omitted))); *Sawmill Prods., Inc. v. Town of Cicero, Cook Cnty., Ill.*, 477 F. Supp. 636, 639 (N.D. Ill. 1979) (officers and shareholders in a corporation who allege "no direct personal injury" lack standing, even if they allege "a personal loss resulting from a diminution in their anticipated salaries").) The shareholder standing rule is a prudential limitation on the court's power to hear a claim. *See, e.g.*, *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008).

Plaintiffs appear to concede that the shareholder standing rule applies equally to guarantors. (*See* Pls.' TRO Reply at 6-7.) They maintain, however, that they are not mere guarantors of the franchises because the Franchise Agreements bind them personally and directly. (*See id.*) Disappointingly, Plaintiffs do not expand on this argument—but Defendants' discussion of standing is equally abbreviated, and Plaintiffs' argument is viable, at least as applied to Ferguson and Davis. Under Illinois law, "a shareholder who has a direct and personal interest in a cause of action may bring suit in an individual capacity even if the corporation's rights are also implicated," so long as he alleges "something more than wrong to the corporate body." *Davis v. Dyson*, 387 Ill. App. 3d 676, 689, 900 N.E.2d 698, 710, 326 Ill. Dec. 801, 813 (1st Dist. 2008); *see* 12B WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5911 (a shareholder claim might be excepted from the shareholder standing rule when it is an action "based on a contract to which the shareholder is a party"); *cf. Hunter v. Old Ben Coal Co.*, 844 F.2d 428, 432 (7th Cir. 1988) ("To be a 'direct' beneficiary and therefore the third party beneficiary of a contract, the parties to the agreement must have manifested in their contract an intention to confer a benefit upon the third party." (internal quotation marks omitted) (applying Illinois law)). Plaintiffs Ferguson and Davis were parties to the Franchise Agreements in their individual capacities, and they remained personally bound by their terms even after assigning their rights to their solely-owned corporations.

Independent of this, all Plaintiffs reasonably can be understood as alleging that they would not have purchased their franchises but for the misrepresentations Defendants allegedly made directly to them. For this reason too, the court is satisfied that Plaintiffs have standing to assert their claims. *See, e.g.*, *Mann v. Kemper Fin. Cos., Inc.,* 247 Ill. App. 3d 966, 979-80, 618 N.E.2d 317, 326, 187 Ill. Dec. 726, 735 (1st Dist.1992) (mutual fund investors could assert fraud claims in their individual capacities where they alleged that the defendants' fraudulent prospectuses induced them to invest in the fund). That said, the narrowed request for emergency relief unravels that conclusion as applied to Plaintiff Ferguson. The parties agree that Seva terminated his Franchise Agreement, and the request for emergency relief seeks only to prevent the termination of Plaintiffs' Franchise Agreements. Accordingly, granting an injunction would afford Ferguson no relief, and he lacks Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (to establish Article III standing, a plaintiff must allege an injury in fact that is traceable to the defendant's conduct and can be redressed by a favorable judicial decision).

Turning to the merits of Plaintiff Davis and Plaintiff Sashital's request for a TRO or preliminary injunction, the court begins with the issue of irreparable harm because it is dispositive here. As the Seventh Circuit has explained, harm is not irreparable where it is "possible to quantify [a plaintiff's] losses and compensate him fully with damages." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (irreparable harm is "harm that cannot be prevented or fully rectified by the final judgment after trial"). Even where damages can be calculated, however, a damages award may be inadequate if, for example, it "come[s] too late to save the plaintiff's business"; the plaintiff "go[es] broke while waiting" for it; or there is a risk that the defendant may become insolvent before the plaintiff can collect the award. *Roland*, 749 F.2d at 386; *see also id.* (recognizing that the loss of a family business a plaintiff has operated for decades cannot easily be quantified).

Plaintiffs urge that they are entitled to pursue equitable relief for that reason—that their businesses will not survive litigation. They maintain that absent an injunction, they will need to

13

continue paying (allegedly illegal) weekly royalty fees and interest on their loans, and that Seva might assess other unspecified penalties. In addition, Plaintiffs argue that Seva will terminate their Franchise Agreements if they are unable to pay the weekly royalty fees. Given the narrowed request for relief, the court need consider only the latter form of harm, which Plaintiffs contend is irreparable. Specifically, Plaintiffs say that if Seva terminates the Franchise Agreements, their franchises will cease to exist—and the harm from losing one's business is immeasurable. In support, Plaintiffs cite cases in which courts explained that the loss of customers or goodwill is difficult to quantify. (*See* Pls.' TRO Mot. at 19 (citing, *inter alia*, *Travelport, LP v. Am. Airlines, Inc.*, 2011 IL App (1st) 111761 ¶¶ 37-41, 958 N.E.2d 1075, 1084-86, 354 Ill. Dec. 879, 888-90).) Plaintiffs argue that losing customers and goodwill "is exactly what happens if franchisees . . . are unable to pay royalties." (Pls.' TRO Mot. at 19.) They also cite a case in which an Illinois appellate court determined that "[t]he necessity of preserving the *status quo* to prevent the termination of [a business's] existence would seem to satisfy the requirement that irreparable harm be shown." *Peoria Sav. & Loan Ass'n v. Am. Sav. Ass'n*, 109 Ill. App. 3d 1043, 1048, 441 N.E.2d 853, 855-56, 65 Ill. Dec. 538, 540-41 (3d Dist. 1982).

Whatever the merits of this argument might be in another context, it has little traction here, because Plaintiffs offer no evidence or argument that they have loyal customers or goodwill. Nor do they identify another source of intangible value in the mere existence of their franchises. To the contrary, they maintain that their franchises were doomed from the start—and have been total failures—because of Defendants' alleged fraud. Plaintiffs do mention that they wish to "continue their business with another franchisor," but they do not explain why keeping their current franchises is necessary or even helpful for achieving that goal. (Pls.' TRO Reply at 2.) In these circumstances, the court concludes that Plaintiffs have failed to demonstrate that money damages could not adequately compensate for the termination of their franchise agreements. Thus, Plaintiffs have not made a clear showing that they will suffer irreparable harm absent an injunction.

Two other factors bear mention; they support, but are not necessary to, the court's

conclusion. First, at the telephone hearing in August 2020, Seva stated that it had no plans to terminate Plaintiff Sashital or Plaintiff Davis's franchises. This calls into question whether Plaintiffs would suffer the harms they identify if the court does not issue an injunction. Second, Plaintiffs say they discovered the alleged fraud sometime in 2019. (*See* Compl. ¶¶ 86, 91, 97.) But they did not request a TRO or preliminary injunction until July 2020, and the COVID-19 pandemic appears to have prompted their request. Although not dispositive on the issue of irreparable harm, Plaintiffs' delay "raise[s] questions" about their claim that they "will face irreparable harm if a preliminary injunction is not entered." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001).

Plaintiffs' motion for a TRO or preliminary injunction is denied.

**B.     Defendants' Motion to Dismiss or Compel Arbitration**

Defendants move under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiffs' complaint. In the alternative, they ask the court to compel Plaintiffs to arbitrate their claims. Plaintiffs filed an opposition brief, but Defendants never filed a reply. In their opposition, Plaintiffs noted that Defendants' motion to compel entirely ignores the "exceptions to arbitration" clause in the franchise agreements (Section 10.03). Plaintiffs highlight that obvious omission and argue that the Franchise Agreements "expressly allow[]" the claims they have brought before this court, which request only injunctive and declaratory relief. (Pls.' MTD Opp. [17] at 2; *see also id.* at 14-15.)

Plaintiffs also make colorable arguments that the court should deny Defendants' motion to dismiss. For example, the standing issues that Defendants raise are the same the ones they raised in opposing Plaintiffs' motion for a TRO. In response to Defendants' argument that Plaintiffs' claims are time-barred under the one-year statute of limitations provided in the Franchise Agreements, Plaintiffs argue that they did not know or have reason to know about Defendants' alleged fraud—or that the fraud was the reason their franchises were failing—until the arbitration settlements in 2019. According to Plaintiffs, that was less than one year before

15

they filed their complaint in the Circuit Court of Cook County. Plaintiffs maintain that the statute of limitations was tolled under Illinois's discovery rule until 2019, and that their claims are timely. *See, e.g.*, *Greenhill v. Vartanian*, 917 F.3d 984, 988 (7th Cir. 2019) ("The discovery rule in Illinois provides that a period of limitations starts to run when the injured party 'knows or reasonably should know' of the injury and its cause.") (quoting *Knox Coll. v. Celotex Corp.*, 88 Ill. 2d 407, 415, 430 N.E.2d 976, 980, 58 Ill. Dec. 725, 729 (1981)).

Defendants' last argument is that Plaintiffs are improperly seeking a declaratory judgment of liability for past conduct—*i.e.*, they are asking this court to pass judgment on issues that are moot. Plaintiffs counter that a ruling on their declaratory judgment claim would resolve an ongoing controversy—whether the Franchise Agreements are unenforceable for fraudulent inducement—and therefore would guide their present and future conduct, including whether to pay the ongoing weekly royalties. Plaintiffs might be correct their claim concerns an ongoing controversy about the parties' opposing interests in the Franchise Agreements. Although they ask the court to enjoin termination of their franchisees, their argument and the allegations in their complaint also appear to suggest that what they are really seeking is equitable rescission of contract because of fraud and misrepresentation. The fact that Plaintiffs may have mislabeled the claim as one for declaratory judgment is not a proper basis for dismissal. These are complicated issues and neither side briefed them thoroughly. Furthermore, the court's understanding is that the parties are arbitrating other claims arising from the Franchise Agreements. Months have passed since Defendants filed their motion to dismiss or compel arbitration; Defendants never filed a reply; and neither side has filed a status report. The court, therefore, is not sure whether the parties are still seeking a ruling on issues raised in Defendants' motion. The court therefore will strike the motion without prejudice to renewal. Should Defendants choose to renew the motion, the court will expect further briefing.

## **CONCLUSION**

For the foregoing reasons, the court denies Plaintiffs' Motion for a Temporary Restraining

16

Order, Preliminary Injunction, and/or Declaratory Judgment [5]; terminates as moot Plaintiffs' Motion for an Expedited Hearing [7]; and strikes Defendants' Motion to Dismiss or Compel Arbitration without prejudice to renewal [16].

                                        ENTER:

Dated: March 31, 2021

                                        _____
                                        REBECCA R. PALLMEYER
                                        United States District Judge